## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MOHAMMED AL-QAHTANI,** | |
| *Petitioner,* | |
| **v.** | **Case No. 05-CV-1971 (RMC)** |
| **DONALD J. TRUMP,** *et al.,* | |
| *Respondents.* | |

## MOTION TO COMPEL EXAMINATION
## BY A MIXED MEDICAL COMMISSION

Petitioner Mohammed al-Qahtani has spent the last 15 years in custody at the U.S. Naval Station in Guantánamo Bay, Cuba ("Guantánamo"). By the time he arrived he had a long history of severe mental health problems, including a diagnosis of psychosis during an involuntary psychiatric hospitalization in Saudi Arabia less than two years before he was first brought to Guantánamo. While at Guantánamo he was tortured with the complicity of mental health experts. His indefinite imprisonment at the military prison has gravely diminished his mental and physical health, and precludes any chance for recovery or effective treatment while there.

Mr. al-Qahtani respectfully moves the Court to compel Respondents to facilitate his examination by a Mixed Medical Commission, which would further establish his entitlement to direct repatriation pursuant to the terms of Army Regulation 190-8, Section 3-12. Dep't of the Army, Army Reg. 190-8, Enemy Prisoners of War, Retained Personnel, Civilian Internees, and Other Detainees, ch.3, § 12 (Oct. 1, 1997).

In *Aamer v. Obama*, 58 F. Supp. 3d 16 (D.D.C. 2014), this Court held that a similarly-situated Guantánamo prisoner who had not requested repatriation nor been examined by a Mixed

Medical Commission had not established his entitlement to direct repatriation pursuant to U.S. domestic law, namely Army Regulation 190-8. In keeping with this Court's reasoning, Mr. al-Qahtani followed the process outlined in the Regulation by formally applying to the Department of Defense for repatriation and, alternatively, requesting an examination by a Mixed Medical Commission.[1] *See* Pet'r's Letter (Apr. 28, 2017), attached as Ex. A ("Pet'r's Letter"). This Court then directed Respondents to promptly indicate when a response would be forthcoming. Minute Order (June 7, 2017). The government denied all parts of Mr. al-Qahtani's request on June 30, 2017. Resp'ts' Letter (June 30, 2017), ECF No. 367-1, attached as Ex. B ("DOJ Letter"). In response, this Court ordered that, "[i]n light of [the] Government's letter to Petitioner dated June 30, 2017, if Petitioner wishes to pursue the matter, Petitioner shall file a motion to compel, or other pleading, no later than August 8, 2017." Minute Order (July 11, 2017).

Accordingly, Mr. al-Qahtani now respectfully moves the Court to compel Respondents to facilitate his examination by a Mixed Medical Commission.[2] A Mixed Medical Commission is typically comprised of two members from a neutral country and a medical officer of the U.S. Army selected by the Department of the Army Headquarters. *See* Army Reg. 190-8, ch. 3, § 12(2). But because the conflict that gave rise to Mr. al-Qahtani's present captivity may or may not have been a conventional war between nations, there may be no "neutral nations" in this context. *See, e.g.,* Pet'r's Letter at 3.

---

[1]     Under the Regulation, it is unambiguous that Respondents may repatriate Mr. al-Qahtani and thereby "[r]elieve the Mixed Medical Commission of the need to visit…patients who are eligible for direct repatriation," such as him. Army Reg. 190-8, ch. 3, § 12(k)(2). The Regulation states that enemy prisoners of war are eligible for direct repatriation if they are "[s]ick or wounded" and their "conditions have become chronic to the extent that prognosis appears to preclude recovery in spite of treatment within [one] year from inception of disease or date of injury." Army Reg. 190-8, ch.3, § 12(l)(2). If Respondents refuse to exercise their discretion to directly repatriate Mr. al-Qahtani, then a Mixed Medical Commission would confirm that he satisfies the criteria for repatriation under domestic U.S. law so that he may be released and adequately treated.

[2]     Domestic U.S. law requires that the "[c]ommanders concerned will assist, facilitate, and expedite the operations of the Commission to the fullest extent." Army Reg. 190-8, ch.3, § 12(g).

Thus, in conformity with domestic law, Mr. al-Qahtani's undersigned counsel propose the designation of Dr. Emily Keram, his most recent and only independent medical examiner, alongside another security-cleared civilian U.S. medical expert and an expert from the U.S. military to form the Mixed Medical Commission. Mr. al-Qahtani is entitled to the relief sought herein pursuant to the All Writs Act or in the form of an injunction.[3]

## BACKGROUND

Mohammed al-Qahtani, a Saudi Arabian national, has been imprisoned at Guantánamo since February 2002. It is well known that he was tortured in U.S. custody at Guantánamo. In fact, he is the only prisoner there whose torture has been formally acknowledged by a senior U.S. government official. In 2009, Susan J. Crawford, then the Convening Authority in charge of the U.S. Department of Defense's Military Commissions, explained that she had refused to authorize Mr. al-Qahtani's capital trial by military commission in 2008 because "we tortured Qahtani."[4] The torture left Mr. al-Qahtani in a "life-threatening condition," again by Crawford's admission. He was hospitalized twice during his interrogation at Guantánamo because he was on the brink of heart failure and death.

What is not well known, however, is that long before Mr. al-Qahtani was taken into U.S. custody, he suffered from a number of severe psychiatric disabilities. These are documented in detail in the reports of the expert witness in this matter, Dr. Emily A. Keram. Dr. Keram, an independent medical expert, spent 39 hours evaluating Mr. al-Qahtani from May 22 through May 27, 2015, and an additional 30 hours from January 22 to January 27, 2017. Her report, together

---

[3]     Pursuant to Local Civ. R. 7(m), undersigned counsel contacted Respondents' counsel to seek their consent to the relief sought herein. On July 31, 2017, Respondents' counsel informed undersigned counsel that Respondents would oppose the instant Motion.

[4]     Bob Woodward, *Guantanamo Detainee Was Tortured, Says Official Overseeing Military Trials*, The Washington Post (Jan. 14, 2009) (quoting Susan J. Crawford), *available at* http://www.washingtonpost.com/wp-dyn/content/article/2009/01/13/AR2009011303372.html [hereinafter "Washington Post"].

with its supplemental declarations, is based on extensive conversations with Mr. al-Qahtani at Guantánamo, on telephonic interviews with his family in Saudi Arabia, and on her review of records of an involuntary psychiatric hospitalization in 2000 that were independently obtained by his legal team. *See* Report of Dr. Emily A. Keram (June 5, 2016), attached as Ex. C ("Keram Report"); Supplemental Declaration of Emily A. Keram, MD (July 12, 2016), attached as Ex. D ("Keram Supp. Decl."); Supplemental Declaration of Emily A. Keram, M.D. (Dec. 2, 2016), attached as Ex. E ("Keram File Rev. Decl.").

As Dr. Keram attests in her report, Mr. al-Qahtani suffered from schizophrenia, major depression, and a possible neurocognitive disorder due to a traumatic brain injury. Keram Report at 3. He was mentally ill not only prior to his imprisonment and torture at Guantánamo but also long before the period of time when he is alleged to have participated in criminal acts. *Id*. at 3-5.

Mr. al-Qahtani developed psychotic symptoms in his childhood, which worsened as he grew into his teens and twenties. *Id*. at 3. His mental troubles trace back to a string of traumatic brain injuries, beginning with one sustained in a car accident when he was only eight years old. *Id*. at 5. His family recalled "episodes of extreme behavioral dyscontrol" over the years, including one when the Riyadh police contacted the family because they had found Mr. al-Qahtani naked in a garbage dumpster, spells of "auditory hallucinations," and an incident where Mr. al-Qahtani threw a new cellular phone out of a moving car because he believed it was affecting his mind. *Id*. at 3-4.

These symptoms persisted and, in late-May of 2000, Mr. al-Qahtani was involuntarily committed in Mecca for "an acute psychotic break." Medical records from the hospitalization reviewed by Dr. Keram reveal that Mr. al-Qahtani was involuntarily committed to the psychiatric unit of a hospital for a period of days after local police arrested him as he was attempting to

throw himself onto moving traffic. According to the hospital medical records, Mr. al-Qahtani expressed suicidal wishes, and was given antipsychotic medication. *Id*. at 4.

The symptoms continued through his detention at Guantánamo. *Id*. at 6-7. Even before his exposure to the full array of torture techniques described in the specially-approved "First Special Interrogation Plan" to which he was subjected, U.S. government officials acknowledged behaviors consistent with psychosis, such as talking to nonexistent people. An FBI Deputy Assistant Director reported to the Army that in November 2002 he observed a detainee, later identified as Mr. al-Qahtani, exhibiting "behavior consistent with extreme psychological trauma (talking to non-existent people, reportedly hearing voices, crouching in a corner of the cell covered with a sheet for hours on end)." *See* Letter re: Suspected Mistreatment of Detainees, from T.J. Harrington, Dep. Asst. Dir., Counterterrorism Division, FBI, to Maj. Gen. Donald R. Ryder, Criminal Investigation Command, Dept. of the Army (July 14, 2006).

Dr. Keram found that "Mr. al-Qahtani's pre-existing psychotic, mood, and cognitive disorders made him particularly vulnerable to [...] the conditions of confinement and interrogation" his U.S. captors inflicted on him at Guantánamo under the guise of the "First Special Interrogation Plan." Keram Report at 6. In fact, according to Dr. Keram, the combination of solitary confinement, sleep deprivation, extreme temperature and noise exposure, stress positions, forced nudity, body cavity searches, sexual assault and humiliation, beatings, strangling, threats of rendition, and water-boarding, amounting to "severely cruel, degrading, humiliating, and inhumane treatment" that Mr. al-Qahtani endured would have profoundly disrupted and left long-lasting effects on a person's sense of self and cognitive functioning "even in the absence of pre-existing psychiatric illness." *Id*. at 6-7.

Applied to Mr. al-Qahtani, the torture and conditions of his confinement at Guantánamo were nothing short of devastating, exacerbating his pre-existing psychological ailments. Besides taxing him physically to the point that he was on the brink of death and had to be hospitalized twice, they caused "psychotic symptoms" that included repeated hallucinations involving ghosts and frequent encounters with a talking bird. *Id*. at 6. Mr. al-Qahtani also often soiled himself, cried uncontrollably, and conversed with himself and with others who were not present. *Id*. at 6-7.

### PRESENT MEDICAL CONDITIONS

Today, Mr. al-Qahtani's condition is exactly as one would expect for a man who suffered from severe psychiatric illness before being subjected to a systematic and brutal program of physical and psychological torture. Dr. Keram has diagnosed Mr. al-Qahtani with moderate to severe Post-Traumatic Stress Disorder ("PTSD") together with other serious psychological and physical ailments. *See* Keram Report at 3, 7. "In addition to Mr. al-Qahtani's pre-existing psychiatric diagnoses," which have not subsided, Dr. Keram concludes, "he has developed posttraumatic stress disorder (PTSD)" resulting from his torture, interrogation, and imprisonment. *Id*. at 7. As a doctor with the U.S. Department of Veteran Affairs who has treated patients with PTSD secondary to both combat stress and Prisoner of War confinement for the past 14 years, Dr. Keram found that Mr. al-Qahtani's PTSD symptoms are not only "consistent with those exhibited by survivors of torture," but also that they "have been present for years." *Id*.

Given the present state of Mr. al-Qahtani's mental health, Dr. Keram believes that he "will likely require lifelong mental health care," at least initially in an "inpatient or residential" setting. In her view, "appropriate treatment" of Mr. al-Qahtani's complex condition "requires a

culturally-informed multi-disciplinary approach" that would include "supportive psychotherapy, cognitive-behavioral therapy, skills-based therapy, and psychotropic medication." *Id*. at 8.

Crucially, Dr. Keram concludes "that Mr. al-Qahtani cannot receive effective treatment for his current mental health conditions while he remains in U.S. custody at GTMO or elsewhere, despite the best efforts of available and competent clinicians." *Id*. at 9. Among the factors precluding effective treatment of Mr. al-Qahtani's mental illnesses in U.S. custody is his lack of trust in medical and mental health personnel at Guantánamo owing to their predecessors' involvement in his interrogations and torture. *Id*. Also, Dr. Keram finds that, "given the unique role of family in Mr. al-Qahtani's previous episodes of psychiatric illness, it is imperative that his family members actively participate in his treatment." *Id*.; *see also* Keram Supp. Decl. ¶¶ 4-5; Keram File Rev. Decl. ¶ 8.

Dr. Keram's conclusion, therefore, is that Mr. al-Qahtani would receive effective treatment if he is repatriated to the Kingdom of Saudi Arabia. *Id*. The Saudi Ministry of Interior's custodial rehabilitation and aftercare program for former Guantánamo prisoners would provide Mr. al-Qahtani with the medical attention he direly needs on an inpatient basis, while access to his family would complement his treatment. To that end, we have provided a written assurance from the Saudi Ministry of Interior to a U.S. government interagency Periodic Review Board, offering security and humane treatment guarantees regarding Mr. al-Qahtani and expressing its readiness to welcome him in its rehabilitation and aftercare program. *See* Letter from Mohammed A. Al-Muttairi, Director-General of Legal Affairs & International Cooperation, Ministry of the Interior, Kingdom of Saudi Arabia to the Periodic Review Board, *Request for transfer of detainee at Guantanamo Bay Detention Center: Mohammed M. Al-Qahtani* (Aug. 16, 2015), attached as Ex. F.

Dr. Keram's diagnosis and prognosis indicate that Mr. al-Qahtani meets the requirements for repatriation under domestic law: his physical and psychiatric conditions have become "chronic to the extent that prognosis appears to preclude recovery in spite of treatment within 1 year from inception of disease or date of injury." Army Reg. 190-8, ch.3, § 12(l). Although Mr. al-Qahtani presently can be convinced to accept medication from Joint Medical Group doctors, medication can only be "helpful in improving the frequency and intensity of some of his symptoms." *See* Keram Supp. Decl. ¶ 6; Keram File Rev. Decl. ¶¶ 9-10. Medication "would likely need to be increased over time and would only be considered palliative," *id*. at ¶ 10; absent "multi-modal treatment for his … PTSD and schizophrenia" he will not experience any meaningful recovery and is "highly likely…to experience episodic worsening of his symptoms as his indefinite detention continues." Keram Supp. Decl. ¶ 6. Mr. al-Qahtani's prognosis includes a continuous treatment plan that "will likely require lifelong mental health care." *See* Keram Report at 8-9. His condition will not significantly improve so long as he remains imprisoned at Guantánamo, warranting prompt repatriation. *Id*.

Dr. Keram's evaluation is consistent with this Court's own conclusion several years ago that "Petitioner is currently incompetent and unable to assist effectively in this case,"[5] and, in and of itself, provides sufficient basis for Mr. al-Qahtani's repatriation.[6] If her findings are deemed insufficient, then it is necessary that a Mixed Medical Commission be permitted to confirm that Mr. al-Qahtani satisfies the criteria for repatriation under the Regulation so that he may be released and adequately treated.

---

[5]     Minute Order (Apr. 20, 2012).
[6]     Commanding officers may complete a Certificate of Direct Repatriation to relieve the Mixed Medical Commission of the need to visit enemy prisoners of war patients who are eligible for direct repatriation. *See* Army Reg. 190-8, ch.3, § 12(k)(2).

## ARGUMENT

### I.   Respondents Disregard This Court's Ruling by Refusing to Treat Mr. al-Qahtani as an "Other Detainee" Pursuant to Army Regulation 190-8

This Court has noted that "the manner in which Army Regulation 190-8 may apply to any particular detainee turns on that person's designation." *Aamer v. Obama*, 58 F. Supp. 3d 16, 21 (D.D.C. 2014), In analyzing Aamer's designation, the Court referred to the Regulation's definition of an "other detainee" as a person in the custody of U.S. Armed Forces who does not fall into any of the designations enumerated in the Regulation and who shall therefore be treated as an enemy prisoner of war until a legal status is ascertained by a competent authority. *Id.* at 21-22. Until the legal status of an "other detainee" is determined by a competent authority, he or she "shall be treated as [an enemy prisoner of war]." *Id.* at 22; *see also* Regulations, at Glossary, Section II – Terms.

The Court weighed Aamer's contention that he is an "other detainee" against Respondents' contention that a 2004 Combatant Status Review Tribunal designation of Aamer as an enemy combatant "precludes him from being treated as an 'other detainee.'" *Aamer*, 58 F. Supp. 3d at 25. The Court found that "Petitioner's logic has some force: while a CSRT designated him an 'enemy combatant,' that classification is not recognized in Army Regulation 190-8." *Id.* at 24. Moreover, the Court found "questionable" Respondents' contention and their reliance on a dated classification of Aamer as an "enemy combatant." *Id.* at 25. The more recent Periodic Review Board does not make any formal determination of a detainee's status, as "enemy combatant" or any other novel category, and even if it did those classifications would likewise have no relevance under Army Regulation 190-8. In both *Aamer* and this case, as this Court aptly noted,  "Respondents put more weight on 'enemy combatant' than the term can bear." *Id*.

Disregarding this Court's precedent, Respondents in their letter refuse to recognize Mr. al-Qahtani's status as an "other detainee." *See* DOJ Letter 2. Mr. al-Qahtani, who has now taken the steps outlined in this Court's ruling in *Aamer*, and who does not fall within any of the Regulation's enumerated designations, remains an "other detainee" under domestic law and, as such, is entitled to the protections afforded an enemy prisoner of war. Respondents cannot simply ignore the Court's clear direction and must not be allowed to keep Mr. al-Qahtani from further establishing his entitlement to repatriation under domestic law.

## II.    Examination by a Mixed Medical Commission Would Further Establish Mr. al-Qahtani's Entitlement to Repatriation

Under domestic law, Mr. al-Qahtani must be allowed to explicitly establish his entitlement to direct repatriation in one of two ways. First, Respondents can authorize direct repatriation based on his current medical condition and Dr. Keram's findings. *See* Army Reg. 190-8, ch. 3, § 12(k)(2). Second, as this Court suggested in *Aamer*, Mr. al-Qahtani can "follow the process outlined in Army Regulation 190-8" by requesting a Mixed Medical Commission. *Aamer*, 58 F. Supp. 3d at 26. An examination by a Mixed Medical Commission would then lead Respondents to effectuate Mr. al-Qahtani's direct repatriation—or this Court to order it.

In keeping with the process laid out in the Regulation and this Court's earlier ruling, Mr. al-Qahtani has directly requested repatriation or, alternatively, a Mixed Medical Commission evaluation. *See* Pet'r's Letter 1-2. Respondents begin and end their letter objecting to the relief Mr. al-Qahtani has requested by noting that their Periodic Review Board "considered" his "mental health [as] a factor" during his June 16, 2016 hearing, after which the Board declined to approve him for release.[7] Like the Combatant Status Review Tribunals, Administrative Review

---

[7]    On February 22, 2017, in a subsequent file review, the Board denied Mr. al-Qahtani a second full hearing. DOJ Letter at 1. A File Review is based on paper submissions to the Periodic Review Board and designed to

Boards, and Bagram Detainee Review Boards that preceded them, Respondents' Periodic Review Boards have no specific medical or psychiatric expertise to draw upon. The Board consists of representatives of six agencies—"one senior official from the Departments of Defense, Homeland Security, Justice, and State; the Joint Staff, and the Office of the Director of National Intelligence."[8] However, none of them need be a mental health or medical professional or have any expertise in the field.[9] In this regard, the Board stands in sharp contrast with the design of the Mixed Medical Commission, which consists entirely of medical experts. *See* Army Reg. 190-8, ch. 3, § 12(a)(2).

The Periodic Review Board is tasked with determining only whether "[c]ontinued law of war detention is warranted … [as] necessary to protect against a continuing significant threat to the national security of the United States." *See* DTM 12-005, Att. 3 (Periodic Review Procedures and Process), § 3. What that determination consists of is ultimately left entirely to the discretion of the Board. *See id*. § 1 (PRB process reviews "continued discretionary exercise of existing detention authority"); *id*. § 1(b) (PRB process is "instituted as a matter of [executive] discretion" and may be suspended or amended at any time by President); *id*. at § 4(a) (PRB makes not legal but "discretionary determinations" about the threat posed by detainee). Indeed, consideration of mental health issues is discretionary: the Board "may" consider "[t]he detainee's physical and psychological condition," but need not. *Id*. § 3(b)(6).

---

evaluate if "a significant question is raised as to whether the detainee's continued detention is warranted," in which case a second full PRB hearing is convened early.

[8]  *See* About the PRB, *available at* http://www.prs.mil/About-the-PRB/.

[9]  *See* DTM 12-005, *Implementing Guidelines for Periodic Review of Detainees Held at Guantanamo Bay per Executive Order 13567* [hereinafter "DTM 12-005"], Att. 3 (Periodic Review Procedures and Process), § 5(a)(1) (May 9, 2012), available at http://www.prs.mil/Portals/60/Documents/DTM-12-005_Implementing_Guidelines_for_Periodic_Review_of_Detainees_Held_at.pdf. *See also id*. § 5(b) (Periodic Review Secretariat (PRS) shall support board with operations and legal staff, but not mentioning experts); *id*. § 5(c) (Analytic Task Force shall consist of representatives of the six agencies with "appropriate intelligence, counterterrorism, military, diplomatic, or legal expertise," again not mentioning medical, psychological or scientific expertise).

In contrast, the Mixed Medical Commission makes determinations as to "eligibility …

for repatriation or accommodation in a neutral country during hostilities" based on whether the

detainee is "sick or wounded." *See* Army Reg. 190-8, ch. 3, § 12(a); *see also id*. § 12(a)(2) ("The

purpose of the Commission will be to determine cases eligible for repatriation."); *id*. § 12(c)(3)

(Mixed Medical Commission shall "[d]etermine those cases eligible for repatriation or

hospitalization in a neutral country"); *id*. § 12(f) ("The United States will carry out the decisions

of the Mixed Medical Commission as soon as possible and within 3 months of the time after it

receives due notice of the decisions."). Its determination, in short, is based on the health status of

the detainee and not on some broader, abstract concept of the threat posed by his repatriation.

Putting to one side the question whether the PRB has expertise sufficient to the task of

evaluating medical entitlement to repatriation, the PRB is "not recognized in Army Regulation

190-8," *Aamer*, 58 F. Supp. 3d at 24, as noted above, nor can it displace, limit, or alter that to

which Mr. al-Qahtani is entitled under the domestic law provisions of Army Regulation 190-8.

Unlike the PRB, a Mixed Medical Commission decides on "eligibility…for repatriation" under

domestic law. That determination can in turn underpin habeas relief. Respondents have taken the

position in other habeas cases (one of them before this very Court) that the fact of PRB clearance

provides no support for habeas relief because the Board's decision that a detainee is "eligible for

transfer" is discretionary, not based on the legality of detention, and that "eligibility" is subject to

a subsequent second discretionary decision to effectuate transfer by the Secretary of Defense.

*See, e.g.*, Resp'ts' Resp. to Order to Show Cause and in Opp'n to Pet'r's Emergency Mot. for

Order Effecting Release, *Barhoumi v. Obama*, No. 05-CV-1506, ECF No. 282 (D.D.C. filed Jan.

17, 2017) ("[T]he determination by the Periodic Review Board that he is eligible for transfer

does not give Petitioner standing to challenge his continued detention, nor does it render his

detention unlawful or otherwise entitle Petitioner to an order effecting release."). The government cannot now be heard to claim that the PRB they dismissed earlier in other cases somehow displaces a mechanism pursuant to domestic law that can help determine Mr. al-Qahtani's entitlement to repatriation and attendant habeas relief in this case.

By refusing to allow the evaluation of Mr. al-Qahtani by a Mixed Medical Commission and denying him any opportunity to establish his entitlement to repatriation, Respondents attempt to cut off the path that this Court's precedent outlined. This Court should compel Respondents to comply with domestic law as set forth in the Regulation and to establish a Mixed Medical Commission to examine Mr. al-Qahtani.

### III.    This Court Should Order Mr. al-Qahtani's Examination by a Mixed Medical Commission Pursuant to the All Writs Act

The All Writs Act grants courts authority to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usage and principles of law." 28 U.S.C.A. § 1651. More specifically, it permits this Court to fashion procedures in aid of its jurisdiction and in order to develop a factual record that would found a decision on the merits of a petitioner's habeas claims. *See, e.g., Al Odah v. United States*, 346 F. Supp. 2d 1, 6 (D.D.C. 2004).

Mr. al-Qahtani's request for repatriation is well within the ambit of this Court's habeas jurisdiction. *See Aamer*, 58 F. Supp. 3d at 25 ("Respondents exclaim that Petitioner's request for repatriation is substantively different from the ordinary habeas petition. Not so. Petitioner seeks release pursuant to domestic law (Army Regulation 190-8) and those portions of an international accord that it incorporates (the Third Geneva Convention)."). This Court has in the past required the findings of a Mixed Medical Commission prior to exercising its habeas jurisdiction and ruling on a motion for judgment based on the illness of an imprisoned Guantánamo petitioner.

*See id.* at 27 ("Section 3-12 of the Regulation conditions medical repatriation on the determinations of a Mixed Medical Commission.").

By refusing to allow a Mixed Medical Commission, Respondents attempt to effectively strip this Court of the ability to exercise its habeas jurisdiction and adjudicate an eventual motion for judgment. Pursuant to the All Writs Act, therefore, this Court should compel Respondents to allow a Mixed Medical Commission to conduct an examination of Mr. al-Qahtani as a prerequisite to the Court's exercise of its habeas jurisdiction in this matter.

### IV.   Mr. al-Qahtani Is Entitled to Injunctive Relief Compelling an Examination by a Mixed Medical Commission

Respondents' indefinite imprisonment and treatment of Mr. al-Qahtani, as confirmed by Dr. Keram's report, have exacerbated his chronic illness and threaten to cause further harm to his already fragile physical and mental health. The threat of irreparable injury caused by his indefinite imprisonment entitles Mr. al-Qahtani to relief under Federal Rule of Civil Procedure 65. To avert this irreparable injury, his repatriation is crucial. In order to further confirm his eligibility for repatriation under domestic law, an examination of Mr. al-Qahtani by a Mixed Medical Commission is necessary. As such, he is also entitled to injunctive relief compelling access to a Mixed Medical Commission immediately.

In considering a petitioner's request for a preliminary injunction, courts determine whether or not: (1) the petitioner would suffer irreparable harm absent the preliminary injunction; (2) the petitioner has a substantial likelihood of success on the merits; (3) the injunction would substantially injure the opposing party; and (4) the public interest would be furthered by issuance of the injunction. *See Serono Labs v. Shalala*, 158 F. 3d 1313, 1317-18 (D.C. Cir. 1998) (citing *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 842 (D.C. Cir. 1977)). "These factors interrelate on a sliding scale and must be balanced

against each other." *Id.* at 1318. "If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." *Id*. All four of these factors weigh in Mr. al-Qahtani's favor.

### A. Mr. al-Qahtani Faces Irreparable Harm Without Examination by a Mixed Medical Commission

Mr. al-Qahtani, whose treatment at the hands of Respondents has significantly harmed him physically and mentally, faces a great risk of irreparable harm absent an injunction compelling an examination by a Mixed Medical Commission. Without such an examination, he may be left unable to further establish his entitlement to repatriation pursuant to domestic law, and will continue to languish at Guantánamo at grave cost to his health.

Another case decided in this district has held that "where the health of a…vulnerable person is at stake, irreparable harm can be established." *Al-Joudi v. Bush*, 406 F. Supp. 2d 13, 20 (D.D.C. 2005). The *Al-Joudi* court further recognized that prisoners at Guantánamo are "indeed vulnerable to further physical deterioration, and possibly death, by virtue of their custodial status at Guantánamo and weakened physical condition." *Id.*

Mr. al-Qahtani is in a particularly vulnerable position and his physical and mental health is at stake, establishing irreparable harm. As Dr. Keram's extensive report describes, he suffers from serious medical conditions, including chronic and severe psychiatric symptoms that have gravely diminished his mental health. Keram Report at 3-5, 7-8. Moreover, his prolonged detention and abuse have caused him to develop:

> posttraumatic stress disorder (PTSD) as a result of the severely cruel, degrading, humiliating, and inhumane treatment he experienced during confinement and interrogation while in US custody. … [His] PTSD symptoms include nightmares, intrusion, attempts to avoid distressing trauma-related thoughts, feelings, and conversations, negative expectations about himself and the world, fear, horror, shame, alienation, and difficulty experiencing positive emotions.

*Id*. at 7. This is in addition to "hypervigila[nce]," and memory and sleep disorders. *Id.* "These symptoms have been present for years and were present at the time of the current evaluation." *Id.* Mr. al-Qahtani's ability to receive treatment for both the PTSD and his preexisting psychiatric disorders is impeded by the fact that "[m]edical and mental health staff members were involved in his interrogations," *id*. at 6, making him generally unwilling to trust the medical and psychiatric staff at Guantánamo.

Drawing on more than a decade of experience evaluating prisoners at Guantánamo, Dr. Keram concludes:

> It is my opinion that Mr. al-Qahtani cannot receive effective treatment for his current mental health conditions while he remains in US custody at GTMO or elsewhere, despite the best efforts of available and competent clinicians. Several factors preclude effective treatment. These include the inability to develop long-term doctor-patient relationships given the rotation schedule of medical staff, lack of trust in the medical and mental health staff due to previous clinician involvement in interrogations…, lack of culturally-informed treatment modalities, and unavailability of family members to participate in treatment.

*Id*. at 9; *see also* Keram Supp. Decl. ¶¶ 5-6; Keram File Rev. Decl. ¶¶ 8-10. Mr. al-Qahtani's continued presence at Guantánamo is certain to cause him further irreparable harm. *See* Keram Supp. Decl. ¶ 6; Keram File Rev. Decl. ¶¶ 9-10. Absent the preliminary injunction sought herein, he will be denied the opportunity for direct repatriation afforded under domestic law and will continue to suffer at Respondents' hands, leaving him physically and mentally vulnerable and facing continued and certain irreparable harm at Guantánamo.

## B.  Mr. al-Qahtani Is Substantially Likely to Prevail on the Merits

To properly exercise its habeas jurisdiction in this case and rule on any motion for judgment on the instant Petition, this Court has required the findings of a Mixed Medical Commission. *See Aamer,* 58 F. Supp. 3d at 27 ("Section 3-12 of the Regulation conditions medical repatriation on the determinations of a Mixed Medical Commission."); *see also Al-*

*Warafi v. Obama*, 716 F.3d 627, 629 (2013) ("[I]n a habeas proceeding such as this, a detainee may invoke Army Regulation 190-8 to the extent that the regulation explicitly establishes a detainee's entitlement to release from custody.").

By refusing to allow a Mixed Medical Commission, Respondents attempt to effectively strip this Court of the ability to exercise its habeas jurisdiction and adjudicate an eventual motion for judgment. This Court has already held that the adjudication of a motion for judgment on these grounds is an appropriate exercise of its habeas jurisdiction. *See Aamer*, 58 F. Supp. 3d at 25 ("Respondents exclaim that Petitioner's request for repatriation is substantively different from the ordinary habeas petition. Not so. Petitioner seeks release pursuant to domestic law (Army Regulation 190-8) and those portions of an international accord that it incorporates (the Third Geneva Convention)."). Thus, Mr. al-Qahtani is substantially likely to prevail on the merits.

### C. An Injunction Would Not Substantially Injure the Government

It is unlikely that Respondents would be unduly burdened if a Mixed Medical Commission were allowed to examine Mr. al-Qahtani. Access to independent medical experts has been ordered without unduly burdening Guantánamo authorities or prison staff and there is no reason this case should be any different. *See, e.g., Al-Oshan,* 753 F. Supp. 2d 1, 2 (D.D.C. 2010); *Zuhair v. Bush*, 592 F. Supp. 2d 16, 17 (D.D.C. 2008). In the present case, this Court first permitted independent medical examination of Mr. al-Qahtani nearly eight years ago, *see* Order, ECF No. 189 (Sept. 3, 2009), and Mr. al-Qahtani has met and spoken with Dr. Keram over the course of two years.

Indeed, this injunction would be far less burdensome than other orders previously issued by sibling courts. *See Al-Oshan,* 753 F. Supp. 2d at 2 (ordering Joint Medical Group to collaborate with independent medical expert on treatment plan); *Zuhair,* 592 F. Supp. 2d at 17

(ordering Joint Detention Group to refrain from restraining petitioner during force feeding and to change force feeding solution used, while directing Respondents to facilitate physical and mental health examination of petitioner by independent medical expert). An injunction would not substantially injure the government.

### D.  Respondents Fail to Acknowledge the Public Interest at Stake

Granting injunctive relief to Mr. al-Qahtani is in the public interest. Establishing a Mixed Medical Commission to evaluate Mr. al-Qahtani would serve the public interest in justice and the rule of law by enabling the Court to exercise its habeas jurisdiction, by allowing him the opportunity to meaningfully challenge his indefinite imprisonment in accordance with domestic and international law, and by ensuring that Respondents do not disregard domestic law and judicial decisions at their own convenience.

The Army Regulation is not a discretionary guideline that Respondents can choose to ignore. It is domestic U.S. law. This law specifically provides "policy, procedures, responsibilities for the administration, treatment, employment, and compensation of enemy prisoners of war…and other detainees in the custody of U.S. Armed Forces." Army Reg. 190-8, ch.1, § 8(3).

In accordance with domestic law, and pursuant to this Court's ruling, Mr. al-Qahtani followed the outlined process with exactitude in order to further confirm his entitlement to repatriation through a Mixed Medical Commission. The government, on the other hand, has rejected both Mr. al-Qahtani's formal request for repatriation and his demand to be examined by a Mixed Medical Commission. *See* DOJ Letter 2. Despite Mr. al-Qahtani's medical conditions, Respondents' obstructionism ignores domestic law and blocks his pathway to repatriation, keeping him imprisoned indefinitely.

Therefore, the public interest weighs heavily in favor of granting Mr. al-Qahtani the relief sought herein.

## CONCLUSION

For the reasons stated above, the Court should grant the relief sought in this Motion and immediately compel Respondents to assist, facilitate, and expedite an examination of Mohammed al-Qahtani by a Mixed Medical Commission that would further establish his eligibility for direct repatriation under Army Regulation 190-8.

Dated: August 8, 2017

Respectfully submitted,

_____/s/_____

| | |
|---|---|
| Ramzi Kassem | Shayana Kadidal |
| (pursuant to LCvR 83.2)(g)) | (D.C. Bar No. 454248) |
| **Main Street Legal Services, Inc.** | **Center for Constitutional Rights** |
| City University of New York School of Law | 666 Broadway, 7th Floor |
| 2 Court Square | New York, NY 10012 |
| Long Island City, NY 11101 | (t) (212) 614-6438 |
| (t) (718) 340-4558 | (f) (212) 614-6499 |
| (f) (718) 340-4478 | (e) kadidal@ccrjustice.org |
| (e) ramzi.kassem@law.cuny.edu | |
| | Prof. Sandra Babcock |
| Lawrence S. Lustberg | (pursuant to LCvR 83.2)(g)) |
| (pursuant to LCvR 83.2)(g)) | **International Human Rights Clinic** |
| **Gibbons P.C.** | Cornell University School of Law |
| One Gateway Center | 158A Myron Taylor Hall |
| Newark, NJ 07102-5310 | Ithaca, NY 14853 |
| (t) (973) 596-4731 | (t) (607) 255-5278 |
| (f) (973) 639-6285 | (f) (607) 255-7193 |
| (e) LLustberg@gibbonslaw.com | (e) slb348@cornell.edu |

*Counsel for Petitioner*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

MOHAMMED AL-QAHTANI,

    *Petitioner,*

    **v.**                                   **Case No. 05-CV-1971 (RMC)**

**DONALD J. TRUMP,** *et al.,*

    *Respondents.*

**[PROPOSED] ORDER TO PERMIT A MIXED MEDICAL COMMISSION**

    **IT IS HEREBY ORDERED THAT** Respondents shall, forthwith, facilitate a physical and psychological examination of Petitioner Mohammed al-Qahtani at the U.S. Naval Station in Guantánamo Bay, Cuba, to be conducted by a Mixed Medical Commission formed pursuant to Army Regulation 190-8, comprising his most recent and only independent medical examiner, Dr. Emily Keram, another security-cleared civilian U.S. medical expert, and a medical officer of the U.S. Army selected by the Department of the Army Headquarters.

Date: _____

                                 _____
                                 HON. ROSEMARY M. COLLYER
                                 United States District Judge