UNCLASSIFIED//FOR PUBLIC RELEASE
~~PROTECTED INFORMATION – FILED UNDER SEAL~~

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| _____ | ) | |
| MOHAMMED AL-QAHTANI, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-1971 (RMC) |
| | ) | |
| DONALD J. TRUMP, *et al.*, | ) | |
| | ) | |
| Respondents. | ) | |
| _____ | ) | |

### RESPONDENTS' OPPOSITION TO PETITIONER'S MOTION TO COMPEL EXAMINATION BY A MIXED MEDICAL COMMISSION

Petitioner Mohammed al-Qahtani (ISN 63) moves the Court for the extraordinary remedy of a permanent injunction compelling the Executive to establish a Mixed Medical Commission pursuant to Section 3-12 of Army Regulation 190-8 ("AR 190-8"), which implements provisions of the 1949 Geneva Convention Relative to the Treatment of Prisoners of War ("Third Geneva Convention" or "GC III"), and also to appoint his hired medical expert, Dr. Emily Keram, to that Commission.  *See* Petr.'s Mot. to Compel Exam. By a Mixed Medical Comm'n ("Petr.'s Mot."), ECF No. 369.  Such an order would necessarily require the Executive to establish a commission, craft procedures for it, and develop criteria applicable to this non-international armed conflict against al-Qaida, Taliban, and associated forces from principles laid down in the Model Agreement annexed to the Third Geneva Convention for determining the types of disabilities and sicknesses that warrant repatriation in conflicts between nation-states.  Each of these steps implicates the United States' interpretation and application of the Third Geneva Convention and implementing military regulations.  Petitioner seeks this relief even though neither the relevant provisions of that military regulation nor of the Third Geneva Convention apply to him.

~~PROTECTED INFORMATION – FILED UNDER SEAL~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
~~PROTECTED INFORMATION – FILED UNDER SEAL~~

The Court should deny Petitioner's motion for two reasons.  First, the Court does not have or should not exercise jurisdiction to consider his claim for relief.  Pursuant to 28 U.S.C. § 2241(e)(2), the Court lacks jurisdiction to hear any claim that does not sound in habeas.  Here, Petitioner's claim for relief does not sound in habeas, and therefore is barred, because he seeks affirmative injunctive relief that will not lead directly to his release or otherwise affect the duration or form of his detention.  Petitioner claims that the Court has authority to order this extraordinary relief pursuant to the All Writs Act, 28 U.S.C. § 1651(a), but the All Writs Act does not confer or enlarge the Court's jurisdiction.  Moreover, even if Petitioner's claim could be said to sound in habeas, the Court should refrain from exercising its jurisdiction as a matter of equity.  An order requiring the Executive to take an action pursuant to certain provisions of a military regulation implementing its treaty obligations, which is contrary to the Executive's considered interpretation about the scope and inapplicability of those provisions, would be inconsistent with the great deference the Court should give the Executive on these matters.  It would also place an extraordinary burden on the Executive by, among other things, requiring the Executive to launch a difficult and unprecedented policy process to establish procedures for a Mixed Medical Commission and standards applicable in this non-international armed conflict.

Second, although framed as a request for a preliminary injunction, Petitioner actually seeks permanent injunctive relief requiring the establishment of a Mixed Medical Commission to examine and make a determination regarding eligibility for repatriation (relief that does not preserve the status quo pending further litigation or that is "preliminary"), but he has not made the showing required to warrant such an extraordinary remedy.  As an initial matter, Petitioner fails to demonstrate that he is entitled to the establishment of, and examination by, a Mixed Medical Commission.  Petitioner claims that he should be accorded the privileges of an enemy

2

UNCLASSIFIED//FOR PUBLIC RELEASE
PROTECTED INFORMATION – FILED UNDER SEAL

prisoner of war—which can include access to a Mixed Medical Commission—because, pursuant to AR 190-8, he qualifies as an "other detainee," a placeholder status for individuals "who have not been classified as an [enemy prisoner of war, or EPW], [retained personnel, or RP], or [civilian internee, or CI], [and who] shall be treated as EPWs until a legal status is ascertained by a competent authority." AR 190-8, Appendix B, § II-Terms. But Petitioner's legal status has been determined. In 2002, the Executive determined that al-Qaida, Taliban, and associated forces do not qualify for prisoner of war status under the Third Geneva Convention. And in 2004, a Combatant Status Review Tribunal ("CSRT") determined that Petitioner is an "enemy combatant," which means that the Executive determined that he is in fact an individual who was part of or supporting al-Qaida, Taliban, or associated forces, forces that the President previously determined do not qualify for prisoner of war status. Accordingly, because Petitioner is detained as part of al-Qaida forces, his status has already been determined, and he does not qualify for protections afforded an enemy prisoner of war, either permanently or as a placeholder under the regulation. He therefore has no basis to seek permanent injunctive relief on those grounds.

Petitioner is also not entitled to such wide-ranging, permanent injunctive relief because he cannot show that the equities tip in his favor. The injunctive relief sought by Petitioner would be improper because it would impose substantial hardships on the Executive and, on the facts presented here, would be wholly unprecedented. For similar reasons, the public interest also tips in favor of Respondents. In contrast, Petitioner's claim that an injunction would remedy his purported irreparable injury is speculative because at best, as he concedes, an order establishing a Mixed Medical Commission would only provide him an *opportunity* to seek release, not actual release. Moreover, as explained in a declaration of the Senior Medical Officer at Guantanamo responsible for Petitioner's care, Petitioner's mental health condition is being well managed and

PROTECTED INFORMATION – FILED UNDER SEAL
UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
~~PROTECTED INFORMATION – FILED UNDER SEAL~~

is amenable to treatment at Guantanamo.  Thus, on balance, Petitioner is not entitled to the relief

he seeks.

## BACKGROUND

### I.     Procedural History

Petitioner is a Saudi Arabian national currently detained at Guantanamo Bay.  Petr.'s

Mot. at 3.  On October 5, 2005, Petitioner filed a petition for writ of habeas corpus, challenging

his detention as unlawful.  *See* Petr.'s for Writ of Habeas Corpus, ECF No. 1.  On October 28,

2008, Respondents submitted an Amended Factual Return explaining that Petitioner is detained

as part of al-Qaida forces pursuant to the AUMF, as informed by the laws of war.  *See* Amended

Factual Return (filed via the CISO); Notice of Filing of Factual Return, ECF No. 73.  The parties

have engaged in discovery and litigation of various ancillary matters, but Petitioner has not yet

submitted a Traverse challenging the factual basis for his detention set forth in the Amended

Factual Return.  Rather, this case has been stayed at Petitioner's request since October 2010, *see,*

*e.g.*, Minute Order (Oct. 12, 2010) (granting initial stay of 90 days); Minute Order (Sept. 30,

2011) (staying case until further order of the Court), with Petitioner providing regular *ex parte*

status reports to the Court since that time.

By letter dated April 28, 2017, Petitioner submitted to Respondents a request that he be

"repatriate[ed] to the Kingdom of Saudi Arabia on account of his gravely diminished health," as

determined by his "independent psychiatrist," Dr. Keram, and "[a]lternatively, . . . that a Mixed

Medical Commission evaluate [him] to confirm that his illness and prognosis satisfy the criteria

for repatriation."  Petr.'s Mot., Exh A at 1-2.  In support of his request, Petitioner relied on a

report prepared by Dr. Keram in connection with Petitioner's Periodic Review Board ("PRB")

~~PROTECTED INFORMATION – FILED UNDER SEAL~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
~~PROTECTED INFORMATION – FILED UNDER SEAL~~

initial review hearing on June 16, 2016.[1]  *See* Petr.'s Mot., Ex. A at 1 (citing Report of Dr. Emily

A. Keram, MD, evaluating Mohammed al-Qahtani (June 5, 2016) ("Keram Report")).

Specifically, Petitioner cited Dr. Keram's diagnosis of "post-traumatic stress disorder (PTSD),

schizophrenia, moderate to severe major depression, along with a host of psychotic, mood, and

cognitive disorders and physical conditions," *id.* (citing Keram Report at 3-9), and asserted that

Petitioner's "illness has become so chronic that recovery, even with optimal circumstances and

care, is precluded within one year," *id.* at 3 (citing Keram Report at 7-8).  He further relied on

Dr. Keram's conclusion "that [Petitioner] cannot receive effective treatment for his current

mental health conditions while he remains in U.S. custody at GTMO or elsewhere."  *Id.* at 7

(citing Keram Report at 9).  Accordingly, Petitioner claimed that he was "eligible for immediate

transfer to treatment in an in-patient setting in Saudi Arabia" and, if the U.S. is unwilling to

authorize repatriation based on Dr. Keram's findings, entitled to "a Mixed Medical Commission

examination to verify his eligibility for repatriation," pursuant to AR 190-8 and those portions of

the Third Geneva Convention that it incorporates.  *Id.* at 3.

---

[1] Petitioner relies on the same report in support of the instant motion.  *See* Petr.'s Mot., Ex. C
("Keram Report").  Respondents disagree with Dr. Keram's ultimate medical finding, as well as
her summary of the conditions of his confinement and interrogations, which are not specifically
addressed herein.  Respondents further disagree with Plaintiff's claim that Dr. Keram's
evaluation is a sufficient basis on its own for Petitioner's repatriation and is consistent with this
Court's Minute Order of April 20, 2012, continuing the stay in this matter because "'Petitioner is
currently incompetent and unable to assist effectively in this case.'"  Petr.'s Mot. at 8 (quoting
Minute Order (Apr. 20, 2012)).  Neither Dr. Keram's report, nor the Court's Minute Order,
which was entered based only on *ex parte* submissions by Petitioner and without any
accompanying opinion or specific findings, are equivalent to a determination that a sick or
wounded prisoner of war (which Petitioner is not) may be directly repatriated.  *See* GC III, Art.
112 (decision to repatriate without having an examination by a Mixed Medical Commission is
left to "the opinion of the medical authorities of the Detaining Power"); *see also* AR 190-8, § 3-
12(k) (providing for a certificate of direct repatriation signed by "the commanding officers of
designated hospitals").

~~PROTECTED INFORMATION – FILED UNDER SEAL~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
~~PROTECTED INFORMATION – FILED UNDER SEAL~~

Respondents responded by letter on June 30, 2017, informing Petitioner that "the Executive has not determined that the repatriation of Petitioner for the reasons [] identified is warranted," Petr.'s Mot., Ex. B at 1, and that "Petitioner does not qualify as an 'enemy prisoner of war' [] and, accordingly, is not entitled to the protections afforded by those provisions of the Geneva Convention that call for the appointment of a Mixed Medical Commission," *id.* at 2.

On August 8, 2017, Petitioner filed the instant motion seeking to compel Respondents to establish a Mixed Medical Commission, to appoint Dr. Keram to that Commission, and to direct the Commission to examine Petitioner.  *See* Petr.'s Mot.

## II.    Petitioner's Current Medical Condition

The Senior Medical Officer of the Joint Medical Group ("JMG") at Guantanamo assesses that Petitioner's current mental health condition is stable.  Declaration of CDR ████████ MD, Senior Medical Officer (Aug. 21, 2017) at ¶ 20 ("SMO Decl.") (attached hereto as Ex. 1).  Up until 2016, Petitioner was referred intermittently for Behavioral Health Unit ("BHU") services for isolated incidents, including becoming "very emotional" during prayer (2007), exhibiting parasuicidal behavior (meaning not intended to cause death) (2013), and engaging in non-religious fasting (2015); however, in each instance he refused follow-up appointments.  *Id.* ¶ 16.  Petitioner has had one instance of self-harm without lethal intent (2008), which involved a one centimeter laceration to his left arm.  He has in the past exhibited symptoms of Adjustment Disorder with Anxiety and Narcissistic Traits, as well as Unspecified Anxiety Disorder, "but did not meet the clinical criteria for a definitive diagnosis of either."  *Id.* ¶ 15.

Beginning in March 2016 and continuing through the summer, the guard force reported certain behaviors of Petitioner that "were concerning for an underlying psychotic process (picking at the air, talking to himself, and sitting or standing in one position for hours at a time)."

~~PROTECTED INFORMATION – FILED UNDER SEAL~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
~~PROTECTED INFORMATION – FILED UNDER SEAL~~

*Id.* ¶ 17.  The JMG also received a copy of the letter submitted by Petitioner's counsel in connection with Petitioner's June 2016 PRB hearing, "which indicated that [Petitioner] had a remote history of psychosis pre-dating his detention at Guantanamo Bay."  *Id.*  Since that time, JMG (and specifically the BHU) has continued to observe and engage Petitioner (as much as he allows) in order to assess his condition and provide treatment.  *Id.* ¶ 15.  From June to September 2016, Petitioner had documented diagnoses of "Adjustment Disorder, Unspecified Anxiety Disorder, Personality Disorder with Borderline and Narcissistic traits, Schizophrenia, and Posttraumatic Stress Disorder" based primarily on Petitioner's self-reported symptoms, reports of the guard force, and Petitioner's mental health history as reported in his counsel's letter to the PRB in June 2016.  *Id.*  "Because [Petitioner] would not constructively engage with BHU providers, it was difficult to assess his condition."  *Id.*  In September 2016, Petitioner was started on an anti-psychotic medication, aripiprazole, which was changed to haloperidol in April 2017.  *Id.* ¶ 17.  He was also started on sertraline (an anti-depressant) in March 2017.  *Id.*  "[Petitioner] has refused to take his current medications on a regular basis as advised."  *Id.*

Based on BHU's ongoing evaluation, Petitioner's current diagnoses are "Unspecified Psychotic Disorder ([meaning] that his psychotic symptoms do not meet all of the diagnostic criteria for a specific psychotic disorder, such as Schizophrenia)" and "Unspecified Depressive Disorder (the BHU has been unable to confirm that [Petitioner's] non-specific symptoms are related to Posttraumatic Stress Disorder, given his refusal to fully participate in BHU services)."  *Id.* ¶ 15.  Since beginning treatment in 2016, his condition has remained stable.  *Id.* ¶ 20.  As a result of his recent change in anti-psychotic medication, the guard staff no longer reports observing the behaviors noted above and Petitioner has reported "a subjective sense of symptomatic improvement."  *Id.*  "There are no indications at this time that his mental health

7

~~PROTECTED INFORMATION – FILED UNDER SEAL~~

UNCLASSIFIED//FOR PUBLIC RELEASE
~~PROTECTED INFORMATION – FILED UNDER SEAL~~

condition affects his ability to perform his activities of daily living or otherwise function normally in the context of detention." *Id.* When BHU personnel interact with Petitioner, he "displays good hygiene, is engaged and maintains good eye contact, speaks articulately, usually in English, and is calm." *Id.* ¶ 21. "[He] is able to discuss with BHU personal events occurring in his daily life that impact him (such as his PRB results and his relationships with other detainees)." *Id.*

Despite Petitioner's long-term daily access to medical and mental health care at Guantanamo, he "often voluntarily has chosen not to seek or actively engage in treatment from the JMG[,]" demonstrating an "ongoing unwillingness to attend medical appointments with his [Primary Care Manager], to allow outpatient care with specialists, or to meet with BHU staff in a manner that allows him to fully discuss treatment of his mental status and behavior." *Id.* ¶ 10. He regularly refuses to attend BHU appointments, and thus BHU personnel routinely visit Petitioner at his cell (as opposed to a medical space) where he will often speak to them. *Id.* ¶ 21. Petitioner often refuses medications, including his anti-psychotic and anti-depressant medications. *Id.* ¶ 19. For example, Petitioner refused to take approximately half of the doses of aripiprazole prescribed to him beginning in September 2016, *id.* ¶ 17, and completely refused all psychiatric medications during Ramadan 2017 (May 27-June 24, 2017), *id.* ¶ 20. Petitioner's non-compliance with his providers' mental health treatment plans is, however, "not uncommon for individuals with his illnesses either in detention or outside of a detention environment." *Id.* ¶ 21.

Nevertheless, "[i]t is the opinion of the JMG psychiatric consultants that [Petitioner's] condition is currently well managed with minimal residual symptoms and even if his condition were more severe, the JMG has capability in excess of what he would need to be treated." *Id.*

~~PROTECTED INFORMATION – FILED UNDER SEAL~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
~~PROTECTED INFORMATION – FILED UNDER SEAL~~

This includes a medical facility staffed with ███████████ professionally trained individuals, including physicians, psychiatrists, a physician's assistant, nurses, hospital corpsmen (formally trained Navy medical personnel akin to a "medic" in the Army), various technicians, and administrative staff, as well as routine access to specialists from numerous medical professions and the ability to request subspecialists as needed. *Id.* ¶ 4. An ████████ Behavioral Health Services staff, including two board certified psychiatrists and nine hospital corpsmen, "supports the outpatient mental health needs of the detainees, and runs the ███████ Behavioral Health Unit (BHU) designed for detainees requiring inpatient psychiatric care and monitoring." *Id.* ¶ 9. "The BHU staff conducts mental health assessments, provides crisis intervention, develops individualized treatment plans, formulates therapy for management of self-injurious ideations or behavior, and provides supporting care and psychiatric medication therapy, as needed to treat symptoms of major psychiatric disorders." *Id.* The JMG provides care through a "coordinated team approach based on individualized plans that account for each patient's condition and circumstances." *Id.*

"The JMG is committed to providing appropriate and comprehensive medical care to all detainees. JMG providers take seriously their duty to protect the physical and mental health of the detainees and approach their interactions with detainees in a manner that encourages provider-patient trust and rapport." *Id.* ¶ 7. JMG providers do not participate in detention-related activities or operations, except for certain approved health care-related reasons, and "do not have any involvement in the supervision, conduct, or direction of interrogations." *Id.* ¶ 6. Although the medical staff rotate in and out, JMG makes numerous efforts to ensure continuity of care for the detainees, including mandatory medical staff orientations, a two-week formal transition between incoming and outgoing personnel, assignment of another staff member to

~~PROTECTED INFORMATION – FILED UNDER SEAL~~

UNCLASSIFIED//FOR PUBLIC RELEASE

~~PROTECTED INFORMATION – FILED UNDER SEAL~~

first-time visiting sub-specialists, and the use of medical linguists who have been assigned to the facility for many years. *Id. ¶* 5.

With these resources at hand, "JMG will continue to recommend appropriate evaluation and treatment to [Petitioner] as necessary for his . . . mental health conditions." *Id. ¶* 22.

## ARGUMENT

Petitioner moves the Court for an injunction requiring the United States to establish a Mixed Medical Commission in order to, as he describes it, "further establish his entitlement to direct repatriation pursuant to the terms of AR 190-8, Section 3-12." Petr.'s Mot. at 1.[2] Petitioner's claim for relief is inappropriate for two reasons. First, a claim for injunctive relief requiring the Executive to establish a commission to examine Petitioner's mental health condition does not sound in habeas because an examination by such commission will not necessarily affect the fact, duration, or form of his confinement. As such, it is barred by 28 U.S.C. § 2241(e)(2). Even if the claim did sound in habeas, the Court should refrain from exercising jurisdiction in light of the equitable principles at issue when the Judiciary is asked to compel Executive action pursuant to a military regulation implementing an international treaty in contravention of the Executive's interpretation of that regulation and treaty. Second, Petitioner

---

[2] Although Petitioner ultimately seeks repatriation to Saudi Arabia, *see, e.g.*, Petr.'s Mot. at 1, 7, the only relief the Court could properly order, if that request were before the Court, is release from U.S. custody, not repatriation or transfer to a specific country. *See Munaf v. Geren*, 553 U.S. 674, 693 (2008) ("Habeas is at its core a remedy for unlawful executive detention . . . [and the] typical remedy for such detention is, of course, release. But here . . . petitioners [do not] want [] simple release.") (citations omitted); *Ahmed v. Obama*, 613 F. Supp. 2d 51, 66 (D.D.C. 2009) (granting the writ of habeas corpus, but, in framing the remedy, stating that the court was "[m]indful of the limitations on the scope of the remedy in this situation" and ordered only that "the Government . . . take all necessary and appropriate diplomatic steps to facilitate Petitioner's release").

~~PROTECTED INFORMATION – FILED UNDER SEAL~~

~~PROTECTED INFORMATION – FILED UNDER SEAL~~

has not made the showing required to warrant a permanent injunction: he is not entitled to the

relief he seeks, and the balance of harms tips decisively in favor of Respondents.

## I.     Legal Framework

### A.     Third Geneva Convention

Articles 109 and 110 of the Third Geneva Convention require that parties to an

international armed conflict repatriate directly certain types of sick and wounded prisoners of

war.  GC III, Arts. 109, 110.  Those classes of prisoners of war include, as relevant here,

wounded and sick who "are not likely to recover within one year, whose condition requires

treatment and whose mental or physical fitness seems to have been gravely diminished."  *Id.* Art.

110.  Article 112 provides that "Mixed Medical Commissions shall be appointed to examine sick

and wounded prisoners of war, and to make all appropriate decisions regarding them."  *Id.* Art.

112; *see* Art. 113 (describing the prisoners entitled to a Mixed Medical Commission

examination).  In implementing these Convention obligations in international armed conflicts,

Article 110 expressly contemplates that parties to the conflict have flexibility to interpret the

standards for repatriation set by that Article by concluding special agreements "to determine the

cases of disablement or sickness that would entail direct repatriation."  *Id.* Art. 110.  In the

absence of an agreement, such determinations are to be made "in accordance with the principles

laid down in the Model Agreement," which is Annex I to the Third Geneva Convention.  *Id.*

Annex II to the Third Geneva Convention includes regulations concerning the appointment,

duties, and functioning of Mixed Medical Commissions.  *Id.* Art. 112.

~~PROTECTED INFORMATION – FILED UNDER SEAL~~

UNCLASSIFIED//FOR PUBLIC RELEASE
~~PROTECTED INFORMATION – FILED UNDER SEAL~~

   **B.**      **AR 190-8**

AR 190-8 is one of several regulations addressing detainee operations.[3]  The general

purpose of AR 190-8 is to "establish[] policies and planning guidance for the treatment, care,

accountability, legal status, and administrative procedures for Enemy Prisoners of War, Civilian

Internees, Retained Persons, and Other Detainees."  AR 190-8 at i.  By promulgating AR 190-8,

the Secretaries of the Army, Navy, and Air Force exercised their authorities and responsibilities

to provide the United States armed forces with guidance regarding the treatment of detainees,

including ensuring that United States military personnel (through military disciplinary

mechanisms) act in accordance with international law, in particular the 1949 Geneva

Conventions.  *See* AR 190-8 at i ("This regulation implements Department of Defense Directive

2310.1 [currently, DODD 2310.01E (Aug 19, 2014) (Change 1 May 24, 2017)] and establishes

policies and planning guidance for the treatment, care, accountability, legal status, and

administrative procedures for" certain detainees); *id.* at 1 ("This regulation implements

international law . . . relating to" the administration, treatment, employment, and compensation

of certain detainees).

     Petitioner's motion relies on Section 3-12 of AR 190-8, which implements the medical

repatriation provisions of the Third Geneva Convention.  It provides that "[s]ick or wounded

EPW [enemy prisoners of war] and RP [retained personnel] whose conditions have become

chronic to the extent that prognosis appears to preclude recovery in spite of treatment within 1

year from inception of disease or date of injury" are "eligible for direct repatriation."  AR 190-8,

---

[3] AR 190-8 was also issued by the Navy, *see* OPNAVINST 3461.6; by the Marine
Corps, *see* MCO 3461.1; and by the Air Force, *see* AFJI 31-304.  Because the Secretary of the
Army serves as the DoD Executive Agent for for the administration of the DOD Detainee
Program, DODD 2310.01E (Aug. 19, 2014) (Change 1 May 24, 2017), DoD Detainee Program ¶
1.c, these four instructions will collectively be referred to as AR 190-8.

~~PROTECTED INFORMATION – FILED UNDER SEAL~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
PROTECTED INFORMATION – FILED UNDER SEAL

§ 3-12(l)(2).  The regulation also provides for the establishment of a Mixed Medical Commission to "[e]xamine EPW, and RP who have applied for repatriation" and "[d]etermine those cases eligible for repatriation."  *Id.* § 3-12(c).  It further specifies that the Mixed Medical Commission shall be composed of two members, appointed by the [International Committee of the Red Cross] and approved by the parties to the conflict, from a neutral country (if possible, one surgeon and one physician) and one member who is a U.S. Army medical officer selected by the Headquarters of the Department of the Army.  *Id.* § 3-12(a)(2).

AR 190-8 defines enemy prisoner of war[4] and retained personnel,[5] to which the provisions of Section 3-12 expressly apply.  It also provides for a category of "Other Detainee," a temporary category for individuals who are awaiting a determination whether they meet the qualifications of an enemy prisoner of war, retained personnel, or civilian internee.[6]  The regulation provides that "Other Detainees" "shall be treated as EPWs until a legal status is ascertained by competent authority."  *Id.* App. B, § II – Terms.

## II.     The Court Does Not Have Jurisdiction to Hear Petitioner's Request for Injunctive Relief.

The Court does not have jurisdiction to hear Petitioner's motion.  The Court of Appeals has made clear that 28 U.S.C. § 2241(e)(2) deprives courts of jurisdiction to consider non-habeas

---

[4] AR 190-8 defines "Enemy Prisoner of War" as "[a] detained person as defined in Articles 4 and 5 of [the Third Geneva Convention].  In particular, one who, while engaged in combat under orders of his or her government, is captured by the armed forces of the enemy."  AR 190-8, App. B, § II – Terms.

[5] AR 190-8's definition of "Retained Personnel" includes certain medical personnel, chaplains attached to the enemy armed forces, and staff of National Red Cross societies and certain other voluntary aid societies.  *Id.*

[6] A Civilian Internee is a person "who is interned during armed conflict or occupation for security reasons or for protection or because he has committed an offense against the detaining power."  *Id.*  This category of detainee is not relevant here.

PROTECTED INFORMATION – FILED UNDER SEAL
UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
~~PROTECTED INFORMATION – FILED UNDER SEAL~~

claims of detainees such as Petitioner, and a claim for injunctive relief that will not necessarily

result in release or a change in conditions of confinement does not sound in habeas.  The All

Writs Act—the only authority that Petitioner cites in support of his claim that the Court may

order the Executive to establish a Mixed Medical Commission—does not enlarge the Court's

habeas jurisdiction or provide it with an independent basis for jurisdiction in the first instance.

Furthermore, even if the Court determines that Petitioner's claim sounds in habeas, the Court

should refrain from exercising its habeas jurisdiction as a matter of equity given that the relief

requested would be inconsistent with the Executive's interpretation of the relevant treaty and

regulation provisions, and would place an extraordinary and unprecedented burden on the

Executive to take a series of steps necessary to establish the requested commission.

A.   **Petitioner's Claim for Injunctive Relief Is Not Cognizable in Habeas, and Therefore Is Barred by 28 U.S.C. § 2241(e)(2), Because It Will Not Necessarily Alter the Fact, Duration, or Form of His Detention.**

Petitioner's motion seeks relief beyond the scope permitted by the habeas statute and,

therefore, is barred.[7]  Through the Military Commissions Act of 2006, Congress withdrew the

---

[7] The only authority that Petitioner cites for his requested relief is the All Writs Act, 28 U.S.C. § 1651(a), which provides that federal courts "may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usage and principles of law."  *See* Petr.'s Mot. at 13-14.  The Supreme Court has made clear, however, that the All Writs Act "is not an independent grant of [] jurisdiction," *Clinton v. Goldsmith*, 526 U.S. 529, 535 (1999) (citation omitted), and it "cannot enlarge a court's jurisdiction," *id.* (citation omitted).  Contrary to Petitioner's suggestion, the relief requested here is not akin to that afforded under the All Writs Act in *Al Odah v. United States*, 346 F. Supp. 2d 1 (D.D.C. 2004), in which the court held that Guantanamo habeas petitioners were entitled to counsel in order to prosecute their petitions in the district court.  *Id.* at 8.  The *Al Odah* court held that it could "fashion appropriate modes of procedure, by analogy to existing rules or otherwise in conformity with judicial usage."  *Id.* at 6 (citing *Harris v. Nelson*, 394 U.S. 286, 299 (1969)).  Although the statutory provisions governing federal habeas actions did not specifically address appointment of counsel, the court found authority for such procedure by analogy to the Criminal Justice Act, 18 U.S.C. § 3006, and rules governing state habeas actions under 28 U.S.C. § 2254, which specifically contemplate appointment of counsel in the habeas context.  *Id.* at 7-8.  Here, on the other hand, Petitioner asks this Court for an unprecedented order compelling the Executive to convene an international

~~PROTECTED INFORMATION – FILED UNDER SEAL~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
~~PROTECTED INFORMATION – FILED UNDER SEAL~~

courts' jurisdiction over (1) habeas actions filed by or on behalf of Guantanamo detainees and (2) any other action related to any aspect of, *inter alia*, the detainees' transfer, treatment, or trial. *See* 28 U.S.C. § 2241(e)(1) (withdrawing habeas jurisdiction); *id.* § 2241(e)(2) (barring "other" claims "relating to any aspect of the [detainees'] detention, transfer, treatment, trial, or conditions of confinement").  While the Supreme Court in *Boumediene v. Bush*, 553 U.S. 723 (2008), held Section 2241(e)(1) unconstitutional as applied to Guantanamo detainees like Petitioner, Section 2241(e)(2) still serves to divest courts of jurisdiction over any actions that are not "proper claim[s] for habeas relief."  *Kiyemba v. Obama*, 561 F.3d 509, 513 (D.C. Cir. 2009); *see also Aamer v. Obama*, 742 F.3d 1023, 1030 (D.C. Cir. 2014) ("[I]f petitioners' claims do not sound in habeas, their challenges constitute an action other than habeas corpus barred by § 2241(e)(2).") (citation and internal alterations omitted); *Al-Zahrani v. Rodriguez*, 669 F.3d 315, 319 (D.C. Cir. 2012) (lawsuit seeking damages is "an action other than habeas corpus").

Petitioner's claim does not sound in habeas, and therefore is barred, because rather than seek an order of release or challenge his conditions of confinement, Petitioner instead seeks an order compelling the United States to take a series of actions that only, in the end, may *possibly* result in his release.  Specifically, Petitioner's motion seeks an order compelling the United States to establish a Mixed Medical Commission (which it does not appear that the United States has ever done under the 1949 Geneva Conventions), to appoint his hired medical expert as a member of the Commission (which is inconsistent with the terms of the treaty and implementing regulation), and to require the Commission to examine his case.  But, as explained below, such an order would also require the United States to, among other things, develop standards for

---

commission not contemplated by, and in fact beyond, the Court's habeas jurisdiction, pursuant to a military regulation and treaty that by their very terms do not apply to Petitioner's case.

~~PROTECTED INFORMATION – FILED UNDER SEAL~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
~~PROTECTED INFORMATION – FILED UNDER SEAL~~

determining the disabilities and sicknesses that would warrant repatriation in this non-international armed conflict against al-Qaida, Taliban, and associated forces, which stretches habeas far beyond its traditional remedy of release.

Although the Supreme Court has not directly addressed whether a claim that *may* result in release sounds in habeas, its recent decisions strongly suggest that it would not.  In *Skinner v. Switzer*, 562 U.S. 521 (2011), a case in which a prisoner filed a non-habeas claim seeking to compel access to certain evidence for DNA testing, the Supreme Court rejected the argument that the claim should have been filed as a habeas petition and explained that "when a prisoner's claim would not 'necessarily spell speedier release,' that claim does not lie at 'the core of habeas corpus,' and may be brought, *if at all*, under [42 U.S.C.]§ 1983."[8]  *Id.* at 535 n.13 (quoting *Wilkinson v. Dotson*, 544 U.S. 74, 82 (2005)) (emphasis added).  The Court further explained that it was not aware of any case "in which the Court has recognized habeas as the sole remedy, *or even an available one*, where the relief would 'neither terminat[e] custody, accelerat[e] the future date of release from custody, nor reduc[e] the level of custody.'"  *Id.* at 534 (quoting *Dotson*, 544 U.S. at 86 (Scalia, J., concurring)) (emphasis added);[9] *see also Muhammad v. Close*, 540 U.S. 749, 754-55 (2004) (per curiam) (holding that a petitioner "raise[s] no claim on which

---

[8] The series of Supreme Court cases including *Skinner* addressed the relationship between claims brought under 42 U.S.C. § 1983 and claims brought as habeas petitions.  As the Supreme Court explained in one of its later decisions on the issue, "considerations of linguistic specificity, history, and comity led the Court to find an implicit exception from § 1983's otherwise broad scope for actions that lie 'within the core of habeas corpus.'"  *Wilkinson v. Dotson*, 544 U.S. 74, 79 (2005) (quoting *Preiser v. Rodriguez*, 411 U.S. 475, 487 (1973)).

[9] In his concurrence in *Dotson*, Justice Scalia noted that it "would utterly sever the writ from its common-law roots" to hold that a request for an order "mandating [] a new parole hearing that may or may not result in release, prescription of the composition of the hearing panel, and specification of the procedure to be followed" "lies at the 'core of habeas.'"  *Dotson*, 544 U.S. at 86 (Scalia, J., concurring) (citations omitted).

~~PROTECTED INFORMATION – FILED UNDER SEAL~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
PROTECTED INFORMATION – FILED UNDER SEAL

habeas relief could have been granted on any recognized theory" where the administrative determinations he challenged did not "raise any implication about the validity of the underlying conviction" nor "necessarily" "affect the duration of time to be served").

Guided by these recent Supreme Court decisions, the D.C. Circuit recently reassessed its related habeas jurisprudence and strongly suggested that claims like Petitioner's do not sound in habeas. In *Davis v. U.S. Sentencing Comm'n*, 716 F.3d 660 (D.C. Cir. 2013), the Court of Appeals analyzed *Skinner* and explained that "habeas might not even be *available* for 'probabilistic' claims." *Id.* at 665 (citing *Skinner*, 562 U.S. at 534). Based in significant part on that reasoning, the Court of Appeals overturned *Razzoli v. Fed. Bureau of Prisons*, 230 F.3d 371 (D.C. Cir. 2000), a decision holding that a claim must be brought in habeas even when it would have merely a probabilistic impact on the duration of custody.[10] *Davis*, 716 F.3d at 666.

Relying on both *Skinner* and *Davis*, a court in this district recently found that it lacked jurisdiction to order the Government to set a date for a Guantanamo habeas petitioner's PRB hearing because such relief did not sound in habeas. *Salahi v. Obama*, Civ. No. 05-0569, 2015 WL 9216557, at *3 (D.D.C. Dec. 17, 2015). In *Salahi*, Judge Lamberth rejected the petitioner's

---

[10] Prior to *Skinner*, in a lawsuit seeking to compel access to a parole eligibility hearing, the Court of Appeals held that such a lawsuit could not be brought under § 1983 because "a prisoner's challenge to the determination of his eligibility for parole does indeed attack the 'fact or duration' of confinement … [and] therefore, habeas is the sole remedy available to such a prisoner." *Chatman-Bey v. Thornburgh*, 864 F.2d 804, 810 n.5 (D.C. Cir. 1988). After two subsequent Supreme Court decisions "cast doubt on [the D.C. Circuit's] view, expressed in *Chatman-Bey*, that its scope extended beyond claims for immediate release or a definite reduction in the length of imprisonment," *Davis*, 716 F.3d at 663, a federal prisoner challenging a decision to delay his eligibility for parole contested the validity of the *Chatman-Bey* decision in *Razzoli v. Fed. Bureau of Prisons*, 230 F.3d 371 (D.C. Cir. 2000). In *Razzoli*, the Court of Appeals found "*Chatman-Bey* alive and at worst only modestly ailing," 230 F.3d at 376, and held that "habeas is indeed exclusive even when a non-habeas claim would have a merely probabilistic impact on the duration of custody," *id.* at 373. In *Davis*, however, the Court of Appeals overturned *Razzoli*.

PROTECTED INFORMATION – FILED UNDER SEAL

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
~~PROTECTED INFORMATION – FILED UNDER SEAL~~

argument that habeas-channeling cases like *Skinner* and *Davis* should be disregarded "because they turn[] on whether [a] claim for relief is at the 'core of habeas' and do not describe the full scope of statutory habeas jurisdiction." *Id.* Quoting the holdings discussed above, Judge Lamberth held that "*Skinner* and *Davis* clearly do make statements about the scope of statutory habeas in general" and "seem to except probabilistic claims from the category of habeas."[11] *Id.* (citing *Skinner*, 562 U.S. at 534) (petitioner "has found no case, nor has the dissent, in which the Court has recognized habeas as the sole remedy, or even an available one, where the relief sought would 'neither terminat[e] custody, accelerat[e] the future date of release from custody, nor reduc[e] the level of custody"), and *Davis*, 716 F.3d at 665 ("probabilistic' claims may not even lie within the bounds of habeas, much less at its core.")). Because the PRB hearing that the petitioner sought to compel would only possibly result in his release, the court concluded that it lacked jurisdiction to hear his claim. *Id.*

Although the Court of Appeals has not yet taken the next step and squarely held that probabilistic claims do not sound in habeas, the Court of Appeals for the Ninth Circuit recently did when it held that a claim challenging prison disciplinary proceedings was not cognizable in habeas "[b]ecause success on [the petitioner's] claims would not necessarily lead to his immediate or earlier release from confinement," and thus "[his] claim does not fall within 'the core of habeas corpus.'" *Nettles v. Grounds*, 830 F.3d 922, 935 (9th Cir. 2016) (en banc)

---

[11] Judge Lamberth also rejected the argument that *Aamer v. Obama*, 742 F.3d 1023 (D.C. Cir. 2014), which recognized statutory habeas jurisdiction over a claim by a Guantanamo detainee challenging certain conditions of confinement, establishes that habeas encompasses any claim that some aspect of detention has deprived the detainee of "a right to which he is entitled while in custody." *Salahi*, 2015 WL 9216557, at *3. As in *Salahi*, and so too here, *Aamer* does not compel the conclusion that the district court has jurisdiction to compel the Executive to provide a Guantanamo detainee with an administrative process that only speculatively could lead to his release. "[W]hile *Aamer* does show that claims not relating to release may sound in habeas, it does not show that 'probabilistic' or 'discretionary' claims relating to release do so." *Id.*

~~PROTECTED INFORMATION – FILED UNDER SEAL~~
UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
~~PROTECTED INFORMATION – FILED UNDER SEAL~~

(quoting *Skinner*, 562 U.S. at 535 n.13); *cf. Hernandez v. Stephens*, No. 3:13-cv-1391, 2014 WL
667373, at *2 (N.D. Tex. Feb. 20, 2014) ("Petitioner's constitutional challenge to Texas' good-
time parole eligibility statute and the denial of a presumptive parole date are not cognizable on
habeas review" because it "d[id] not allege that Petitioner would be automatically entitled to
accelerated release if [relief were granted][.]").

Petitioner's claim for relief is even further afield from the types of claims that the
Supreme Court and Court of Appeals suggested should not be brought in habeas. *See Dotson*,
544 U.S. at 82 ("[T]he prisoners' claims for *future* relief (which, if successful, will not
necessarily imply the invalidity of confinement or shorten its duration) are yet more distant from
th[e] core [of habeas corpus].") (citation omitted). In *Dotson*, state prisoners challenged certain
aspects of Ohio's parole procedures, including a determination about one petitioner's eligibility
for an administrative parole hearing, 544 U.S. at 76-77, and the Supreme Court held that such a
"claim does not lie at the core of habeas corpus, and may be brought, *if at all*, under [42 U.S.C.]§
1983." *Skinner*, 562 U.S. at 535 n.13 (emphasis added). Here, Petitioner goes even further than
challenging the availability of a parole hearing, and instead asks the Court to issue an order
establishing the relevant administrative body in the first instance.

Additionally, while success for the petitioners in *Dotson* would have meant that they
would receive a hearing from a parole board that had the authority to order release, Petitioner's
request involves several intermediate steps before a similar outcome is even possible (if it is
possible at all). An order compelling the Executive to establish a Mixed Medical Commission
would require it to first develop procedures and criteria for the Commission to apply, including,
the standards for determining the disabilities and sicknesses that qualify for repatriation in the
circumstances of the non-international armed conflict in which Petitioner was detained. *See*

~~PROTECTED INFORMATION – FILED UNDER SEAL~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
~~PROTECTED INFORMATION – FILED UNDER SEAL~~

*infra* at 35-38.  Until those standards are developed, it is speculative as to whether they would even apply to the mental health conditions alleged by Petitioner or whether Petitioner could even qualify for such relief in light of his only partial adherence to the recommended mental health care and treatment provided at Guantanamo.  *See generally* SMO Decl.; *see infra* at 12 (explaining that Section 3-12(l)(2) of AR 190-8 applies to medical conditions that persist "in spite of treatment").  The Court's determination of "whether a claim is the type that sounds in habeas is itself a jurisdictional question," *Aamer*, 742 F.3d at 1033 (citations omitted), and questions of jurisdiction should not turn on such a speculative chain of events, *cf. Turlock Irrigation Dist. v. FERC*, 786 F.3d 18, 24 (D.C. Cir. 2015) ("[A] prediction that separate [] proceedings will result in [a particular outcome] hypothesizes as to the outcome of future legal proceedings, and is thus 'too speculative to invoke the jurisdiction of an Art[icle] III Court.'") (citation omitted).  Otherwise, any number of claims that might possibly lead to release would then sound in habeas.

Accordingly, the Court should adhere to the relevant guidance of the Supreme Court and Court of Appeals and determine that Petitioner's claim does not sound in habeas, and is thus barred by § 2241(e)(2),[12] because it seeks extraordinary relief too far removed from habeas' traditional remedy of release.

---

[12] The appropriate consideration is whether a claim properly sounds in habeas, not the likelihood of success or actual success of a petitioner in obtaining the relief sought.  *Cf. Dotson*, 544 U.S. at 87 (Scalia, J., concurring) (explaining that the correct focus is "whether the claims [petitioners] pleaded were claims that may be pursued in habeas—not [] whether [petitioners] can be successful in obtaining habeas relief on those claims"); *cf. also Mitchell v. United States*, 930 F.2d 893, 897 (Fed. Cir. 1991) (appropriate question is whether claim may be brought under Administrative Procedure Act or whether other avenues offer adequate remedies, not whether petitioner is entitled to receive those other remedies); *McGregor v. Greer*, 748 F. Supp. 881, 884 (D.D.C. 1990) (same).

~~PROTECTED INFORMATION – FILED UNDER SEAL~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~PROTECTED INFORMATION – FILED UNDER SEAL~~

> **B.** **Even if Petitioner's Claim Sounds in Habeas, the Court Should Refrain from Exercising Its Habeas Jurisdiction in Light of the Equitable Principles Implicated by Petitioner's Request for Injunctive Relief.**

As the Supreme Court explained in *Munaf v. Geren*, 553 U.S. 674 (2008), a case decided the same day as *Boumediene*, "[h]abeas corpus is governed by equitable principles," and "prudential concerns . . . may require a federal court to forgo the exercise of its habeas corpus power." *Id.* at 693 (internal citations omitted); *see also id.* ("The habeas statute provides only that a writ of habeas corpus '*may* be granted,' § 2241(a) (emphasis added), and directs federal courts to 'dispose of [habeas petitions] as law and justice require, § 2243.")  If the Court finds that it otherwise has jurisdiction to hear Petitioner's claim as part of his habeas case, the Court should nonetheless refrain from exercising that jurisdiction here because Petitioner's request for injunctive relief—an order requiring the Executive to take certain actions in conformance with asserted treaty obligations, as implemented through military regulation,[13] and contrary to the Executive's interpretation of how those obligations apply to Petitioner—would be inconsistent with the Executive's interpretation of the relevant treaty and regulation provisions, and would place an extraordinary burden on the Executive.

As *Boumediene* and *Munaf* outline, limitations on the Court's "exercise of its habeas power" are appropriate given the historical understanding that habeas actions generally serve as a

---

[13] Although Petitioner couches his claim as seeking relief under domestic law (AR 190-8), *see, e.g.*, Petr.'s Mot. at 1, such relief necessarily implicates the Third Geneva Convention because AR 190-8 is part of the United States' implementation of the Third Geneva Convention, AR 190-8 § 1-1(b), and, in the event of any conflict or discrepancy between the regulation and the Geneva Conventions, the Conventions take precedence, *id.*  The Court recognized these facts in *Aamer v. Obama*, 58 F. Supp. 3d 16, 21 (D.D.C. 2014) (citing AR 190-8, § 1-1(b)).  As relevant here, "Enemy Prisoner of War" is defined in AR 190-8 expressly by reference to Articles 4 and 5 of the Third Geneva Convention, *see* AR 190-8, Appendix B, § II-Terms, and the provisions for a Mixed Medical Commission refer to Annex II of the Third Geneva Convention, *see id.* § 3-12(a)(2).

~~PROTECTED INFORMATION – FILED UNDER SEAL~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
~~PROTECTED INFORMATION – FILED UNDER SEAL~~

limited vehicle for challenging the fact or duration of detention.  *See Boumediene*, 553 U.S. at

792; *Munaf*, 553 U.S. at 693.  The Court in *Munaf* found that jurisdiction existed, but that

substantial equitable principles barred the relief sought in that case—avoidance of transfer to a

foreign sovereign for criminal prosecution—noting, first, that the petitioners were not seeking an

order securing their release from custody, the core equitable remedy of habeas corpus.  *Munaf*,

553 U.S. at 692 ("[T]he relief sought by the habeas petitioners makes clear under our precedents

that the power of the writ ought not to be exercised").  Second, the Court found that important

equitable concerns, including concerns about the judiciary interfering in the activities of a

foreign sovereign and "concerns about unwarranted judicial intrusion into the Executive's ability

to conduct military operations abroad," counseled against the continuation of the petitioners'

claim.  *Id.* at 700.  Similar equitable factors weigh against the Court's exercise of its habeas

power with regard to Petitioner's claim here.  Like the petitioners in *Munaf*, Petitioner seeks

relief that, if it sounds in habeas at all, is far removed from the core.  *See Dotson*, 544 U.S. at 82;

*see also Davis*, 716 F.3d at 665.  Petitioner does not ask the Court to order his release, but rather

asks the Court to order the Executive to take multiple administrative and policy steps under the

Third Geneva Convention and AR 190-8, which may not even lead to his release.  Petitioner asks

the Court to establish a Mixed Medical Commission, even though the Executive has already

determined that the relevant provisions do not apply to Petitioner as a matter of law.  *See infra* at

27-35.  Additionally, any order directing the establishment of a Mixed Medical Commission

necessarily requires the Executive to also develop standards for determining the disabilities and

sicknesses that merit repatriation.  *See infra* at 35-38.  The standards for repatriations set forth in

the Model Agreement provided as Annex I of the Third Geneva Convention, which were drafted

in 1949, would need to be interpreted and adjusted in light of developments in the field of

~~PROTECTED INFORMATION – FILED UNDER SEAL~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
~~PROTECTED INFORMATION – FILED UNDER SEAL~~

medicine and in light of the nature of the non-international armed conflict against al-Qaida,

Taliban, and associated forces.  Such a pronouncement by the United States regarding its

interpretation of the terms of the Model Agreement and how they apply by analogy in this non-

international armed conflict could have lasting significance.  *Cf. Adams v. Vance*, 570 F.2d 950,

955 (D.C. Cir. 1978) ("This country's interests in regard to foreign affairs and international

agreements may depend on the symbolic significance to other countries of various stances" and

"[c]ourts are not in a position to exercise a judgement that is fully sensitive to these matters.").

Finally, Petitioner also asks the Court to appoint his hired expert, Dr. Keram, as a member of the

Commission, even though such an appointment would be inconsistent with the relevant

provisions of AR 190-8 and Annex II of the Third Geneva Convention.  *See infra* at 37-38 &

n.25.  And Petitioner asks the Court to order all of this relief because it *may* eventually lead to

his release.

Moreover, as in *Munaf*, equitable principles concerning the substantial burden that such

an order would place on the Executive—requiring the Executive to take the apparently

unprecedented step of establishing a Mixed Medical Commission under the terms of the 1949

Third Geneva Convention, and a military regulation that implements it, for a non-international

armed conflict—counsel against the Court's exercise of habeas jurisdiction over Petitioner's

claim for injunctive relief.  Petitioner's request would go well beyond preserving the status quo.

Any such order would contradict the Executive's long-standing interpretation about the

inapplicability of these provisions of the regulation and treaty to detainees like Petitioner.[14]  *See*

---

[14] Of course, the Military Commissions Act of 2006 also prohibits Guantanamo detainees from
directly invoking the protections of the Third Geneva Convention as a source of rights in habeas
proceedings.  *See* Military Commissions Act of 2006, Pub. L. No. 109-355,§ 5, 120 Stat.
2600, 2631 (codified at 28 U.S.C. § 2241 note).

~~PROTECTED INFORMATION – FILED UNDER SEAL~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
~~PROTECTED INFORMATION – FILED UNDER SEAL~~

*Abbott v. Abbott*, 560 U.S. 1, 15 (2010) ("It is well settled that the Executive's interpretation of a treaty is entitled to great weight.") (citation omitted).  Moreover, such an order would also inevitably require the Executive to make complex and novel determinations about the proper application of AR 190-8 and Annex II of the Third Geneva Convention regarding the establishment of Mixed Medical Commissions, and about the development of standards for deciding the disabilities and sicknesses that warrant repatriation in this non-international armed conflict.[15]  *See infra* at 35-38.

For the foregoing reasons, the Court lacks or should refrain from exercising habeas jurisdiction with respect to Petitioner's claim for relief.[16]

### III.     Petitioner Has Not Made the Showing Required to Warrant Injunctive Relief.

The relief that Petitioner seeks is extraordinary.  Although framed as a request for a preliminary injunction, *see* Petr.'s Mot. at 14, Petitioner's motion actually seeks a permanent injunction requiring the United States Government to establish a Mixed Medical Commission pursuant to the relevant terms of AR 190-8 and the Third Geneva Convention.[17]  Such an order

---

[15] The Court of Appeals has treated the issue of judicial involvement with the Executive's implementation of international treaties as very sensitive matters that warrant circumspection. *See, e.g.*, *Adams v. Vance*, 570 F.2d 950, 954-55 (D.C. Cir. 1978) ("A request for an order directing action by the Secretary of State in foreign affairs plainly constitutes [a deep intrusion into the core concerns of the Executive]" and "d[oes] not merely preserve the status quo pending further proceedings, but command[s] an unprecedented action irreversibly altering the delicate diplomatic balance in the [international] arena."); *Holmes v. Laird*, 459 F.2d 1211, 1220 (D.C. Cir. 1972) ("[I]t consistently [has] been held that the courts cannot command the United States to take action assertedly necessary to performance of a treaty[.]").

[16] Petitioner may obtain release from custody by pursuing his habeas case on the merits, demonstrating that he is unlawfully detained and, if appropriate, the Court may order his release.

[17] Even if considered a request for a preliminary injunction, Petitioner's motion seeks mandatory injunctive relief, *i.e.*, an injunction that "would alter, rather than preserve, the *status quo* by commanding some positive act."  *Newark Pre-School Council v. U.S. Dep't of Health & Human Servs.*, 201 F. Supp. 3d 72, 78 (D.D.C. 2016) (citation omitted).  As such, he "must meet a higher

~~PROTECTED INFORMATION – FILED UNDER SEAL~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
PROTECTED INFORMATION – FILED UNDER SEAL

would go well beyond the scope of a preliminary injunction, the purpose of which "is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).

Here, Petitioner seeks an injunction not to preserve the status quo pending the outcome of his merit claims, but rather seeks a determination of his purported rights that would require the Executive to take affirmative actions under certain provisions of AR 190-8 and the Third Geneva Convention, contrary to the Executive's long-standing interpretation about the inapplicability of those obligations to detainees such as Petitioner. *See Abbott*, 560 U.S. at 15 ("It is well settled that the Executive's interpretation of a treaty is entitled to great weight.") (quotation omitted). It would also require the Executive to launch a difficult and unprecedented policy process to establish the procedures for a Mixed Medical Commission and to develop the contours of the standards it would apply in this non-international armed conflict to determine the disabilities and sicknesses that merit repatriation. For example, this process would involve consideration of issues of the potential impact of such standards and procedures in future conflicts, as well as issues of the safe and orderly operation of the detention facility at Guantanamo and the potential risks that detainees will refuse medical treatment or engage in self-harm in order to avail themselves of these procedures. Petitioner is not entitled to such drastic relief based solely upon a purported showing of entitlement to preliminary injunctive relief, which "is customarily granted on the basis of procedures that are far less formal and evidence that is less complete than in a trial on the merits." *Camenisch*, 451 U.S. at 395; *see also id.* at 394 (noting "the significant

---

standard than in the ordinary case by showing clearly that he [] is entitled to relief or that extreme or very serious damage will result from the denial of the injunction." *Id.* "A district court should not issue a mandatory preliminary injunction unless the facts and law clearly favor the moving party." *Nat'l Conference on Ministry to Armed Forces v. James*, 278 F. Supp. 2d 37, 43 (D.D.C. 2003) (citation omitted).

PROTECTED INFORMATION – FILED UNDER SEAL

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
~~PROTECTED INFORMATION – FILED UNDER SEAL~~

procedural differences between preliminary and permanent injunctions"); *cf. Adams*, 570 F.2d at 955 ("[W]hile we do not determine the justiciability of a request for [an injunction requiring a diplomatic objection], we think it clear that if such a request is justiciable, the party seeking this kind of relief would have to make an extraordinarily strong showing to succeed.").

"An injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010); *see also Dorfmann v. Boozer,* 414 F.2d 1168, 1173 (D.C. Cir. 1969) ("[t]he power to issue a preliminary injunction, especially a mandatory one, should be sparingly exercised."). "A permanent injunction is only appropriate, however, after a [petitioner] has prevailed on the merits of his claim." *Renoir v. Governor of Va.*, 755 F. Supp. 2d 82, 87 (D.D.C. 2010) (citing *Hi-Tech Pharmacal Co. v. U.S. Food & Drug Admin.*, 587 F. Supp. 2d 13, 17 (D.D.C. 2008). Once a petitioner has prevailed and "the right to relief is clearly established," *San Antonio Gen. Maint., Inc. v. Abnor*, 691 F. Supp. 1462, 1467 (D.D.C. 1987), he must then satisfy a four-factor test before a court may grant such relief: "(1) that [he] has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Monsanto Co.*, 561 U.S. at 156-57 (citation omitted). "Failing to satisfy any factor is grounds for denying relief." *Morgan Drexen, Inc. v. Consumer Fin. Prot. Bureau*, 785 F.3d 684, 694 (D.C. Cir. 2015) (citation omitted).

Petitioner fails at the first step because he is not entitled to the establishment of or an examination by a Mixed Medical Commission pursuant to the terms of the Third Geneva Convention or AR 190-8. Even if Petitioner could demonstrate such an entitlement, however,

~~PROTECTED INFORMATION – FILED UNDER SEAL~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
~~PROTECTED INFORMATION – FILED UNDER SEAL~~

the permanent injunctive relief Petitioner seeks is nevertheless inappropriate because it would

impose substantial hardships upon the Government, Petitioner's purported injury is not

irreparable, and the public has a strong interest in the courts deferring to the Executive's

considered interpretation of the scope and applicability of a treaty and its implementing

regulations.

### A. Petitioner Has No Right to Relief Because the Relevant Provisions of the Third Geneva Convention and AR 190-8 Do Not Provide Him with Status that Entitles Him to Examination by a Mixed Medical Commission.

Petitioner is being detained pursuant to the AUMF, as informed by the laws of war,

because he was part of al-Qaida at the time of his capture.  The Executive respects the

humanitarian principles embodied in Articles 109 and 110 of the Third Geneva Convention,

which provide for the repatriation of certain wounded and sick prisoners of war, and it takes

them into account when determining whether it should continue to detain individuals in the

circumstances of this non-international armed conflict.[18]  But, as a matter of treaty law,

---

[18] To that end, in determining whether the continued detention of Petitioner remains necessary to protect against a continuing significant threat to the security of the United States, the PRB considered Petitioner's psychological condition, to include the information reported by Dr. Keram in both written submissions (Petr.'s Mot. at Ex. C, E) and testimony on Petitioner's behalf.  The PRB has reviewed Petitioner twice, first in an initial review in which a determination was made on July 18, 2016 that Petitioner's detention remains necessary, *see* Unclassified Summary of Final Determination, http://www.prs.mil/Portals/60/Documents/ ISN063/160718_U_ISN063_FINAL_DETERMINATION_PUBLIC.pdf, and a second time in a file review, *see* Memorandum for Record (Feb. 22, 2017), http://www.prs.mil/Portals/60/ Documents/ISN063/FileReview/ 170118_U_ISN63_FINAL_DETERMINATION_PUBLIC_ V1.pdf (determining that "no significant question is raised as to whether the detainee's continued detention is warranted").  Contrary to Petitioner's suggestion, Respondents do not claim that the PRB process is a substitute for or "displaces" a Mixed Medical Commission.  Petr.'s Mot. at 13. As explained *infra*, Petitioner (or any other Guantanamo detainee) is not entitled to such commission as a matter of law.  In any case, the PRB process considers all available relevant information, including regarding a detainee's mental health, to assist the Executive in making informed decisions as to whether detainees held at Guantanamo should remain in law of war detention.

~~PROTECTED INFORMATION – FILED UNDER SEAL~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
PROTECTED INFORMATION – FILED UNDER SEAL

Petitioner is not entitled to the establishment of, and an examination by, a Mixed Medical Commission because the United States determined that detainees who are part of al-Qaida are not entitled to prisoner of war status.  Also, in light of this prior determination, Petitioner cannot be an "other detainee" who enjoys prisoner of war status as a placeholder until the Executive determines his legal status.

The Third Geneva Convention sets forth rules concerning the treatment of prisoners of war.  In order to qualify for the full panoply of protections afforded prisoners of war, the Third Geneva Convention sets forth certain criteria that must be met by the forces involved in the armed conflict.  In order to determine whether an individual qualifies for prisoner of war status, which in turn ensures access as appropriate to a Mixed Medical Commission under the Convention or AR 190-8, the Third Geneva Convention first looks to determine whether the conflict at issue is an international armed conflict or a non-international armed conflict.  Pursuant to Article 2, the full provisions of the Third Geneva Convention apply to "all cases of declared war or of any other armed conflict which may arise between two or more of the High Contracting Parties, even if the state of war is not recognized by one of them."  GC III, Art. 2.  In such an international armed conflict, prisoner of war status is afforded principally to (1) members of the armed forces of a State that is a Party to the conflict, and to (2) members of other militias or volunteer corps that are commanded by a responsible superior officer, have fixed distinctive insignia, carry arms openly, and conduct their operations in accordance with the laws of war, including by refraining from conducting attacks against civilians.  *Id.* Art. 4(A)(1) & (2).  In contrast, Article 3 applies to non-international armed conflicts, and states that "[i]n the case of armed conflict not of an international character occurring in the territory of one of the High Contracting Parties, each party to the conflict shall be bound to apply, as a minimum, the

28

PROTECTED INFORMATION – FILED UNDER SEAL

~~PROTECTED INFORMATION – FILED UNDER SEAL~~

following . . . [detained persons] shall in all circumstances be treated humanely." *Id.* Art. 3; *see also Hamdan v. Rumsfeld*, 548 U.S. 557, 629-31 (2006).

In February 2002, President Bush determined that al-Qaida forces do not qualify for prisoner of war status. *See* White House Press Secretary Announcement of President Bush's Determination Re Legal Status of Taliban and Al Qaeda Detainees (Feb. 7, 2002), http://www.state.gov/s/l/38727.htm ("President's Determination"). The United States' armed conflict against al-Qaida forces is a non-international armed conflict, subject as a matter of the Third Geneva Convention only to the protections afforded in Article 3, because al-Qaida is a terrorist organization and not a State that is a High Contracting Party to the Third Geneva Convention.[19] *Id.*; *see also Hamdan*, 548 U.S. at 629-31. In light of this prior determination by the Executive, the full protections provided by the Third Geneva Convention to prisoners of war do not apply to Petitioner as a matter of law because he is part of al-Qaida forces. Thus, Petitioner is not entitled to the protections afforded in the relevant provisions of the Third Geneva Convention, or in the relevant terms of Section 3-12 of AR 190-8 that implement that Convention, to require the establishment of a Mixed Medical Commission.

Petitioner, however, insists that he is an "other detainee" under AR 190-8, *see* Petr.'s Mot. at 9-10, which is defined as "persons in the custody of the U.S. armed forces who have not

---

[19] The United States initially characterized the armed conflict against Taliban forces as an international armed conflict, but the President determined that Taliban forces do not qualify for prisoner of war status because of their failure to adhere to the requirements of Article 4 of the Third Geneva Convention. *See* President's Determination. The United States' armed conflict against the Taliban in Afghanistan is no longer an international armed conflict. *See, e.g.*, ICRC, International Humanitarian Law and the Challenges of Contemporary Armed Conflicts, at 725 (Sept. 2007), available at https://www.icrc.org/eng/assets/files/other/irrc-867-ihl-challenges.pdf; White House, Report on the Legal and Policy Frameworks Guiding the United States' Use of Force and Related National Security Operations, at 19 (Dec. 2016), available at https://fas.org/man/eprint/frameworks.pdf.

~~PROTECTED INFORMATION – FILED UNDER SEAL~~

UNCLASSIFIED//FOR PUBLIC RELEASE
~~PROTECTED INFORMATION – FILED UNDER SEAL~~

been classified as an [enemy prisoner of war], [retained personnel], or [civilian internee]," and

whom "shall be treated as [enemy prisoners of war] until a legal status is ascertained by a

competent authority," AR 190-8 Appendix B, § II – Terms.  The process and interim status of

"other detainee" in AR 190-8 are provided "[i]n accordance with Article 5, [Third Geneva

Convention]," AR 190-8, ¶ 1-6(a), which as explained above is not applicable to this non-

international armed conflict.  Petitioner, however, attempts to rely on the Court's observation in

*Aamer v. Obama*, 58 F. Supp. 3d 16 (D.D.C. 2014), that the "logic [of the claim that the

petitioner was an "other detainee"] has some force."  Petr.'s Mot. at 9 (quoting *Aamer*, 58 F.

Supp. 3d at 23-24)  Petitioner then makes an inexplicable leap to characterize the Court's order

in *Aamer* as a "ruling" that he accuses Respondents of ignoring.  *Id.*  Petitioner's claim

misconstrues the order in that case and is simply incorrect as a matter of law.

Petitioner's suggestion that the Court decided the issue of a Guantanamo detainee's

entitlement to treatment as a prisoner of war through the placeholder status of an "other

detainee" is belied by the Court's statement in *Aamer*, made after its observation of the

petitioner's argument, that "[t]he arguments of the parties are not particularly satisfying."

*Aamer*, 58 F. Supp. 3d at 25.  The Court then stated that "[t]he parties [] present the Court with

tangled arguments—a seemingly Gordian knot of regulations, detainee jurisprudence, and logic,"

but far from accepting Petitioner's claim that he qualifies for prisoner of war status as an "other

detainee," it concluded that "[u]nraveling the knot does not require the blunt force that the parties

presuppose."  *Id.* at 26.  The Court ruled on other grounds, namely that the petitioner's claim was

not ripe because he had neither applied for repatriation nor requested an examination by a Mixed

Medical Commission.  *Id.* at 26-27.

~~PROTECTED INFORMATION – FILED UNDER SEAL~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
~~PROTECTED INFORMATION – FILED UNDER SEAL~~

Furthermore, as explained above, the Executive has already made a determination about

the status of al-Qaida forces, of which Petitioner was previously determined to be a part, when it

concluded that those forces do not qualify for prisoner of war status and its attendant privileges

as a matter of treaty law.  *See also Hamdan v. Rumsfeld*, 415 F.3d 33, 43 (D.C. Cir. 2005), *rev'd*

*on other grounds*, 548 U.S. 557 (2006) ("The President found that [petitioner] was not a prisoner

of war under the Convention.  Nothing in [AR 190-8], and nothing [petitioner] argues, suggests

that the President is not a 'competent authority' for these purposes.").[20]  If unclear in

Respondents' briefing in *Aamer*, a decision by a CSRT that Petitioner was an "enemy

combatant" was the military's finding of fact that Petitioner is part of al-Qaida, Taliban, or

associated forces, forces that the President already determined did not qualify for prisoner of war

status.[21]  *See* Order Establishing Combatant Status Review Tribunal (Jul. 7, 2004), available at

http://www.defense.gov/news/Jul2004/d20040707review.pdf; *compare id.* at (e) ("A [CSRT]

---

[20] The Commander-in-Chief is unquestionably a "competent authority" to make a force-level
determination of whether al-Qaida forces are entitled to prisoner of war status.  Neither AR 190-
8 nor the Third Geneva Convention requires that overarching legal determinations such as the
overall characteristics of a force that will determine whether that force qualifies for lawful
combatant status or the characterization of the conflict as a non-international armed conflict, be
individually adjudicated for each detainee.  *See* DOD Law of War Manual § 4.27.3 (2016)
(explaining that "if there was no doubt that the armed group to which a person belongs fails to
qualify for POW status, then the [Third Geneva Convention] would not require a tribunal to
adjudicate the person's claim to POW status by virtue of membership in that group").

[21] In the United States' conflict against al-Qaida, Taliban, and associated forces, the CSRTs
determined whether an individual was detained properly as a part of those forces.  In *Aamer*,
the Court stated that the fact that the Executive Branch no longer uses the term "enemy
combatant" "raises questions concerning Respondents' current reliance on it" and the CSRT
determination.  *Aamer*, 58 F. Supp. 3d at 25.  The change, however, does not undermine the
individual determination—which was made after the President's initial, force-level determination
in 2002—that Petitioner is part of al-Qaida forces.  Moreover, Petitioner may challenge in habeas
the Executive's determination that he is lawfully detained as part of, or substantially supporting,
al-Qaida, Taliban, or associated forces.  *Cf. Al-Zahrani*, 669 F.3d at 318-19 (Section 2241(e)(2)
bars nonhabeas claims where a CSRT determined a detainee to be an "enemy combatant").

31

~~PROTECTED INFORMATION – FILED UNDER SEAL~~

~~PROTECTED INFORMATION – FILED UNDER SEAL~~

shall be composed of three neutral commission officers of the U.S. Armed Forces … [t]he senior

member (in the grade O-5 or above) shall serve as President of the Tribunal") *with Hamdan*, 415

F.3d at 43 (military commission qualifies as a "competent tribunal" under AR 190- 8, § 1-6(c)

because it includes three commission officers, one of whom is of field grade). *See also* DoD

Law of War Manual § 4.6.1.1 (GC III Art. 4(a)(2) Conditions Required on a Group Basis).

Therefore, because the President already determined that al-Qaida forces are not entitled to

prisoner of war status, and a CSRT determined that Petitioner was part of those forces, Petitioner

is not an "other detainee" under AR 190-8, which is a placeholder designation for individuals

whose status has not yet been determined.

Petitioner's suggestion that he must qualify as an "other detainee"—and therefore is

entitled to be treated as a prisoner of war pending a status determination—because the term

"enemy combatant" does not exist under AR 190-8 creates a false choice that leaves no room for

the detention of individuals fighting for forces that do not adhere to the laws of war.  This error is

made clear by the recently reissued Department of Defense directive pertaining to its detainee

program, DODD 2310.01E (Aug. 19, 2014) (Change 1 May 24, 2017), available at

http://www.esd.whs.mil/Portals/54/Documents/DD/issuances/dodd/231001e.pdf.  That Directive

defines DoD policy for detainee operations, and in doing so, makes clear that a detainee may fall

outside of the categories of persons set forth in AR 190-8.  Specifically, it distinguishes between

detainees who (regardless of legal status) must receive a "minimum" standard of protections,

including, among others, those set forth in Article 3 of the Third Geneva Convention applicable

to this non-international armed conflict, *id.* ¶ 3(a), and detainees who qualify for prisoner of war

status and who "enjoy protections and privileges *beyond* the minimum standards of treatment

established in this directive," *id.* ¶ 3(g) (emphasis added).  *See also Schwaner v. Dep't of Army*,

~~PROTECTED INFORMATION – FILED UNDER SEAL~~

~~PROTECTED INFORMATION – FILED UNDER SEAL~~

370 F. Supp. 2d 408, 414 (E.D. Va. 2004), *aff'd sub nom. Schwaner v. Dep't of Army, Fort Eustis, Va.*, 119 F. App'x 565 (4th Cir. 2005) ("Army regulations must be in accord with directives promulgated by the Department of Defense.").

Petitioner's claim that he should qualify for prisoner of war protections as an "other detainee" also rests on strained logic. To accept Petitioner's argument would be to afford, as a matter of law, prisoner of war status—a *privilege* afforded only to State forces and certain combatants who adhere to the laws and customs of war in the context of international armed conflict—to individuals detained at Guantanamo as part of al-Qaida, Taliban, or associated forces in the context of this non-international armed conflict even though those individuals have been determined by the United States, by the President and through CSRTs, to be members of forces that decidedly do *not* adhere to the laws of war. Such an approach risks undermining the very purpose and function of the Geneva Conventions. *See Al Warafi v. Obama*, 716 F.3d 627, 632 (D.C. Cir. 2013) ("Without compliance with the requirements of the Geneva Conventions, the Taliban's personnel are not entitled to the protection of the Convention."); DoD Law of War Manual § 4.3.1 ("States have been reluctant to conclude treaties to afford unprivileged enemy belligerents the distinct privileges of POW status or the full protections afforded civilians."); *see also Aamer*, 58 F. Supp. 3d at 25 ("To accept Petitioner's gauzy conception of AR 190–8 would be to elevate form over function."). Thus, AR 190-8 does not support Petitioner's attempt to contort the rules for his benefit.

The decision of the Court of Appeals in *Al Warafi* does not compel a different result. In *Al Warafi*, the Court of Appeals held that a Guantanamo detainee may invoke AR 190-8 only insofar as it "explicitly establishes a detainee's entitlement to release." *Al Warafi*, 716 F.3d at 629. Here, unlike the provisions of AR 190-8 addressed in *Al Warafi*, the provisions of Section

~~PROTECTED INFORMATION – FILED UNDER SEAL~~

~~PROTECTED INFORMATION – FILED UNDER SEAL~~

3-12 that address the establishment of a Mixed Medical Commission do not explicitly establish a

detainee's entitlement to release. Rather, the regulation requires the Department of the Army

first to establish procedures for operating a Mixed Medical Commission, and once established

and provided with governing procedures and criteria, the Commission would then determine

which detainees, if any, "are eligible for direct repatriation." AR 190-8, § 3-12(l); *see also*

*Aamer*, 58 F. Supp. 3d at 26 n.9 (noting that "[t]he applicability of Section 3-12 to Petitioner is

distinctly unclear" because "Section 3-12(l) speaks only in terms of *eligibility* for repatriation

whereas *Al Warafi[]* requires an explicit showing of an *entitlement* to release").

   Moreover, the provisions at issue in *Al Warafi* concerned a fundamentally distinct

category of persons—*i.e.*, retained personnel. Under the terms of the Geneva Conventions,

retained personnel (the status claimed by the petitioner in *Al Warafi*) may only be *retained* under

specific and limited circumstances. *See, e.g.*, Geneva Convention for the Amelioration of the

Condition of the Wounded and Sick in Armed Forces in the Field, Art. 28, para. 1 (medics

qualify as Retained Persons). Thus, insofar as that category is applicable to the conflict against

al-Qaida, Taliban, and associated forces, an issue assumed but not decided in *Al Warafi*,[22] an

individual falling into such a category may well be entitled explicitly to release. Release on

those grounds stands in stark contrast to Petitioner's claim for prisoner of war protections under

AR 190-8, which seeks the establishment of a Mixed Medical Commission and speculates as to

---

[22] *See Warafi v. Obama*, 409 Fed. Appx. 360 (D.C. Cir. 2011) (unpublished) (assuming *arguendo* application of AR 190-8, § 3-15(b) concerning retained personnel and remanding for consideration of "single question," *Al Warafi*, 716 F.3d at 629, whether petitioner served exclusively as medical personnel within meaning of regulation). Thus, the Court's concern expressed in *Aamer*, 58 F. Supp. 3d at 25, that there would be no need for the *Al Warafi* court to consider whether the petitioner in that case qualified as retained personnel if an "enemy combatant" designation removed Guantanamo detainees from the coverage of Army Regulation 190–8, reads too much into the *Al Warafi* decision.

~~PROTECTED INFORMATION – FILED UNDER SEAL~~

UNCLASSIFIED//FOR PUBLIC RELEASE
PROTECTED INFORMATION – FILED UNDER SEAL

the outcome of that Commission's consideration of his situation based on his mental health

condition or humanitarian need.[23]  Moreover, the *Al Warafi* court's ultimate holding supports

Respondents' position here—that because al-Qaida did not comply "with the requirements of the

Geneva Conventions" its forces (including Petitioner) "are not entitled to the protection of the

Convention."  *Al Warafi*, 716 F.3d at 632.  As such, the holding of *Al-Warafi* should be limited

to its facts, and it does not support Petitioner's claim of entitlement to release.

> **B.**     **An Order Requiring the Executive to Establish an Entity Pursuant to
> Provisions of the Third Geneva Convention and an Implementing Army
> Regulation Would Be Inconsistent with the Executive's Long-Standing
> Interpretation about the Inapplicability of Those Provisions to Detainees
> Like Petitioner and Would Impose Substantial Hardship on  the Executive.**

An order compelling the United States to establish a Mixed Medical Commission

pursuant to the Third Geneva Convention and AR 190-8 is contrary to the Executive's

considered interpretation of the scope and inapplicability of those provisions to Petitioner, which,

as discussed previously, is entitled to great deference.  Article 112 of the Third Geneva

Convention states that, "[u]pon the outbreak of hostilities, Mixed Medical Commissions shall be

appointed to examine sick and wounded prisoners of war, and to make all appropriate decisions

regarding them."  GC III, Art. 112.  AR 190-8 requires the Headquarters of the Department of

---

[23] Indeed, even in international armed conflicts to which the full protections of the Third Geneva
Convention apply by its terms, prisoners of war do not enjoy any "special immunity" similar to
retained personnel, either in the form of immunity from detention until the end of hostilities or
with regard to release prior to the cessation of hostilities.  When prisoners of war are directly
repatriated under Article 110 of the Third Geneva Convention, they are not returned because
they possess different legal status like that of retained personnel; rather, their repatriation occurs
because the Detaining Power determined (as provided for in the Convention or in special
agreements between the parties to the conflict, by the Detaining Power, or by a Mixed Medical
Commission) that they suffer from a medical ailment such that they are "gravely diminished."
*See* GC III, Art. 110 (applies to those "whose mental or physical fitness seems to have been
gravely diminished"); *see also id.* (discussing the means "to determine the cases" that qualify
under Article 110); *id.* Art. 113 (discussing detainees who, though not identified by the
Detaining Power, "present themselves for examination" under Article 110).

PROTECTED INFORMATION – FILED UNDER SEAL

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
~~PROTECTED INFORMATION – FILED UNDER SEAL~~

the Army to establish procedures for a Mixed Medical Commission pursuant to the regulation

and Annex II to the Third Geneva Convention.  AR 190-8, § 3-12(a)(2).  Annex II to the

Convention, which sets forth regulations concerning Mixed Medical Commissions, further

directs that the Commissions "shall begin their work as soon as possible after the neutral

members have been approved."  GC III, Annex II, Art. 9.  The Executive determined in 2002,

however, that al-Qaida forces, which included Petitioner, were not entitled to prisoner of war

status and the related privileges, which would include access to a Mixed Medical Commission.

Thus, a decision by this Court that the Executive was required to take these steps would

contradict the Executive's considered interpretation on this issue in a manner inconsistent with

the deference that is due to the Executive's interpretation of its treaty obligations.  *See Abbott*,

560 U.S. at 15.

Additionally, an order requiring the establishment of a Mixed Medical Commission

necessarily requires that the United States first establish procedures for operating a Mixed

Medical Commission—which it does not appear that the United States has ever done under the

1949 Geneva Conventions—and then determine the contours of the standards the Commission

would apply, including what disablements or sicknesses qualify a detainee for release.  *See* AR

190-8, § 3-12(a)(2) ("Procedures for a Mixed Medical Commission will be established by [Head

Quarters, Department of the Army], according to this regulation and Annex II of the [Third

Geneva Convention].").  In international armed conflicts to which the full provisions of the Third

Geneva Convention apply, Article 110 provides that, "[i]f no special agreements are concluded

between the Parties to the conflict concerned, to determine the cases of disablement or sickness

entailing direct repatriation or accommodation in a neutral country, such cases shall be settled in

accordance with the principles laid down in the Model Agreement . . . and in the Regulations

36

UNCLASSIFIED//FOR PUBLIC RELEASE
~~PROTECTED INFORMATION – FILED UNDER SEAL~~

concerning Mixed Medical Commissions annexed to the present Convention."  GC III, Art. 110.

Annex I to the Convention includes "Principles for Direct Repatriation and Accommodation in

Neutral Countries" and lists a variety of disablements and sicknesses that, in international armed

conflicts, qualify for direct repatriation under the Annex.

But those provisions do not apply as a matter of treaty law to the conflict in which

Petitioner is detained, and they are provided as a model agreement, from 1949, that is subject to

modification by the parties to the armed conflict.  Thus, if the Court ordered the establishment of

a Mixed Medical Commission, before the Commission could examine Petitioner (or any other

detainee),[24] the United States would need to establish procedures governing the operation of the

Commissions and "to determine the cases of disablement or sickness entailing direct

repatriation."  GC III, Art. 110.  An order requiring the United States to take a position on the

types of disabilities and sicknesses that qualify a detainee for repatriation under the Third

Geneva Convention as implemented by AR 190-8, and as applied in this asymmetrical non-

international armed conflict against al-Qaida and Taliban forces, would raise novel, complex,

and difficult issues for the Executive.  As suggested by Petitioner's request that the Court also

order the appointment of Dr. Keram to the Mixed Medical Commission (a proposal that typifies

Petitioner's disregard for the plain application of the relevant provisions of the treaty and

---

[24] If the Court granted the relief sought by Petitioner, there is no limiting principle that would prevent any other detainee at Guantanamo from seeking to be examined by a Mixed Medical Commission.  The Third Geneva Convention does not limit examination to only those prisoners of war who submit with their request the report of a retained medical expert (as Petitioner did here); they need only "present themselves for examination."  *See* GC III Art. 113; *see also* AR 190-8, § 3-12(h)(4) (enemy prisoners of war who submit requests will be examined by the Mixed Medical Commission).  Therefore the United States would very likely need to develop the criteria for a range of disabilities and sicknesses.

~~PROTECTED INFORMATION – FILED UNDER SEAL~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
~~PROTECTED INFORMATION – FILED UNDER SEAL~~

regulation),[25] these novel, complex, and difficult issues are then likely to be the subject of additional litigation that further entangles the Court in the interpretation and application of the relevant provisions of AR 190-8 and the Third Geneva Convention.  In addition to the immediate effect that such an order would have upon the Executive and the conduct of its ongoing detention operations at Guantanamo, it would also have an effect upon the United States' interests with regard to the Geneva Conventions and related laws and customs of armed conflict.  *Cf. Adams*, 570 F.2d at 953 (cautioning against judicial intervention "irreversibly altering the delicate diplomatic balance in [a certain international legal] arena").  For these reasons, the relief sought by Petitioner would impose tremendous hardships upon Respondents by requiring a judicial finding inconsistent with the Executive's interpretation of treaty obligations, and force the Executive to develop positions on sensitive law of war issues concerning disabilities and sicknesses that warrant repatriation in a non-international armed conflict to which the relevant provisions of the Geneva Conventions do not apply as a matter of treaty law.

---

[25] Petitioner "propose[s] the designation of Dr. Emily Keram, his most recent and only independent medical examiner . . . to [] the Mixed Medical Commission" that he asks the Court to compel.  Petr.'s Mot. at 3; *see also id.* at 20 (proposed order).  Even though Petitioner is not entitled to an order requiring the Executive to establish a Mixed Medical Commission, *see supra* at 27-35, and even assuming that the Court has authority to dictate the composition of any Mixed Medical Commission that it ordered to be established, such an appointment would be inconsistent with the express terms of AR 190-8 and Annex II of the Third Geneva Convention for several reasons.  First, "[t]he neutral members [of a Mixed Medical Commission] [must] be entirely independent of the Parties to the conflict," GC III, Annex II, Art. 7, but Dr. Keram is Petitioner's hired expert, and therefore hardly independent or neutral.  Second, "[t]he two neutral members shall be appointed by the International Committee of the Red Cross[,]" *id.* Art. 2; AR 190-8, § 3-12(a)(2), but the ICRC is not before this Court and any order directed at the ICRC would raise a number of significant issues.  Third, "[t]he neutral members shall be approved by the Parties to the conflict[,]" GC III, Annex II, Art. 3, so Respondents would maintain authority to approve or disapprove the appointment of any neutral member to a Mixed Medical Commission, including Dr. Keram.

~~PROTECTED INFORMATION – FILED UNDER SEAL~~

UNCLASSIFIED//FOR PUBLIC RELEASE

~~PROTECTED INFORMATION – FILED UNDER SEAL~~

### C.        Petitioner Has Not Established Irreparable Injury.

Petitioner claims that he "faces a great risk of irreparable harm absent an injunction

compelling an examination by a Mixed Medical Commission" because, "[w]ithout such an

examination, he may be left unable to further establish his entitlement to repatriation pursuant to

domestic law, and will continue to languish at Guantanamo at grave cost to his health."  Petr.'s

Mot. at 15.  But, insofar as Petitioner contends that he is suffering irreparable harm as a result of

his continued detention at Guantanamo, Petitioner implicitly concedes that the injunctive relief

he seeks, which does not directly address that harm, is not certain to remedy that harm.  *See also*

Petr.'s Mot. at 16 ("Absent the preliminary injunction sought herein, [Petitioner] will be denied

the *opportunity* for direct repatriation . . . ") (emphasis added).  And the mere possibility of

relieving (allegedly) irreparable harm is not a sufficient basis for obtaining a permanent

injunction.  *See Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) ("[T]he movant must

show that the alleged harm will directly result from the action which the movant seeks to

enjoin.").

Additionally, Petitioner has not established that his purported harm is irreparable.  For the

reasons explained more fully by the Senior Medical Officer, Petitioner's mental health condition

"is currently well managed with minimal residual symptoms and even if his condition were more

severe, the JMG has capability in excess of what he would need to be treated."  SMO Decl. ¶ 21.

Indeed, Petitioner has reported "a subjective sense of symptomatic improvement" as a result of

his recent change in anti-psychotic medication.  *Id.* ¶ 20.  And "[t]here are no indications at this

time that his mental health condition affects his ability to perform his activities of daily living or

otherwise function normally in the context of detention."  *Id.*  Moreover, even if Petitioner's

claims about his condition were accurate, it is so at least in part because he often refuses to

~~PROTECTED INFORMATION – FILED UNDER SEAL~~

~~PROTECTED INFORMATION – FILED UNDER SEAL~~

follow mental health care and treatment plans recommended by the Guantanamo medical staff. *See* AR 190-8, § 3-12(l)(2) (eligibility for repatriation depends on prognosis that appears to preclude recovery "in spite of treatment within 1 year").  Petitioner has demonstrated an "ongoing unwillingness to . . . meet with BHU staff in a manner that allows him to fully discuss treatment of his mental status and behavior," SMO Decl. ¶ 10; regularly refuses to attend BHU appointments, *id.* ¶ 21; and often refuses medications, including his anti-psychotic and anti-depressant medications, *Id.* ¶ 19.  According to the Senior Medical Officer, it is not uncommon for individuals with Petitioner's conditions, either in detention or outside of a detention environment, to be non-compliant with their mental health treatment plans.  *Id.* ¶ 21.  Petitioner cannot, however, regularly refuse care that otherwise might alleviate his alleged harms, and then argue that the Government's alleged inability to provide sufficient care constitutes irreparable harm.  *Cf. Judicial Watch, Inc. v. Nat'l Energy Policy Dev. Grp.*, 230 F. Supp. 2d 12, 15 (D.D.C. 2002) ("[A party] cannot be permitted to manufacture irreparable harm[.]").

### D.      The Public Interest Weighs in Favor of Respondents.

The public interest also tips strongly against the issuance of an injunction requiring the Executive to take certain, affirmative actions purportedly pursuant to AR 190-8, one of the several military regulations that implements the 1949 Geneva Conventions.  Here, the injunction sought by Petitioner would contradict the long-standing position that the Executive has taken on this treaty issue to date, and constitute an unprecedented step that would raise novel, complex, and difficult issues for the Executive.  *See supra* at 35-38.

~~PROTECTED INFORMATION – FILED UNDER SEAL~~

UNCLASSIFIED//FOR PUBLIC RELEASE
~~PROTECTED INFORMATION – FILED UNDER SEAL~~

## CONCLUSION

For the reasons set forth above, the Court should deny Petitioner's Motion to Compel

Examination by a Mixed Medical Commission.


Dated:  August 29, 2017                        Respectfully submitted,

                                               CHAD A. READLER
                                               Acting Assistant Attorney General


                                               */s/ Daniel M. Barish*_____

                                               */s/ Kathryn C. Davis*_____
                                               TERRY M. HENRY
                                               ANDREW I. WARDEN (Indiana Bar #23840-49)
                                               DANIEL M. BARISH (DC Bar No. 448263)
                                               KATHRYN C. DAVIS (DC Bar No. 985055)
                                               United States Department of Justice
                                               Civil Division, Federal Programs Branch
                                               20 Massachusetts Avenue, N.W.
                                               Washington, DC 20530
                                               Tel: (202) 616-8298
                                               E-mail: Kathryn.C.Davis@usdoj.gov

                                               *Counsel for Respondents*

~~PROTECTED INFORMATION – FILED UNDER SEAL~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
~~PROTECTED INFORMATION – FILED UNDER SEAL~~

### CERTIFICATE OF SERVICE

I hereby certify that on August 29, 2017, I electronically filed a copy of Respondents'

Opposition to Petitioner's Motion to Compel Examination by a Mixed Medical Commission

under seal via the Court's CM/ECF system, and served a copy of said filing by electronic mail to

the following counsel for Petitioner:

Ramzi Kassem
Main Street Legal Services, Inc.
City University of New York School of Law
2 Court Square
Long Island City, NY 11101
ramzi.kassem@law.cuny.edu

Lawrence S. Lustberg
Gibbons P.C.
One Gateway Center
Newark, NJ 07102-5310
LLustberg@gibbonslaw.com

Shayana Kadidal
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012
kadidal@ccrjustice.org

Prof. Sandra Babcock
International Human Rights Clinic
Cornell University School of Law
158A Myron Taylor Hall
Ithaca, NY 14853
slb348@cornell.edu

/s/ *Terry M. Henry*
TERRY M. HENRY

42

~~PROTECTED INFORMATION – FILED UNDER SEAL~~

UNCLASSIFIED//FOR PUBLIC RELEASE