## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MOHAMMED AL-QAHTANI,** | |
| *Petitioner,* | |
| **v.** | **Case No. 05-CV-1971 (RMC)** |
| **DONALD J. TRUMP,** *et al.,* | |
| *Respondents.* | |

### PETITIONER'S REPLY IN FURTHER SUPPORT OF
### MOTION TO COMPEL EXAMINATION BY A MIXED MEDICAL COMMISSION

This Court must wield the jurisdiction it possesses over Petitioner Mohammed al-Qahtani's Motion to Compel an Examination by a Mixed Medical Commission. The law of war does not bar the application of domestic law that Mr. al-Qahtani presently seeks, nor does the government's categorical assertion that Mr. al-Qahtani is excluded from the law's protection. Both domestic law and the law of war require an individualized status determination by a competent tribunal, not a blanket decision by the President. In the absence of that determination, Mr. al-Qahtani is entitled to the protections afforded by the domestic law provisions of Army Regulation 190-8 and to the relief he seeks herein.

**I.   THE COURT MUST USE THE JURISDICTION IT HAS OVER MR. AL-QAHTANI'S MOTION**

**A.   The Court Fully Possesses Jurisdiction over Mr. al-Qahtani's Motion**

*1.   The Relief Mr. al-Qahtani Seeks Is a Prerequisite Part of the Court's Habeas Jurisdiction*

At its core, the government's argument in opposition to Mr. al-Qahtani's Motion is no more than an inelegant Catch-22, which the Court should not endorse. Indeed, the government asserts that "a claim for injunctive relief that will not necessarily result in release or a change in

conditions of confinement does not sound in habeas." Opp'n 14.[1] But the relief sought herein forms a prerequisite part of the Court's exercise of its habeas jurisdiction over a request to be released on health grounds in application of domestic law, as this Court earlier held. *See Aamer v. Obama*, 58 F. Supp. 3d 16, 20 (D.D.C. 2014) ("There is no dispute that this Court has subject matter jurisdiction over Petitioner's Motion […]."). In that same ruling, this Court also held that "Petitioner has made no attempt to establish his entitlement to release under the terms of the regulation." *Id.* at 17. But if this Court allows the government to prevent Mr. al-Qahtani from further establishing—upon examination by a Mixed Medical Commission—his entitlement to direct repatriation under Army Regulation 190-8, then the terms of that provision of domestic law become essentially meaningless.

The government's logic would even prevent this Court from ruling on a motion to compel access to a prisoner at Guantánamo filed by his lawyers. That species of relief, strictly speaking, would not directly implicate release from custody or a change in conditions of confinement, either, even though, like the relief at issue here, it is a predicate to seeking release in habeas.

---

[1] Respondents filed their Opposition under seal, claiming it contains "protected information." However, their nearly-identical filing in *Aamer v. Obama* is entirely public. *See* Resp'ts' Opp'n to Pet'r's Mot. to Compel Exam. by Mixed Medical Commission, *Aamer v. Obama*, 04-CV-2215, ECF No. 281 (D.D.C. July 2, 2015). There seem to be two possible grounds for protection: the filings include Mr. al-Qahtani's medical information and/or the Senior Medical Officer's declaration—unlike the one filed publicly in redacted form in *Aamer*, ECF No. 270-1, Ex. 1 (July 17, 2014)—reveals the officer's name, branch, and rank. The first ground cannot be valid as Mr. al-Qahtani has made his medical condition public himself, through his own filings in support of this Motion. As for the second ground, Petitioner does not object to the redaction of the Senior Medical Officer's name.

Of course, only the Court has the authority to deem information protected. Protective Order ¶¶ 10, 34, ECF No. 62. Here, Respondents have not complied with the Protective Order's requirement that they "attempt to reach an agreement about the designation of the information" prior to filing. *Id.* at ¶ 10. Nonetheless, undersigned counsel reached out to Respondents' counsel, who stated that a team at the Defense Department would review the filings in order to produce a public version within a timeframe that remains to be determined. To avoid delay, this Court should order the government to file on the public record versions of its opposition filings redacting only the Senior Medical Officer's name, and nothing more, or in the alternative produce a written justification for protecting additional information, within two weeks of the filing of this brief, by September 22, 2017, and to indicate to Petitioner's counsel that it does not object to the filing of this reply brief in its entirety on the public record, or alternatively state its specific objections.

In any event, the analysis in *Al Warafi v. Obama*, 716 F.3d 627 (D.C. Cir. 2013), is again instructive here. Exercising its habeas jurisdiction in application of the same domestic law in that case, the Court of Appeals considered a number of factual indicators set forth in the Geneva Conventions, including, notably, whether Al Warafi wore an "armlet" or carried a card identifying him as medical personnel. *Al Warafi*, 716 F.3d at 630. The findings of a Mixed Medical Commission are to the Court in this case what the basic facts about whether Al Warafi carried an armlet or card were to the district and appellate courts in that case. The *Al Warafi* court was entitled to that information as it considered a claim for release properly brought in habeas, and this Court is no less entitled to the findings of a Mixed Medical Commission so it can exercise its habeas jurisdiction over a renewed motion for judgment.

### 2. The All Writs Act Empowers the Court to Order Mr. al-Qahtani's Examination by a Mixed Medical Commission

The government also mischaracterizes Mr. al-Qahtani's reliance on the All Writs Act. The instant Motion does not point to the All Writs Act in order to "confer or enlarge the Court's jurisdiction." Opp'n 2. Rather, the judicial use that Mr. al-Qahtani suggests would plainly fulfill the Act's purpose of enabling courts to exercise their extant jurisdiction fully. The All Writs Act grants courts authority to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usage and principles of law." 28 U.S.C. § 1651(a). More specifically, it permits this Court to fashion procedures in aid of its jurisdiction and to develop a factual record that would support a decision on the merits of a petitioner's habeas claims. *See, e.g.*, *Al Odah v. United States*, 346 F. Supp. 2d 1, 6 (D.D.C. 2004).

When the government claimed that Shaker Aamer's similar request for repatriation was outside the ambit of habeas litigation, this Court disagreed. *See Aamer*, 58 F. Supp. 3d at 25 ("Respondents exclaim that Petitioner's request for repatriation is substantively different from

the ordinary habeas petition. Not so. Petitioner seeks release pursuant to domestic law (Army Regulation 190-8) and those portions of an international accord that it incorporates (the Third Geneva Convention).”). To properly exercise its habeas jurisdiction in that case and rule on a renewed motion for judgment on Aamer's petition, this Court required the findings of a Mixed Medical Commission regarding the state of Aamer's health. *See id.* at 27 (“Section 3-12 of the Regulation conditions medical repatriation on the determinations of a Mixed Medical Commission.”).

By refusing to allow a Mixed Medical Commission, the government effectively attempts to strip this Court of the ability to exercise its habeas jurisdiction and adjudicate a motion for judgment in this case. Pursuant to the All Writs Act, therefore, this Court should compel Respondents to allow a Mixed Medical Commission to conduct an examination of Mr. al-Qahtani as it forms a prerequisite part of the Court's exercise of its habeas jurisdiction in this matter.

### 3. *The Cases Respondents Cite Are Inapposite*

The Court need not be distracted by Respondents' attempt to rely upon a line of irrelevant cases interpreting 42 U.S.C. § 1983. Opp'n 16-20. That jurisprudence began with *Preiser v. Rodriguez*, 411 U.S. 475 (1973), holding that state prisoners cannot bring § 1983 claims that relate to the “core of habeas.” Respondents simply ignore the fact that the D.C. Circuit specifically rejected the relevance of these cases to habeas law in *these* cases. *See, e.g.*, *Aamer v. Obama*, 742 F.3d 1023, 1031-33 (D.C. Cir. 2014). *Preiser* and its progeny are cases about the scope of § 1983, *not* the scope of habeas.

In particular, the D.C. Circuit in *Aamer* found that when the Supreme Court held that prisoners cannot bring § 1983 claims that “fall within the ‘heart’ or ‘core’ of habeas corpus”—

defined as habeas cases challenging the fact or duration of imprisonment—the Supreme Court was not limiting the broader remit of habeas. *Id.* at 1031-31 ("Significantly, the [Supreme] Court did not hold that […] any claim challenging something apart from the fact or duration of confinement may not be raised in habeas.").

Equally misleading is Respondents' claim that cherry-picked quotes from later cases applying *Preiser*—including a concurrence in *Wilkinson v. Dotson*, 544 U.S. 74 (2005), and a footnote in *Skinner v. Switzer*, 562 U.S. 521 (2011)—somehow "suggest" that the Supreme Court intended to limit the scope of habeas. The Supreme Court denied that these cases, neither of which dealt with habeas petitioners, were forging new law. *Skinner*, 562 U.S. at 535 n.13 ("Given the importance of providing clear guidance to the lower courts, 'we see no reason for moving the line our cases draw.'") (quoting *Dotson*).

It bears emphasis that Respondents already tried unsuccessfully to make this argument to the D.C. Circuit in *Aamer*, quoting some of the exact same language. Appellee's Br., *Aamer v. Obama*, No. 13-5223 (D.C. Cir. Sept. 4, 2013), at 19 (quoting *Wilkinson* and *Preiser*). The D.C. Circuit, following all of the Supreme Court cases Respondents cite, rejected this line of argument and confirmed the broad scope of habeas. *Aamer*, 742 F.3d at 1031-33.[2]

In this connection, Respondents also cite *Davis v. U.S. Sentencing Comm'n*, 716 F.3d 660 (D.C. Cir. 2013). Opp'n 17. *Davis*, like *Dotson*, is a parole case. Perhaps those cases would be apposite if Mr. al-Qahtani had moved to compel a Periodic Review Board, which is the closest current analog to parole in the Guantánamo context, but they have no bearing on Mr. al-

---

[2] Respondents' reliance on *Turlock Irrigation Dist. v. FERC*, 786 F.3d 18 (D.C. Cir. 2015), is puzzling at best. That case concerned a fish passage licensing process and discussed a scenario where "the two projects will not have a coordinated fish passage, which will lead to a decline in the fish population, potentially reducing the number of tourists to the river, and, consequently, the amount of money [they] will make off of tourism." *Id.* at 24. While fish lawyers everywhere would probably agree that the scenario in question was far too speculative to found judicial relief, *Turlock* is not a habeas corpus case and nothing in that case leads to the conclusion that Mr. al-Qahtani's instant request for relief is similarly tenuous.

Qahtani's instant claim that leads to judicial, not administrative relief. Indeed, Mr. al-Qahtani does not press for the establishment of a Mixed Medical Commission so he can then seek parole or some other form of administrative or discretionary release. He asks for it as a prerequisite to this Court's exercise of its habeas corpus jurisdiction over this case.

For the same reasons, the government's citation to a 2015 decision, *Salahi v. Obama*, 05-CV-569, 2015 WL 9216557 (D.D.C. Dec. 17, 2015), denying a motion to compel a Periodic Review Board hearing, is inapposite. Relief from a PRB is a matter of discretion, not legal right. Judge Royce C. Lamberth found it dispositive that the entitlement to a Periodic Review Board hearing was not pursuant to Congressional action. *See id.* at *2 ("Here, unlike *St. Cyr*, petitioner points to no statute conferring a right to periodic review of the threat he poses."). The non-discretionary relief sought here is available under a longstanding provision of domestic law implementing a treaty ratified by the Senate. Again, this Court has already correctly determined that the relief Mr. al-Qahtani seeks is "pursuant to domestic law" and is not discretionary but rather sounds in habeas as it goes to the legality of detention, not its necessity. *Aamer*, 58 F. Supp. 3d at 25.

Finally, the Ninth Circuit's decision in *Nettles v. Grounds*, 830 F.3d 922, 935 (9th Cir. 2016) (en banc), involved a request for legal relief one degree removed from a discretionary parole proceeding. In *Nettles*, a prisoner demanded to challenge a prison disciplinary determination in habeas on the grounds that it might affect a future parole board proceeding. The Ninth Circuit found that it lacked habeas jurisdiction because relief from the parole board would be discretionary and because the petitioner could attempt to expunge his disciplinary report (in order to improve his chances in a parole hearing) under 42 U.S.C. § 1983 rather than through habeas. 830 F.3d at 34-35. Again, for the reasons stated above, the instant request for relief

properly sounds in habeas as it forms part of Mr. al-Qahtani's demonstration that he is unlawfully detained under the domestic law provision of Army Regulation 190-8.

### B.  The Court Must Exercise Its Jurisdiction over Mr. al-Qahtani's Motion

In this round of litigation, as in the *Aamer* case before it, the government again demands judicial deference to the Executive's whims. *See* Opp'n 21-24 (asking Court to refrain from exercising jurisdiction). This Court has already appropriately declined to accord the government the unquestioned deference it seeks. *See Aamer*, 58 F. Supp. 3d at 25 ("[T]he Executive does not have unreviewable detention powers.").

Further, in *Al Warafi*, the court of appeals analyzed a Guantánamo prisoner's entitlement to release under domestic law and the Geneva Conventions instead of holding, as the government asserts in this case, that such an inquiry is best left to the executive branch. *See, e.g., Al Warafi*, 716 F.3d at 630 (court of appeals examining details of Geneva Conventions in context of habeas review as it discusses fact that Al Warafi "wore no such armlet and carried no such card"); *id.* at 631 (holding certain "indicia of status" to be "mandatory" pursuant to detailed analysis of Geneva Conventions); *id.* (opining on "the proof required under the Convention"); *id.* at 632 (referencing "the strong mandatory language of the Convention"). Mr. al-Qahtani only asks this Court to engage in a similar analysis of his entitlement to release. Respondents, on the other hand, would have this Court believe that the D.C. Circuit needlessly issued an opinion analyzing the Geneva Conventions where it should have simply refrained from exercising its jurisdiction.

The government's claim that this Court's exercise of its jurisdiction in this case "would […] require the Executive to launch a difficult and unprecedented policy process" to establish a Mixed Medical Commission, Opp'n 25, is also factually incorrect. During World War II, under the predecessor 1929 Geneva Convention, the United States activated Mixed Medical

Commissions beginning "in November 1943 to examine sick and wounded German prisoners to determine their eligibility for repatriation." Lt. Col. James T. McGibony, *Hospitalization and Disposition of PW Patients in the United States*, Military Rev., June 1947, at 60, 63-64.[3]

Nor is there anything daunting about the single case presented here: "From the activation of the mixed medical commission in 1943 until its deactivation in 1945, approximately 8,000 German prisoners were examined. Of this number over 1,000 were found eligible for direct repatriation which was accomplished." *Id.*; *see also*, Headquarters Army Service Forces, Office of the Provost Marshal General, *World War II, A Brief History* 500-04 (1946) (describing operations of Mixed Medical Commissions). Even under the 1949 treaty, Mixed Medical Commissions have not fallen into desuetude. *See, e.g.*, Int'l Comm. Red Cross, *Annual Report 1982* 64-65 (1982) (describing Mixed Medical Commissions in both Iraq and Iran during armed conflict); Dep't of Def., *Law of War Manual* § 9.36.5 (2015) (mandating appointment of Mixed Medical Commissions upon outbreak of hostilities).[4]

The few cases that the government cites in support of its bold demand for deference reveal themselves—even on glancing review—to be patently inapposite. *Adams v. Vance*, 570 F.2d 950 (D.C. Cir. 1978), involved a request for an order directing action by the Secretary of State in the realm of foreign affairs and *Holmes v. Laird*, 459 F.2d 1211 (D.C. Cir. 1972), concerned courts commanding treaty performance. This case is about the application of domestic law, simply put, and none of the above. *See Aamer*, 58 F. Supp. 3d at 25 ("Respondents exclaim that Petitioner's request for repatriation is substantively different from the ordinary habeas petition. Not so. Petitioner seeks release pursuant to domestic law (Army Regulation 190-8) and those portions of an international accord that it incorporates (the Third Geneva Convention).").

---

[3] Available at http://hdl.handle.net/2027/uiug.30112105093162.

[4] Available at https://www.defense.gov/Portals/1/Documents/pubs/Law-of-War-Manual-June-2015.pdf.

*Munaf v. Geren*, 553 U.S. 674 (2008), provides Respondents no succor, either. The factual circumstances in *Munaf*, which were "essential to the Court's holding," were unique and distinct from the ones this case presents. *Id.* at 706 (Souter, J., concurring). The *Munaf* petitioners were not ultimately seeking release, which is Mr. al-Qahtani's objective in his habeas corpus petition. *Id.* at 680, 689 (stating that *Munaf* petitioners challenged only their transfer to Iraqi custody). And *Munaf* involved individuals who had allegedly committed crimes within a foreign country's territory and the question whether they may be transferred to that country's government for prosecution. *Id.* at 680, 694. The Supreme Court in that case simply held that "it is for the political branches, not the judiciary, to assess practices in foreign countries" with respect to determining whether transfer is appropriate. *Id.* at 700-01. The matter at hand, in contrast, involves no such foreign relations interests, which even Respondents concede were the concerns driving the *Munaf* decision. Opp'n 22.

Finally, the government complains that there would be no principle limiting to Mr. al-Qahtani alone any relief granted here, that "any other detainee at Guantánamo who thought it appropriate" could seek examination by a Mixed Medical Commission. Opp'n 37 n.24. Respondents' floodgates argument is leaky. Mr. al-Qahtani only seeks this form of relief following detailed findings regarding the state of his mental and physical health by Dr. Emily Keram, his only independent medical examiner to date after over fifteen years in captivity. *See* ECF No. 369-1, Exs. C-E (report and supplemental declarations of Dr. Emily A. Keram). The relief Mr. al-Qahtani seeks is appropriate in his case.

## II. The Law of War Favors the Application of Domestic Law Mr. al-Qahtani Seeks

### A. Army Regulation 190-8 Is Domestic Law Applicable to Mr. al-Qahtani

The provision of domestic law at issue, Army Regulation 190-8, Section 3-12, applies to Mr. al-Qahtani, notwithstanding Respondents' protestations to the contrary. *See* Dep'ts of the Army, Navy, Air Force, and Marine Corps, Army Regulation 190-8/OPNAVINST 3461.6/AFJI 31-304/MCO 3461.1, *Enemy Prisoners of War, Retained Personnel, Civilian Internees and Other Detainees* § 3-12 (1997) ("Army Regulation 190-8"). Respondents fail to appreciate the scope of these provisions of domestic law when they suggest that the procedures outlined in Army Regulation 190-8 somehow do not reach the conflict in which Mr. al-Qahtani was taken into U.S. custody.

While this Court has rightly noted that domestic law "does not […] alter the obligations of the United States under the Geneva Conventions," *Aamer*, 58 F. Supp. 3d at 21, quoting the provision that "[i]n the event of conflicts or discrepancies between [the] [R]egulation and the Geneva Conventions, the provisions of the Geneva Conventions take precedence," Army Regulation 190-8 § 1-1, that language anticipates interpretations of domestic law that would dilute the protections guaranteed by the treaty. The language does not set a ceiling and the United States remains at liberty to expand protections by statute beyond those enshrined as a baseline in the Geneva Conventions, as it has done here through domestic law.

Outside of this Court, Respondents recognize as much, as is evidenced by a Department of Defense directive requiring compliance with the laws of war during all conflicts, "however such conflicts are characterized, *and in all other military operations*." Dep't of Def., Dir. 2311.01E, *DoD Law of War Program* ¶ 4.1 (May 9, 2006) (emphasis added). The Defense Department's new Law of War Manual also reflects the broad scope of regulations for the

treatment of prisoners, noting that "[p]ractioners are advised to consult all applicable policies and regulations, as *these, in many cases, exceed the requirements of the GPW, U.S. Statutes, and Executive Orders*." Dep't of Def., *Law of War Manual* § 9.1.3 (2015) (emphasis added). In fact, the Manual explicitly cites Army Regulation 190-8 as an example of domestic law "issued to implement law of war obligations relating to detainees and *to establish higher standards*." *Id.* at § 18.7 n.62 (emphasis added) (quoting Army Regulation 190-8 § 1-1 as implementing both customary and codified international law and encompassing detention of "those persons held during military operations other than war").

Indeed, by its own plain terms, Army Regulation 190-8 sweeps broadly to include all detainees, even "persons held during military operations other than war." *See* Army Regulation 190-8 § 1-1 ("This regulation implements international law, both customary and codified, relating to EPW, RP, CI, and ODs *which includes those persons held during military operations other than war*.") (emphasis added). This language further confirms the applicability of these provisions of domestic law to all "persons" held during a range of military operations that is even broader than those covered by the Geneva Conventions. Indeed, "military operations other than war" ("MOOTW") was a military term of art for all military operations "short of war" or a conflict under the Geneva Conventions, including, but not limited to, "combatting terrorism," "support to counterinsurgency," and "peace operations." Joint Chiefs of Staff, Joint Pub. 3-07, *Joint Doctrine for Military Operations Other Than War* vi, ix (1995).[5]

Disregarding the inconvenient facts above, Respondents attempt to drive a wedge between the treaty and the provision of domestic law that implements it in order to avoid implementing either one. They try to make hay of the reference to "eligib[ility] for direct

---

[5] While the military discontinued use of the term MOOTW in 2006, *see, e.g.,* Joint Chiefs of Staff, Joint Pub. 3-0, *Joint Operations* iii (2006), widespread use of the term contemporaneous with the promulgation of Army Regulation 190-8 guides interpretation of that provision of domestic law and illustrates the breadth of its intended application.

repatriation" in domestic law, contrasting it with the holding in *Al Warafi* regarding an "entitlement to release." Opp'n 33-34. But neither source of authority, read fairly, supports Respondents' hair-splitting.

Domestic law requires that Respondents determine Mr. al-Qahtani's eligibility for repatriation. *See* Army Regulation 190-8 § 3-12(a) ("Sick and wounded prisoners will be processed and their eligibility determined for repatriation or accommodation in a neutral third country […] according to the procedures set forth […].”). Moreover, reading the provision of domestic law together with the plain text of the Geneva Convention further clarifies that there is no room for discretion by the captor: sick prisoners who meet the criteria must be repatriated. *See* Geneva Convention Relative to the Treatment of Prisoners of War, Arts. 109-110, Aug. 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S 135 (hereinafter "Third Geneva Convention") (obligating repatriation of those who are "[w]ounded and sick who, according to medical opinion, are not likely to recover within one year, whose condition requires treatment and whose mental and physical fitness seems to have been gravely diminished"); *Al Warafi*, 716 F.3d at 629 (holding that domestic law incorporating treaty provisions must be analyzed together with those treaty provisions); *Aamer*, 58 F. Supp. 3d at 23 (same).

Finally, to the extent there is a discrepancy between the reference to "eligibility" in domestic law—and, a fortiori, *Al Warafi*'s reference to "entitlement"—and the obligation imposed by treaty, the latter controls. This Court has already held as much in the *Aamer* litigation, *see* 58 F. Supp. 3d at 21, quoting the domestic law provision that "[i]n the event of conflicts or discrepancies between [the] [R]egulation and the Geneva Conventions, the provisions of the Geneva Conventions take precedence." Army Regulation 190-8 § 1-1.[6]

---

[6] Also, to the extent that Respondents' Opposition invites confusion, Opp'n 27 n.18, the instant Motion does not call for this Court to make any threat-determination. Mr. al-Qahtani only seeks application of domestic law and,

### B.  The Law of War Is Not an Obstacle to the Instant Motion

#### 1.  *The Characterization of the Conflict Does Not Bar this Court's Application of Domestic Law*

Despite the plain text of Army Regulation 190-8 examined above, Respondents nonetheless argue that the applicability of the domestic law provisions turns on whether a conflict is characterized as international or non-international. Opp'n 27-28. But even assuming momentarily the accuracy of the government's characterization of the conflict in question as non-international, the legal conclusion the government invites this Court to draw from that single consideration would be at odds with the law in this circuit.

Indeed, in *Al Warafi*, undeterred by the government's characterization of the same conflict as non-international in nature, the court of appeals delved into the specific protections afforded "Retained Personnel" under the Geneva Conventions as it construed and applied the domestic law provisions of Army Regulation 190-8. *Al Warafi*, 716 F.3d at 629-31. If, as Respondents contend, their characterization of the conflict determined the application *vel non* of the domestic law provisions of Army Regulation 190-8, then the court of appeals would have stopped at that threshold characterization of this very conflict instead of conducting its thorough analysis.

Just as the court of appeals found that the Military Commissions Act did not bar its consideration of the claims in *Al Warafi*, *id.* at 629; *see also Aamer*, 58 F. Supp. 3d at 23, and just as it did not defer to the Combatant Status Review Tribunal's finding that the petitioner in that case was an "enemy combatant," *Al Warafi*, 716 F.3d at 627-29; *see also Aamer*, 58 F. Supp.

---

ultimately, a ruling from this Court as to the limits on the U.S. government's authority to detain him pursuant to the Authorization for Use of Military Force, Pub. L. 107-40 §2(a), 115 Stat. 224 (2001) (AUMF), as informed by Army Regulation 190-8 and the law of war. His argument in a motion for judgment would go to the legality of his current and ongoing imprisonment, not its necessity. *See Aamer*, 58 F. Supp. 3d at 25 ("Respondents exclaim that Petitioner's request for repatriation is substantively different from the ordinary habeas petition. Not so. Petitioner seeks release pursuant to domestic law […].").

UNCLASSIFIED//FOR PUBLIC RELEASE

3d at 25, the government's characterization of the conflict as non-international in nature did not stop the court of appeals from exercising its habeas jurisdiction and applying the domestic law provisions of Army Regulation 190-8. This Court should not stay its hand, either. Respondents' characterization of the conflict does not end the inquiry.

### 2. *This Court Need Not Be the First to Rule on the Nature of the Conflict*

While this Court need not address the nature of the conflict in order to grant Mr. al-Qahtani the relief he seeks, it is important to note that there is no controlling authority finding that the conflict out of which Mr. al-Qahtani's open-ended imprisonment arose was non-international in nature. Respondents seem to misread the Supreme Court's jurisprudence on this point. The Supreme Court specifically did not reach the question because it found that *at least* Common Article 3 of the Geneva Conventions applies, since that provision reaches both international and non-international armed conflicts, and that was enough for the Supreme Court to decide the case before it. *See Hamdan v. Rumsfeld*, 548 U.S. 557, 628-29 (2006) ("We need not decide the merits of this argument because there is at least one provision of the Geneva Conventions that applies here even if the relevant conflict is not one between signatories.").[7]

The court of appeals has not squarely addressed the characterization of the conflict at issue, either, and a recent concurring opinion suggests an acceptance that it is an open question. *See Al Warafi*, 716 F.3d at 633 (Brown, J., concurring), *cert. denied*, 134 S. Ct. 2134 (2014) ("Because Al Warafi has failed to produce the requisite indicia of protected status, however, we

---

[7] By contrast, the reasoning of the President's February 2002 statement, which Respondents continue to rely on here, Opp'n 28, was itself soundly rejected in *Hamdan*. *See Hamdan v. Rumsfeld*, 548 U.S. 557, 630 (2006) ("The Court of Appeals thought, and the Government asserts, that Common Article 3 does not apply to Hamdan because the conflict with al Qaeda, being 'international in scope,' does not qualify as a 'conflict not of an international character.' That reasoning is erroneous.") (internal citations and quotation marks omitted).

UNCLASSIFIED//FOR PUBLIC RELEASE

need not reach the vexing questions whether Al Warafi was a member of a transnational terrorist organization or the armed forces of a High Contracting Party [...].").

No higher court has ruled that the conflict out of which Mr. al-Qahtani's open-ended imprisonment arose is non-international in nature. For the reasons outlined above, this Court need not be the first to do so and can decide the instant Motion in Mr. al-Qahtani's favor as a straightforward application of domestic law in a habeas corpus petition.

### 3. Army Regulation 190-8 Protects Mr. al-Qahtani Because He Was Captured During an International Armed Conflict

Should the Court nevertheless choose to accept Respondents' framing of the issues despite *Al Warafi*, for purposes of the present motion it can presume that Mr. al-Qahtani was taken captive during an international armed conflict and retains the protections afforded by the domestic law provisions of Army Regulation 190-8. Mr. al-Qahtani was allegedly taken into U.S. custody in December of 2001, and rendered to Guantánamo on February 13, 2002. *See* Reprieve, *The Journey of Death—Over 700 Prisoners Illegally Rendered to Guantanamo Bay with the Help of Portugal*, Jan. 28, 2008, at 16 (noting that Mr. al-Qahtani was rendered on that date by flight to Guantánamo from Incirlik, Turkey, and via Portuguese territory).[8] The government concedes that the United States still characterized the conflict at that point in time as an international armed conflict.[9] Opp'n 29 n.19; *see also* International Committee of the Red Cross, *News Release: Geneva Convention on prisoners of war*, Feb. 9, 2002 (welcoming "the United

---

[9] Mr. Al-Qahtani has not conceded that he was taken into U.S. custody during a non-international armed conflict. *See, e.g.,* Mot. to Compel Mixed Medical Commission, ECF No. 369-1, Ex. A, at 3 (stating only that conflict that gave rise to Mr. al-Qahtani's captivity "may or may not have been a conventional war between two nations").

[9] Mr. Al-Qahtani has not conceded that he was taken into U.S. custody during a non-international armed conflict. *See, e.g.,* Mot. to Compel Mixed Medical Commission, ECF No. 369-1, Ex. A, at 3 (stating only that conflict that gave rise to Mr. al-Qahtani's captivity "may or may not have been a conventional war between two nations").

States' reaffirmation of the applicability of the Third Geneva Convention to the international

armed conflict in Afghanistan").[10]

There is also no dearth of authoritative commentary confirming this characterization of

the conflict at that historical juncture. *See, e.g.,* Françoise J. Hampson, *Afghanistan 2001-2010*,

in *International Law and the Classification of Conflicts*, Elizabeth Wilmshurst, ed., at 242-43

(2012) (noting existence of international armed conflict in Afghanistan between the Taliban and

al-Qaeda, on one side, and the United States and coalition partners, on the other, from October

2001 at least until installation of Hamid Karzai as President of Afghanistan in June 2002); Robin

Geiss & Michael Siegrist, *Has the Armed Conflict in Afghanistan Affected the Rules on the

Conduct of Hostilities*, 93 Int'l Rev Red Cross 11, 13 (2011) (stating it is "widely accepted" that

there was an "international armed conflict" between U.S. forces and "the Taliban governing

Afghanistan, lasting from 7 October 2001 to 18 June 2002"); Gary D. Solis, *The Law of Armed

Conflict: International Humanitarian Law in War* 211 (2010) (stating that U.S. invasion of

Afghanistan in October 2001 initiated "an armed conflict between two state parties to the 1949

Geneva Convention, a common Article 2 international armed conflict" to which "the 1949

Geneva Conventions in their entirety" applied).[11]

Irrespective of whether the conflict in Afghanistan remained international in nature after

June 2002, Mr. al-Qahtani retains today the protections he enjoyed pursuant to the domestic law

provisions of Army Regulation 190-8 and international humanitarian law at the time of his

capture during an international armed conflict. *See* Third Geneva Convention, Art. 5 (stating that

---

[10] Available at https://www.icrc.org/eng/resources/documents/misc/57jrm3.htm.

[11] One respected scholar of international humanitarian law goes even further, not only agreeing that the conflict was international in nature from its inception, but arguing that it remained international past the installation of Hamid Karzai and at least through the time of writing in 2011. Yoram Dinstein, *Terrorism and Afghanistan*, in International Law Studies, Vol. 85, *The War in Afghanistan: A Legal Analysis*, Michael N. Schmitt, ed., at 51 (2011).

prisoners of war retain that status "until their final release and repatriation"). In Iraq, for example, prisoners in U.S. custody prior to the transfer of sovereignty on June 28, 2004, retained any status and protections that they enjoyed under the Geneva Conventions even after that date and the transformation of that conflict.

Of course, this Court can characterize the conflict out of which this case arose as an international armed conflict regardless of Respondents' view. *See United States v. Noriega*, 808 F. Supp. 791 (S.D. Fla. 1992) (determining over government objections that U.S. invasion of Panama was an international armed conflict two years after that conflict was over, that the Third Geneva Convention applied, and that Manuel Noriega remained a prisoner of war); *see also Al Warafi v. Obama*, No 09-cv-2368 (RCL), 2015 WL 4600420, at *5, *7 (D.D.C. July 30, 2015) (rejecting "proposition that it is the President and not this Court who must decide whether active hostilities exist" and holding that hostilities are ongoing).

In light of his capture in 2001, while an international armed conflict raged in Afghanistan, Mr. al-Qahtani retains the protections afforded by the domestic law provisions of Army Regulation 190-8 and those parts of the Geneva Conventions it incorporates.

### 4. *Army Regulation 190-8 Would Protect Mr. al-Qahtani Even if He Had Been Captured During a Non-International Armed Conflict*

Finally, even accepting for the sake of argument Respondents' characterization of the context of Mr. al-Qahtani's imprisonment as a non-international armed conflict, and their claim that the Court is therefore restricted in its consideration of the limits that law of war principles impose on AUMF detention authority, then, still, that would not leave Mr. al-Qahtani at the absolute mercy of Respondents' whims and without legal protection or recourse to release on grounds of illness.

UNCLASSIFIED//FOR PUBLIC RELEASE

In a non-international armed conflict, Mr. al-Qahtani would remain under the protection of Common Article 3 to the Geneva Conventions and other customary provisions of international humanitarian law as well as international human rights law. *See, e.g., Hamdan*, 548 U.S. at 631 (holding that Common Article 3 applies to prisoners at Guantánamo Bay). Common Article 3 encompasses the obligation to repatriate ill prisoners like Mr. al-Qahtani. Indeed, expounding customary law as to the protection of detainees, the Appeals Chamber of the International Criminal Tribunal for the former Yugoslavia has held that "Common Article 3 of the Geneva Conventions reflects the same spirit of the duty to protect members of armed forces who have laid down their arms and are detained as the specific protections afforded to prisoners of war in Geneva Convention III as a whole." *Prosecutor v. Mile Mrkšić* (Vukovar Hospital Case), IT-95-13/1-A, Judgment (May 5, 2009), para. 70.[12]

A leading scholar concurs, noting that, while "[t]he standards set forth in Common Article 3 and in Protocol I article 75 do not address the issue of repatriating detainees who are sick or severely injured," the requirement for humane treatment in both provisions compel him to view "the standards set forth in Geneva Convention III article 110 as establishing general benchmarks for humane treatment," and to conclude that if "any of the detainees at present or in the future reach such stages of mental or physical fitness, the obligation of humane treatment imposed on the United States requires termination of their captivity." Sean D. Murphy, *Evolving Geneva Convention Paradigms in the War on Terrorism: Applying the Core Rules to the Release of Persons Deemed Unprivileged Combatants*, 75 Geo. Wash. L. Review 1105, 1162–63 (2006-07).

Thus, irrespective of whether or how the conflict out of which Mr. al-Qahtani's imprisonment arose is characterized, this Court should continue to exercise its habeas corpus

---

[12] Available at http://www.icty.org/x/cases/mrksic/acjug/en/090505.pdf.

UNCLASSIFIED//FOR PUBLIC RELEASE

jurisdiction in application of the relevant protections that Mr. al-Qahtani enjoys under the domestic law provisions of Army Regulation 190-8.

### III. DOMESTIC LAW AND THE LAW OF WAR REQUIRE AN INDIVIDUALIZED STATUS DETERMINATION BY A COMPETENT TRIBUNAL

This Court has previously articulated its skepticism with respect to the "enemy combatant" designations issued by Combatant Status Review Tribunals. In *Aamer*, this Court explained that "while a CSRT designated [Aamer] an 'enemy combatant,' that classification is not recognized in Army Regulation 190-8," *Aamer*, 58 F. Supp. 3d at 24, noting that it was "apparently jettisoned" by the Obama Administration years ago, *id.* at 25, and finding "questionable […] Respondents' contention that Petitioner's designation as an 'enemy combatant' by a CSRT precludes him from being treated as an 'other detainee' under Army Regulation 190-8." *Id.*[13]

Under the law of war, if any doubts arise as to whether a person belongs to any of the categories enumerated in Article 4 of the Third Geneva Convention, such a person, characterized as an "other detainee," is to be treated and enjoys the protection of the Convention as an enemy prisoner of war until such time as their status has been determined by a competent tribunal. *See* Army Regulation 190-8, Appendix B, § II – Terms; *id.* at §1-6(a); Third Geneva Convention, Art. 5. As the Court has already noted, "Section 3-12 states that detainees who are, *or are being treated as*, enemy prisoners of war or retained personnel are 'eligible for direct repatriation'" if certain conditions are met. *Aamer*, 58 F. Supp. 3d at 22 (emphasis added). As an "other detainee,"

---

[13] The government acknowledges, as it must, this Court's earlier observation that "the Executive Branch no longer uses the term 'enemy combatant.'" Opp'n 31 n.21; *see also Aamer*, 58 F. Supp. 3d at 25. However, it does not take a position on whether or not the term remains a valid designation, as it did in its earlier opposition filed before this Court in *Aamer*. *See* Resp'ts' Opp'n to Pet'r's Mot. to Compel Exam. by Mixed Medical Commission at 3 n.2, *Aamer v. Obama*, 04-CV-2215, ECF No. 281 (stating outright that "the U.S. Government no longer uses the term 'enemy combatant'"). Instead, it states that "[t]he change… does not undermine the individual determination … that Petitioner is part of al-Qaida forces." Of course, the actual determination made by the CSRT was that Petitioner "remains" an "enemy combatant." Opp'n 31 n.21.

UNCLASSIFIED//FOR PUBLIC RELEASE

Mr. Al-Qahtani is entitled to the examination by a Mixed Medical Commission that he seeks through this Motion and, ultimately, to the relief of release.

Refusing to accept the above, Respondents instead attempt to recycle rejected arguments in the form of a spurious syllogism, contending that "because the President already determined that al-Qaida forces are not entitled to prisoner of war status, and a CSRT determined that Petitioner was part of those forces, Petitioner is not an 'other detainee' under [Army Regulation] 190-8." Opp'n 32. In sum and substance, the government now argues that the key legal determination was actually made upstream of the Combatant Status Review Tribunal, in blanket fashion, by the President himself, when he decided that al-Qaida and Taliban affiliated individuals did not qualify for the protections afforded by the Geneva Conventions. *See* Opp'n 29 (citing President George W. Bush's February 7, 2002 announcement that al-Qaida and Taliban forces did not qualify for prisoner of war status).

Notwithstanding the government's attempt to usurp a judicial prerogative, and Respondents' presumptuous claim that "the Executive has already determined that the relevant provisions do not apply to Petitioner as a matter of law," Opp'n at 22, there can be no real question that the interpretation of domestic law and the adjudication of habeas corpus petitions are squarely within the judiciary's authority. *See, e.g., Boumediene v. Bush,* 553 U.S. 723, 781-82 (2008) (holding that for the "writ [to] be effective…[t]he habeas court must have sufficient authority to conduct a meaningful review of both the cause of detention and the Executive's power to detain"); *Marbury v. Madison*, 5 U.S. (1 Cranch) 53, 137, 177 (1803) ("It is the province and duty of the judicial department to say what the law is. Those who apply the rule to particular cases, must of necessity expound and interpret that rule."); *see also Sanchez-Llamas v. Oregon*, 548 U.S. 331, 353-54 (2006) ("If treaties are to be given effect as federal law under our

UNCLASSIFIED//FOR PUBLIC RELEASE

legal system, determining their meaning as a matter of federal law 'is emphatically the province and duty of the judicial department,' headed by the 'one supreme Court' established by the Constitution.") (quoting *Marbury*, 5 U.S. (1 Cranch) at 137, 173, 177). Simply put, it is not the Executive's province to say what the law is here.

In *Hamdan v. Rumsfeld*, the Supreme Court already rejected many of the arguments Respondents repackage here. It disagreed with the contention "that the war with al Qaeda evades the reach of the Geneva Conventions." 548 U.S. at 628. It was not persuaded by the notion that the petitioner, a Guantánamo prisoner like Mr. al-Qahtani, was "not entitled" to the protections of the Geneva Conventions. *Id.* at 625-26. And, crucially, the Supreme Court expressly reserved the question of Hamdan's potential status under Army Regulation 190-8 and the Geneva Conventions, regardless of Respondents' refrain then and now that the Executive has unilaterally resolved that very question. *See id.* at 630 n.61 ("Because we hold that Hamdan may not, in any event, be tried by the military commission the President has convened […], the question whether *his potential status as a prisoner of war* independently renders illegal his trial by military commission may be reserved.") (emphasis added).[14]

Here, both domestic law and the law of war require an individualized determination of a detainee's status, precluding the sort of categorical presidential assessment the government appears to rely upon in the latest iteration of its argument. If there is any doubt as to whether a "person" is a prisoner of war, domestic law provides that a "competent tribunal shall determine

---

[14] To the extent that Respondents seem to rely on the D.C. Circuit's opinion in *Hamdan v. Rumsfeld*, 415 F.3d 33 (D.C. Cir. 2005), *see, e.g.*, Opp'n 31, suffice it to say that the court of appeals was reversed in *Hamdan v. Rumsfeld*, 548 U.S. 557 (2006), and that a judge on the court of appeals expressly noted that the D.C. Circuit's *Hamdan* decision is "an opinion that is not precedential." *Al-Bihani v. Obama*, 619 F.3d 1, 21 (2010) (Kavanaugh, J., concurring).

the status" of any such person. Army Regulation 190-8 § 1-6.[15] The Geneva Conventions themselves also require it. *See* Third Geneva Convention, Art. 5 (stating that in cases of doubt individuals shall be treated as prisoners of war "until such time as their status has been determined by a competent tribunal").

Of course, the President is not a competent tribunal. Two Supreme Court Justices concurring in the judgment in *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004), stated as much in unequivocal terms. Reacting to the government's argument that "the President's determination that Taliban detainees do not qualify as prisoners of war is conclusive as to Hamdi's status and removes any doubt that would trigger application of the Convention's tribunal requirement," the Justices note that "reliance on this categorical pronouncement to settle doubt is apparently at odds with […] Army Regulation 190–8, ch. 1, §§ 1–5, 1–6 (1997), adopted to implement the Geneva Convention, and setting out a detailed procedure for a military tribunal to determine an individual's status." *Hamdi*, 542 U.S. at 550 (Souter, J., concurring).

Then as now, the government professed adherence to the law of war and respect for the principles embodied in the Geneva Conventions. *See, e.g.*, Opp'n 27. But the Justices concluded "that the Government has not made out its claim that in detaining Hamdi in the manner described, it is acting in accord with the laws of war." *Hamdi*, 542 U.S. at 551 (Souter, J., concurring).[16]

Thus, in the absence of an individualized status determination by a competent tribunal, Mr. al-Qahtani must be treated as an "other detainee" who is entitled to the protections afforded

---

[15] This provision of domestic law even provides that a detainee who "committed a belligerent act" against the United States or its allies may be "determined by a competent tribunal not to be entitled to prisoner of war status." Army Regulation 190-8 § 1-6(g). No competent tribunal has ever found Mr. al-Qahtani to have committed a belligerent act.

[16] Scholars as eminent as Harold Koh, who recently served as the Legal Adviser at the U.S. Department of State, agree. *See* Harold Hongju Koh, *The Case Against Military Commissions*, 96 Am. J. Int'l L. 337, 340 n.21 (2002) (noting that "[a] correct application of the Geneva Conventions would have required that all detainees in U.S. custody be presumed" to be POWs "until each had his status individually determined by the 'competent tribunal' required by Article 5 of Geneva Conventions" and that the Conventions did not allow the President "to make his own blanket determination that all detainees are per se unlawful combatants").

enemy prisoners of war, including direct repatriation following an examination by a Mixed Medical Commission upon request.

## IV.  MR. AL-QAHTANI IS ENTITLED TO INJUNCTIVE RELIEF

Respondents' claim that the relief Mr. al-Qahtani seeks is inappropriate for a preliminary injunction misconstrues the law. First, Respondents' argument that Petitioner "actually seeks a permanent injunction requiring the United States Government to establish a Mixed Medical Commission," Opp'n 24, misses the fact that Respondents are already under a legal obligation to establish such a Commission. Army Regulation 190-8 mandates that "[p]rocedures for a Mixed Medical Commission *will be* established [...] according to this regulation and Annex II" of the Third Geneva Convention. Army Regulation 190-8 § 3-12(a)(2).

Second, Mr. al-Qahtani does not ask that Respondents *permanently* establish a Mixed Medical Commission, but simply that they convene one for purposes of assessing him and further confirming his eligibility for direct repatriation. Moreover, Respondents' suggestion that doing so would "impose substantial hardships," Opp'n 27, ignores the provision in domestic law of detailed guidance for Mixed Medical Commissions, even including relevant forms. *See, e.g.,* Army Regulation 190-8 § 3-12 & p.53 (DA Form 2670-R, "Mixed Medical Commission Certificate for EPW").

Finally, Respondents' insistence that preliminary injunctions are only appropriate to preserve the status quo overlooks the fact that such injunctions can be mandatory as well as prohibitory. *See, e.g., Simms v. Dist. of Columbia*, 872 F. Supp. 2d 90, 94 n.5 (D.D.C. 2012) (granting preliminary injunction requiring government to return seized car pending forfeiture proceedings and rejecting contention that mandatory injunction requires different burden).

In any event, Mr. al-Qahtani should prevail whether his request for relief is construed as

UNCLASSIFIED//FOR PUBLIC RELEASE

one for a preliminary or a permanent injunction. The record now before this Court shows that Mr. al-Qahtani has suffered from psychosis from his adolescence to the present day. *See* Supplemental Decl. of Dr. Emily A. Keram, M.D., in Resp. to Decl. of Senior Med. Officer, Joint Med. Group, JTF-GTMO (Sept. 12, 2017), attached as Ex. G ("Keram Resp. Decl."), at ¶ 3. The Senior Medical Officer at Guantánamo does not contest this fact. His declaration, which Respondents submitted with their Opposition, largely corroborates Dr. Keram's findings and diagnoses, supplying but the latest in a long string of similar conclusions regarding Mr. al-Qahtani's mental health reached by various observers, including Saudi doctors and the Federal Bureau of Investigation. *Id.* Notwithstanding the Senior Medical Officer's cautious hesitation, as Dr. Keram states, "beginning in adolescence al-Qahtani exhibited *all* of the diagnostic criteria for Schizophrenia" listed in the DSM-5. *Id.* at ¶¶ 5-7 (emphasis added). Additionally, he presents "significant symptoms of PTSD *in excess of* those required to meet the DSM-5 diagnostic criteria." *Id.* at ¶ 8 (emphasis added). Indeed, Mr. al-Qahtani's physical and psychiatric condition is so grave that he "will likely require lifelong mental health care," and he "cannot receive effective treatment for his current mental health conditions while he remains in U.S. custody at GTMO or elsewhere, despite the best efforts of available and competent clinicians." Keram Report, Ex. C, at 8-9; *see also* Keram Resp. Decl., Ex. G, at ¶¶ 12-14, 18, 22 (reaffirming conclusion that Mr. al-Qahtani cannot receive effective treatment at Guantánamo).

Medication, the focus of the Senior Medical Officer's declaration, would be at best palliative, not a magic bullet. *See* Keram Supp. Decl., Ex. D, at ¶ 6; Keram File Rev. Decl., Ex. E, at ¶ 10. Given the severity of his diagnosis and his history, Mr. al Qahtani requires multi-modal treatment with the involvement of his family, far from the place where he was tortured. *See* Keram Supp. Decl., Ex. D, at ¶ 6; Keram Report, Ex. C, at 9.

UNCLASSIFIED//FOR PUBLIC RELEASE

Respondents' argument that Mr. al-Qahtani's purported refusal to deal with Guantánamo medical personnel is somehow surprising or blameworthy, Opp'n 39-40, is itself shameless in light of the record before this Court.[17] Mr. al-Qahtani suffers from psychosis and PTSD caused by torture and mistreatment at Guantánamo planned and facilitated by medical personnel there, who were actively involved in its implementation. Pet'r's Mot., ECF No. 369, at 3-6. What Dr. Keram originally concluded should be patently obvious to any observer: "It is impossible for Mr. al-Qahtani to form an effective doctor-patient relationship with clinician members of the Joint Medical Group (JMG)." Keram Supp. Decl., Ex. D, at ¶ 5. Indeed, it has been extremely difficult for him to accept the intervention of *any* mental health professionals for this reason. *Id*. at ¶ 7. Under such circumstances, refusal of treatment, in and of itself, would be a rational response to trauma exposure and the victim's desire to mitigate his symptoms. *Cf.* Keram File Rev. Decl., Ex. E, at ¶ 6(b). Dr. Keram's supplemental responsive declaration, submitted with this Reply, notes that the Senior Medical Officer's observations about Mr. al-Qahtani's occasional resistance to interacting with Guantánamo medical staff demonstrates that the military's "clinicians have an incomplete understanding of al-Qahtani's mental health history, current symptoms, and concerns about treatment." Keram Resp. Decl., Ex. G, at ¶ 20. His interactions and acceptance of antipsychotic medications confirm that he "believe[s he] ha[s] a mental illness" and "has a strong desire to reduce his symptoms of PTSD and Schizophrenia." *Id*. at ¶ 22.

At any rate, the domestic law provisions of Army Regulation 190-8 nowhere state that only prisoners who submit fully to their captors' regular medical staff—as opposed to a Mixed Medical Commission—are entitled to repatriation and other protections.

---

[17] It is, for example, remarkable that a medical professional would note, in a declaration relating to a schizophrenic patient, that he could "make a request" for treatment at any time, Opp'n, Ex. 1, at ¶ 8, or to characterize such a patient's lack of active engagement as "voluntar[y]." *Id*. at ¶ 10. Perhaps this is unsurprising given that the Senior Medical Officer doesn't appear to have ever met Mr. al-Qahtani. *Id*. at ¶ 3.

Taken together, Dr. Keram's findings, along with Respondents' own declaration by their Senior Medical Officer at Guantánamo—not to mention earlier findings by other observers—firmly support Mr. al-Qahtani's request for relief. The conditions that both Dr. Keram and the Senior Medical Officer have diagnosed "are so chronic as to preclude recovery in spite of treatment at Guantánamo Bay." Keram Resp. Decl., Ex. G, at ¶ 4; *see also* Army Regulation 190-8, ch.3, §12(l)(2) (mandating repatriation of prisoners whose condition is "chronic to the extent that prognosis appears to preclude recovery in spite of treatment within [one] year from inception of disease or date of injury"); Third Geneva Convention, Art. 110 (obligating repatriation of those who are "[w]ounded and sick who, according to medical opinion, are not likely to recover within one year, whose condition requires treatment and whose mental and physical fitness seems to have been gravely diminished"). These overlapping diagnoses confirm that Mr. al-Qahtani's examination by a Mixed Medical Commission is both necessary and appropriate.

## CONCLUSION

For the reasons stated above and in Mr. al-Qahtani's Motion, the Court should grant the relief sought and immediately order Respondents to assist, facilitate, and expedite an examination of Mr. al-Qahtani by a Mixed Medical Commission that would further establish his eligibility for direct repatriation under Army Regulation 190-8.[18]

---

[18] Should the Court not wish to order the government to convene a Mixed Medical Commission, then it should order briefing and rule on a motion for judgment on the basis of the medical expert findings that are already before it, notwithstanding this Court's earlier rulings in *Aamer* that such relief should proceed through a request for a Mixed Medical Commission under Army Regulation 190-8. The Court has already rightly held in *Aamer* that a motion for judgment on the grounds set forth in the domestic law provisions of Army Regulation 190-8 properly sounds in habeas and that the Court possesses the jurisdiction to rule on such a motion. Whatever the path ultimately determined to be appropriate, this Court must exercise its jurisdiction.

Dated: September 12, 2017

Respectfully submitted,

_____/s/_____
Ramzi Kassem
(pursuant to LCvR 83.2(g))
**Main Street Legal Services, Inc.**
City University of New York School of Law
2 Court Square
Long Island City, NY 11101
(t) (718) 340-4558
(f) (718) 340-4478
(e) ramzi.kassem@law.cuny.edu

Lawrence S. Lustberg
(pursuant to LCvR 83.2(g))
**Gibbons P.C.**
One Gateway Center
Newark, NJ 07102-5310
(t) (973) 596-4731
(f) (973) 639-6285
(e) LLustberg@gibbonslaw.com

Shayana Kadidal
(D.C. Bar No. 454248)
**Center for Constitutional Rights**
666 Broadway, 7th Floor
New York, NY 10012
(t) (212) 614-6438
(f) (212) 614-6499
(e) kadidal@ccrjustice.org

Sandra Babcock
(pursuant to LCvR 83.2(g))
**International Human Rights Clinic**
Cornell University School of Law
158A Myron Taylor Hall
Ithaca, NY 14853
(t) (607) 255-5278
(f) 607) 255-7193
(e) slb348@cornell.edu

UNCLASSIFIED//FOR PUBLIC RELEASE

**EXHIBIT G**

Supplemental Declaration of Dr. Emily Keram in Response to Declaration of Senior Medical
Officer, Joint Medical Group, JTF-GTMO
(September 12, 2017)

EMILY A. KERAM, MD
1160 N. DUTTON AVENUE, SUITE 255
SANTA ROSA, CA 95401
TEL: 707.525.0800 FAX: 707.526.8868

**Supplemental Declaration in Response to Declaration
of Senior Medical Officer, Joint Medical Group, JTF-GTMO**

1. The following is my response to the August 21, 2017 declaration of the Senior Medical
Officer (SMO) for the Joint Medical Group (JMG) of Joint Task Force Guantánamo Bay
(JTF GTMO), in Cuba.

2. The SMO's declaration corroborates my earlier finding that al-Qahtani has a diagnosis of
a psychotic disorder. In arriving at al-Qahtani's psychiatric diagnosis, the SMO did not
interview al-Qahtani but relied on discussions with JMG Psychiatric consultants treating
al-Qahtani, JMG Behavior Health Unit (BHU) reports, the observations of Joint
Detention Group (JDG) guards in 2016, and records from al-Qahtani's June 2016
Periodic Review Board (PRB) which described al-Qahtani's pre-detention history of
psychotic symptoms. (SMO Declaration, paras. 3, 15, and 17.)

3. As noted in my declaration for the PRB, in formulating al-Qahtani's psychiatric
diagnosis, in addition to interviewing al-Qahtani himself, I interviewed al-Qahtani's
brother, who stated al-Qahtani developed psychotic symptoms during adolescence. These
included paranoid delusions, auditory hallucinations, incoherent speech, and behavioral
disturbance including being found in a dumpster by police. These symptoms resulted in
al-Qahtani's academic and occupational failure. I obtained objective evidence for al-
Qahtani's diagnosis of psychotic disorder when I reviewed inpatient treatment records
from al-Qahtani's hospitalization for an acute psychotic episode in May 2000. Al-Qahtani
was taken into police custody after experiencing paranoid delusions, auditory
hallucinations, and running semi-dressed through the streets of Mecca, Saudi Arabia.
Federal Bureau of Investigation (FBI) agents observed symptoms consistent with
psychosis (speaking to non-existent people, apparent auditory hallucinations) in
November 2002. During my evaluation of al-Qahtani in 2015 and 2017 he endorsed
contemporaneous auditory hallucinations. The JDG guards' observation of al-Qahtani's
psychotic symptoms in 2016, including picking at the air, talking to himself, and sitting
or standing in one position for hours at a time (SMO Declaration, para. 17) further
support my finding.

4. The SMO's declaration supports my earlier finding that al-Qahtani cannot develop an
effective treatment relationship with JMG clinicians. The SMO wrote that al-Qahtani
demonstrated an unwillingness "to meet with BHU staff in a manner that allows him to
fully discuss treatment of his mental status and behavior." (SMO Declaration, para. 10.)
The SMO described al-Qahtani's "refusal to fully participate in BHU services." (SMO
Declaration para. 15.) The SMO documented the lack of a therapeutic relationship
between al-Qahtani and JMG clinicians, but did not offer an opinion regarding its basis.
Please see paragraphs 12-15 and 22, below, for my findings on this issue. In fact, the

conditions that both the SMO and I have diagnosed are so chronic as to preclude recovery in spite of treatment at Guantánamo Bay.

5. It remains my opinion that al-Qahtani's psychiatric diagnoses are Schizophrenia and Posttraumatic Stress Disorder. While the SMO concurs that al-Qahtani has a psychotic disorder, he offers a diagnosis of an Unspecified Psychotic Disorder because al-Qahtani's "symptoms do not meet all the diagnostic criteria for psychotic disorder, such as Schizophrenia." (SMO Declaration para. 15.) The SMO does not describe how al-Qahtani's symptoms fail to meet these diagnostic criteria.

6. The Diagnostic and Statistical Manual, 5th edition, (DSM-5) of the American Psychiatric Association provides diagnostic criteria for Schizophrenia—specifically, two or more of the following, each present for a significant portion of time during a one-month period: delusions, hallucinations, disorganized speech, grossly disorganized or catatonic behavior, or negative symptoms (diminished emotional expression or avolition); for a significant portion of the time since the onset of the disturbance, level of functioning in one or more areas, such as work, interpersonal relations, or self-care, is markedly below the level achieved prior to the onset; continuous signs of the disturbance for at least six months (may include prodromal or residual symptoms); and other diagnoses must be ruled out.

7. As noted above, beginning in adolescence al-Qahtani exhibited all of the diagnostic criteria for Schizophrenia. The diagnostic criteria do not require the presence of continuous acute symptoms. It is not uncommon for negative symptoms of schizophrenia to predominate over time.

8. At the time of my 2015 and 2017 evaluations of al-Qahtani he endorsed significant symptoms of PTSD in excess of those required to meet the DSM-5 diagnostic criteria. He endorsed symptoms in each of the five categories listed, In addition to exposure to actual and threatened death, serious injury, and sexual violence at Guantánamo (GTMO), al-Qahtani endorsed symptoms in each of the four categories listed. These include intrusive symptoms (intrusive and distressing memories, nightmares, and intense psychological distress and physical reactivity on exposure to reminders of trauma); avoidance of reminders of the traumatic event (avoidance of memories and avoidance of JMG clinicians); negative alterations in cognitions and mood (feeling "broken," experiencing horror, anger, and shame); and marked alterations in arousal and reactivity (irritability, hypervigilance, insomnia, exaggerated startle response, and decreased concentration).

9. The SMO's declaration indicates that al-Qahtani is diagnosed with an Unspecified Depressive Disorder and that "BHU has been unable to confirm that Mr. al-Qahtani's non-specific symptoms are related to PTSD, given his refusal to fully participate in BHU services." (SMO Declaration, para. 15.) However, the extreme torture to which al-Qahtani was subjected at GTMO, as well as the medical and mental health consequences of this torture (including medical hospitalization) are well-documented. This documentation is presumably available to JMG clinicians, whom the SMO described as, "familiar with his complete medical and mental health history." (SMO Declaration para. 3.)

2

UNCLASSIFIED//FOR PUBLIC RELEASE

10. The documented torture to which al-Qahtani was subjected at GTMO should have led BHU clinicians to broach this history and conduct a PTSD symptom review with al-Qahtani. During my evaluations of al-Qahtani he stated that no BHU clinician had discussed torture or conducted a PTSD symptom review with him.

11. I note that the SMO relied on external records to support a diagnosis of a psychotic disorder. He apparently did not give similar weight to the sections of my declarations that discussed al-Qahtani's symptoms and diagnosis of PTSD.

12. As noted in paragraph 4 above, it is my opinion that al-Qahtani cannot receive effective treatment for PTSD at GTMO. Al-Qahtani was subjected to extremely dehumanizing, degrading, and humiliating torture at GTMO. This torture resulted in profound disruption of his dignity, sense of self, and personhood. These effects were amplified by al-Qahtani's pre-existing psychotic disorder.

13. JTF personnel, including JMG clinicians, directly participated in al-Qahtani's torture at GTMO. This is the context in which al-Qahtani intermittently refuses to engage with current JMG and BHU clinicians. It is unreasonable to believe that a survivor of torture could divorce his experience of torture from reminders of that torture. For al-Qahtani, this incomprehensible violation of a clinician's primary duty to their patient ("first do no harm") resulted in an irreparable rupture in the trust that forms the basis of a therapeutic clinician-patient relationship. To maintain that the passage of time would mitigate this betrayal is to deny a patient his dignity.

14. Other factors pose impediments to effective treatment at GTMO. Indefinite detention is, of itself, traumatizing as it devastates any attempt the individual makes to re-establish some semblance of personal agency. Rotations of JMG clinicians preclude the development of the long-term therapeutic relationship required for trauma recovery. The SMO posited that long-term linguists create continuity of care. (SMO Declaration para. 5.) I do not find this argument persuasive. A linguist does not deliver care and is not a medical professional. They should not be relied upon to act as a clinical member of a treatment team. Furthermore, linguists at GTMO may come from cultural or religious backgrounds that make trust difficult for detainees to establish.

15. The SMO's declaration states, "JMG Clinicians receive training to equip them to provide quality care in a detention setting by ensuring that they have a working knowledge and understating of the requirements and standards for providing health care to detainees." (SMO Declaration, para. 5.) There are no standards for providing psychiatric care to detainees who have been tortured while they remain in the environment in which they were tortured. Similarly, there are no standards for the provision of care to detainees who have been tortured by the clinician members of the authority that perpetrated the torture.

16. The SMO's declaration states, "The level and type of treatment provided to a detainee is dependent on the accepted medical standard of care for the condition being treated." (SMO Declaration para. 7.) However, BHU clinicians do not provide care for PTSD as outlined in several well-accepted practice guidelines. These include the following:

UNCLASSIFIED//FOR PUBLIC RELEASE

a.  Clinical Practice Guideline for the Management of Posttraumatic Stress Disorder and Acute Stress Disorder, United States Department of Veterans Affairs and United States Department of Defense, 2017;[1]

b.  Clinical Practice Guideline for the Treatment of Posttraumatic Stress Disorder, American Psychological Association, 2017;[2]

c.  Practice Guideline for the Treatment of Patients with Acute Stress Disorder and Posttraumatic Stress Disorder, American Psychiatric Association, 2004;[3] and

d.  Guideline Watch Practice Guideline for the Treatment of Patients with Acute Stress Disorder and Posttraumatic Stress Disorder, American Psychiatric Association, 2009.[4]

17. These practice guidelines review effective evidence-based treatments for PTSD. In the interest of brevity, I will provide just one example. The VA/DoD practice guideline recommends individual, manualized trauma-focused therapies over medication treatment. Recommended therapies have a primary component of exposure and/or cognitive restructuring. Recommended modalities included Prolonged Exposure Therapy, Cognitive Processing Therapy (CPT), Eye Movement Desensitization and Reprocessing (EMDR), specific cognitive behavioral therapies for PTSD, Brief Eclectic Psychotherapy (BEP), Narrative Exposure Therapy (NET), and written narrative exposure. Clinical Practice Guideline for the Management of Posttraumatic Stress Disorder and Acute Stress Disorder, United States Department of Veterans Affairs and United States Department of Defense, 2017, at pp. 44-46.[5]

18. I do not believe these treatment modalities are available to GTMO detainees.

19. I am unable to comment on al-Qahtani's medication regimen. I have not seen him since January 2017. As the SMO notes, BHU clinicians have not fully assessed his current mental state. I do not have adequate clinical information to assess the appropriateness of the medications he is currently prescribed. I do note that al-Qahtani was previously prescribed aripiprazole and is now taking quetiapine as needed. Both of these antipsychotic medications are associated with metabolic syndrome. Patients on these medications require a minimum of annual laboratory assessment of cholesterol,

---

[1] Available at
https://www.healthquality.va.gov/guidelines/MH/ptsd/VADoDPTSDCPGFinal082917.pdf (accessed Sept. 11, 2017).
[2] Available at http://www.apa.org/ptsd-guideline/ptsd.pdf (accessed Sept. 11, 2017).
[3] Available at
http://psychiatryonline.org/pb/assets/raw/sitewide/practice_guidelines/guidelines/acutestressdisorderptsd.pdf (accessed Sept. 11, 2017).
[4] Available at
http://psychiatryonline.org/pb/assets/raw/sitewide/practice_guidelines/guidelines/acutestressdisorderptsd-watch.pdf (accessed Sept. 11, 2017).
[5] Available at
https://www.healthquality.va.gov/guidelines/MH/ptsd/VADoDPTSDCPGFinal082917.pdf (accessed Sept. 11, 2017).

triglycerides, fasting glucose, and HgBA1C. Al-Qahtani should be offered a medication for insomnia that does not require blood work if he will not comply with this regime for quetiapine.

20. The SMO admits that al-Qahtani has not been fully assessed by BHU clinicians. Al-Qahtani has demonstrated an unwillingness "to meet with BHU staff in a manner that allows him to fully discuss treatment of his mental status and behavior." (SMO Declaration para. 10.) Therefore BHU clinicians have an incomplete understanding of al-Qahtani's mental health history, current symptoms, and concerns about treatment. This calls into question the accuracy of the SMO's diagnostic assessment of al-Qahtani, as well as his findings regarding al-Qahtani's current symptoms and response to treatment, or lack thereof.  Thus, the SMO's assessment that al-Qahtani's symptoms did not deteriorate during Ramadan is based on insufficient information. (SMO Declaration para. 20.)

21. The SMO noted, "It is the opinion of the JMG psychiatric consultants that Mr. al-Qahtani's condition is currently well managed with minimal residual symptoms and even if his condition were more severe, the JMG has capability in excess of what he would need to be treated." (SMO Declaration para. 21.) Again, this assessment in based upon insufficient information as supported by the SMO's admission that al-Qahtani has not been fully assessed by BHU clinicians.

22. The SMO noted, "While Mr. al-Qahtani is not fully compliant with the providers' treatment plans as it related to his mental illness, that is not uncommon for individuals with his illnesses either in detention or outside of the detention environment." (SMO Declaration para. 21.) This statement accurately describes patients who do not believe they have a mental illness or those who do not desire treatment for their diagnosis. However, al-Qahtani has a strong desire to reduce his symptoms of PTSD and schizophrenia. He is unable to be effectively treated while he is detained at GTMO.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 12th day of September, 2017.

Emily A. Keram, MD