# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____

)
**MOHAMMED AL-QAHTANI,** )
)
**Petitioner,** )
)
**v.** )    **Civil Action No. 05-1971 (RMC)**
)
**DONALD J. TRUMP,** *et al.*, )
)
**Respondents.** )
_____ )

## MEMORANDUM OPINION

Petitioner Mohammed al-Qahtani is a national of Saudi Arabia who has been held at the United States Naval Station, Guantanamo Bay, for the past 18 years. In October 2010, Mr. al-Qahtani was granted a stay of his 2005 petition for a writ of habeas corpus seeking release. His counsel have now moved for an examination by a mixed medical commission to determine if he is entitled to direct repatriation pursuant to Army Regulation 190-8, Section 3-12, which deals with the repatriation of sick and wounded prisoners. Dept. of the Army, Army Reg. 190-8, Enemy Prisoners of War, Retained Personnel, Civilian Internees, and Other Detainees, ch.3, § 12 (Oct. 1, 1997). The government opposes his motion.

## I.  BACKGROUND

Mr. al-Qahtani was taken into U.S. custody abroad during the hostilities authorized after September 11, 2001 by the Authorization for Use of Military Force (AUMF), Pub. L. No. 107-40, § 2(a), 115 Stat. 224. "That authority includes detaining 'those who are part of forces associated with Al Qaeda or the Taliban.'" *Qassim v. Trump*, 927 F.3d 522, 525 (D.C. Cir. 2019) (citing *Al Madhwani v. Obama*, 642 F.3d 1071, 1074 (D.C. Cir. 2011)). Mr. al-Qahtani was transferred to Guantanamo Bay in February 2002. He has been declared an enemy

combatant by the United States. Mr. al-Qahtani alleges that he was subjected to torture during his detention at Guantanamo Bay, for which he says that he was repeatedly hospitalized and placed in a life-threatening condition. *See* Pet'r Mot. [Dkt. 369] at 3. His allegation is supported by the then-convening authority of the Department of Defense (DOD) Military Commissions, Susan J. Crawford, who determined in 2009 that Mr. al-Qahtani would not be subjected to a capital trial because of the torture he had endured at the hands of the U.S. military. *See id*. at 3 n.4 (citing Bob Woodward, *Detainee Tortured, Says U.S. Official*, The Washington Post (Jan. 14, 2009), http://www.heal-online.org/torture011409.pdf (quoting Susan J. Crawford)). The government does not contest this public information.

In addition, Mr. al-Qahtani states that he has a history of mental illness, which was known to him and his family before he was taken into U.S. custody. *See* Ex. C, Pet'r Mot., Report of Dr. Emily A. Keram (June 5, 2016) [Dkt. 369-1] (Keram Rep.); Ex. D, Pet'r Mot., Suppl. Decl. of Dr. Emily A. Keram (July 12, 2016) [Dkt. 369-1] (Keram Suppl. Decl.); Ex. E, Pet'r Mot., Second Suppl. Decl. of Dr. Emily A. Keram (Dec. 2, 2016) [Dkt. 369-1] (Keram Second Suppl. Decl.). Dr. Emily Keram, an independent medical expert retained by counsel for Mr. al-Qahtani, has confirmed this prior illness through interviews of Mr. al-Qahtani at Guantanamo Bay, telephonic interviews with his family in Saudi Arabia, and review of previous records of psychiatric evaluations conducted on Mr. al-Qahtani.

Dr. Keram reports that Mr. al-Qahtani was mentally ill before he is alleged to have participated in terrorist activities and before his imprisonment and torture at Guantanamo Bay. Keram Rep. at 3-5. Prior to entering U.S. custody, Mr. al-Qahtani was diagnosed with schizophrenia, major depression, and a possible neurocognitive disorder due to a traumatic brain injury. *Id*. at 3. As a child, Mr. al-Qahtani was involved in a car accident and suffered a head

injury.  *Id.* at 5.  After that incident he suffered from "episodes of extreme behavioral dyscontrol" and "auditory hallucinations."  *Id.* at 3.  In one incident he was found by Riyadh police in a dumpster and in another he threw a cell phone out of a moving vehicle because "he believed it was making him 'tired'" and affecting his mind.  *Id.* at 3-4.  In 2000, Mr. al-Qahtani was committed to the psychiatric unit of a hospital in Mecca after he attempted to throw himself into moving traffic.  *Id.* at 4.  During this hospitalization he expressed suicidal thoughts and was prescribed antipsychotic medication.  *Id.*

In 2002, when Mr. al-Qahtani was first detained at Guantanamo Bay but before he was tortured, U.S. government officials observed "behaviors consistent with psychosis, such as talking to nonexistent people."  Pet'r Mot. at 5; *see also* Letter re:  Suspected Mistreatment of Detainees, from FBI Deputy Assistance Director, Counterterrorism Division, T.J. Harrington (July 14, 2006), https://www.aclu.org/sites/default/files/torturefoia/released/FBI_4622_4624.pdf. While at Guantanamo Bay, Mr. al-Qahtani was subjected to solitary confinement, sleep deprivation, extreme temperature and noise exposure, stress positions, forced nudity, body cavity searches, sexual assault and humiliation, beatings, strangling, threats of rendition, and water-boarding.  Keram Rep. at 6.  Dr. Keram concluded that these conditions were "severely cruel, degrading, humiliating, and inhumane" and "would have profoundly disrupted and left long-lasting effects on a person's sense of self and cognitive functioning 'even in the absence of pre-existing psychiatric illness.'"  Pet'r Mot. at 5 (quoting Keram Rep. at 6-7).  Dr. Keram opines that Mr. al-Qahtani's treatment at Guantanamo Bay exacerbated his psychological ailments, to which he was particularly vulnerable due to his pre-existing disorders.

In addition to his pre-existing psychiatric conditions, Dr. Keram diagnosed Mr. al-Qahtani with severe Post-Traumatic Stress Disorder (PTSD) as a result of the treatment,

interrogation, and imprisonment at Guantanamo Bay.  Keram Rep. at 3, 7.  Dr. Keram believes

that Mr. al-Qahtani will likely require lifelong mental health care through "a culturally-informed

multi-disciplinary approach," including "supportive psychotherapy, cognitive-behavioral

therapy, skills-based therapy, and psychotropic medication."  *Id.* at 8.  As a result, she has

concluded that Mr. al-Qahtani cannot receive effective treatment while he remains in custody at

Guantanamo Bay, due to, among other factors, his lack of trust in the medical and mental health

professionals at Guantanamo Bay.  *Id.* at 9.  Dr. Keram recommends repatriation to Saudi Arabia

because she believes Mr. al-Qahtani would benefit from being close to his family who supported

him when he dealt with mental illness in the past.  *Id.*  The Saudi Ministry of Interior indicated in

2015 that Saudi Arabia would welcome back Mr. al-Qahtani and provide him with the

rehabilitation and aftercare that he needs.  *See* Ex. F, Pet'r Mot., Letter from Mohammed A. Al-

Muttairi (Aug. 16, 2015) [Dkt. 369-1].

       In October 2005, Mr. al-Qahtani filed a Petition for Writ of Habeas Corpus.  *See*

Petition [Dkt. 1].  Respondents filed an amended factual return in October 2008, stating that Mr.

al-Qahtani is detained pursuant to the AUMF.  Notice of Am. Factual Return [Dkt. 73].  The

Petition remains outstanding as Mr. al-Qahtani has yet to file a Traverse but has instead sought

repeated stays.  *See* 10/12/2010 Minute Order; 9/30/2011 Minute Order.  Thus, the basis for the

United States to detain Mr. al-Qahtani as part of the forces associated with al-Qaeda or the

Taliban has not been disputed.

       On April 28, 2017, Mr. al-Qahtani applied to the Department of Defense for

repatriation or, in the alternative, an examination by a mixed medical commission.  *See* Ex. A,

Pet'r Mot., Pet'r Letter Requesting Mixed Medical Commission (April 28, 2017) [Dkt. 369-1]

(Apr. 2017 Letter).  The government denied this request on June 30, 2017.  *See* Ex. B, Pet'r

Mot., Resp't Letter Denying Mixed Medical Commission (June 30, 2017) [Dkt. 369-1] (DOJ

Letter).  On August 8, 2017, Mr. al-Qahtani filed the instant motion to compel examination by

mixed medical commission.  *See* Pet'r Mot.  Respondents opposed, *see* Resp't's Opp'n to Pet'r's

Mot. to Compel [Dkt. 370] (Opp'n), and Mr. al-Qahtani replied.  *See* Pet'r's Reply in Further

Supp. of Mot. to Compel [Dkt. 371] (Reply).  The Court held oral argument on the motion on

April 19, 2018.  The motion is ripe for review.

## II.  LEGAL STANDARD

In exercising its habeas jurisdiction over detainees at Guantanamo Bay, *see*

*Boumediene v. Bush*, 553 U.S. 723, 777 (2008); *Rasul v. Bush*, 542 U.S. 466, 484 (2004);

*Kiyemba v. Obama (Kiyemba II)*, 561 F.3d 509, 512 n.2 (D.C. Cir. 2009), the Judicial Branch

"serv[es] as an important . . . check on the Executive's discretion in the realm of detentions."

*Hamdi v. Rumsfeld*, 542 U.S. 507, 536 (2004) (plurality opinion).[1]  Emblematic is this Circuit's

recent detainee jurisprudence.  While the D.C. Circuit "has repeatedly held that under the

[AUMF], individuals may be detained at Guantanamo so long as they are determined to have

been part of Al Qaeda, the Taliban, or associated forces, and so long as hostilities are ongoing,"

*Aamer v. Obama*, 742 F.3d 1023, 1041 (D.C. Cir. 2014) (*Aamer I*) (citing *Al-Bihani v. Obama*,

590 F.3d 866, 873-74 (D.C. Cir. 2010)),[2] it has not hesitated to expand the scope of claims

---

[1] The legal status of habeas petitions from detainees at Guantanamo Bay "has a long and winding history."  *Qassim*, 927 F.3d at 526.  The Detainee Treatment Act of 2005, Pub. L. No. 109-148, 119 Stat. 2739, intended to strip such habeas cases from the federal courts.  *Hamden v. Rumsfeld*, 548 U.S. 557 (2006), reinstated jurisdiction over habeas petitions then pending.  *Id.* at 575-84.  Congress then passed the Military Commissions Act of 2006 for the same purpose.  Pub. L. No. 109-366, 120 Stat. 2600.  The relevant section of that law was, as described *infra* in the text, declared unconstitutional by *Boumediene*.

[2] *Aamer I* concerned a force-feeding protocol that the government instituted in response to hunger strikes by detainees at Guantanamo.  *See* 742 F.3d at 1026.  That litigation, which was brought by Mr. Aamer and two other detainees, presented the following issue:  whether

subject to habeas review, *see id.* at 1030 (finding that federal courts have subject-matter

jurisdiction over challenges to conditions of confinement even though such claims "undoubtedly

fall outside the historical core of the writ"). Similarly, the Circuit has determined that the scope

of the Executive's detention authority under the AUMF is not *sui generis* but is constrained by

domestic caselaw and statutes. *See id.* at 1031-38 (reviewing habeas challenges by American

prisoners to their conditions of confinement); *Al Warafi v. Obama*, 716 F.3d 627, 629 (D.C. Cir.

2013) (*Al Warafi II*) (finding Army Regulation 190-8 applicable to detainees), *cert. denied*, 572

U.S. 1100 (2014); *Al-Bihani*, 590 F.3d at 871-72 (resolving detainee's challenge to legitimacy of

his detention by "look[ing] to[] the text of relevant statutes and controlling domestic caselaw").

      The question before this Court is whether Army Regulation 190-8 applies to Mr.

al-Qahtani, such that his physical and mental health require the United States to repatriate him

immediately. Army Regulation 190-8 finds its principal guidance in the Geneva Conventions,[3]

of which the Third Geneva Convention is relevant here. Accordingly, an overview of the

provisions of the Third Geneva Convention and Army Regulation 190-8 is necessary.

---

Guantanamo detainees could utilize habeas corpus to challenge the government's force-feeding
practices. *Id.* As discussed *infra*, the D.C. Circuit answered this question in the affirmative.

[3] The Geneva Conventions are comprised of four multilateral treaties, *see* Geneva Convention
for the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field,
Aug. 12, 1949, 6 U.S.T. 3114, 75 U.N.T.S. 31 (First Geneva Convention); Geneva Convention
for the Amelioration of the Condition of the Wounded, Sick and Shipwrecked Members of
Armed Forces at Sea, Aug. 12, 1949, 6 U.S.T. 3217, 75 U.N.T.S. 85 (Second Geneva
Convention); Geneva Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949,
6 U.S.T. 3316, 75 U.N.T.S. 135 (Third Geneva Convention); and Geneva Convention Relative to
the Protection of Civilian Persons in Time of War, Aug. 12, 1949, 6 U.S.T. 3516, 75 U.N.T.S.
287 (Fourth Geneva Convention), and three Additional Protocols. The United States has ratified
all four Conventions and Additional Protocol III. *See* U.S. Dep't of State, Treaties in Force 465-
66 (2013).

## A. The Third Geneva Convention

The Third Geneva Convention sets forth the parameters by which signatories agreed to detain, treat, and, ultimately, release prisoners of war. Article 4 defines prisoners of war as follows:

> 1) Members of the armed forces of a [p]arty to the conflict as well as members of militias or volunteer corps forming part of such armed forces;

> 2) Members of other militias and members of other volunteer corps, including those of organized resistance movements, belonging to a [p]arty to the conflict and operating in or outside their own territory, even if this territory is occupied, provided that such militias or volunteer corps, including such organized resistance movements, fulfil[l] the following conditions:
>   a) that of being commanded by a person responsible for his subordinates;
>   b) that of having a fixed distinctive sign recognizable at a distance;
>   c) that of carrying arms openly;
>   d) that of conducting their operations in accordance with the laws and customs of war.

> 3) Members of regular armed forces who profess allegiance to a government or an authority not recognized by the [d]etaining [p]ower.

> 4) Persons who accompany the armed forces without actually being members thereof, . . . provided that they have received authorization from the armed forces which they accompany, who shall provide them for that purpose an identity card . . . .

> 5) Members of crews, . . . who do not benefit by more favourable treatment under any other provisions of international law.

> 6) Inhabitants of a non-occupied territory, who on the approach of the enemy spontaneously take up arms to resist the invading forces, without having had time to form themselves into regular armed units, provided they carry arms openly and respect the laws and customs of war.

Third Geneva Convention, 6 U.S.T. 3316, art. 4.  Where there is doubt as to whether a captured

person qualifies as a prisoner of war, Article 5 requires the individual to be accorded such status

until a "competent tribunal" determines otherwise.  *Id.*, art. 5.

In general, the Third Geneva Convention ensures that persons designated as

prisoners of war are handled humanely and receive appropriate treatment while detained.  This

overarching principle includes repatriation upon becoming seriously injured or ill.  Article 110 of

the Third Geneva Convention obligates signatories to return a prisoner of war to his home

country if he is (1) "[i]ncurably wounded and sick [such that his] mental or physical fitness

seems to have been gravely diminished"; (2) "[w]ounded and sick . . . [and] not likely to recover

within one year"; and (3) recovered from being "[w]ounded and sick . . . , but [his] mental and

physical fitness seems to have been gravely and permanently diminished."  *Id.*, art. 110.  The

Commentary to the Third Convention explains that generally "mixed medical commissions,"

which are discussed in Articles 112 and 113, will evaluate the injuries and illnesses of prisoners

and make repatriation recommendations.  3 Int'l Comm. of the Red Cross, Commentary: Geneva

Convention Relative to the Treatment of Prisoners of War 515-17 (J. Pictet ed., 1960).[4]  The

Commentary also notes that Article 110 obligates detaining powers to return prisoners of war

that fall into the aforementioned categories "before the end of hostilities."  *Id.* at 515.

**B.  Army Regulation 190-8**

Despite its name, Army Regulation 190-8 has been adopted by the other military

services and applies across all U.S. military branches.  *See* U.S. Dep'ts of the Army, Navy, Air

---

[4] As the Supreme Court has explained, the "International Committee of the Red Cross is . . . the body that drafted and published the official commentary to the Conventions.  Though not binding law, the commentary is . . . relevant in interpreting the Conventions' provisions." *Hamdan*, 548 U.S. at 619 n.48.

Force, & Marine Corps, Enemy Prisoners of War, Retained Personnel, Civilian Internees and Other Detainees, Army Regulation 190-8 (1997), http://www.apd.army.mil/pdffiles/r190_8.pdf. The Secretaries of the U.S. Army, Air Force, and Navy promulgated Army Regulation 190-8 to "provide[] policy, procedures, and responsibilities for the administration, treatment, employment, and compensation of . . . [persons] in the custody of the U.S. Armed Forces." *Id*. § 1-1(a). In so doing, the Regulation "implements international law, both customary and codified," and identifies the Geneva Conventions as "[t]he principal treaties relevant to [the] [R]egulation." *Id*. § 1-1(b). It does not, however, alter the obligations of the United States under the Geneva Conventions. *Id*. § 1-1(b)(4) ("In the event of conflicts or discrepancies between [the] [R]egulation and the Geneva Conventions, the provisions of the Geneva Conventions take precedence.").

The manner in which Army Regulation 190-8 may apply to any particular detainee turns on that person's designation. Where an individual commits a belligerent or hostile act in support of enemy armed forces and either claims prisoner of war status or doubt exists as to such status, a "competent tribunal" determines the individual's status under the Regulation. *Id*. § 1-6(b). There are four "[p]ossible" designations that may result: (1) "enemy prisoner of war," which is a term co-extensive with the definition of prisoner of war set forth in Articles 4 and 5 of the Third Geneva Convention; (2) "retained personnel," who are individuals who serve in a medical or religious capacity, attached to enemy armed forces, or are staff on voluntary aid societies; (3) "civilian internee," who is a person interned for operational security or in connection with an offense that s/he is believed to have committed against the detaining power; or (4) "innocent civilian," who is an individual who does not fall into any of these categories and should be immediately released. *Id*. § 1-6(e)(10); *see also id*. at Glossary, Section II—Terms.

Army Regulation 190-8 further provides that "[p]ersons in the custody of the U.S. Armed Forces who have not been classified as an [enemy prisoner of war] . . . , [retained personnel] . . . , or [civilian internee] . . . shall be treated as [enemy prisoners of war] until a legal status is ascertained by competent authority." *Id*. at Glossary, Section II—Terms. The Regulation refers to such unclassified individuals as "other detainees." *Id.*

Pertinent to the instant litigation are the Regulation's provisions addressing repatriation due to illness or injury. Section 3-12 states that detainees who are, or are being treated as, enemy prisoners of war or retained personnel are "eligible for direct repatriation" if they are (1) "suffering from disabilities as a result of injury, loss of limb, paralysis, or other disabilities, when these disabilities are at least the loss of a hand or foot, or the equivalent," or (2) are ill or injured and their "conditions have become chronic to the extent that prognosis appears to preclude recovery in spite of treatment within 1 year from inception of disease or date of injury." *Id.* § 3-12(l). The Regulation provides that a mixed medical commission, upon request, will determine whether a prisoner of war/retained person suffers from an illness or injury that satisfies the criteria for repatriation. *Id.* § 3-12(c), (h). If the mixed medical commission, which is comprised of a medical officer of the U.S. military and two physicians from a neutral country, *id.* § 3-12(a)(2), determines that the detained individual should be repatriated, then the United States must "carry out [that] decision[] . . . as soon as possible and within 3 months of the time after it receives due notice of the decision[]." *Id.* § 3-12(f).

## III. ANALYSIS

### A. Jurisdiction

The United States Congress initially withdrew habeas jurisdiction and jurisdiction over any other claims "relating to any aspect of the detention, transfer, treatment, trial, or conditions of confinement" of Guantanamo Bay detainees. *See* 28 U.S.C. § 2241(e). However,

the Supreme Court held in *Rasul* that the federal habeas statute applies to foreign detainees held at Guantanamo Bay. *See* 542 U.S. at 484; *see also Qassim*, 927 F.3d at 526. After *Rasul,* the Court decided *Boumediene*, in which it determined that § 2241(e)(1) was unconstitutional and extended habeas coverage to detainees at the U.S. Naval Station at Guantanamo Bay even though it was not located within the 50 states. 553 U.S. at 798. However, *Boumediene* did not reinstitute jurisdiction over the other actions related to the detention, transfer, treatment, trial, or conditions of confinement. *See Kiyemba II*, 561 F.3d at 513; *Aamer I*, 742 F.3d at 1030 ("[I]f petitioners' claims do not sound in habeas, their challenges constitute an action other than habeas corpus barred by § 2241(e)(2).") (internal quotation marks omitted). While *Boumediene* did not indicate exactly what habeas entailed, it did opine:

> We do consider it uncontroversial, however, that the privilege of habeas corpus entitles the prisoner to a meaningful opportunity to demonstrate that he is being held pursuant to "the erroneous application or interpretation" of relevant law. And the habeas court must have the power to order the conditional release of an individual unlawfully detained—though release need not be the exclusive remedy and is not the appropriate one in every case in which the writ is granted. These are the easily identified attributes of any constitutionally adequate habeas corpus proceeding.

553 U.S. at 779 (internal citations omitted). "The habeas court must have sufficient authority to conduct a meaningful review of both the cause for detention and the Executive's power to detain." *Id.* at 783.

Respondents argue that the Court lacks jurisdiction to hear Mr. al-Qahtani's motion to compel a mixed medical commission because 28 U.S.C. § 2241(e)(2) "deprives courts of jurisdiction to consider non-habeas claims of detainees such as [Mr. al-Qahtani]" and the motion does not "sound in habeas" because it does not seek an order of release or challenge his conditions of confinement. Opp'n at 13-15. Respondents posit that Mr. al-Qahtani's motion for a mixed medical commission is not a motion for release but, rather, a motion for a military

proceeding that *might* result in release. Mr. al-Qahtani argues that he is entitled to review by a mixed medical commission and that a mixed medical commission will provide the factual basis necessary for this Court to find that he is entitled to release. Therefore, Mr. al-Qahtani argues, his request is for release through the mixed medical commission process.

The question presented is whether Mr. al-Qahtani's request for a mixed medical commission sounds in habeas. Respondents cite five cases for the proposition that motions for conditional, potential, or speculative release do not sound in habeas. In *Muhammad v. Close*, 540 U.S. 749 (2004), an inmate brought an action under 42 U.S.C. § 1983 against a corrections officer alleging the officer engaged in retaliatory disciplinary proceedings. The case was dismissed by the Sixth Circuit for failure to exhaust administrative remedies. The Supreme Court reversed and held that defendants may bring an action under the Civil Rights Act of 1871, 42 U.S.C. § 1983, to challenge grievance proceedings without first exhausting their administrative habeas rights. *Muhammad* stated that "[c]hallenges to the validity of any confinement or to particulars affecting its duration are the province of habeas corpus." *Id*. at 750. However, a prisoner's claim that "threatens no consequences for his conviction or the duration of his sentence," *id*. at 751, does not sound in habeas so that exhaustion of habeas procedures is not required before litigation.

*Wilkinson v. Dotson*, 544 U.S. 74 (2005), decided a year later, involved a § 1983 challenge to the constitutionality of state parole procedures. The Supreme Court again held that prisoners need not first exhaust habeas before bringing lawsuits that do not seek to reduce their sentences or its particulars. *Wilkinson* traced the history of habeas exhaustion requirements and explained that "the Court has focused on the need to ensure that state prisoners use only habeas corpus . . . remedies when they seek to invalidate the duration of their confinement." *Id*. at 81.

In 2011, the Supreme Court decided for a third time that a prisoner need not first exhaust habeas proceedings before bringing a § 1983 claim, this time in the context of seeking DNA testing. *Skinner v. Switzer*, 562 U.S. 521 (2011). *Skinner* noted in dicta that it "has found no case, nor has the dissent, in which the Court has recognized habeas as the sole remedy, or even an available one, where the relief sought would 'neither terminate custody, accelerate the future date of release from custody, nor reduce the level of custody.'" *Id*. at 534 (quoting *Wilkinson*, 544 U.S. at 86 (Scalia, J., concurring)).

Respondents also cite two local cases. The D.C. Circuit has held that a federal prisoner must rely on habeas "only if success on the merits will 'necessarily imply the invalidity of confinement or shorten its duration.'" *Davis v. United States Sentencing Comm'n*, 716 F.3d 660, 666 (D.C. Cir. 2013); *see also id*. at 665 ("Claims that 'will not necessarily imply the invalidity of confinement or shorten its duration' are not at the 'core' of habeas and therefore may be pursued through other causes of action." (citations and emphasis omitted)). Because the case involved an equal protection challenge to the Fair Sentencing Act of 2010, Pub. L. No. 111-220, 124 Stat. 2372, Davis's claim did not arise in habeas.

Finally, Judge Royce C. Lamberth of this District considered whether a Guantanamo Bay detainee's motion for review before a Periodic Review Board sounded in habeas. A Periodic Review Board reviews each detainee's status and determines whether to recommend release. Judge Lamberth found that the motion did not sound in habeas because the Periodic Review Board's determination made release discretionary and, therefore, the district court lacked jurisdiction. *Salahi v. Obama*, No. 05-569, 2015 WL 9216557 (D.D.C. Dec. 17, 2015). The discretion involved in the Periodic Review Board's consideration of the detainee's status and the further discretion provided to the Secretary of Defense about whether to accept the

recommendation of the Periodic Review Board were essential to Judge Lamberth's decision that the request did not arise under habeas.[5]  The evaluation conducted by a mixed medical commission and the duty to carry out its finding are not similarly discretionary.  *See* Army Reg. 190-8 § 3-12(f) ("The United States will carry out the decisions of the Mixed Medical Commission as soon as possible and within 3 months of the time after it receives due notice of the decisions.").

Respondents focus on the Supreme Court's statement that habeas might not even be an available remedy in cases that do not truly implicate the duration or conditions of confinement.  *See Skinner*, 562 U.S. at 534 (noting in dicta that it "has found no case, nor has the dissent, in which the Court has recognized habeas as the sole remedy, or even an available one, where the relief sought would 'neither terminate custody, accelerate the future date of release from custody, nor reduce the level of custody'").  Respondents do not dispute that Mr. al-Qahtani seeks an end to his U.S. custody because of his mental illness.  They focus on the fact that his request is for review by a mixed medical commission, which Respondents equate to review by a Probation Commission or Periodic Review Board.  Respondents argue that Mr. al-Qahtani's review by a mixed medical commission is similarly probabilistic and discretionary and, therefore, does not sound in habeas.

Respondents' argument ignores the structure and requirements of Army Regulation 190-8.  While the United States has not had the occasion to utilize a mixed medical

---

[5] *Salahi* is usually cited for its clear statement that "the Due Process Clause of the Fifth Amendment[] does not apply to Guantanamo detainees."  2015 WL 9216557, at *5.  *Salahi* relied upon *Kiyemba v. Obama (Kiyemba I)*, 555 F.3d 1022, 1026 (D.C. Cir. 2009), but a D.C. Circuit concurring opinion denying a motion for hearing *en banc* in *Ali v.  Trump*, No. 18-5297, 2019 WL 850757, at *1-2 (D.C. Cir. Feb. 22, 2019), recently noted that the question of the Due Process Clause's reach to Guantanamo is unresolved in the Circuit.

commission since it adopted Army Regulation 190-8, that Regulation makes a mixed medical commission review quite distinct from a Periodic Review Board: if certain criteria are met, the detained individual must be released. A mixed medical commission is designed to make findings about the health of an individual; those findings lead to a result certain, not an exercise of discretion. The review will result in Mr. al-Qahtani's release or not, which is at the core of habeas.

Respondents' cases do not point to the result they seek. Each of Respondents' cases holds that a particular claim that may be brought under § 1983 need not be brought first in habeas. The analysis in all cited cases emphasizes that the core of habeas involves a motion for release from, or reduction in the duration of, confinement. Requests for different relief can be brought under § 1983. Respondents emphasize one case from this District: *Salahi* decided that habeas was not available to a detainee seeking a hearing before a Periodic Review Board, which Respondents analogize to a mixed medical commission. It is true that a Periodic Review Board may recommend that a detainee be released but the discretion involved in making such a recommendation, and involved again in the ultimate decision as to whether to actually release a detainee as recommended, distinguishes *Salahi* from this case. A mixed medical commission relies on its professional expertise to decide facts concerning an applicant's health. Depending on those facts, release may be warranted and, if warranted, the applicant must be released. Habeas gives prisoners the ability to enforce just that type of nondiscretionary release mechanism.

Respondents also minimize the D.C. Circuit's opinion in *Aamer I*, in which the Circuit affirmatively answered the question of whether habeas covers a Guantanamo detainee's claim that he was being impermissibly force fed. In so doing, the Circuit reaffirmed its decision

in *Kiyemba II*, finding that *Boumediene* extended jurisdiction to the federal courts "with respected to all habeas claims brought by Guantanamo detainees, not simply with respect to so-called 'core' habeas claim." *Aamer I*, 742 F.3d at 1029 (quoting *Kiyemba II*, 561 F.3d at 512).[6] The Circuit addressed the question posed here: "[A]re petitioners' claims the sort that may be raised in federal habeas petition under section 2241?" *Id*. at 1030. In finding habeas jurisdiction, the opinion generally identified the scope of habeas and held that challenges to the fact or duration of detention are at the "core" of habeas, but challenges to conditions of confinement also sound in habeas. *Id*. at 1036.

The Supreme Court itself has consistently avoided defining the scope of habeas relief, despite the 1971 holding in *Wilwording v. Swenson*, 404 U.S. 249, 249 (1971), that prisoners could challenge their "living conditions and disciplinary measures" through habeas. *See Boumediene*, 553 U.S. at 792 (declining to "discuss the reach of the writ with respect to claims of unlawful conditions of treatment or confinement"); *Bell v. Wolfish*, 441 U.S. 520, 527 n.6 (1979) (leaving "to another day the question of the propriety of using a writ of habeas corpus to obtain review of the conditions of confinement, as distinct from the fact or length of confinement itself"); *Preiser v. Rodriguez*, 411 U.S. 475, 499 (1973) ("This is not to say that habeas corpus may not also be available to challenge . . . prison conditions.").

The D.C. Circuit has not been so shy: it has permitted prisoners to use habeas to challenge the conditions of their confinement, not just its legitimacy or duration. *See, e.g.*, *United States v. Wilson*, 471 F.2d 1072, 1081 (D.C. Cir. 1972) (finding defendant brought his

---

[6] Although *Boumediene* did not strike down 28 U.S.C. § 2241(e)(2)—which stripped jurisdiction from federal courts to consider "all other actions" potentially brought by a Guantanamo Bay detainee—"[t]he remaining, lawful subsection of [Military Commissions Act] section 7 has, by its terms, no effect on habeas jurisdiction." *Aamer I*, 742 F.3d at 1031 (internal quotation marks omitted).

claim in the wrong jurisdiction, but noting that a claim of cruel and unusual punishment because of mental illness was "unquestionably" a challenge to the conditions of his confinement which sounded in habeas); *Hudson v. Hardy*, 424 F.2d 854 (D.C. Cir. 1970) (holding a petition seeking relief from beatings and threats by jail officials was a complaint about "an unlawful deprivation of liberty" that sounded in habeas); *id*. at 855 n.3 ("Habeas corpus tests not only the fact but also the form of detention."); *Creek v. Stone*, 379 F.2d 106, 109 (D.C. Cir. 1967) ("[I]n general habeas corpus is available not only to an applicant who claims he is entitled to be freed of all restraints, but also to an applicant who protests his confinement in a certain place, or under certain conditions, that he claims vitiate the justification for confinement.").

> The illegality of a petitioner's custody may flow from the fact of detention, *e.g.*, *Johnson v. Zerbst*, 304 U.S. 458, 467-68 . . . (1938), the duration of detention, *e.g.*, *Preiser*, 411 U.S. at 487 . . . , the place of detention, *e.g.*, *Miller* [*v. Overholser*], 206 F.2d [415,] 419 [(1953)], or the conditions of detention, *e.g.*, *Hudson II*, 424 F.2d at 855 n. 3. In all such cases, the habeas petitioner's essential claim is that his custody in some way violates the law, and he may employ the writ to remedy such illegality.

*Aamer I*, 742 F.3d at 1036. While Mr. al-Qahtani does not explicitly identify his habeas petition as a challenge to a condition of his confinement, *United States v. Wilson* placed complaints about mental health while incarcerated within the scope of the action.

Mr. al-Qahtani argues that jurisdiction is found in this Court because the final relief he seeks is release under Army Regulation 190-8 for which a mixed medical commission is merely a procedural necessity, but the fact of his mental illness is not contested. He urges the Court to rely on the All Writs Act, 28 U.S.C. § 1651, to issue the orders necessary to develop a factual record on which it can exercise its habeas jurisdiction.

Indeed, jurists in this District have invoked the All Writs Act to extend the right to counsel to Guantanamo detainees who filed habeas petitions, *Al Odah v. United States*, 346 F.

Supp. 2d 1, 6-8 (D.D.C. 2004), and to order the government to provide information to counsel regarding a detainee's physical condition. *Al-Joudi v. Bush*, 406 F. Supp. 2d 13, 21-22 (D.D.C. 2005). These cases embody the general principal that the purpose of the All Writs Act is to provide courts with the tools necessary to "dispose of the matter as law and justice require." *Harris v. Nelson*, 394 U.S. 286, 290 (1969).

The essence of Mr. al-Qahtani's motion is a request for a finding that he is legally entitled to review and release under Army Regulation 190-8 because of his current physical and mental condition. This Court has previously held that a request for review by a mixed medical commission is a request for "release pursuant to domestic law (Army Regulation 190-8) and those portions of an international accord that it incorporates (the Third Geneva Convention)." *Aamer v. Obama*, 58 F. Supp. 3d 16, 25 (D.D.C. 2014) (*Aamer II*). As a request for release, Mr. al-Qahtani's motion fits squarely into this Court's habeas jurisdiction. The Court may also, under the All Writs Act, compel a mixed medical commission evaluation of Mr. al-Qahtani to provide the Court with the necessary medical facts to reach a legal conclusion on his habeas petition.[7]

**B. Is Army Regulation 190-8 applicable to Guantanamo Detainees?**

*Al Warafi II* held that Army Regulation 190-8 is domestic law which may be invoked in habeas proceedings. 716 F.3d at 629. Therefore, although the Geneva Conventions themselves are not applicable in habeas proceedings, *see* Military Commissions Act of 2006,

---

[7] Respondents ask the Court to rely on equitable principles and refrain from exercising its habeas power because requiring the United States to utilize the mixed medical commission process for a detainee like Mr. al-Qahtani is inconsistent with the Executive Branch interpretation of the scope of Army Regulation 190-8, *i.e.*, that Army Regulation 190-8 does not apply to detainees in non-international armed conflict. Respondents cite nothing in the Regulation that suggests the exception. More to the point, Respondents ignore the D.C. Circuit opinion in *Al Warafi II*, 716 F.3d at 629, that found Army Regulation 190-8 applicable to a Guantanamo detainee.

Pub. L. No. 109-366, § 5(a), 120 Stat. 2600, 2631, because Army Regulation 190-8 "expressly incorporates relevant aspects of the Geneva Convention[s]," courts "may and must analyze" those portions that have been incorporated into domestic law. *Al Warafi II*, 716 F.3d at 629.

### 1. Is Mr. al-Qahtani an "Other Detainee"?

Mr. al-Qahtani's right to a mixed medical commission or ultimate repatriation under Army Regulation 190-8 is dependent upon his classification. *See* Army Reg. 190-8 § 1-1(a). Mr. al-Qahtani claims the rights of an unclassified person who is treated as an enemy prisoner of war. *See id.* at 33 (defining other detainee as "[p]ersons in the custody of the U.S. Armed Forces who have not been classified as an [enemy prisoner of war], [retained person], or [civilian internee]," who "shall be treated as [enemy prisoners of war] until a legal status is ascertained by competent authority"). Mr. al-Qahtani argues he should be classified as an "other detainee" and, therefore, receive the protections of an enemy prisoner of war because he has not been designated as any of the other types of detainees under Army Regulation 190-8. Respondents argue that Mr. al-Qahtani has been found to be an "enemy combatant," which he has not challenged, so he is neither entitled nor able to be designated as an "other detainee" under Army Regulation 190-8. Mr. al-Qahtani calls this a distinction without a difference: as an "enemy combatant," a descriptor not found in Army Regulation 190-8, he remains an "other detainee" for the purposes of the Regulation and is, by its terms, entitled to be treated as a prisoner of war.

In *Aamer II* this Court discussed whether an individual detained in Guantanamo and designated by a Combatant Status Review Tribunal (CSRT) as an "enemy combatant" could also be considered an "other detainee" under Army Regulation 190-8. 58 F. Supp. 3d at 23-25. Although this Court did not ultimately determine that Mr. Aamer was an "other detainee," it

considered the D.C. Circuit's decision in *Al Warafi II* and determined that, by implication, the Circuit found that mere designation as an "enemy combatant" did not render Army Regulation 190-8 inapplicable. *Al Warafi II* considered whether an individual detained as an "enemy combatant" at Guantanamo qualified as "medical personnel" under Army Regulation 190-8 and should be repatriated. If "an 'enemy combatant' designation removes Guantanamo detainees from the coverage of Army Regulation 190-8, there would have been no need for the *Al Warafi II* court to conduct such an analysis." *Aamer II*, 58 F. Supp. 3d at 25.

Following *Al Warafi II*, this Court concludes that Mr. al-Qahtani meets the criteria for an "other detainee" in Army Regulation 190-8: he is a person in the custody of the United States and he has not been otherwise classified as either an enemy prisoner of war, retained person, or civilian internee.[8]

### 2. Is Mr. al-Qahtani Entitled to Examination by a Mixed Medical Commission?

Section 3-12 of Army Regulation 190-8 provides for the repatriation of sick and wounded enemy prisoners of war and, therefore, for sick and wounded other detainees. To qualify for medical repatriation, an "other detainee" must be evaluated by a mixed medical commission. Section 3-12(h) states that enemy prisoners of war (and therefore other detainees) "*will be examined* by the Mixed Medical Commission" if (1) they are "designated by a camp or hospital surgeon or a retained physician or surgeon who is exercising the functions of the

---

[8] *See supra* at 9-10 (defining retained person and civilian internee); *see also* Army Reg. 190-8 at 33 (defining enemy prisoner of war as "one who, while engaged in combat under orders of his or her government, is captured by the armed forces of the enemy"). Enemy combatant is not defined in Army Regulation 190-8 and is not defined by the Respondent in this case. The Supreme Court has previously noted the government's reluctance to officially define "enemy combatant." *See Hamdi*, 542 U.S. at 516 ("There is some debate as to the proper scope of th[e] term [enemy combatant], and the Government has never provided any court with the full criteria that it uses in classifying individuals as such.")

surgeon in a camp," (2) they have an application submitted by a prisoner representative, (3) they are otherwise recommended by a "power on which [they] depend or by an organization duly recognized by that power and that gives assistance to them," or (4) they "submit written requests."  Army Reg. 190-8 § 3-12(h)(1)-(4) (emphasis added).

Mr. al-Qahtani submitted a written request for a mixed medical commission on April 28, 2017.  Therefore, under the plain language of the regulation, which states the enemy prisoners of war (and by extension other detainees) that meet one of the above four characteristics *will be examined* by a mixed medical commission, he is entitled to examination by a mixed medical commission.

## C.  The Court's Power to Order Examination by a Mixed Medical Commission

### 1.  All Writs Act

The All Writs Act permits the Court to "fashion procedures . . . in order to develop a factual record as necessary for the Court to make a decision on the merits of Petitioners' habeas claims."  *Al Odah*, 346 F. Supp. 2d at 6.  This Court has already decided above that review by a mixed medical commission will provide necessary facts to resolve Mr. al-Qahtani's habeas petition.

The D.C. Circuit has recently emphasized that Guantanamo detainees "must be afforded a habeas process that ensures 'meaningful review' of their detention."  *Qassim*, 927 F.3d at 524 (quoting *Boumediene*, 553 U.S. at 783).

> The Supreme Court's decision in *Boumediene* was explicit that detainees must be afforded those "procedural protections" necessary (1) to "rebut the factual basis for the Government's assertion that he is an enemy combatant"; (ii) to give the prisoner "a meaningful opportunity to demonstrate that he is being held pursuant to the erroneous application or interpretation of relevant law"; and (iii) to create a record that will support "meaningful review" by the district court.

*Id*. at 528-29 (quoting *Boumediene*, 553 U.S. at 779, 783).  Mr. al-Qahtani argues that he is being

held pursuant to Respondents' erroneous application of Army Regulation 190-8, which the D.C.

Circuit has held is applicable domestic law.  He moves this Court to compel examination by a

mixed medical commission so a record will exist to allow for meaningful review of

Respondents' failure to repatriate him.  Lacking the necessary expertise to evaluate Mr. al-

Qahtani's physical and psychological condition to determine whether he qualifies for medical

repatriation under Army Regulation 190-8, this Court must require Respondent to conduct the

necessary evaluation and provide the Court with the record to evaluate Mr. al-Qahtani's habeas

petition fully.

### 2.  *Injunctive Relief*

Having found the Court may order a mixed medical commission pursuant to its

powers to ensure meaningful review of Mr. al-Qahtani's habeas petition, the Court need not

consider Mr. al-Qahtani's alternative request that the Court grant injunctive relief or

Respondents' argument that Mr. al-Qahtani's motion to compel a mixed medical commission is

actually a request for a permanent injunction.[9]  Should it assist review, the Court will briefly

address the legal standard governing preliminary injunctions.

When evaluating a request for a preliminary injunction, courts consider "whether

(1) there is a substantial likelihood [petitioner] will succeed on the merits; (2) [petitioner] will be

irreparably injured if an injunction is not granted; (3) an injunction will substantially injure the

other party; and (4) the public interest will be furthered by the injunction."  *Serono Labs., Inc. v.*

---

[9] By arguing that a preliminary injunction would have the effect of a permanent injunction Respondents may inadvertently admit that (1) Mr. al-Qahtani is mentally ill and unlikely to recover where he is; (2) a mixed medical commission would find that he qualifies for repatriation under the terms of Army Regulation 190-8; and (3) Respondents would be required by the Regulation to comply.

*Shalala*, 158 F.3d 1313, 1317-18 (D.C. Cir. 1998); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) ("A [petitioner] seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."). Where the requested injunction would "'alter, rather than preserve, the *status quo*,'" as is requested here, "judges in this Circuit have required the moving party to 'meet a higher standard than in the ordinary case by showing clearly that he or she is entitled to relief or that extreme or very serious damage will result from the denial of the injunction.'" *Newark Pre-School Council, Inc. v. HHS*, 201 F. Supp. 3d 72, 78 (D.D.C. 2016) (quoting *Elec. Privacy Info. Ctr. v. DOJ*, 15 F. Supp. 3d 32, 39 (D.D.C. 2014)) (emphasis in original).

a. Irreparable Harm

Mr. al-Qahtani has been held in Guantanamo Bay for over 18 years and has no hope of release until the Executive Branch determines that hostilities have ended. *See al-Alwi v. Trump*, 901 F.3d 294, 300 (D.C. Cir. 2018), *cert. denied* 139 S. Ct. 1893 (2019) ("However characterized, the Executive Branch represents, with ample support from record evidence, that the hostilities described in the AUMF continue. In the absence of a contrary Congressional command, that controls."). His doctor reports that Mr. al-Qahtani's physical and mental conditions have deteriorated during his detention. Indeed, *Al-Joudi* found that Guantanamo detainees are "vulnerable to further physical deterioration, and possibly death, by virtue of their custodial status at Guantanamo and weakened physical condition" and "where the health of a . . . vulnerable person is at stake, irreparable harm can be established." 406 F. Supp. 2d at 20. The record indicates that Mr. al-Qahtani may be such a vulnerable person who suffers from both physical and mental conditions that are aggravated by his detention. Respondents suggest that Mr. al-Qahtani is to blame for his condition because he fails to take advantage of the available

medical resources despite the ongoing efforts of the medical staff to provide care. His doctor

and lawyers attribute Mr. al-Qahtani's reluctance to his continuing fear of all authority figures at

Guantanamo, including medical staff, due to his torture and his current mental instability. *See*

Karem Rep. at 9; Pet'r Mot. at 6-7. The Court does not rule on the question but finds that Mr. al-

Qahtani has demonstrated irreparable harm.

### b. Likelihood of Success on the Merits

This Court will not substitute its lay opinion for that of a competent mixed

medical commission. However, if the mixed medical commission finds that Mr. al-Qahtani

qualifies for repatriation, Army Regulation 190-8 mandates that he be repatriated.

### c. Effect of Injunction on Respondents

Respondents argue that establishing a mixed medical commission, which has

never been done, would be extremely costly and burdensome on the government. Just

determining the foreign members of such a commission would not be easy because the conflict at

issue is not between the United States and another nation. Mr. al-Qahtani responds that courts

have required the government to make other medical evaluations and provide treatments and the

proposed process is not significantly more burdensome. *See Al-Oshan v. Obama*, 753 F. Supp.

2d 1, 2 (D.D.C. 2010) (requiring the government to create a treatment plan in collaboration with

an independent medical expert); *Zuhair v. Bush*, 592 F. Supp. 2d 16, 17 (D.D.C. 2008) (requiring

the government to locate an independent medical examiner to evaluate the detainee).

The Court agrees that creating a mixed medical commission would require the

government to enter uncharted territory which would be unusual and likely burdensome.

### d. Public Interest

Mr. al-Qahtani argues that the public interest in justice and the rule of law support

an injunction to ensure that the Court can fully exercise its habeas jurisdiction and evaluate Mr.

al-Qahtani's right to repatriation. Respondents argue that the public interest is better served by not ordering the Executive Branch to contravene its decision that Army Regulation 190-8 does not apply to Guantanamo detainees. This Court is bound by the precedent set by the D.C. Circuit, which decided in *Al Warafi II* that Army Regulation 190-8 is domestic law and can apply to a Guantanamo detainee's habeas petition. The Court is not persuaded that it should disregard *Al Warafi II* or the dictates of Army Regulation 190-8. To the contrary, the Court concludes that the dual public interest in the rule of law and the Court's ability to exercise its habeas jurisdiction is the more important interest.

## IV. CONCLUSION

For the reasons discussed above, Petitioner's Motion to Compel Examination by a Mixed Medical Commission, Dkt. 369, will be granted. A memorializing Order accompanies this Memorandum Opinion.


Date: March 6, 2020

_____
ROSEMARY M. COLLYER
United States District Judge