UNCLASSIFIED//FOR PUBLIC RELEASE

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MOHAMMED AL-QAHTANI,

*Petitioner*,

v.

DONALD J. TRUMP, *et al.*,

*Respondents*.

Case No. 05-CV-1971 (ESH)

**FILED UNDER SEAL**

**ORAL ARGUMENT REQUESTED**

### PETITIONER'S OPPOSITION TO RESPONDENTS' MOTION FOR CLARIFICATION AND STAY PENDING APPEAL OF THE COURT'S MARCH 6, 2020 ORDER

The following facts are uncontroverted. Petitioner Mohammed al-Qahtani has spent the last eighteen years in custody at the U.S. Naval Station in Guantánamo Bay, Cuba. By the time he arrived, he had a long history of severe mental health problems, including a diagnosis of psychosis during an involuntary psychiatric hospitalization in Saudi Arabia less than two years before he was first brought to Guantánamo. While at Guantánamo he was systematically tortured with the complicity of mental health experts; a senior U.S. official later publicly admitted that the abuse constituted "torture." That torture, along with his indefinite imprisonment without trial at the military prison, have gravely diminished his mental and physical health, precluding any chance for recovery or effective treatment while in U.S. custody.

In August 2017, Mr. al-Qahtani moved this Court to compel Respondents to facilitate his examination by a Mixed Medical Commission, which would establish his entitlement to direct medical repatriation pursuant to a provision of domestic law, Army Regulation 190-8. More than two years later, the Court granted his motion. Respondents now seek a stay pending appeal—or, barring that, an administrative stay—and they also ask the Court to clarify its March 6, 2020 Order.

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

The Court should deny Respondents' motion. The Order is straightforward, requiring the application of domestic law to Mr. al-Qahtani; it needs no further clarification. And the request for a stay pending appeal is a continuation of the dilatory tactics that have been Respondents' hallmark since the inception of these Guantánamo habeas cases nearly two decades ago. But delay here carries a more serious consequence: the well-documented and precipitous decline in Mr. al-Qahtani's mental health over the last four years will likely render it more difficult for the psychiatric experts of the Mixed Medical Commission to successfully evaluate him should his condition worsen with the passage of time. Respondents, on the other hand, have not shown that they would be irreparably harmed without a stay, nor are they likely to succeed on the merits of their appeal. The above considerations, together with the public interest in immediate implementation of the Court's Order, all weigh in favor of denying Respondents' motion.[1]

## **ARGUMENT**

## I.   **THE COURT'S ORDER IS CLEAR**

There is no ambiguity or vagueness to the Court's March 6, 2020 Order that requires clarification. Indeed, a motion for clarification's "general purpose … is to explain or clarify something ambiguous or vague." *United States v. Philip Morris USA Inc.*, 793 F. Supp. 2d 164, 168 (D.D.C. 2011). Here, the Order does not require the appointment of any particular individual to the Mixed Medical Commission or Medical Commission. Nor does Mr. al-Qahtani presume to dictate the Medical Commission's composition or contend that Dr. Emily Keram (the only medical

---

[1]   Respondents filed their Motion under seal, claiming it contains protected information. Of course, only the Court has the authority to deem information protected. Protective Order ¶¶ 10, 34, ECF No. 62. The parties are presently "attempt[ing] to reach an agreement about the designation of the information." *Id.* ¶ 34. Petitioner files his response under seal while those discussions are ongoing but expects that versions suitable for public release of the two briefs in question, in addition to any reply subsequently filed by Respondents, will be filed on the public record as soon as possible.

UNCLASSIFIED//FOR PUBLIC RELEASE

expert independent of the U.S. government known to have examined Mr. al-Qahtani during his captivity) must be appointed. Mr. al-Qahtani merely seeks implementation of what domestic law provides, and that is precisely what this Court's Order granted.

In their bid for clarification, Respondents present a partial picture of the process of forming a Mixed Medical Commission or a Medical Commission under the domestic law provisions of Army Regulation 190-8 and the portions of the Geneva Conventions that it incorporates. Resp'ts' Mot. for Clarification and Stay Pending Appeal of the Ct.'s Mar. 6, 2020 Order ("Resp'ts' Mot.") at 6, 6 n.2, ECF No. 389. Respondents claim that implementation of the Court's Order is impossible here because no State has been designated as a Protecting Power. Mot. at 16 (quoting Decl. of Steven W. Dalbey ("Dalbey Decl."), ECF No. 389-2, ¶ 5). They overlook the fact that Army Regulation 190-8 contemplates that the International Committee of the Red Cross (ICRC) can act as the Protecting Power. *See* Dep'ts of the Army, Navy, Air Force, and Marine Corps, Army Regulation 190-8/OPNAVINST 3461.6/AFJI 31-304/MCO 3461.1, *Enemy Prisoners of War, Retained Personnel, Civilian Internees and Other Detainees* § 1-5(e) (1997) ("Army Regulation 190-8") ("A neutral state or an international humanitarian organization, such as the ICRC, may be designated by the U.S. Government as a Protecting Power (PP)."). At oral argument, undersigned counsel for Mr. al-Qahtani explained that Respondents can set up a Medical Commission rather than a Mixed Medical Commission with the ICRC acting as the Protecting Power, pursuant to domestic law. *See* Hr'g Tr. (Apr. 19, 2018) at 21:16-22, 57:19-58:17 ("The roadmap is very clearly delineated. If you can't find neutral doctors from a third country, then the U.S. can get together with the ICRC, form a Medical Commission instead of a Mixed Medical Commission, and move forward from there."); Army Regulation 190-8, § 3-12(b) ("If for any reason the use of neutral doctors cannot be arranged for by the ICRC, the United States, acting in

agreement with the Protecting Power concerned, will set up a Medical Commission. This Commission will perform the duties of a Mixed Medical Commission.").

While the ICRC could, in theory, propose Dr. Keram as one of the medical professionals to form the Medical Commission, that is by no means required by domestic law or by the Court's Order. Accordingly, the Court's Order needs no clarification.

## II.   A STAY OF THE COURT'S ORDER IS UNWARRANTED AND WILL SUBSTANTIALLY INJURE MR. AL-QAHTANI

In requesting a stay pending appeal, Respondents seek no ordinary remedy. "A stay is an intrusion into the ordinary processes of administration and judicial review[.]" *Nken v. Holder*, 556 U.S. 418, 427 (2009) (internal quotations and citations omitted). Respondents must meet "stringent standards required for a stay pending appeal." *Shays v. Fed. Election Comm'n*, 340 F. Supp. 2d 39, 44 (D.D.C. 2004).

Neither an administrative stay nor a stay pending appeal of the Court's Order would be appropriate because (A) Mr. al-Qahtani will be substantially injured as a result; (B) in contrast, there is no likelihood of irreparable harm to Respondents without a stay; (C) Respondents have failed to make a strong showing that they are likely to succeed on the merits of their appeal; and (D) the public interest is not well-served by a stay. *See, e.g., Hilton v. Braunskill*, 481 U.S. 770, 776 (1987); *see also Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011).

Respondents' claim that the court of appeals has "reserved the question" of *Winter*'s effect, Resp'ts' Mot. at 8 n.3, on the sliding-scale approach articulated in *Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.*, 559 F.2d 841, 843-44 (D.C. Cir. 1977), is imprecise. In holding that an injunction would not be appropriate even under the *Holiday Tours* sliding-scale analysis, the *Sebelius* court "read *Winter* at least to suggest *if not to hold* that a likelihood of success

is an independent, free-standing requirement for a preliminary injunction." *Sebelius*, 644 F.3d at 393 (internal quotations and citations omitted) (emphasis added). The court of appeals has thus indicated, in agreement with the Supreme Court, that the four stay factors are independent prerequisites, not considerations to be balanced.

Still, regardless of whether this Court uses the sliding-scale approach of *Holiday Tours* or hews to the *Winter* standard, Respondents have failed to show a sufficient likelihood of either success on the merits or irreparable harm to themselves. Moreover, the claim that a stay will not substantially harm Mr. al-Qahtani eschews the inconvenient truth that Respondents have imprisoned him—a mentally ill man—without trial for almost twenty years and publicly admitted torturing him. Any statement Respondents offer about the prospect of additional harm to Mr. al-Qahtani must be judged against that background. His mental and physical health will continue to degrade so long as he remains in U.S. custody—a downward spiral that a stay pending appeal will only exacerbate. Finally, denying the stay sought is firmly in the public interest. All four factors weigh against granting a stay.

### A. A Stay Will Substantially Harm Mr. al-Qahtani

A prisoner that a Mixed Medical Commission or Medical Commission deems eligible for medical repatriation under domestic law may enforce that entitlement in habeas corpus proceedings. Delay—whether in the form of a stay or otherwise—is itself irreparable harm in habeas. *See, e.g.*, *Boumediene v. Bush*, 553 U.S. 723, 795 (2008) (stating that "costs of delay can no longer be borne by those who are held in custody"); *Yong v. INS*, 208 F.3d 1116, 1119 (9th Cir. 2000) (district courts have less discretion to stay habeas proceedings); *Cross v. Harris*, 418 F.2d 1095, 1105 n.64 (D.C. Cir. 1969) (habeas proceedings are "particularly inappropriate for any delay").

Moreover, Mr. al-Qahtani is particularly vulnerable to harm due to his pre-existing schizophrenia, the post-traumatic stress disorder (PTSD) resulting from his undisputed torture at Guantánamo, and his inability to receive effective treatment for either at Guantánamo. *See* Keram Report at 8-9; *Al-Joudi v. Bush*, 406 F. Supp. 2d 13, 20 (D.D.C. 2005) ("[W]here the health of a ... vulnerable person is at stake, irreparable harm can be established."). The extensive record in this case describing the trajectory of Mr. al-Qahtani's mental health shows that it is unmistakably degenerating rapidly. A stay now would visit irreparable harm on Mr. al-Qahtani. Even if he were ultimately to prevail in Respondents' appeal, his condition may devolve to a point where it becomes impossible for the Mixed Medical Commission to evaluate him and make a determination.

### 1. *Mr. al-Qahtani Arrived at Guantánamo with Pre-Existing Mental Illnesses that Were Exacerbated and Compounded by Torture and Indefinite Imprisonment*

Mr. al-Qahtani has been imprisoned at Guantánamo since February 2002. Within months of his arrival, Mr. al Qahtani was subjected to a systematic and brutal program of physical, sexual, and psychological torture. Officials in Washington, up to and including then-Secretary of Defense Donald Rumsfeld, helped design and approve the plan, with the active participation of psychiatrists. He is the only prisoner at Guantánamo whose torture has been formally admitted by a senior U.S. government official.[2] He was hospitalized twice during his torture at Guantánamo because he was on the brink of heart failure and death.

---

[2]      Bob Woodward, *Guantanamo Detainee Was Tortured, Says Official Overseeing Military Trials*, Wash. Post (Jan. 14, 2009) (quoting Susan J. Crawford), *available at* http://www.washingtonpost.com/wp-dyn/content/article/2009/01/13/AR2009011303372.html. His torture became widely known far earlier, in 2005, when *Time* magazine reported on how Mr. al-Qahtani was tortured. Adam Zagorin & Michael Duffy, *Inside the Interrogation of Detainee 063*, TIME (June 19, 2005), *available at* http://time.com/3624326/inside-the-interrogation-of-detainee-063/.

As early as his first year at Guantánamo, in 2002, and even before the implementation of the worst of the torture plan on him by military interrogators and psychiatrists, the FBI observed behaviors consistent with psychosis, such as "talking to non-existent people, reporting hearing voices" and "crouching in a corner of the cell covered with a sheet for hours on end."[3] Mr. al-Qahtani was already severely mentally ill long before he arrived at Guantánamo. Indeed, he was suffering from psychosis well before the time period when Respondents accuse him of having associated with specific individuals or traveling to Afghanistan.

Mr. al-Qahtani's history of psychiatric problems began when he was in a car accident at age eight: he was thrown from the car and suffered a traumatic brain injury, after which his performance in school, which had been excellent, suddenly collapsed. In late adolescence, the classic age for onset of schizophrenia, his family witnessed uncontrolled crying and inability to deal with basic life functions. At one point the Riyadh police pulled him naked from a garbage dumpster he had thrown himself into. Later, in Mecca, in May 2000, he was arrested by police after throwing himself half-naked into traffic and was involuntarily confined to a psychiatric hospital where he was diagnosed with schizophrenia. *See* Report of Dr. Emily A. Keram (June 5, 2016), ECF No. 369-1, Ex. C (Keram Rep.) at 3-5.

Respondents do not contest these facts, which are documented in the five reports and declarations of Dr. Emily Keram, the only psychiatrist independent of the U.S. government known to have examined Mr. al-Qahtani since his imprisonment, and in records of his hospitalization in Mecca from May 2000.[4] After Judge Collyer found that Mr. al-Qahtani was "incompetent and

---

[3]    *See* Letter re: Suspected Mistreatment of Detainees, from T.J. Harrington, Deputy Assistant Director, Counterterrorism Division, FBI, to Major General Donald R. Ryder, Criminal Investigation Command, Department of the Army (July 14, 2004).

[4]    *See* Pet'r's Mot., Ex. C, Report of Dr. Emily A. Keram (June 5, 2016), ECF No. 369-1 (Keram Rep.); *id.*, Ex. D, Suppl. Decl. of Dr. Emily A. Keram (July 12, 2016) (Keram Suppl.

unable to assist effectively in this case," Minute Order (Apr. 20, 2012), she appointed Dr. Keram

pursuant to the Criminal Justice Act to conduct a psychiatric evaluation of Mr. al-Qahtani.

Following a series of visits beginning in 2015, Dr. Keram confirmed his diagnosis of schizophrenia

and major depression. Once Dr. Keram's report became public in 2016, Respondents finally

acknowledged that Mr. al-Qahtani's symptoms, as observed by the Guantánamo guard force and

Joint Medical Group mental health professionals, are consistent with schizophrenia and began

efforts to dispense antipsychotic medications to him, including Aripiprazole (Abilify), Quetiapine,

and Haldol. *See* Sr. Med. Officer Decl. (Aug. 21, 2017), ECF No. 372-2, ¶ 17 (SMO Decl.).

"In addition to Mr. al-Qahtani's pre-existing psychiatric diagnoses," Dr. Keram concluded,

"he has developed posttraumatic stress disorder (PTSD)" resulting from his systematic torture—

which included prolonged solitary confinement, sleep deprivation, physical violence and grotesque

sexual humiliation along with other forms of psychological torture—and subsequent indefinite

imprisonment. Keram Rep., ECF No. 369-1, Ex. C, at 7. As a doctor with the U.S. Department of

Veteran Affairs who has treated patients with PTSD secondary to both combat stress and Prisoner

of War confinement for many years, Dr. Keram found that Mr. al-Qahtani's PTSD symptoms are

not only "consistent with those exhibited by survivors of torture," but also that they "have been

present for years," *id.* at 7-8, and that his torture was so "inhumane" that, "[e]ven in the absence

of pre-existing psychiatric illness," it is unsurprising that it had "profoundly disruptive and long-

lasting effects on [his] sense of identity, selfhood, dignity, perception of reality, mood, cognitive

functioning, and physiology." *Id.* at 6-7.

---

Decl.); *id.*, Ex. E, Suppl. Decl. of Dr. Emily A. Keram (Dec. 2, 2016) (Keram Second Suppl. Decl.); Pet'r's Reply, Ex. G, Suppl. Decl. of Dr. Emily A. Keram in Resp. to Decl. of Sr. Med. Officer (Sept. 12, 2017), ECF No. 373 (Keram Third Suppl. Decl.); Suppl. Decl. of Dr. Emily A. Keram (Apr. 14, 2018), ECF No. 377 (Keram Fourth Suppl. Decl.).

Schizophrenia is a chronic disorder. It is permanent; it may be eventually manageable, but it is not curable. As Dr. Keram put it, "[the g]oals of appropriate treatment are symptom management, not cure." Keram Fourth Suppl. Decl., ECF No. 377, ¶ 17. Moreover, the systematic torture Mr. al-Qahtani survived at Guantánamo left him unable to trust U.S. military doctors:[5] his torture program was planned by psychologists, and one of the psychologists who helped design it has been publicly reported as having been in the room during Mr. al-Qahtani's interrogations under torture.[6] Although PTSD—unlike psychosis—is often curable, Dr. Keram believes that Mr. al-Qahtani needs to be treated by Saudi doctors who understand his culture and speak Arabic, and that any recovery from PTSD cannot take place at Guantánamo, where he was tortured. Keram Rep., ECF No. 369-1, Ex. C, at 9; Keram Supp. Decl. (July 12, 2016), ECF No. 369-1, Ex. D, ¶ 6. She also believes that successful treatment for his psychosis and PTSD requires the involvement of Mr. al-Qahtani's family as well. *Id.* Dr. Keram's conclusion on this front is worth reproducing at some length:

> Mr. al-Qahtani cannot receive effective treatment for his current mental health conditions while he remains in U.S. custody at GTMO or elsewhere, despite the best efforts of available and competent clinicians. Several factors preclude effective treatment. These include the inability to develop long-term doctor-patient relationships given the rotation schedule of medical staff, lack of trust in the medical and mental health staff due to previous clinician involvement in interrogations ... , lack of culturally-informed treatment modalities, and unavailability of family members to participate in treatment."

---

[5]     Indeed, Mr. al-Qahtani's resistance to meeting mental health practitioners extended to various experts his counsel attempted to have him meet with over the years; it was only with great difficulty, documented in some of the *ex parte* status reports filed with the Court, that he agreed to meet with Dr. Keram. *See Ex Parte* Status Report, ECF No. 234, ¶ 4 (Dec. 20, 2010); *Ex Parte* Status Report, ECF No. 241, ¶ 4 (citing attached Kassem Decl. ¶ 7) (Mar. 30, 2011); *Ex Parte* Status Report, ECF No. 314, ¶ 9 (Nov. 19, 2013); Keram Supp. Decl. (July 12, 2016), ECF No. 369-1, Ex. D, ¶ 7.

[6]     *See* Daniel Schulman, *Will Gitmo Shrinks Lose Their Credentials?*, Mother Jones (July 7, 2010), *available at* https://www.motherjones.com/politics/2010/07/guantanamo-psychologists-complaint-john-leso-larry-james/.

UNCLASSIFIED//FOR PUBLIC RELEASE

Keram Rep., ECF No. 369-1, Ex. C, at 9; *see also* Keram Supp. Decl. (July 12, 2016), ECF No.

369-1, Ex. D, ¶¶ 5-6; Keram Second Suppl. Decl. (Dec. 2, 2016), ECF No. 369-1, Ex. E, ¶¶ 8-10.

### 2. *Respondents' Assessment that Mr. al-Qahtani's Condition Is Stable and Well-Managed Has No Grounding in Reality*

Respondents argue that a lengthy stay would not harm Mr. al-Qahtani, describing his

condition as "stable," noting "subjective sense of symptomatic improvement," and declaring, in

sum and substance, that Guantánamo medical personnel can treat him effectively. Mot. at 20-21.

Of course, any claim Respondents offer about their care for Mr. al-Qahtani's health must be judged

against the admitted fact that they have tortured him to the brink of death. But even on their own

merit, none of Respondents' factual assertions bear scrutiny.

As detailed above, there is already an extensive factual record before the Court

documenting the sharp degeneration in Mr. al-Qahtani's mental state since Dr. Keram's first report

in 2016. In response to Dr. Keram, Respondents produced a declaration by the Senior Medical

Officer at Guantánamo. SMO Decl. (Aug. 21, 2017), ECF No. 372-2. That declaration, written by

a non-psychiatrist just a few years removed from medical residency, is based in relevant part

entirely on secondhand information; it does not appear that the SMO ever examined Mr. al-

Qahtani, and his declaration admits that Mr. al-Qahtani has not been fully assessed by clinicians

with the Behavioral Health Unit (BHU) at Guantánamo. *See id.* ¶¶ 3, 10, 15; Keram Third Suppl.

Decl. (Sept. 12, 2017), ECF No. 373, Ex. G, ¶ 20. Nonetheless, it is mainly notable for its

consistency with Dr. Keram's findings—particularly the fact that Mr. al-Qahtani manifests

symptoms of psychosis, *see* SMO Decl. ¶¶ 15, 17—and the Guantánamo Joint Medical Group's

acceptance of her findings. *See, e.g., id.* ¶ 17; *see also* Pet'r's Reply, ECF No. 373, at 24; Keram

Third Suppl. Decl. (Sept. 12, 2017), ECF No. 373, Ex. G, ¶¶ 3-8.

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

Respondents notably declined to submit any declaration by a medical expert with their present motion, which, together with the declaration by Steven Dalbey, a senior U.S. Department of Defense official, seek to draw conclusions about Mr. al-Qahtani's current health and ability to seek care based on the hearsay declaration that the SMO submitted back in 2017.[7] Respondents therefore have no firsthand or current observations—only Mr. Dalbey's "understanding," and what unnamed "medical personnel [have] advise[d]" him of—to support the idea that Mr. al-Qahtani is "stable" no less "improving." Indeed, the absence of any record of government doctors' observations of Mr. al-Qahtani based on direct examination itself speaks volumes to the quality of medical care he is receiving.

This leaves Dr. Keram as the only medical professional who has evaluated Mr. al-Qahtani over any significant period of time.[8] Her direct observations and those of undersigned counsel confirm that, in the five years since her first visit, Mr. al-Qahtani's condition has deteriorated to an alarming degree. To begin with, the symptoms of his underlying conditions remain severe. Dr. Keram's April 2018 declaration noted that he experiences "insomnia, impaired concentration and memory, hypervigilance, … exaggerated startle response," and "hopelessness," concluding "it remains my opinion that Mr. al Qahtani's symptoms … are worsening." Keram Fourth Suppl. Decl. (Apr. 14, 2018), ECF No. 377, ¶¶ 5, 17. The overall thrust of Dr. Keram's findings across

---

[7]        For instance, the Dalbey Declaration cites the 2017 SMO Declaration as support for the allegation that, *today*, "medical personnel advise that [Mr. al-Qahtani's] mental health condition does not affect his ability to perform his activities of daily living or otherwise function normally in the context of detention." Dalbey Decl. ¶ 4. Similarly, Respondents claim that Mr. al-Qahtani's mental condition is "stable," Mot. at 20, and that he manifests "symptomatic improvement," *id.* (quoting SMO Decl. ¶ 20), but provide no documented evidence of that improvement beyond multiple citations to the 2017 SMO Declaration and a passing reference to the supposed assessment by the current SMO. Indeed, the motion for a stay refers to a suicide attempt in 2018 (characterized as "para-suicidal"), which is at odds with the rosy picture otherwise presented therein. Mot. at 20.
[8]        The treating physicians at Guantánamo's BHU "change every 3 to 6 months." *See* Keram Fourth Suppl. Decl. (Apr. 14, 2018), ECF No. 377, ¶ 7.

11
UNCLASSIFIED//FOR PUBLIC RELEASE

her multiple writings on file with the Court is that Mr. al-Qahtani will remain unable to build trust with any medical staff at Guantánamo.[9]

Counsel submitted an *ex parte* Status Report in late 2019 to apprise the Court of a steep decline in Mr. al-Qahtani's mental and physical condition. The declaration supporting that status report (lodged at ECF No. 383-3) communicated Mr. al-Qahtani's deteriorating health conditions, including an inability to control his behavior that is triggered by his hallucinations, such as "screaming, being angry, throwing things, [and] taking off [his] clothes," which has understandably deterred interaction with fellow prisoners. Decl. of Ramzi Kassem (Sept. 4, 2019), Ex. 1, ¶ 35. In Mr. al-Qahtani's words, his condition has made it "hard for others to live with me ... [m]y screams bother the others," adding, "I find myself unable to control myself or listen to anyone else[.] I hear people talk to me when they haven't said a word. I tell them to shut up and they tell me they haven't spoken to me." *Id.* ¶¶ 37, 42. His deteriorating condition has not only worn him down physically and mentally but it has also caused him to withdraw considerably from interacting with family, missing six out of seven family calls in 2018 alone—a profound deviation from a previously rarely-interrupted pattern of regular communication. *Id.* ¶ 28.

Moreover, Mr. al-Qahtani's retreat from the world around him also affects his ability to communicate with his attorneys. Since June 2017, Mr. al- Qahtani has failed to attend multiple, important meetings, and then forgotten having done so. *Id.* ¶ 44. One such instance was in July

---

[9]      Keram Third Suppl. Decl. (Sept. 12, 2017), ECF No. 373, Ex. G, at ¶ 13 ("JTF personnel, including JMG clinicians, directly participated in al-Qahtani's torture at GTMO. This is the context in which al-Qahtani intermittently refuses to engage with current JMG and BHU clinicians. It is unreasonable to believe that a survivor of torture could divorce his experience of torture from reminders of that torture. For al-Qahtani, this incomprehensible violation of a clinician's primary duty to their patient ('first do no harm') resulted in an irreparable rupture in the trust that forms the basis of a therapeutic clinician-patient relationship. To maintain that the passage of time would mitigate this betrayal is to deny a patient his dignity."). *See also* Keram Fourth Suppl. Decl. (Apr. 14, 2018), ECF No. 377, at ¶¶ 13-14, 20.

UNCLASSIFIED//FOR PUBLIC RELEASE

2018, when his counsel were earnestly concerned that he would forget to attend his Periodic Review Board hearing. *Id.* ¶¶ 8-10. He arrived at the site, but on arrival, admitted not knowing what the hearing was about or why he was there, despite having had hours' worth of discussions with counsel on the topic. *Id.* Even in his independent life, Mr. al-Qahtani's mental deterioration eminently interferes with both his capacity to perform a basic daily regimen and with his ability—in his eyes—to "be a Muslim," as he recently relayed to counsel that he had forgotten how to pray. *Id.* ¶ 48.

His suicidal ideations have manifested in physical acts such as tying fabric around his neck as a threat to hang himself or slamming his head into the cement wall of his cell days before his 2018 PRB hearing "to make the noises stop." *Id.* ¶ 12. On a June 2019 phone call with Mr. al-Qahtani, counsel learned that he often cries for extended periods due to feelings of pain throughout his body and feelings of powerlessness to halt the hallucinations that keep him in his own mental prison within a prison. *Id.* ¶ 49. His continuous crying eventually alarmed the guards sufficiently to call for the medical team to intervene. *Id.* As a result, he was taken to the clinic for examination and presented with an increased dose of the sleeping pills he already takes, *id.*, which he refused as failing to address his underlying mental illness, telling counsel: "I'm already taking sleeping pills. I'm a human being, not a beast!" *Id.*

The 2017 SMO Declaration takes pains to excuse Respondents' belated acknowledgment of Mr. al-Qahtani's mental illness by pointedly noting that he would not at times "constructively engage with [Guantánamo Behavioral Health Unit] providers" and "has a history of refusing to take medication." SMO Decl. ¶¶ 15, 17.[10] Yet in the same breath the declaration notes that he was

---

[10]    For years Respondents had insisted that Mr. al-Qahtani was merely suffering from depression and anxiety as a result of his detention and narcissistic personality disorder. *See, e.g.,* SMO Decl. ¶ 15; Dalbey Decl. ¶ 4. It was only in 2017, in the wake of Dr. Keram's initial 2016

UNCLASSIFIED//FOR PUBLIC RELEASE

only recently acknowledged by Respondents to have symptoms of psychosis, and that he had in fact tried several anti-psychotic medications, with typically severe side-effects. *See id.*; Keram Fourth Suppl. Decl. (Apr. 14, 2018), ECF No. 377, ¶ 15. At the April 2018 hearing on Petitioner's Motion to Compel Examination by a Mixed Medical Commission, Judge Collyer spontaneously took issue with Respondents' insinuation that the continuation of Mr. al-Qahtani's schizophrenic symptoms results primarily from his own failure to consistently take antipsychotic medications that Guantánamo medical personnel only recently began prescribing him. As Judge Collyer put it:

> I find it extraordinarily difficult for the government to argue that Mr. al Qahtani, who, admittedly, has some mental problems, doesn't always take his medicine, and so, therefore, it's his own fault if he's not getting better at Guantanamo Bay. I'm sorry, that is a sign of his illness.
> It's not as if he had a broken bone and refused to allow a doctor to set it. That argument would have some bearing in that situation. It does not have bearing to accuse a person with a mental illness of having a mental illness. ...
> I mean, I find that so callous. It just makes me shiver that the United States would say, "well, you know, you're sick; and since you're so sick and you don't want to take medicine, it's your own fault that you're still sick." What are you talking about?
> Now, please, don't do that to me, okay? Don't go there, because I find that so chilling. That's not humane at all. ... [D]on't argue that it's his own fault. That is so callous. That is so inhumane. It really is not worthy of the United States, even today.

Hr'g Tr. (Apr. 19, 2018) at 51-52. In any event, undersigned counsel have no indication that he is presently even *prescribed* any antipsychotic medications. *Cf.* Kassem Decl. (Sept. 3, 2019), Ex. 1, ¶ 33.

Like many mentally ill people, for most of his life Mr. al-Qahtani was in denial about his condition. He (like his family) understood it not in psychiatric terms as a permanent illness but as a form of possession, for which the likely cure was religious ministration and prayer. Both he and

---

report, that observations from the guard force apparently convinced the mental health professionals at Guantánamo that "an underlying psychotic process" was at work behind his symptoms. SMO Decl. ¶ 17.

his family now fully accept that he has a psychiatric condition and needs medical treatment for it—in all likelihood, in psychiatric confinement—back home in Saudi Arabia. It remains the case that it can be difficult for him to tolerate the side effects of antipsychotic medications, as is the case with most schizophrenics. *See, e.g.*, SMO Decl. ¶ 17 (noting lack of psychiatric efficacy along with 40 pound weight gain on Abilify (aripiprazole)); Keram Fourth Suppl. Decl. (Apr. 14, 2018), ECF No. 377, ¶ 15. It also remains the case that his underlying disease—schizophrenia—is not curable, it can only be managed. *See* Pet'r's Reply, ECF No. 373, at 24 ("Medication, the focus of the Senior Medical Officer's declaration, would be at best palliative, not a magic bullet[.] Given the severity of his diagnosis and his history, Mr. al Qahtani requires multi-modal treatment with the involvement of his family, far from the place where he was tortured."). Dr. Keram perhaps summed it up best:

> [D]espite the availability of competent clinicians at Guantánamo and Mr. al-Qahtani's best efforts, he cannot receive effective treatment from them and would not achieve lasting therapeutic benefit from treatment there or in any other U.S. custodial setting. This is because he remains in the environment in which he was tortured, exposure to this environment causes continued symptoms, and the most effective treatment requires the involvement his family members.

Keram Second Suppl. Decl. (Dec. 2, 2016), ECF No. 369-1, Ex. E, ¶ 8. Respondents' claim that Mr. al-Qahtani's condition is stable and well-managed is, at best, a fiction.

### 3. *The Periodic Review Board Completely Lacks Medical Expertise*

Respondents state that "regardless of whether the Order remains in effect during [their] appeal, the Executive will continue to take into account Petitioner's mental and physical health when periodically determining whether it should continue to detain him" through the Periodic Review Board (PRB) procedure. Mot. at 20-21. Like the Combatant Status Review Tribunals, Administrative Review Boards, and Bagram Detainee Review Boards that preceded them, Respondents' Periodic Review Boards have no specific medical or psychiatric expertise to draw

upon. The PRB consists of representatives of six agencies—one senior official from the Departments of Defense, Homeland Security, Justice, and State; the Joint Staff, and the Office of the Director of National Intelligence. However, none of them need be a mental health or medical professional or have any expertise in the field.

In this regard, the PRB stands in sharp contrast with the design of a Medical Commission or Mixed Medical Commission, which consists entirely of medical experts. *See* Army Reg. 190-8, ch. 3, § 12(a)(2). The PRB is tasked with determining only whether "[c]ontinued law of war detention is warranted ... [as] necessary to protect against a continuing significant threat to the security of the United States." *See* Mem. from the Dep. Sec'y of Def., Directive-Type Mem. (DTM) 12-005, Implementing Guidelines for Periodic Review of Detainees Held at Guantanamo Bay per Exec. Order 13,567, to Sec'ies of the Mil. Dep'ts (May 9, 2012), Att. 3 (Periodic Review Procedures and Process), § 3.[11] What that determination consists of is ultimately left entirely to the discretion of the Board. *See id.* § 1 (PRB process reviews "continued discretionary exercise of existing detention authority"); *id.* § 1(b) (PRB process is "instituted as a matter of [executive] discretion" and may be suspended or amended at any time by President); *id.* at § 4(a) (PRB makes not legal but "discretionary determinations" about the threat posed by detainee). Indeed, consideration of mental health issues is discretionary: the PRB "may" consider "[t]he detainee's physical and psychological condition," but need not. *Id.* § 3(b)(6).

In contrast, the Mixed Medical Commission makes determinations as to "eligibility ... for repatriation or accommodation in a neutral country during hostilities" based on whether a prisoner is "sick or wounded." *See* Army Reg. 190-8, ch. 3, § 12(a); *see also id.* § 12(a)(2) ("The purpose

---

[11]     *Available at* https://www.prs.mil/Portals/60/Documents/DTM-12-005_Implementing_Guidelines_for_Periodic_Review_of_Detainees_Held_at.pdf.

of the Commission will be to determine cases eligible for repatriation."); *id.* § 12(c)(3) (Mixed Medical Commission shall "[d]etermine those cases eligible for repatriation or hospitalization in a neutral country"); *id.* § 12(f) ("The United States will carry out the decisions of the Mixed Medical Commission as soon as possible and within 3 months of the time after it receives due notice of the decisions."). Its determination, in short, is based on the health status of the prisoner and not on some broader, abstract concept of the threat posed by his repatriation. The discretionary, inexpert decision-making of the PRB is no substitute for the determinations of a Mixed Medical Commission or Medical Commission.

### 4.   *Mr. al-Qahtani May Not Remain in a Condition Permitting his Examination by a Mixed Medical Commission After a Stay*

As noted above, for many years, Mr. al-Qahtani could not bring himself to meet with mental health practitioners because clinicians participated in his systematic torture. His resistance to meeting mental health practitioners extended to various experts his habeas counsel attempted to have him meet with over the years; it was only with great difficulty that he agreed to meet with Dr. Keram. *See, e.g.*, Keram Supp. Decl. (July 12, 2016), ECF No. 369-1, Ex. D, ¶ 7.

Since Dr. Keram's initial evaluations and first report in 2016, Mr. al-Qahtani's mental health has followed a downward spiral, with his worsening symptoms of psychosis leading to further social isolation inside the prison, which in turn increases his inability to distinguish reality from hallucination. *See* Kassem Decl. (Sept. 3, 2019), Ex. 1, ¶¶ 13-16, 35-38, 54-55 ("[Mr. Al-Qahtani's] lack of social interaction with real people who speak his language (Arabic) [has] diminished his ability to distinguish reality from hallucination—real voices from the voices in his head, as it were."). As noted above, Mr. al-Qahtani's cognitive capacity seems to be diminishing rapidly, resulting in him missing meetings with counsel and losing track of important pending

UNCLASSIFIED//FOR PUBLIC RELEASE

events. Even more alarmingly, the record before this Court already reflects suicidal behavior on Mr. al-Qahtani's part.

Given Mr. al-Qahtani's past difficulties interacting with mental health professionals and the impact of his worsening condition, any delay in implementing this Court's order to convene a Mixed Medical Commission makes it more likely that the psychiatric evaluations required of the Commission will be more difficult—or outright impossible—to carry out. Respondents request a stay pending appeal which may well span two years in the normal course of appellate litigation. Under present circumstances, Mr. al-Qahtani cannot be made to bear the costs of that additional delay. *Cf. Boumediene*, 553 U.S. at 794-95 ("While some delay in fashioning new procedures is unavoidable, the costs of delay can no longer be borne by those who are held in custody.").

## B. Denying a Stay Would Not Irreparably Harm Respondents

The party moving for a stay is required to demonstrate that the irreparable injury claimed is "both certain and great, and actual and not theoretical." *Comm. on the Judiciary v. McGahn*, 407 F. Supp. 3d 35, 39 (D.D.C. 2019) (quoting *Citizens for Responsibility & Ethics in Washington ("CREW") v. Fed. Election Comm'n*, 904 F.3d 1014, 1019 (D.C. Cir. 2018) (per curiam)) (internal alterations and quotations omitted). Indeed, "[b]are allegations of what is likely to occur are of no value since the court must decide whether the harm will *in fact* occur." *Wis. Gas Co. v. F.E.R.C.*, 758 F.2d 669, 674 (D.C. Cir. 1985) (emphasis in original). "The key word in this consideration is *irreparable*. Mere injuries, however substantial, in terms of money, time, and energy necessarily expended in the absence of a stay are not enough." *Id.* (internal citation omitted) (emphasis in original). All of Respondents' anticipated injuries are bare allegations of what may occur absent a stay; as the court of appeals and this Court have ruled, such speculation is of no value. Respondents fail to show that convening a Mixed Medical Commission will expose the government to certain

UNCLASSIFIED//FOR PUBLIC RELEASE

and great injury, and thus fail to demonstrate the necessary likelihood of irreparable injury required to support a stay.

### 1. Convening a Mixed Medical Commission Would Not Upend the Status Quo

Respondents argue that "the Court's order sets forth no limiting principle" should other prisoners at Guantánamo seek examination. Mot. at 12 n.5. To the contrary, the limiting principle is baked into in the statutory scheme itself. This Court accurately recited who is entitled to examination by Mixed Medical Commission under Army Regulation 190-8. Mem. Op. at 20-21, ECF No. 386. Respondents' quibble here is with Congress: Army Regulation 190-8 is an executive regulation that was adopted pursuant to statutory authorization. *See* 10 U.S.C. §§ 121, 3061, 6011, 9061 (authorizing President to issue military regulations); *Al-Bihani v. Obama,* 619 F.3d 1, 14 n.3 (D.C. Cir. 2010) (Kavanaugh, J., concurring in denial of reh'g en banc) ("[I]nternational-law norms also may be incorporated into domestic U.S. law by way of executive regulations that have been adopted pursuant to statutory authorization. For example, Army Regulation 190–8 governs the treatment of enemy prisoners of war and other detainees … . [W]hen I refer to domestic U.S. law, the reference includes statutorily authorized executive regulations that have the force of law.").

The suggestion that creating a Mixed Medical Commission in Mr. al-Qahtani's case would be "simply unworkable," Mot. at 16, ignores the provision in domestic law of detailed guidance for such commissions, even including relevant forms. *See, e.g.,* Army Regulation 190-8, § 3-12 & p.53 (DA Form 2670-R, "Mixed Medical Commission Certificate for EPW"). In actuality, Army Regulation 190-8, the domestic law provision at issue here, together with the underlying treaty obligations that it incorporates, provide a turnkey scheme that sets forth clearly how a Mixed Medical Commission or Medical Commission should be appointed and what its composition ought

to be. The scheme flexibly accounts for a variety of situations, including Mr. al-Qahtani's. Respondents' bottom line, that there are no "Protecting Powers" here, is simply mistaken. The applicable rules contemplate the ICRC acting as a Protecting Power and participating in the process of convening a Medical Commission (as distinct from a Mixed Medical Commission). *See id.* § 1-5(e) ("A neutral state or an international humanitarian organization, such as the ICRC, may be designated … as a Protecting Power (PP)."); *id.* § 3-12(b) ("If for any reason the use of neutral doctors cannot be arranged for by the ICRC, the United States, acting in agreement with the Protecting Power concerned, will set up a Medical Commission. This Commission will perform the duties of a Mixed Medical Commission.").[12]

Importantly, Mr. al-Qahtani is a national of the Kingdom of Saudi Arabia. His government has made clear, officially and on the record of these proceedings, that it would welcome him home. *See* Letter from Mohammed A. Al-Muttairi, Dir.-Gen. of Legal Affairs & Int'l Cooperation, Ministry of the Interior, Saudi Arabia to the Periodic Review Board (Aug. 16, 2015), ECF No.

---

[12]     Respondents' assertion that the current pandemic prohibits them from even initiating the Mixed Medical Commission process does not begin to explain why such work, including the interagency coordination and deliberation Respondents describe, cannot be undertaken remotely. As to Respondents' concerns about the pandemic preventing any examination for the "foreseeable future," Dalbey Decl. ¶ 7, appeals are themselves lengthy endeavors, allowing time for present circumstances to change. In 2019, in the D.C. Circuit, the median time from the filing of a notice of appeal or docket date to the last opinion or final order was 9.8 months, and 26.1 months from the filing in the lower court to the last opinion or final order in the appeals court. U.S. Courts, *U.S. Courts of Appeals—Median Time Intervals in Months for Cases Terminated on the Merits, by Circuit, During the 12-Month Period Ending September 30, 2019* (2019), https://www.uscourts.gov/sites/default/files/data_tables/jb_b4_0930.2019.pdf. While the timeline for a vaccine for COVID-19 is uncertain, communities and institutions are finding ways to continue their work; surely, the logistical apparatus at Guantánamo is no exception. "It takes time to decide a case on appeal. Sometimes a little; sometimes a lot. 'No court can make time stand still' while it considers an appeal, and if a court takes the time it needs, the court's decision may in some cases come too late." *Nken*, 556 U.S. at 421 (quoting *Scripps–Howard Radio, Inc. v. FCC*, 316 U.S. 4, 9 (1942)).

369-1, Ex. F; Hr'g Tr. (Apr. 19, 2018) at 64:11-16 (counsel noting presence of representative from Saudi Embassy in court to observe hearing).

Finally, the Court's exercise of its jurisdiction in this case by ordering the establishment of a Mixed Medical Commission does not "command[] the Executive to take affirmative, unprecedented actions." Mot. at 15. The United States has convened Mixed Medical Commissions before. For instance, during World War II, under the predecessor 1929 Geneva Convention, the United States activated Mixed Medical Commissions beginning "in November 1943 to examine sick and wounded German prisoners to determine their eligibility for repatriation." Lt. Col. James T. McGibony, *Hospitalization and Disposition of PW Patients in the United States*, Military Rev., June 1947, at 60, 63-64. Nor is there anything daunting about the single case presented here: "From the activation of the mixed medical commission in 1943 until its deactivation in 1945, approximately 8,000 German prisoners were examined. Of this number over 1,000 were found eligible for direct repatriation which was accomplished." *Id.*; *see also*, Headquarters Army Service Forces, Office of the Provost Marshal General, *World War II, A Brief History* 500-04 (1946) (describing operations of Mixed Medical Commissions). Even under the 1949 treaty, Mixed Medical Commissions have not fallen into disuse. *See, e.g.*, Int'l Comm. Red Cross, *Annual Report 1982* at 64-65 (1982) (describing Mixed Medical Commissions in both Iraq and Iran during armed conflict); Dep't of Def., Law of War Manual § 9.36.5 (2015) (mandating appointment of Mixed Medical Commissions upon outbreak of hostilities)."

While Judge Collyer acknowledged that a Mixed Medical Commission would be "unusual" and "likely burdensome," Mem. Op. at 24, that does not make a Mixed Medical Commission unduly burdensome or unwarranted, as required to earn a stay pending appeal. Respondents claim that setting up Mixed Medical Commission procedures in this context would require "extensive

UNCLASSIFIED//FOR PUBLIC RELEASE

coordination among multiple Executive agencies and potentially ... consultation with international partners." Mot. at 15-16; *see also* Dalbey Decl. ¶ 3. Even assuming *arguendo* that such extensive coordination is required, that is all the more reason *not* to stay the Court's order. Respondents should use the time while the appeal is pending to complete the coordination process so that a Mixed Medical Commission can promptly evaluate Mr. al-Qahtani if the court of appeals affirms this Court's order. Any other approach would come at the expense of Mr. al-Qahtani, who, having already spent eighteen years in U.S. custody without trial, would have to wait years more until the final disposition of the appeal and, even if he were to prevail, would then have to languish longer still while the "extensive coordination" Respondents describe occurs. That would run afoul of the Supreme Court's unequivocal admonition that "the costs of delay can no longer be borne by those who are held in custody." *Boumediene*, 553 U.S. at 795.

### 2. *Mr. al-Qahtani Would Pose No Threat if Repatriated*

As an initial matter, the lengthy medical record in this case demonstrates that Mr. al-Qahtani's physical and mental condition are not such that he can meaningfully engage in any kind of war or hostilities. Dr. Keram has explained that, "from the perspective of a forensic psychiatric Violence Risk Assessment, Mr. al-Qahtani's psychiatric diagnoses do not place him at risk for future violence." Keram Second Suppl. Decl. (Dec. 2, 2016), ECF No. 369-1, Ex. E, ¶ 11; Keram Supp. Decl. (July 12, 2016), ECF No. 369-1, Ex. D, ¶ 8. Moreover, "Mr. al-Qahtani eschews violence and has accepted the limitations in occupational and social functioning imposed by his psychiatric illnesses," *id.*, so "there are protective factors in place that argue against the possibility of Mr. al-Qahtani engaging in future violence." Keram Second Suppl. Decl. ¶ 11.

Respondents insist that, under the medical repatriation framework set out by domestic law and the treaty obligations it incorporates and implements, the opposing party is supposed to prevent

the repatriated prisoner from joining the battle, and that because the opposing party here is al-Qaida, there is no guarantee that they will do so. But, obviously, Mr. al-Qahtani would not be medically repatriated *to al-Qaida*. As Respondents' own declarant had to acknowledge, al-Qaida is not a country. Dalbey Decl. ¶ 4 ("[T]he opposing party to the conflict is not another State, but al-Qaida."). Rather, Mr. al-Qahtani would be repatriated to the Kingdom of Saudi Arabia, one of the U.S. government's staunchest allies in the world, and into the custody of a government that has successfully received scores of returnees from Guantánamo. Psychiatric confinement, almost certainly within the Saudi government's custodial rehabilitation program, would be his destination.

Respondents' declarant is disingenuous, however, when he states that there can be no "credible commitment that GTMO and other al-Qaida detainees who are medically repatriated would refrain or be prevented from engaging in hostilities." Dalbey Decl. ¶ 4. Some of the statutes Respondents cite already require that commitment. Indeed, one of the "security requirements" for receiving countries is a certification that they have agreed to take steps to "substantially mitigate any risk" of purported recidivism. Nat'l Defense Auth. Act for Fiscal Year 2016 § 1034(b), Pub. L. No. 114-92, 129 Stat. 726, 969-70 (2015); cited at Mot. at 18 n.7. Foreign governments have offered commitments pursuant to this statute and Respondents have accepted them as credible before repatriating or resettling other Guantánamo prisoners, including to Saudi Arabia under this administration.[13] That disposes of Respondents' proclaimed concern.

And, again, the "credible commitment" Respondents seek has already been given here, at least in significant part, in the form of an official letter from the Saudi government, supporting Mr.

---

[13]     *See* Charlie Savage, *U.S. Transfers First Guantánamo Detainee Under Trump, Who Vowed to Fill It*, The New York Times (May 2, 2018), *available at* https://www.nytimes.com/2018/05/02/us/politics/guantanamo-detainee-transferred-trump-al-darbi.html.

UNCLASSIFIED//FOR PUBLIC RELEASE

al-Qahtani's motion. Letter from Mohammed A. Al-Muttairi, ECF No. 369-1, Ex. F. In that letter, the Saudi government affirmed its willingness to welcome Mr. al-Qahtani home and stated that, for over a decade, Saudi Arabia has successfully "provided appropriate security and humane treatment assurances [sic]" to facilitate the transfer of over 100 prisoners from Guantánamo. *Id.* The letter also noted that Saudi Arabia's rehabilitation program is "among the most successful in the world, as evidenced by a low recidivism rate." *Id.* An senior official from the Saudi embassy also attended the last hearing before this Court, as pointed out at oral argument. Hr'g Tr. (Apr. 19, 2018) at 64:11-16. It seems Respondents refuse to take yes for an answer.

### 3. *Respondents Exaggerate the Risk that Other Guantánamo Prisoners Would Abuse the Mixed Medical Commission Process*

Respondents make much of the possibility that other prisoners at Guantánamo may seek to avail themselves of a Mixed Medical Commission. The specter of a paralyzing flood of requests that Respondents conjure is not only speculative, it is also implausible under the circumstances. To put Respondents' claims into perspective, only forty prisoners remain at Guantánamo today.[14] If one or more request examination by a Mixed Medical Commission in writing, surely that will not bring the operation of Joint Task Force-Guantánamo (JTF-GTMO) to a screeching halt. Indeed, if another prisoner does ask to be examined, the Department of Defense can either accede to their written request or deny it, as it did in this case. That prisoner would have the option of filing a motion to compel in district court, as Mr. al-Qahtani did.[15] The district court would then decide whether or not to grant that motion to compel. The government can decline requests from any

---

[14]     *See The Guantánamo Docket: 40 Current Detainees*, The New York Times, *available at* https://www.nytimes.com/interactive/projects/guantanamo/detainees/current.

[15]     Mr. al-Qahtani's motion, of course, was supported by ample expert testimony based on extensive evaluation by an independent specialist, which included both review of his pre-detention mental health records and lengthy interviews with him, resulting in one report and four supplemental declarations for a total of no fewer than five submissions by Dr. Keram.

suspected malingerers, or this Court would deny their subsequent motions, or the Mixed Medical Commission itself would weed them out in its expert examination.

In the end, even if a court were to grant or the Department of Defense agreed to allow a prisoner an examination by Mixed Medical Commission, the Commission itself would easily sort wheat from chaff. In other words, even if the Court were to entertain the wholly speculative parade of horribles depicted in Rear Admiral Kuehhas' declaration, any Mixed Medical Commission (or Medical Commission), by definition, would be composed of medical experts who would quickly be able to see through any false claims by malingering prisoners and by prisoners who actually created or significantly contributed to the medical conditions of which they complained—although it should be noted that it is difficult to imagine how a prisoner could harm himself in a way that meets the standards of the Army Regulations and Geneva Convention. *See* Army Regulation 190-8, § 3-12(l)(2) (mandating repatriation of prisoners whose condition is "chronic to the extent that prognosis appears to preclude recovery in spite of treatment within [one] year from inception of disease or date of injury"); Geneva Convention Relative to the Treatment of Prisoners of War, Art. 110, Aug. 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S 135 (hereinafter "Third Geneva Convention") (obligating repatriation of those who are "[w]ounded and sick who, according to medical opinion, are not likely to recover within one year, whose condition requires treatment and whose mental and physical fitness seems to have been gravely diminished").[16]

More broadly, self-harm has long been a reality at Guantánamo. Respondents' line of argument smacks of the same sort of victim-blaming that drew the Court's strong condemnation

---

[16]    Nowhere do Respondents explain how the hypothetical prospect of Guantánamo prisoners harming themselves as news of the Court's Order spreads, Kuehhas Decl. ¶¶ 8-9, is unique to prisoners at Guantánamo. That same possibility exists with respect to "enemy" prisoners of any stripe in any conflict. Again, this is fundamentally an argument against the statutory scheme itself, not its particular application here in the Guantánamo context.

at oral argument. Hr'g Tr. (Apr. 19, 2018) at 52:5-12 ("I find that so callous. It just makes me shiver that the United States would say, well, you know, you're sick; and since you're so sick and you don't want to take medicine, it's your own fault that you're still sick. ... Now, please, don't do that to me, okay? Don't go there, because I find that so chilling. That's not humane at all.").

Finally, Respondents' reliance on *Dhiab v. Trump* is misplaced. In *Dhiab*, the petitioner had already been released to Uruguay, and the reviewing court faced only the question whether recordings of the petitioner being force-fed and forcibly removed from his cell should be released to the public given that they had become part of the record of the proceeding. *Dhiab v. Trump*, 852 F.3d 1087, 1090 (D.C. Cir. 2017). The freedom and health of a human being did not hang in the balance, as they do here.

### 4. *High Value Detainees Facing Trial by Military Commission Would Not Necessarily Be Eligible for Examination by a Mixed Medical Commission*

Any of the nine so-called "High Value Detainees" referred for trial by military commission who seek examination by a Mixed Medical Commission in habeas corpus proceedings would have to contend with the *Councilman* abstention doctrine. *Schlesinger v. Councilman*, 420 U.S. 738 (1975). *Councilman* allows Respondents to move to halt a prisoner's habeas proceedings in order to allow the criminal case against that prisoner to proceed first. *Id.* at 756-58. Respondents have not hesitated to invoke the doctrine in Guantánamo cases. *See, e.g., Al-Nashiri v. Obama*, 76 F. Supp. 3d 218 (D.D.C. 2014) (granting Respondents' motion to hold habeas petition in abeyance while military commission trial was pending), *aff'd sub nom. In re Al-Nashiri*, 835 F.3d 110 (D.C. Cir. 2016); Resp'ts' Mot. to Dismiss Habeas Pet. Without Prejudice or, Alternatively, to Hold Pet. in Abeyance Pending Completion of Military Commission Proceedings at 8-9, *Al Darbi v. Obama*, Case No. 05-CV-2371 (RCL), 2009 WL 949088 (D.D.C. Apr. 7, 2009) (arguing that habeas petition should be dismissed or held in abeyance until completion of military commission

proceedings). It is improbable that denying the stay Respondents seek in this case would jeopardize their interests in ongoing military commission proceedings in any significant way.

### 5.  *Respondents' Claim that Implementation of this Court's Order Would Effectively Moot Their Appeal Is Speculative at Best*

Finally, Respondents invoke a prospect that even they concede is remote at this stage—Mr. al-Qahtani's release—to support their request for a stay. Mot. at 18 (presenting this claim "aside from the *more immediate* harms discussed above") (emphasis added). The concern about their appeal being mooted by Mr. al-Qahtani's release as a consequence of the Court's order requires multiple leaps. This Court did not order Mr. al-Qahtani repatriated; it required his examination by a Mixed Medical Commission. The difference matters. While undersigned counsel believe that the Mixed Medical Commission or Medical Commission will echo Dr. Keram's findings, the Commission could decide that Mr. al-Qahtani should not be repatriated. In any event, "*every* stay-pending-appeal request concerning injunctive relief that a lower court has ordered involves a risk that interim compliance will moot the appeal; yet, courts have required more—i.e., that the injury suffered be irreparable in nature—in order to substantiate the stay." *Comm. on the Judiciary*, 407 F. Supp. 3d at 42 (emphasis in original).

A stay on grounds that Mr. al-Qahtani's eventual release would moot Respondents' appeal would be premature at this stage. Should a Mixed Medical Commission or Medical Commission be allowed to perform its role and should it later conclude that Mr. al-Qahtani meets the criteria under domestic law for medical repatriation, Respondents would have two choices. They could affirmatively seek a stay from this Court or the court of appeals at that point in time, if the appeal is still pending, asserting the same grounds, which would then be ripe for adjudication. Or, if Respondents choose to ignore the conclusion and recommendation of the Medical Commission,

the matter would be back before this Court for resolution in habeas, again presenting a more timely opportunity for Respondents to seek a stay pending disposition of their appeal.

Respondents' reliance on *Al-Adahi v. Obama* to support their position on this point is misplaced: that case concerned the appeal of a granted writ of habeas corpus in which the court had already ordered the government to "take all necessary and appropriate diplomatic steps to facilitate Petitioner's release forthwith." *Al-Adahi v. Obama*, Case No. 05-CV-280 (GK), 2009 WL 2584685, at *16 (D.D.C. Aug. 21, 2009), *rev'd*, 613 F.3d 1102 (D.C. Cir. 2010). No such final determination has been made here. This Court ordered an examination by a Mixed Medical Commission, not Mr. al-Qahtani's repatriation.

## C. Respondents Are Unlikely to Succeed on the Merits of Their Appeal Because Army Regulation 190-8 Applies Here

Respondents fail to satisfy the stringent standard to demonstrate the requisite likelihood of success on the merits of their appeal. "[A] party seeking a stay pending appeal must 'raise questions going to the merits so serious, substantial, difficult, and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation.'" *Comm. on the Judiciary*, 407 F. Supp. at 38-39 (quoting *Holiday Tours*, 559 F.2d at 844) (alterations omitted). "A movant's failure to satisfy this stringent standard for demonstrating a likelihood of success on the merits is 'an arguably fatal flaw for a stay application.'" *Id.* at 38-39 (quoting *CREW*, 904 F.3d at 1019).

Beyond the threshold question whether the Court's Order is immediately reviewable, Respondents ineffectually attempt to distinguish the instant case from *Al Warafi v. Obama* ("*Al Warafi II*"), 716 F.3d 627 (D.C. Cir. 2013), *cert. denied*, 572 U.S. 1100 (2014), where the D.C. Circuit held plainly that prisoners in Mr. al-Qahtani's position can invoke Army Regulation 190-8 in habeas proceedings. This Court has correctly recognized Mr. al-Qahtani's status as an "other detainee" who is protected by Army Regulation 190-8. He is not, as Respondents claim, attempting

UNCLASSIFIED//FOR PUBLIC RELEASE

to invoke "through [Army Regulation] 190-8 the privileges afforded prisoners of war under the Third Geneva Convention." Mot. at 9. Rather, Mr. al-Qahtani is availing himself of a domestic law, Army Regulation 190-8, in these habeas proceedings to seek release from captivity.

### 1.  *Respondents Face Many Procedural Hurdles in Appealing the Court's Interlocutory Order*

As a threshold matter, it is no foregone conclusion that the Court's interlocutory order is immediately reviewable under the collateral order exception to the final judgment rule. 28 U.S.C. § 1291. The "small category" of collateral rulings that are reviewable as final orders "includes only decisions that are conclusive, that resolve important questions separate from the merits, and that are effectively unreviewable on appeal from the final judgment in the underlying action." *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 106 (2009). Similarly, assuming solely for the sake of argument but without conceding that the Court's Order constitutes an injunction, an interlocutory appeal under 28 U.S.C. § 1292(a)(1) of an order granting an injunction is also construed as a narrow exception to the final judgment rule and is "available only in circumstances where an appeal will further the statutory purpose of permit[ting] litigants to effectually challenge interlocutory orders of serious, perhaps irreparable, consequence." *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 84 (1981) (internal citations and quotations omitted). Orders which have the "practical effect" of an injunction are immediately reviewable under 28 U.S.C. § 1292(a)(1) only if they affect predominantly all of the merits of the case or if they "might have a 'serious, perhaps irreparable, consequence,' and … can be 'effectually challenged' only by immediate appeal." *Salazar ex rel. Salazar v. District of Columbia*, 671 F.3d 1258, 1262 (D.C. Cir. 2012) (quoting *Carson*, 450 U.S. at 84).

The Court's March 6, 2020 Order is reviewable on appeal from a final judgment in Mr. al-Qahtani's underlying habeas action. In the event that the Mixed Medical Commission recommends

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

Mr. al-Qahtani's repatriation and Respondents choose not to implement that recommendation, this matter would return before this Court for resolution in habeas. If Mr. al-Qahtani then prevails and obtains a writ of habeas corpus based on the Commission's recommendation, Respondents would be able to appeal both the Court's March 6, 2020 Order and any final judgment. While Respondents speculate that implementing the Court's Order would produce all manner of burdens, "[t]hat a ruling 'may burden litigants in ways that are only imperfectly reparable by appellate reversal of a final district court judgment … has never sufficed'" to show that an order is effectively unreviewable. *Mohawk Industries*, 558 U.S. at 107 (quoting *Digital Equipment Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 872 (1994)). Indeed, "'the substance of the rights entailed, rather than the advantage to a litigant in winning his claim sooner,' is dispositive." *Digital Equipment*, 511 U.S. at 879 (quoting *Van Cauwenberghe v. Biard*, 486 U.S. 517, 524 (1988)) (alterations omitted). Here, the rights and values at stake, Mr. al-Qahtani's liberty and health, as well as Respondents' adherence to domestic law, are paramount and weigh in Mr. al-Qahtani's favor. Petitioner intends to raise these objections before the court of appeals, which Respondents would have to overcome.

Should the court of appeals agree that the Court's Order is not immediately reviewable under either the collateral order exception or 28 U.S.C. § 1292(a)(1), Respondents would then need to seek leave out of time from both this Court and the court of appeals to appeal the March 6 Order, pursuant to 28 U.S.C. § 1292(b), placing additional procedural hurdles in their path and further lowering their likelihood of success on the merits.

### 2. Al Warafi II *Is Binding Precedent*

Respondents maintain that *Al Warafi II* does not "compel" this Court's holding, Mot. at 10, but *Al Warafi II* is the binding law of this circuit on the question at the heart of the Court's recent ruling. There, the D.C. Circuit held that "Army Regulation 190–8 is domestic U.S. law, and in a

30

habeas proceeding such as this, a detainee may invoke Army Regulation 190-8." 716 F.3d at 629; *see also* Mem. Op. at 18 ("*Al Warafi II* held that Army Regulation 190-8 is domestic law which may be invoked in habeas proceedings.").

Respondents remain in denial about binding precedent they dislike. Importantly, they are necessarily unlikely to succeed on the merits in what is effectively an appeal of *Al Warafi II*: any panel of the court of appeals reviewing the Order will be bound by the rule of interpanel accord, under which only the court of appeals sitting en banc can overrule a panel's decision in a prior case. *See, e.g., United States v. Caldwell*, 543 F.2d 1333, 1369-70 (D.C. Cir. 1974); *United States v. Bryant*, 471 F.2d 1040, 1046 (D.C. Cir. 1972). To have their appeal on this issue heard—let alone to succeed—Respondents would have to move the court of appeals to grant initial hearing or rehearing en banc, which would require them to persuade a majority of voting judges on the court of appeals.

Respondents make much of the fact that *Al Warafi II* analyzed whether the petitioner in that case qualified for the protections afforded "medical personnel" under the First Geneva Convention, while Mr. al-Qahtani seeks protection as an "other detainee" under the Third Geneva Convention. This is a distinction without a difference: there is no inherent reason why that one part of the Geneva Conventions would be relevant but not the one at issue here. Respondents themselves routinely invoke other parts of the Geneva Conventions scheme—to wit, Article 118 of the Third Geneva Convention—to justify detaining people until the cessation of hostilities. *See, e.g.*, Br. for Resp'ts in Opp'n on Pet. for a Writ of Cert. at 14-15, *al-Alwi v. Trump*, 139 S. Ct. 1893 (2019) (No. 18-740) ("To the contrary, petitioner's authorities addressing international armed conflicts confirm the 'open-ended and unqualified' nature of the basic rule.") (citing Third Geneva Convention, Art. 118); Public Br. for Appellees at 14, *al-Alwi v. Trump*, 901 F.3d 294 (D.C. Cir.

2018) (No. 17-5067) ("The Geneva Conventions similarly require that prisoners of war be released only at the 'cessation of active hostilities.'") (citing same). Further, as the court of appeals reiterated, "[t]he Geneva *Conventions* and their commentary provide a roadmap for the establishment of protected status." *Al Warafi II*, 716 F.3d at 631 (emphasis added). This Court need not limit its analysis to the Third Convention.

Respondents also seek to draw a distinction between people affiliated with the Taliban and those allegedly affiliated with al-Qaida in their bid to deprive Mr. al-Qahtani of the protections of this domestic law. To this end, they cherry-pick language from *Al Warafi II* that, when quoted completely, speaks of the Taliban in terms that are all but identical to those Respondents use regarding al-Qaida. *Compare* Mot. at 11 ("Indeed, *Al Warafi II*'s holding supports Respondents' position here: because al-Qaida did not comply 'with the requirements of the Geneva Conventions,' its forces (including Petitioner) 'are not entitled to the protection of the Convention.'") (quoting *Al Warafi II*, 716 F.3d at 632), *with Al Warafi II*, 716 F.3d at 632 ("Without compliance with the requirements of the Geneva Conventions, the Taliban's personnel are not entitled to the protection of the Convention."). The U.S. government's position has always been that both Taliban and al-Qaida affiliated detainees do not enjoy protection as prisoners of war under the Geneva Conventions. White House Mem., Humane Treatment of Taliban and al Qaeda Detainees 2 (Feb. 7, 2002).[17] That did not prevent the court of appeals in *Al Warafi II* from applying domestic law implementing the Conventions to an alleged "enemy combatant" detainee whom Respondents notably described as "an al-Qaida operative" who traveled to Afghanistan to "fight

---

[17]     *Available at* https://www.aclu.org/other/memo-president-bush-white-house-senior-executive-branch-officials-regarding-humane-treatment.

with the Taliban." Narrative for Pet'r Makhtar Yahia Naji al Warafi (ISN 117) at 1, *Al Warafi v. Obama*, Case No. 04-CV-1254, 2015 WL 4600420 (D.D.C. July 30, 2015).

The court of appeals' binding holding is clear: Army Regulation 190-8 is "domestic U.S. law" and can be invoked in habeas proceedings irrespective of Respondents' classification of the person invoking it. *Al Warafi II*, 716 F.3d at 629; *see also* 10 U.S.C. §§ 121, 3061, 6011, 9061 (authorizing President to issue military regulations such as Army Regulation 190-8); *Al-Bihani*, 619 F.3d at 14 n.3 (Kavanaugh, J., concurring in denial of reh'g en banc) (citing Army Regulation 190-8 as an example of "domestic U.S. law," including "statutorily authorized executive regulations that have the force of law"). Respondents' reliance on *Al Warafi II* to support their contention that, because al-Qaida did not comply with the requirements of the Geneva Conventions, its forces (including, allegedly, Mr. al-Qahtani) are not entitled to the protection of the Conventions, is thus misplaced.[18] In *Al Warafi II*, the petitioner's classification as a member of a "transnational terrorist organization" or of the armed forces of a High Contracting Party would have turned on whether the conflict at the time of his capture was characterized as international or non-international in nature. But neither the court of appeals nor the Supreme Court have needed to squarely characterize the conflict at issue.[19]

Finally, Respondents again attempt to make hay of the reference to "eligibility" in domestic law, contrasting it with the reference to "entitlement" in *Al Warafi II*. Mot. at 11. But neither source

---

[18]    Mr. al-Qahtani disputes Respondents' unproven allegations about his membership in al-Qaida.

[19]    A concurring opinion in *Al Warafi II* suggests an acceptance that it is an open question. *See Al Warafi II*, 716 F.3d at 633 n.1 (Brown, J., concurring) ("Because Al Warafi has failed to produce the requisite indicia of protected status, however, we need not reach the vexing questions whether Al Warafi was a member of a transnational terrorist organization or the armed forces of a High Contracting Party, and if the former, whether he is categorically barred from invoking the supplemental protections of Article 24.").

supports Respondents' pettifogging. Domestic law requires that Respondents determine Mr. al-Qahtani's eligibility for repatriation. *See* Army Regulation 190-8, § 3-12(a) ("Sick and wounded prisoners will be processed and their eligibility determined for repatriation or accommodation in a neutral third country . . . according to the procedures set forth."). Moreover, reading the provision of domestic law together with the plain text of the Geneva Convention further clarifies that there is no room for discretion by the captor: sick prisoners who meet the criteria must be repatriated. *See* Third Geneva Convention, Arts. 109-110 (obligating repatriation of those who are "[w]ounded and sick who, according to medical opinion, are not likely to recover within one year, whose condition requires treatment and whose mental and physical fitness seems to have been gravely diminished"); *Al Warafi II*, 716 F.3d at 629 (holding that domestic law incorporating treaty provisions must be analyzed together with those treaty provisions); *Aamer v. Obama*, 58 F. Supp. 3d 16, 23 (D.D.C. 2014) (same). To the extent there is any discrepancy between, on the one hand, the reference to "eligibility" in Army Regulation 190-8—and, a fortiori, the reference in *Al Warafi II* to "entitlement"—and, on the other hand, the obligation imposed by treaty, the latter controls. This Court has already held as much in *Aamer v. Obama*, 58 F. Supp. 3d at 21, quoting the domestic law provision that "[i]n the event of conflicts or discrepancies between [the] [R]egulation and the Geneva Conventions, the provisions of the Geneva Conventions take precedence." Army Regulation 190-8, § 1-1.

### 3. *This Court Correctly Recognized Mr. al-Qahtani's Status as an "Other Detainee"*

Under both domestic law and the law of war, if any doubts arise as to whether a person belongs to any of the categories enumerated in Article 4 of the Third Geneva Convention, such a person, characterized as an "other detainee," is to be treated and enjoys the protection of the Convention as an enemy prisoner of war until such time as their status has been determined by a

competent tribunal. *See* Army Regulation 190-8, § 1-6(a) & Appendix B, § II – Terms, "Other Detainee (OD)"; Third Geneva Convention, Art. 5. As the Court has already noted, "Section 3-12 states that detainees who are, or are being treated as, enemy prisoners of war or retained personnel are 'eligible for direct repatriation'" if certain conditions are met. *Aamer*, 58 F. Supp. 3d at 22. The Court correctly held that "Mr. al-Qahtani meets the criteria for an 'other detainee' in Army Regulation 190-8: he is a person in the custody of the United States and he has not been otherwise classified as either an enemy prisoner of war, retained person, or civilian internee." Mem. Op. at 20.

Respondents reiterate that Mr. al-Qahtani was designated an "enemy combatant" by a Combatant Status Review Tribunal ("CSRT"), but that designation is not dispositive. In *Al Warafi II*, "by implication, the Circuit found that mere designation as an 'enemy combatant' did not render Army Regulation 190-8 inapplicable." Mem. Op. at 20. As this Court has further noted, the term "enemy combatant" is not defined or listed in Army Regulation 190-8 and is not defined by Respondents in this case. *Id.* n.8. ("The Supreme Court has previously noted the government's reluctance to officially define 'enemy combatant.'"); *see also Hamdi v. Rumsfeld*, 542 U.S. 507, 516 (2004) ("There is some debate as to the proper scope of th[e] term [enemy combatant], and the Government has never provided any court with the full criteria that it uses in classifying individuals as such.").

By relying on the Executive's 2002 determination that people whom it deems part of al-Qaida are not entitled to prisoner-of-war protections under the Geneva Convention, Respondents once more put forth a specious syllogism. Their contention is that, because "in February 2002 President George W. Bush determined that al-Qaida personnel do not qualify for prisoner of war status under the Third Geneva Convention," and a CSRT subsequently found Mr. al-Qahtani to be

UNCLASSIFIED//FOR PUBLIC RELEASE

affiliated with al-Qaida—a determination that he disputes—Mr. al-Qahtani is therefore not protected by Army Regulation 190-8. Mot. at 12. In sum and substance, Respondents argue that the key legal determination was actually made upstream of the CSRT, in blanket fashion, by the President himself, when he decided that both al-Qaida and Taliban-affiliated individuals did not qualify for the protections afforded by the Geneva Conventions.

In aid of their contention, Respondents offer *Hamdan v. Rumsfeld* as "recognizing" the President's February 2002 determination regarding al-Qaida personnel. Mot. at 12. But, there, all the Supreme Court did was note—without endorsing—a presidential statement regarding the Taliban. *See Hamdan v. Rumsfeld*, 548 U.S. 557, 629 n.60 (2006) ("The President has stated that the conflict with the Taliban is a conflict to which the Geneva Conventions apply."). In fact, far from endorsing Respondents' position, *Hamdan* rejected the President's February 2002 reasoning that no part of the Geneva Conventions applies. *See id.* at 630 ("The Court of Appeals thought, and the Government asserts, that Common Article 3 does not apply to Hamdan because the conflict with al Qaeda, being 'international in scope,' does not qualify as a 'conflict not of an international character.' That reasoning is erroneous.") (internal citations omitted). In relying on the President's 2002 determination, Respondents attempt again to shift the goalposts to focus on some alleged distinction between al-Qaida and Taliban membership, rather than keeping this Court's focus on what the applicable statute asks: whether a "competent tribunal" has made a valid status determination regarding Mr. al-Qahtani.

Respondents claim that Mr. al-Qahtani's "legal status [has been] ascertained by competent authority," Mot. at 12 (quoting Army Regulation 190-8, App. B, § II – Terms), specifically by the Executive branch. However, the President is not a competent tribunal, as two Supreme Court Justices have stated. *See Hamdi*, 542 U.S. at 550 (Souter & Ginsburg, JJ., concurring) ("[R]eliance

UNCLASSIFIED//FOR PUBLIC RELEASE

on this categorical pronouncement to settle doubt is apparently at odds with … Army Regulation 190–8, ch. 1, §§ 1–5, 1–6 (1997), adopted to implement the Geneva Convention, and setting out a detailed procedure for a military tribunal to determine an individual's status.").

### 4. Mr. al-Qahtani May Invoke Army Regulation 190-8 Regardless of the Characterization of the Conflict at Issue

In *Al Warafi II*, undeterred by Respondents' characterization of the same conflict as non-international in nature, the court of appeals delved into the specific protections afforded "Retained Personnel" under the Geneva Conventions as it construed and applied the domestic law provisions of Army Regulation 190-8. 716 F.3d at 629-31. If Respondents' characterization of the conflict determined the applicability of Army Regulation 190-8 to the petitioner in that case, then the court of appeals would have stopped at that threshold characterization of this very conflict instead of conducting its thorough analysis.

While the Court in this case accordingly did not need to address the nature of the conflict to grant Mr. al-Qahtani the relief he seeks, it is important to note that there is no controlling authority finding that the conflict out of which Mr. al-Qahtani's open-ended imprisonment arose was non-international in nature. Again, neither the court of appeals nor the Supreme Court have squarely characterized the conflict at issue. The Supreme Court specifically did not reach the question in *Hamdan* because it found that *at least* Common Article 3 of the Geneva Conventions applies, as that provision reaches both international and non-international armed conflicts, and that was enough to decide the case before it. *See Hamdan*, 548 U.S. at 628-29 ("We need not decide the merits of this argument because there is at least one provision of the Geneva Conventions that applies here even if the relevant conflict is not one between signatories.").

Should the Court nevertheless choose to accept Respondents' framing of the issues despite the above, it can safely presume that Mr. al-Qahtani was taken captive during an international

UNCLASSIFIED//FOR PUBLIC RELEASE

armed conflict and retains the protections afforded by the domestic law provisions of Army Regulation 190-8. Mr. al-Qahtani was allegedly taken into U.S. custody in December 2001 and rendered to Guantánamo on February 13, 2002. *See* Reprieve, *The Journey of Death—Over 700 Prisoners Illegally Rendered to Guantanamo Bay with the Help of Portugal* 16 (Jan. 28, 2008), at 16 (noting that Mr. al-Qahtani was rendered on that date by flight to Guantánamo from Incirlik, Turkey, and via Portuguese territory).[20] Respondents have conceded that the United States still characterized the conflict at that point in time as an international armed conflict. Resp'ts' Opp'n to Pet'r's Mot. to Compel Examination by a Mixed Medical Commission at 29 n.19, ECF No. 372-1; *see also* International Committee of the Red Cross, *News Release: Geneva Convention on Prisoners of War*, (Feb. 9, 2002) (welcoming "the United States' reaffirmation of the applicability of the Third Geneva Convention to the international armed conflict in Afghanistan").[21]

Irrespective of whether the conflict in Afghanistan remained international in nature after June 2002, Mr. al-Qahtani would retain today the protections he enjoyed pursuant to domestic and international humanitarian law at the time of his capture during an international armed conflict. *See* Third Geneva Convention, Art. 5 (stating that prisoners of war retain that status "until their final release and repatriation"). In Iraq, for example, prisoners in U.S. custody prior to the transfer of sovereignty on June 28, 2004, retained any status and protections that they enjoyed under the Geneva Conventions even after that date and the transformation of that conflict.

And even accepting for the sake of argument Respondents' characterization of the context of Mr. al-Qahtani's imprisonment as a non-international armed conflict, Mr. al-Qahtani would still

---

[20]     *Available at* http://humanrights.ucdavis.edu/projects/the-guantanamo-testimonials-project/testimonies/testimony-of-other-physicians/journey_of_death.pdf/at_download/file.
[21]     *Available at* https://www.icrc.org/en/doc/resources/documents/news-release/2009-and-earlier/57jrm3.htm.

UNCLASSIFIED//FOR PUBLIC RELEASE

not be without legal protection or recourse to release on grounds of illness. In a non-international armed conflict, Mr. al-Qahtani would remain under the protection of Common Article 3 to the Geneva Conventions, as Respondents must now recognize after *Hamdan*, and other customary provisions of international humanitarian law, as well as international human rights law. *See, e.g.*, *Hamdan*, 548 U.S. at 631 (holding that Common Article 3 applies to prisoners at Guantánamo Bay). Common Article 3 encompasses the obligation to repatriate ill prisoners like Mr. al-Qahtani.

Indeed, expounding customary law as to the protection of detainees, the Appeals Chamber of the International Criminal Tribunal for the former Yugoslavia has held that "Common Article 3 of the Geneva Conventions reflects the same spirit of the duty to protect members of armed forces who have laid down their arms and are detained as the specific protections afforded to prisoners of war in Geneva Convention III as a whole." *Prosecutor v. Mile Mrkšić* (Vukovar Hospital Case), IT-95-13/1-A, Judgment (May 5, 2009), para. 70. A leading scholar concurs, noting that, while "[t]he standards set forth in Common Article 3 and in Protocol I article 75 do not address the issue of repatriating detainees who are sick or severely injured," the requirement for humane treatment in both provisions compel him to view "the standards set forth in Geneva Convention III article 110 as establishing general benchmarks for humane treatment," and to conclude that if "any of the detainees at present or in the future reach such stages of mental or physical fitness, the obligation of humane treatment imposed on the United States requires termination of their captivity." Sean D. Murphy, *Evolving Geneva Convention Paradigms in the War on Terrorism: Applying the Core Rules to the Release of Persons Deemed Unprivileged Combatants*, 75 Geo. Wash. L. Review 1105, 1162–63 (2007).

UNCLASSIFIED//FOR PUBLIC RELEASE

Thus, for all the reasons above, Mr. al-Qahtani is entitled to the protections of Army Regulation 190-8. Respondents have not demonstrated the requisite likelihood of success on the merits to support a stay.

### D. The Public Interest Is Not Well-Served by a Stay of the Court's Order

Granting Mr. al-Qahtani the relief at issue is unquestionably in the public interest. Establishing a Mixed Medical Commission or Medical Commission to evaluate him forthwith would serve the public interest in justice and the rule of law by enabling the Court to exercise its habeas jurisdiction, by allowing Mr. al-Qahtani the opportunity to meaningfully challenge his indefinite imprisonment in accordance with domestic and international law, and by ensuring that Respondents do not disregard domestic law at their own convenience.

Army Regulation 190-8 is not a discretionary guideline but "domestic U.S. law," *Al Warafi II*, 716 F.3d at 629, which specifically provides "policy, procedures, responsibilities for the administration, treatment, employment, and compensation of enemy prisoners of war . . . and other detainees [] in the custody of U.S. Armed Forces." Army Regulation 190-8, § 1-1(a). In accordance with domestic law, and pursuant to this Court's ruling, Mr. al-Qahtani followed the outlined process with exactitude in order to further confirm his entitlement to repatriation through a Mixed Medical Commission. It is in the public interest for Respondents, too, to adhere to the provisions of that same domestic law without further delay.

### CONCLUSION

For the reasons stated above, the Court need not clarify its March 6, 2020 Order, as no part of the order merits clarification. Because Respondents have failed to demonstrate that the extraordinary remedy of a stay pending appeal is merited here, this Court should neither stay the March 6 Order pending Respondents' appeal nor issue an administrative stay.

Dated:          May 29, 2020

Respectfully submitted,

_____/s/_____
Ramzi Kassem
(pursuant to LCvR 83.2(g))
Sonya Levitova
Ayah Zaki
*Law Student Interns*
**Main Street Legal Services, Inc.**
City University of New York
    School of Law
2 Court Square
Long Island City, NY 11101
(t) (718) 340-4558
(f) (718) 340-4478
(e) ramzi.kassem@law.cuny.edu

Shayana Kadidal
(D.C. Bar No. 454248)
**Center for Constitutional Rights**
666 Broadway, 7th Floor
New York, NY 10012
(t) (212) 614-6438
(f) (212) 614-6499
(e) kadidal@ccrjustice.org

*Counsel for Petitioner*

UNCLASSIFIED//FOR PUBLIC RELEASE

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 29, 2020, I electronically filed a copy of Petitioner's

Opposition to Respondents' Motion for Clarification and Stay Pending Appeal of the Court's

March 6, 2020 Order under seal via the Court's CM/ECF system, and served a copy of said filing

by electronic mail to the following counsel for Respondents:

Kathryn C. Davis
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20530
E-mail: Kathryn.C.Davis@usdoj.gov

_____/s/_____
Ramzi Kassem

UNCLASSIFIED//FOR PUBLIC RELEASE

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

MOHAMMED AL-QAHTANI,

    *Petitioner*,

    v.

DONALD J. TRUMP, *et al.*,

    *Respondents*.

Case No. 05-CV-1971 (ESH)

**PETITIONER'S OPPOSITION TO RESPONDENTS' MOTION FOR CLARIFICATION
AND STAY PENDING APPEAL OF THE COURT'S MARCH 6, 2020 ORDER**

**EXHIBIT 1**
**Declaration of Ramzi Kassem (Sept. 4, 2019)**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

MOHAMMED AL-QAHTANI,

     *Petitioner*,

     v.

DONALD J. TRUMP, *et al.*,

     *Respondents*.

Case No. 05-CV-1971 (RMC)

~~**FILED *EX PARTE* UNDER SEAL**~~

**<u>DECLARATION OF RAMZI KASSEM</u>**

Pursuant to 28 U.S.C. § 1746, I certify that the following is true and correct to the best of my knowledge:

1. My name is Ramzi Kassem. I am a Professor of Law at the City University of New York (CUNY) School of Law, where I co-direct its Immigrant & Non-Citizen Rights Clinic, and an attorney admitted to practice law in the State of New York. With my clinic students, I serve as pro bono counsel to Petitioner Mohammed al-Qahtani in the above-captioned matter.

2. I submit this declaration to apprise the Court of the serious deterioration in Mr. al-Qahtani's psychiatric condition since the last report to this Court in Dr. Emily Keram's Supplemental Declaration of April 14, 2018, ECF No. 377, which was filed on April 16, 2018, days before the Court heard argument on Mr. al-Qahtani's Motion to Compel Examination by a Mixed Medical Commission on April 19, 2018.

3. In brief, in recent months Mr. al-Qahtani's hallucinations have become more frequent and severe, which has resulted in a withdrawal from social interactions with fellow detainees, as well as his family and counsel. That withdrawal appears to have diminished his ability to distinguish reality from hallucination. The combination of factors has made it nearly impossible for Petitioner's counsel or his psychiatric expert, Dr. Keram, to communicate with him in order to evaluate or try to ameliorate his current condition.

4. As of Dr. Keram's April 2018 declaration, Mr. al-Qahtani was making efforts to interact with psychiatric staff affiliated with Joint Task Force-Guantánamo's (JTF-GTMO) Joint Medical Group (JMG), but those efforts were severely hampered by the frequent turnover among staff attending to him. As Dr. Keram's last declaration filed with this Court stated, Mr. al-Qahtani's "JMG psychiatrists continued to change every 3 to 6 months. He sees them once a week to once a month with the frequency determined by the different

psychiatrists. Each visit lasts approximately one hour." *Id*. at ¶ 7. All the while he continued to experience symptoms of his psychosis and PTSD, including insomnia, "visions of being chased by ghosts during the day," and so forth. *Id.* ¶ 11. Mr. al-Qahtani related to me and my co-counsel, Mr. Shayana Kadidal, that the new doctors will often seek to begin treatment from scratch, stopping medication prescribed by departed doctors to observe the effects of their preferred drug regimens against his untreated baseline.

5. Although the government has not provided us his recent medical records, Mr. al-Qahtani's accounts and the limited records we do have (*e.g.*, the redacted Declaration of Senior Medical Officer, ECF No. 372-2 (Aug. 21, 2017)) indicate that the drugs that have been dispensed to him since late 2016 have been first-generation anti-psychotics, which generally have more severe side effects than the newer products available on the market.

6. According to Mr. al-Qahtani (presumably as related to him by one of his doctors), if a doctor decides to prescribe for him a newer, less-commonplace anti-psychotic drug, a request must be put in through bureaucratic military channels to have the drug approved for delivery to the prison. As a practical matter, this means such requests can take months to be fulfilled and result in him receiving the medication. Although the prison's Senior Medical Officer indicated JMG's preference for first-generation drug Haldol was due to the ability to deliver it in (long-acting) intramuscular injection form, thereby ensuring compliance, *see id*. at 5 ¶ 17, Mr. Kadidal and I suspect the difficulty in obtaining drugs not otherwise in routine use among the military population at the base may also have something to do with why the prescribing doctors have not experimented with using many of the lower-side-effect new-generation antipsychotics on Mr. al-Qahtani.

7. I noted a marked decline in Mr. al-Qahtani's condition during visits on February 6 and April 24, 2018, and a phone call on March 22, 2018. Some of my observations were incorporated into Dr. Keram's April 2018 declaration: Mr. al-Qahtani was suffering from difficulty sleeping and concentrating, and from an inability to exercise, was feeling like ghosts were chasing him during the day (i.e. was experiencing hallucinations), and manifested episodes of screaming in his cell, which he related to me, but were also frequently noted to me and Mr. Kadidal by Mr. al-Qahtani's fellow detainees. Below are our observations since then.

**SUMMER 2018**

8. My co-counsel, Mr. Kadidal, saw Mr. al-Qahtani during two separate trips to the base in the summer of 2018: first during a visit in June to prepare for Mr. al-Qahtani's Periodic Review Board (PRB) hearing, and then in July for last-minute preparation and for the hearing itself.

9. During the first trip, Mr. al-Qahtani came out for both scheduled meetings, although we confined the meetings to half-day sessions (lasting approximately 2.5 hours each) in order to accommodate his fatigue and poor concentration.

2

10. During the second trip, Mr. al-Qahtani came to a half-day meeting on Friday, July 20, but according to JTF-GTMO staff refused to emerge from his cell for scheduled meetings that Monday. The Monday meeting had been scheduled as a dry-run for the PRB hearing itself, and we had emphasized its importance during our Friday meeting. Mr. al-Qahtani did emerge from his cell to be transported to the hearing location on the morning of the hearing, Tuesday, July 24, but when Mr. Kadidal and his interpreter sat with him before the hearing, Mr. al-Qahtani was confused about the date and purpose of the meeting.

11. Like me, during the June and July meetings, Mr. Kadidal also observed that Mr. al-Qahtani's affect had deteriorated, to a level where it was as poor as he had seen it since early 2008. At that time, he had been in solitary confinement for the better part of several years. Mr. al-Qahtani was unfocused during the meetings; clearly exhausted from inability to sleep, but also suffering symptoms beyond mere exhaustion. During all of Mr. Kadidal's meetings with him, Mr. al-Qahtani carried on separate lines of conversation under his breath incessantly. He frequently switched his line of eye contact to places in the meeting room no one was sitting, creating the appearance of looking at non-existent conversation partners. When asked directly, he confirmed experiencing auditory hallucinations (i.e., hearing voices) during these meetings. As related in the previous paragraph, he missed appointments even when it had been made crystal-clear to him what the planned meeting schedule was, and he appeared to not understand what day it was even on the day of his actual hearing.

12. During Mr. Kadidal's summer visits, a number of self-harm incidents were related to us by the authorities. A few days before our June meetings with him, Mr. al-Qahtani had been seen with a sheet or t-shirt tied around his neck, which was interpreted by the authorities as a threat or attempt to hang himself. On or around July 19, a few days before the PRB hearing, Mr. al-Qahtani had banged his head against the wall of his cell (in order, he told us, to make the voices in his head stop), leaving a mark that was visible even on the day of the hearing.

13. The decline in his condition at that point in time since the spring of 2018 coincided with his being moved ███████████████████████████████████████████
███████████████████

14. Mr. al-Qahtani's original cell block in Camp ███████████████████████████
███████████ had ██████████████████ other detainees in it, many of whom he had known for years, and several of whom used to keep watch over his psychological state.

15. But, as his hallucinations continued to worsen, prison authorities began to consider moving Mr. al-Qahtani ██████████████████████ He broached this possibility in his April 24 meeting with me, wondering aloud if he might be able to "quiet" his thoughts in solitary confinement. I tried to discourage the move because Mr. al-Qahtani had survived torture while in solitary confinement at Guantánamo, and a renewed stint was likely to trigger those traumatic memories for him, and also because solitary could widen Mr. al-Qahtani's separation from reality.

3

16. Mr. al-Qahtani remained housed in ███████████ cell block for some time, spending most of the day inside the confines of his cell. The lack of social interaction with real people who speak his language (Arabic) diminished his ability to distinguish reality from hallucination—real voices from the voices in his head, as it were.

## FALL 2018

17. In light of the decline in his condition since the spring of 2018, even prior to the summer 2018 PRB hearing, we began to make arrangements to schedule an unsecure (i.e., over an unclassified medium) telephone call between Mr. al-Qahtani, Dr. Keram and our Arabic-language interpreter, ████████████. Over the past three years, Mr. al-Qahtani has generally responded positively to his interactions with Dr. Keram and has found her advice for coping with the rigors of his detention and his psychological ailments useful. We received approvals from JTF-GTMO to attempt three calls on August 17, October 5, and October 12. According to the base authorities, Mr. al-Qahtani refused to leave his cell for any of them.

18. During that period of time, I managed to see Mr. al-Qahtani in person on September 20 and informed him that a call from Dr. Keram was coming, telling him it was important to come out for it. Mr. al-Qahtani promised to come out for it, making his refusals on October 5 and 12 all the more striking.

19. During that September 2018 trip to Guantánamo, I had two visits scheduled with Mr. al-Qahtani on two different days. Mr. al-Qahtani did not come out for the first day of meetings. On the second day, September 20, when he did meet with me, his condition seemed worse even than the descriptions above in this declaration.

20. Mr. al-Qahtani appeared tired and unkempt, with long hair and fingernails. He had gained weight. He spoke to himself frequently, and had to put his head down on the table to take breaks for long periods of time.

21. He explained to me that he had missed the previous day's meeting because he was not in a good state and was unable to sleep at all the night before that meeting, only falling asleep for a short while after dawn on the day of our meeting.

22. When I asked Mr. al-Qahtani why he had missed the last four calls with his family in Saudi Arabia and shared that they were very worried about him, his only answer was: "I'm not in a good state."

23. Mr. al-Qahtani confirmed to me that he was still hearing voices and seeing things. He had stopped exercising entirely, and was missing meals and prescribed Islamic prayers daily. During this meeting, I had to repeat myself many times at Mr. al-Qahtani's request as he was unable to concentrate. At times during the meeting, Mr. al-Qahtani would abruptly start praying, palms facing upwards.

4

24. Subjectively, Mr. al-Qahtani reported: "I feel as though this period I'm in is worse than earlier periods. I spend entire days in my cell most of the time. … There used to be people here with me who gave me strength. But they left, and I'm still here. It's harder to think about the future now."

25. Although he was already in a cell block with ███████████ Mr. al-Qahtani informed me that he had requested to be moved to an even smaller cellblock in Camp ████████ ███████████████████████████████████████████ He said that cellblock "should be more quiet." He also stated: "It bothers me to deal with others, I can't bear their noise." Mr. al-Qahtani asked me to submit a request to prison authorities endorsing his move to the smaller cellblock even as I was trying to convince him that social interaction might be better for him and might help him improve some.

26. In September, Mr. al-Qahtani told me that he was taking five different medications, some daily. But he could not recall the names or purposes of these medications. All he could say was that he was trying to take his medications, in the hope that they might help, but that he did not think that they were helping at all. Because Respondents have not provided Petitioner's counsel and Dr. Keram access to Mr. al-Qahtani's medical records, we have no way of knowing which medications Mr. al-Qahtani has been prescribed, whether he has been taking those medications, and to what effect.

27. Subsequent to my September 2018 visit with Mr. al-Qahtani, my co-counsel, Mr. Kadidal, attempted a visit with our client in Cuba on November 1, 2018. Unfortunately, Mr. al-Qahtani did not come out for that meeting.

**WINTER 2018-2019**

28. By late December, Mr. al-Qahtani had failed to appear for six out of the last seven monthly ICRC-facilitated audio or video calls with his family (according to members of his family who spoke with me). To our knowledge, it is highly unusual for him to refuse a family call since they became available to detainees around 2009, let alone so many. According to one of his siblings who was on the last call that went through, Mr. al-Qahtani told his family that he was "done." He reportedly added: "I'm tired, I can't anymore, I've reached my limit."

29. I was able to meet with Mr. al-Qahtani in Cuba on February 6, 2019. ███████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████

30. Mr. al-Qahtani explained to me that he was now being held in Camp █████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████

31. Because it was hard to sustain a conversation with Mr. al-Qahtani and he was noticeably struggling to focus, I asked him about any medications he was taking at this point in time and whether he was engaging with JTF-GTMO medical staff. He reported: "Even their meds make you worse. They're calming agents, they make you sleepy, lazy, numb. You sleep, you wake up, but you're still tired physically."

32. I asked Mr. al-Qahtani if he recalled the name of the medications. He told me about the Ambien he had been prescribed: "I take the sleeping pills. I'm addicted to them now. I can't sleep without them. I can't sleep with them, either. Not in a regular way, at least. My sleep is erratic even with the pills. I can't tell you how many hours I sleep daily. I don't sleep well. I see visions when I try to sleep, nightmares. They wake me up. Once you wake up, the effect of the Ambien wears off."

33. Mr. al-Qahtani reported to me that he was still taking five or six medications daily, along with some ointments. He believed they were mostly sedatives. Besides the Ambien, he could only name Tylenol and Zyrtec. We have no indication Mr. al-Qahtani is on antipsychotic medications at the current time. Access to Mr. al-Qahtani's medical records would give us and Dr. Keram some insight into our client's treatment.

34. As for JTF-GTMO medical personnel, Mr. al Qahtani said they were not helpful and that he could not bring himself to trust them. "I can't talk to them. I have nothing to say to their psychologist. They have nothing to offer. And you never know. If I tell him honestly how I'm feeling, he might order me removed to the BHU [Behavioral Health Unit—the psych ward] have me placed under observation. I'm afraid of that."

35. Mr. al-Qahtani explained to me that some of his behaviors ███████████████████████ ████████████████████████████████████████████████ "Screaming, being angry, throwing things, taking off my clothes ███████████████████████████ ████████████████████████████████████████████████████████████████

36. Even though Mr. al-Qahtani wanted to be held with fewer fellow prisoners, he still feared being held alone in solitary confinement: "So I have to hide because I'm under threat. The psychologist is threatening me with isolation so I have to hide. I can't let him know how I'm really feeling."

37. I asked Mr. al-Qahtani to shed light on the tension between not wanting to be alone, while struggling to be with others. He said: "I can't live in a cell block with other people. The noise, it bothers me. Also, with the ghosts that I see, it makes it hard for others to live with me, too. My screams bother the others. I don't know where the ghosts are coming from. The others complain because of my condition. You know the Americans use sorcery and ghosts, don't you?"

38. I inquired about the ghosts that Mr. al-Qahtani mentioned. He answered: "Sometimes they look like soldiers. They appear to me when I'm alone, usually in the shape of American

6

guards. But I know they're ghosts, like djinn, from another world. I know because I'm alone in a locked cell and they're in there with me, speaking to me in Arabic and English."

39. I asked Mr. al-Qahtani if there were any ghosts with us now, in the Camp Echo shack where we were meeting. He said: "No, I'm focusing with you right now."

40. Throughout our meeting, however, Mr. al-Qahtani would bury his head in his folded arms on the table, muttering to himself, mostly unintelligibly, but sometimes in discernible prayer: "God, save me from this place."

41. Mr. al-Qahtani told me that, where he is being held now, he does not go out into the sunlight at all.

42. When I asked him about the previous summer's reported self-harm incidents, Mr. al-Qahtani did not deny wanting and attempting to harm himself: "I find myself unable to control myself or listen to anyone else. Not that I really think this other person is a problem. I'm the one with the problems, I know that. I hear people talk to me when they haven't said a word. I tell them to shut up and they tell me they haven't spoken to me. This makes me cry, scream, it makes me want to kill myself."

43. At one point during our conversation, Mr. al-Qahtani looked across the table, over my left shoulder, staring at a fixed point in mid-air. He then raised his right index finger into the air, as if to quiet someone down. Apologetically, he said: "I have to make them go away so that I can stay focused here, sorry."

44. Mr. al-Qahtani could not recall declining calls or meetings with counsel or with his family.

45. Towards the end of my February 6, 2019 meeting with Mr. al-Qahtani, he asked me if there was any hope.

## SPRING & SUMMER 2019

46. I spoke by telephone with Mr. al-Qahtani on June 6, 2019. He did not seem well, reporting the following to me: "I'm really tired. I wish not to remain in this life."

47. He shared that he was totally unable to fast during Ramadan. The previous year, at least, he was able to fast half of the holy Islamic month.

48. Mr. al-Qahtani stated: "I've even forgotten how to pray. I'd like to be a Muslim again."

49. Mr. al-Qahtani also reported that JTF-GTMO prison officials were alarmed because Mr. al-Qahtani often cries from feelings of pain throughout his body and from constant hallucinations. Ten days prior to our telephone call, the officials ordered prison doctors to take Mr. al-Qahtani to the clinic for an examination. The doctors then tried to increase the sleeping medications that Mr. al-Qahtani had been prescribed. He refuses to take those

7

additional pills because he is already on such medication and it makes him lethargic. He said: "I'm already taking sleeping pills. I'm a human being, not a beast!"

50. Mr. al-Qahtani's isolation had also increased: "I don't go out to exercise at all. I can't bear the voices and noises from other people. ██████████████████████████ ██████████████████ but now I can't stand to be with more people. ████████████████████ And, if it were up to me, I would live alone, by myself. It's like I live in one world, and everyone else lives in another. I can't read books. Even watching television has become difficult so I only do it rarely."

51. Most recently, I was able to meet with Mr. al-Qahtani in Cuba on June 26, 2019. He looked the worst he has ever looked for as long as I have represented him.

52. Mr. al-Qahtani was disheveled, overweight, and haggard. His eyes were red and tired-looking. His hands and knuckles were bloody because of severely cracked, dry, eczematic skin. Because Dr. Keram had previously explained to me that such rashes were often symptomatic of psychological distress, I asked Mr. al-Qahtani if he was experiencing similar rashes elsewhere on his body. He showed me his feet and legs, which were covered with identical patches of cracked, bloody skin.

53. Mr. al-Qahtani's mental state was also at its worst state, for as long as I have known and observed him. For example, during our legal meeting, he suddenly looked up and to his left, as if he was looking for someone who had called his name. It took Mr. al-Qahtani five seconds to come back to our meeting, even though I called his name. Repeatedly throughout our meeting, for long stretches, he buried his face in his palms, elbows on the table, often muttering to himself unintelligibly or praying. At one point, he crossed his arms on the table and buried his face in it for many minutes, no longer able to follow our conversation.

54. Mr. al-Qahtani reported that his sleep has dwindled to a few hours by day and a few hours by night. When I asked him if he could explain why, he stated: "I see different things in my sleep. Last night, for example, I woke up five or six times. I see scary things in my sleep. Even when I'm awake, I see shapes, I hear voices, djinn speaking to me. I see them now. They're behind you. I hear them now, too."

55. Mr. al-Qahtani's mobility is radically reduced, and his isolation has remained at its nadir. He still does not go out for recreation time at all. He moves slowly, remarking: "I swear if someone saw me moving around, they'd say it's impossible that I'm forty years old. They'd think I was well over seventy because of how I move." He also reported that he had been weighed at 215 pounds a few days before our meeting, when his healthy weight should be between 160 and 170 pounds.

56. At the end of our meeting, Mr. al-Qahtani apologized to me: "I'm so tired. I can barely last an hour in a meeting with you. There is no life for me here." He asked me to cancel the meeting I had scheduled with him on the following morning, which I did.

57. Mr. Kadidal and I are very concerned that our window of opportunity to reach Mr. al-Qahtani is rapidly shrinking.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in New York City on this 4th day of September, 2019.

_____/s/_____

RAMZI KASSEM
**IMMIGRANT & NON-CITIZEN RIGHTS CLINIC**
**MAIN STREET LEGAL SERVICES, INC.**
CUNY SCHOOL OF LAW
2 COURT SQUARE
LONG ISLAND CITY, NY 11101
(t) (718) 340-4558
(f) (718) 340-4478
(e) ramzi.kassem@law.cuny.edu