## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**MOHAMMED AL-QAHTANI,**

*Petitioner*,

**v.**

**JOSEPH R. BIDEN, JR.,** *et al.*,

*Respondents*.

**Case No. 05-CV-1971 (PLF)**

## PETITIONER'S OPPOSITION TO MOTION
## FOR RECONSIDERATION OF ORDER GRANTING PETITIONER'S
## MOTION TO COMPEL EXAMINATION BY A MIXED MEDICAL COMMISSION

Petitioner Mohammed al-Qahtani hereby opposes Respondents' Motion for Reconsideration, ECF No. 407 (Jan. 15, 2021), of this Court's Order of March 6, 2020, ECF No. 387, which granted Mr. al-Qahtani's Motion to Compel Examination by a Mixed Medical Commission pursuant to Army Regulation 190-8, ECF No. 369 (Aug. 8, 2017).

## INTRODUCTION

The following facts are undisputed. Petitioner Mohammed al-Qahtani has spent the last nineteen years in custody at the U.S. Naval Station in Guantánamo Bay, Cuba. By the time he arrived, he had a long history of severe mental health problems, including a diagnosis of psychosis during an involuntary psychiatric hospitalization in Saudi Arabia two years before he was first brought to Guantánamo. While at Guantánamo, he was systematically tortured with the complicity of mental health experts; a senior U.S. official later publicly admitted that the abuse constituted "torture." That torture, along with his indefinite incarceration without trial at the military prison, have gravely diminished his mental and physical health, precluding any chance for recovery or effective treatment while in U.S. custody.

In August 2017, Mr. al-Qahtani moved this Court to compel Respondents to facilitate his examination by a Mixed Medical Commission, which would establish his entitlement to direct medical repatriation pursuant to a provision of domestic law, Army Regulation 190-8. More than two years later, the Court granted his motion. In the year since, Respondents have unsuccessfully attempted to appeal and, separately, to stay the March 2020 order, both before the court of appeals and in this Court. Finally, in a last-ditch effort in the waning days of the outgoing Trump administration, the former Secretary of the Army signed a memorandum, purporting to exclude the U.S. prison at Guantánamo from the scope of application of Army Regulation 190-8. Days later, on January 15, 2021, less than a week before the presidential inauguration and transfer of power, Respondents filed their instant motion for reconsideration, based chiefly on the purported exception memorandum. In sum, following the failure of their dilatory tactics and having lost under the rules, Respondents now brazenly attempt to rewrite those rules. Mr. al-Qahtani's mental health, meanwhile, continues to deteriorate steadily, with repeated suicide attempts in recent months.

The Court should deny Respondents' motion rather than entertain a transparent effort to move the goalposts in the middle of the game. The purported exception is invalid because the former Secretary of the Army, a civilian, political appointee, was not the official vested with the power to issue exceptions under Army Regulation 190-8. The text of the regulation allocates that power to the Deputy Chief of Staff, a career military official. Moreover, the purported exception is no exception at all, but a bid to substantively change a provision of domestic law, and it is procedurally irregular, impermissibly retroactive, and inconsistent with controlling law and regulation as of the date of the former Army Secretary's memorandum, including this Court's ruling, binding D.C. Circuit precedent, as well as Army Regulation 190-8 itself and, through it, the Third Geneva Convention. Finally, the purported exception would raise grave separation of powers

concerns. Since Respondents' arguments in support of their motion are either unavailing or have already been rejected by the courts, this Court should deny the motion and proceed with the implementation of its March 2020 order.

**FACTUAL BACKGROUND**

Mohammed al-Qahtani has been imprisoned without trial at Guantánamo since February 2002. Within months of his arrival, Mr. al-Qahtani was subjected to a systematic and brutal program of physical, sexual, and psychological torture. Officials in Washington, up to and including then-Secretary of Defense Donald Rumsfeld, helped design and approve the plan, with the active participation of psychiatrists. Respondents cannot deny these facts; indeed, Mr. al-Qahtani remains the only prisoner at Guantánamo whose torture has been formally admitted by a senior U.S. government official.[1] He was hospitalized twice during his torture at Guantánamo because he was on the brink of heart failure and death.

"Mr. al-Qahtani's mental health issues were evident to U.S. government officials when he was first detained at Guantanamo Bay." Mem. Op. & Order 4, ECF No. 397 (Aug. 12, 2020) (Huvelle, J.) ("Order Denying Stay"). As early as during his first year at Guantánamo, in 2002, and even before the implementation of the worst of the torture plan on him by military interrogators and psychiatrists, the FBI observed behaviors consistent with psychosis, such as "talking to nonexistent people, reporting hearing voices," and "crouching in a corner of the cell covered with a

---

[1]    Bob Woodward, *Guantanamo Detainee Was Tortured, Says Official Overseeing Military Trials*, Wash. Post (Jan. 14, 2009) (quoting Susan J. Crawford), *available at* http://www.washingtonpost.com/wp-dyn/content/article/2009/01/13/AR2009011303372.html. Mr. al-Qahtani's torture became widely known far earlier, in 2005, when *Time* magazine reported some of the details of the abuse. Adam Zagorin & Michael Duffy, *Inside the Interrogation of Detainee 063*, TIME (June 19, 2005), *available at* http://time.com/3624326/inside-the-interrogation-of-detainee-063/.

sheet for hours on end."[2] This is because Mr. al-Qahtani was already severely mentally ill long before he arrived at Guantánamo. Indeed, he was suffering from psychosis well before the timeframe of Respondents' allegations regarding his associations or travel.

In fact, Mr. al-Qahtani's history of psychiatric problems began when he was in a car accident at age eight: he was thrown from the car and suffered a traumatic brain injury, after which his performance in school, which had previously been excellent, suddenly collapsed. In late adolescence, the classic age for onset of schizophrenia, his family witnessed uncontrolled crying and inability to deal with basic life functions. At one point the Riyadh police pulled him naked from a garbage dumpster he had thrown himself into. Later, in Mecca, in May 2000, he was arrested by police after hurling himself half-naked into traffic and was involuntarily confined to a psychiatric hospital where he was diagnosed with schizophrenia. *See* Pet'r's Mot. to Compel Exam. by Mixed Med. Comm'n, Ex. C, Report of Dr. Emily A. Keram 3-5 (June 5, 2016), ECF No. 369-1 ("Keram Rep."); Order Denying Stay 4, ECF No. 397. This entire period was marked by "extreme behavioral dyscontrol and auditory hallucinations." *Id*.

Respondents do not contest these facts, which are documented both in records of his hospitalization in Mecca from May 2000 and in the five reports and declarations of Dr. Emily Keram, the only psychiatrist independent of the U.S. government known to have examined Mr. al-Qahtani since his imprisonment.[3] After this Court found that Mr. al-Qahtani was "incompetent and unable

---

[2]     *See* Letter re: Suspected Mistreatment of Detainees, from T.J. Harrington, Deputy Assistant Dir., Counterterrorism Division, FBI, to Major Gen. Donald R. Ryder, Criminal Investigation Command, Dep't of the Army (July 14, 2004).

[3]     *See* Pet'r's Mot. to Compel Exam. by Mixed Med. Comm'n, Ex. C, Report of Dr. Emily A. Keram (June 5, 2016), ECF No. 369-1 ("Keram Rep."); *id.*, Ex. D, Suppl. Decl. of Dr. Emily A. Keram (July 12, 2016) ("Keram Suppl. Decl."); *id.*, Ex. E, Suppl. Decl. of Dr. Emily A. Keram (Dec. 2, 2016) ("Keram Second Suppl. Decl."); Pet'r's Reply in Further Supp. of Mot. to Compel Exam by Mixed Med. Comm'n, Ex. G, Suppl. Decl. of Dr. Emily A. Keram in Resp. to Decl. of

to assist effectively in this case," Minute Order (Apr. 20, 2012), it appointed Dr. Keram pursuant to the Criminal Justice Act to conduct a psychiatric evaluation of Mr. al-Qahtani. Following a series of visits to Guantánamo beginning in 2015, Dr. Keram confirmed the diagnosis of schizophrenia and major depression. Once Dr. Keram's report became public in 2016, Respondents finally acknowledged that Mr. al-Qahtani's symptoms, as observed by the Guantánamo guard force and Joint Medical Group mental health professionals, are consistent with schizophrenia and began efforts to dispense antipsychotic medications to him, including Aripiprazole (Abilify), Quetiapine, and Haldol. *See* Sr. Med. Officer Decl. ¶ 17 (Aug. 21, 2017), ECF No. 372-2 ("SMO Decl.").

"In addition to Mr. al-Qahtani's pre-existing psychiatric diagnoses," Dr. Keram concluded, "he has developed posttraumatic stress disorder (PTSD)" resulting from his systematic torture—which included prolonged solitary confinement, sleep deprivation, physical violence, and grotesque sexual humiliation, along with other forms of psychological abuse—and subsequent indefinite imprisonment. Keram Rep. 7, ECF No. 369-1. As a doctor with the U.S. Department of Veteran Affairs who has treated patients with PTSD secondary to both combat stress and Prisoner of War confinement for many years, Dr. Keram found that Mr. al-Qahtani's PTSD symptoms are not only "consistent with those exhibited by survivors of torture," but also that they "have been present for years," *id*. 3, 7, and that his prior torture was "inhumane" and "would have profoundly disrupted and left long lasting effects on a person's sense of cognitive functioning even in the absence of pre-existing psychiatric illness," *id*. 6-7.

---

Sr. Med. Officer (Sept. 12, 2017), ECF No. 373 ("Keram Third Suppl. Decl."); Suppl. Decl. of Dr. Emily A. Keram (Apr. 14, 2018), ECF No. 377 ("Keram Fourth Suppl. Decl."). Mr. al-Qahtani submitted under seal a fifth supplemental declaration from Dr. Keram to the Court on August 12, 2020, attached to a proposed surreply opposing Respondents' motion for a stay.

Schizophrenia is a chronic disorder. It is permanent; it may be eventually manageable, but it is not curable. As Dr. Keram put it, "[the g]oals of appropriate treatment are symptom management, not cure." Keram Fourth Suppl. Decl. ¶ 17, ECF No. 377. Moreover, the systematic torture Mr. al-Qahtani survived at Guantánamo left him unable to trust U.S. military doctors:[4] his torture program was planned by psychologists, and one of the psychologists who helped design it has been publicly reported as having been in the room during Mr. al-Qahtani's interrogations under torture.[5] Although PTSD—unlike psychosis—is often curable, Dr. Keram believes that Mr. al-Qahtani needs to be treated by Saudi doctors who understand his culture and speak Arabic, and that any recovery—including from PTSD—simply cannot take place at Guantánamo, the site of Mr. al-Qahtani's torture. Keram Rep. 9, ECF No. 369-1; Keram Supp. Decl. ¶ 6, ECF No. 369-1. She also believes that successful treatment for his psychosis and PTSD requires the involvement of Mr. al-Qahtani's family. *Id.* Dr. Keram's conclusion on this front is worth reproducing at some length:

---

[4]    Indeed, Mr. al-Qahtani's resistance to meeting mental health practitioners extended to various experts his counsel attempted to have him meet with over the years; it was only with great difficulty, documented in some of the *ex parte* status reports filed with the Court, that he agreed to meet with Dr. Keram. *See Ex Parte* Status Report ¶ 4 (Dec. 20, 2010), ECF No. 234; *Ex Parte* Status Report ¶ 4 (Mar. 30, 2011), ECF No. 241 (citing attached Kassem Decl. ¶ 7); *Ex Parte* Status Report ¶ 9 (Nov. 19, 2013), ECF No. 314; Keram Supp. Decl. ¶ 7, ECF No. 369-1.

[5]    *See* Daniel Schulman, *Will Gitmo Shrinks Lose Their Credentials?*, Mother Jones (July 7, 2010), *available at* https://www.motherjones.com/politics/2010/07/guantanamo-psychologists-complaint-john-leso-larry-james/; *see also* Keram Third Suppl. Decl. ¶ 13, ECF No. 373 ("JTF personnel, including JMG clinicians, directly participated in al-Qahtani's torture at GTMO. This is the context in which al-Qahtani intermittently refuses to engage with current JMG and BHU clinicians. It is unreasonable to believe that a survivor of torture could divorce his experience of torture from reminders of that torture. For Mr. al-Qahtani, this incomprehensible violation of a clinician's primary duty to their patient ('first do no harm') resulted in an irreparable rupture in the trust that forms the basis of a therapeutic clinician-patient relationship. To maintain that the passage of time would mitigate this betrayal is to deny a patient his dignity."); Keram Fourth Suppl. Decl. ¶¶ 13-14, 20, ECF No. 377.

> Mr. al-Qahtani cannot receive effective treatment for his current mental health conditions while he remains in U.S. custody at GTMO or elsewhere, despite the best efforts of available and competent clinicians. Several factors preclude effective treatment. These include the inability to develop long-term doctor-patient relationships given the rotation schedule of medical staff, lack of trust in the medical and mental health staff due to previous clinician involvement in interrogations . . . , lack of culturally-informed treatment modalities, and unavailability of family members to participate in treatment.

Keram Rep. 9, ECF No. 369-1; *see also* Keram Supp. Decl. ¶¶ 5-6, ECF No. 369-1; Keram Second Suppl. Decl. ¶¶ 8-10, ECF No. 369-1.

There is already an extensive factual record before the Court documenting the sharp degeneration in Mr. al-Qahtani's mental state since Dr. Keram's first report in 2016. *See* Order Denying Stay 4, ECF No. 397 (concluding that Mr. al-Qahtani's "physical and mental condition has deteriorated significantly in the last few years and his health continues to decline"). In the five years since Dr. Keram's first visit, Mr. al-Qahtani's condition has deteriorated to an alarming degree. To begin with, the symptoms of his underlying conditions remain severe. Dr. Keram's April 2018 declaration noted that he experiences "insomnia, impaired concentration and memory, hypervigilance, … exaggerated startle response," and "hopelessness," concluding "it remains my opinion that Mr. al Qahtani's symptoms … are worsening." Keram Fourth Suppl. Decl. ¶¶ 2-6, 17, ECF No. 377.

Counsel submitted an *ex parte* Status Report in late 2019 to apprise the Court of a steep decline in Mr. al-Qahtani's mental and physical condition. The declaration supporting that status report (lodged at ECF No. 383-3) communicated Mr. al-Qahtani's deteriorating health conditions, including an inability to control his behavior that is triggered by his hallucinations, such as "screaming, being angry, throwing things, [and] taking off [his] clothes," which has understandably limited his interaction with fellow prisoners. [Public] Decl. of Ramzi Kassem ¶ 35 (Sept. 4, 2019), ECF No. 398-2, Ex. 1 ("Public Kassem Decl."). In Mr. al-Qahtani's words, his condition

has made it "hard for others to live with me . . . [m]y screams bother the others," adding, "I find myself unable to control myself or listen to anyone else[.] I hear people talk to me when they haven't said a word. I tell them to shut up and they tell me they haven't spoken to me." *Id.* ¶¶ 37, 42. This deteriorating condition has caused him to withdraw considerably from interacting with family, missing six out of seven family calls in 2018 alone—a profound deviation from a previously rarely-interrupted pattern of regular communication. *Id.* ¶ 28. In the years following the sharp decline in the number of prisoners at the base in 2016, his decreasing social interaction with people who speak Arabic has further diminished his ability to distinguish reality from hallucination—to perceive the difference between real voices and sights from the voices and visions in his head, as it were. *Id.* ¶ 16.

Moreover, Mr. al-Qahtani's retreat from the world around him also affects his ability to communicate with his attorneys. *Id.* ¶ 3. Since June 2017, Mr. al-Qahtani has failed to attend multiple, important meetings, and then has forgotten having done so. *Id*. ¶ 44. One such instance was in July 2018, when his counsel were extremely concerned that he would forget to attend his Periodic Review Board hearing. *Id.* ¶¶ 8-10. He arrived at the site, but on arrival, admitted not knowing what the hearing was about or why he was there, despite having had hours' worth of discussions with counsel on the topic. *Id.* Beyond his interactions with counsel, Mr. al-Qahtani's mental deterioration interferes with both his capacity to perform a basic daily regimen and with his ability—in his eyes—to "be a Muslim," as he recently relayed to counsel that he had forgotten how to pray. *Id.* ¶ 48.

For years Respondents had insisted that Mr. al-Qahtani was merely suffering from depression and anxiety as a result of his detention and narcissistic personality disorder. *See, e.g.*, SMO Decl. ¶ 15, ECF No. 372-2; Decl. of Steven W. Dalbey ¶ 4, ECF No. 398-2 ("Dalbey Decl."). It

was only in 2017, in the wake of Dr. Keram's initial 2016 report, that observations from the guard force apparently convinced the mental health professionals at Guantánamo that "an underlying psychotic process" was at work behind his symptoms. SMO Decl. ¶ 17, ECF No. 372-2. Respondents' subsequently began to emphasize Mr. al-Qahtani's supposed failure to "constructively engage with [Guantánamo Behavioral Health Unit] providers" and "history of refusing to take medication." SMO Decl. ¶¶ 15, 17, ECF No. 372-2. In the same breath, however, the 2017 SMO declaration notes that Mr. al-Qahtani was only recently acknowledged by Respondents to have symptoms of psychosis, and that he had in fact tried several anti-psychotic medications, with typically severe side-effects. *See id.*; Keram Fourth Suppl. Decl. ¶ 15, ECF No. 377. At the April 2018 hearing on Petitioner's Motion to Compel Examination by a Mixed Medical Commission, Judge Rosemary M. Collyer spontaneously took issue with Respondents' insinuation that the continuation of Mr. al-Qahtani's schizophrenic symptoms results primarily from his own failure to consistently take antipsychotic medications that Guantánamo medical personnel only recently began prescribing him. As Judge Collyer put it:

> I find it extraordinarily difficult for the government to argue that Mr. al Qahtani, who, admittedly, has some mental problems, doesn't always take his medicine, and so, therefore, it's his own fault if he's not getting better at Guantanamo Bay. I'm sorry, that is a sign of his illness.
>
> It's not as if he had a broken bone and refused to allow a doctor to set it. That argument would have some bearing in that situation. It does not have bearing to accuse a person with a mental illness of having a mental illness. . . .
>
> I mean, I find that so callous. It just makes me shiver that the United States would say, "well, you know, you're sick; and since you're so sick and you don't want to take medicine, it's your own fault that you're still sick." What are you talking about?
>
> Now, please, don't do that to me, okay? Don't go there, because I find that so chilling. That's not humane at all. . . . [D]on't argue that it's his own fault. That is so callous. That is so inhumane. It really is not worthy of the United States, even today.

Hr'g Tr. 51:10-52:22 (Apr. 19, 2018), ECF No. 380. Our current understanding from Mr. al-Qahtani is that he is in fact taking anti-psychotic medication prescribed to him by physicians with the Joint Medical Group (JMG) of Joint Task Force-Guantánamo (JTF-GTMO), but that it is not appreciably mitigating his symptoms.

Over the years, Mr. al-Qahtani has periodically experienced suicidal ideations, which have manifested in physical acts such as slamming his head into the hard wall of his cell days before his 2018 Periodic Review Board hearing "to make the noises stop." Public Kassem Decl. ¶ 12, ECF No. 398-2. During a June 2019 call with Mr. al-Qahtani, counsel learned that he often cries for extended periods due to the pain throughout his body and feelings of powerlessness to halt the hallucinations that keep him in his own mental prison within a prison. *Id.* ¶ 49. In the last four months, he has attempted to kill himself twice, both times in what appears to be a haze of auditory and visual hallucinations. In November, he described to counsel that he tried to hang himself and only realized what he had attempted when he came to in the prison's mental health clinic. In the most recent attempt, he told counsel that he used pieces of broken glass to try to cut the veins in his arms and then ate some of the shattered glass. He described bleeding profusely before losing consciousness. He reported waking up in urgent care. Undersigned counsel understand from Mr. al-Qahtani that shards of glass remain inside his body and digestive system as a result.

According to Dr. Keram, these most recent events indicate, "to a reasonable degree of medical certainty, that Mr. al-Qahtani's psychiatric symptoms have severely worsened since the fall of 2020," and that he "is at extreme risk of experiencing worsening symptoms." Suppl. Decl. of Dr. Emily A. Keram (Feb. 26, 2021) ¶¶ 18-19 (attached) ("Keram Sixth Suppl. Decl."). She opines that Mr. al-Qahtani "is at high risk for suicide," partly because his "ongoing confinement brings him no relief from memories of his torture." *Id.* ¶ 18. Dr. Keram also finds that Mr. al-

Qahtani's "symptoms already negatively impact his ability to work with his attorneys" and that "[t]his impact is very likely to worsen over time." *Id.* ¶ 19. In her view, "Mr. al-Qahtani requires urgent, immediate and potentially life-saving mental health treatment," *id.* ¶ 22, which he can receive in his home country of Saudi Arabia, *id.*, but not at Guantánamo, *id.* ¶ 23.

## PROCEDURAL HISTORY

On April 28, 2017, Mr. al-Qahtani formally applied to the U.S. Department of Defense for repatriation on medical grounds or, alternatively, an examination by a Mixed Medical Commission, pursuant to the process outlined in Army Regulation 190-8, Section 3-12. ECF No. 369, Ex. A; Dep'ts of the Army, Navy, Air Force, and Marine Corps, Army Regulation 190-8/OPNAVINST 3461.6/AFJI 31-304/MCO 3461.1, *Enemy Prisoners of War, Retained Personnel, Civilian Internees and Other Detainees* § 3-12 (1997) ("Army Regulation 190-8"). This Court directed Respondents to promptly indicate when a response would be forthcoming. Minute Order (June 7, 2017). Respondents finally denied Mr. al-Qahtani's requests on June 30, 2017. ECF No. 367-1, Ex. B. Mr. al-Qahtani then filed a motion to compel his examination by a Mixed Medical Commission on August 8, 2017. ECF No. 369. The motion was argued before the Honorable Rosemary M. Collyer on April 19, 2018. Hr'g Tr., ECF No. 380. The Court granted Mr. al-Qahtani's motion by opinion and order dated March 6, 2020. *Al-Qahtani v. Trump*, 443 F. Supp. 3d 116 (D.D.C. 2020) (ECF Nos. 386, 387). Respondents then filed a notice of appeal, ECF No. 388, and separately moved this Court for clarification and a stay of the order pending appeal, ECF No. 398-1. Mr. al-Qahtani opposed Respondents' motion. ECF No. 393. On August 12, 2020, the Court denied Respondents' request for a stay. *See* Order Denying Stay 3, ECF No. 397 (Hon. Ellen S. Huvelle denying Respondents' request for stay and finding that, "[d]ue to Mr. al-Qahtani's poor health and

worsening condition, his repatriation would need to occur soon for him to be able to receive any benefit from the treatment offered by Saudi Arabia").

Respondents then moved the U.S. Court of Appeals for the D.C. Circuit to stay this Court's March 2020 order pending their appeal. *Al Qahtani v. Trump*, No. 20-5130, Doc. No. 1859370 (D.C. Cir. Aug. 18, 2020). Mr. al-Qahtani opposed that motion and moved to dismiss Respondents' appeal altogether. *Id.*, Doc. Nos. 1861719 (Aug. 31, 2020), 1849026 (June 25, 2020). In a *per curiam* order, the court of appeals granted Mr. al-Qahtani's motion, dismissing Respondents' appeal. *Id.*, Doc. No. 1863930 (Sept. 29, 2020). On November 23, 2020, the mandate issued, returning jurisdiction to this Court to oversee compliance with its March 2020 order compelling Respondents to assist, facilitate, and expedite Mr. al-Qahtani's examination by a Mixed Medical Commission. *Id.*, Doc. No. 1872860.

Rather than implement this Court's order following years of delay and protracted litigation, Respondents produced a memorandum signed by then-Secretary of the Army Ryan D. McCarthy in the final days of former President Donald J. Trump's administration, purporting to "except the detention operations conducted by JTF-GTMO from AR 190-8." Army Regulation (AR) 190-8 Clarification/Exception Mem. 2, ECF No. 407-1 (Jan. 11, 2021) ("Exception Mem."). Relying on their memorandum, Respondents filed the instant motion for reconsideration on January 15, 2021—nearly four months after the court of appeals dismissed their appeal. ECF No. 407.

## ARGUMENT

### I.    The Purported Exception Was Improperly Issued

As Army Regulation 190-8 makes clear, the Secretary of the Army is neither the proponent of the regulation nor the official empowered to issue exceptions. Rather, that provision of domestic law vests exception authority in the Deputy Chief of Staff for Operations and Plans—a position

since renamed the Deputy Chief of Staff, G-3/5/7.[6] Thus, the power to craft exceptions to this multiservice regulation, affecting all four combat branches of the military, is assigned by law to a career military official rather than to a civilian political appointee. In any event, the power to make exceptions is limited, and Respondents' purported January 11th "exception" amounts to a rewriting of Army Regulation 190-8, which goes beyond what is permissible. And even if the purported exception were properly issued, its application here would fail this circuit's test for permissible retroactivity. Respondents' purported exception is therefore invalid.

### A. The Secretary of the Army Is Not Authorized to Issue Exceptions

The very first page of the current, operative version of Army Regulation 190-8 states that "[t]he proponent of this regulation is the *Deputy Chief of Staff for Operations and Plans*. The proponent has the authority to approve exceptions to this regulation that are consistent with controlling law and regulation." Army Reg. 190-8 at i (emphasis added).[7] That is, the regulation, by its own terms, vests exception authority in an official other than the Army Secretary, who therefore improperly issued the purported exception at issue here. This conclusion follows from settled and

---

6    *See* Mot. 9 n.5; Headquarters Department of the Army ("HQDA") General Order No. 3 (Apr. 1, 2005). According to the Army Publishing Directorate, the current proponent of Army Regulation 190-8 is the Provost Marshal General. *See* Army Publishing Directorate, Pub/Form: AR 190-8; *see also* HQDA General Order No. 9 (Sept. 26, 2003) (establishing Office of the Provost Marshal General).

7    It bears emphasis that there can be only one proponent for Army Regulation 190-8. *See* Dep't of the Army, Army Reg. 25-30 at 67, Army Publishing Program (June 13, 2018) ("Army Regulation 25-30") ("Each publication has only one proponent."). And only an HQDA principal official—a category that does not include the Secretary of the Army—can be a proponent for a regulation like Army Regulation 190-8. *See id.* ("Only HQDA principal officials can be proponents for DA policy publications."); *id.*, § 1-8 ("Only HQDA principal officials will be proponents for DA policy publications.") (citing Table 2-1); *id.* at 13-14 (table listing Army Regulations among Department of the Army policy publications); HQDA General Order No. 2020-01 (Mar. 6, 2020) (reflecting that Army Secretary is not among "HQDA principal officials"). Finally, only "the proponent and exception authority" for a regulation "may grant exceptions" to it. Army Reg. 25-30, § 1-8(c).

familiar principles of administrative law. *See C & W Fish Co. v. Fox*, 931 F.2d 1556, 1560 (D.C. Cir. 1991) (rejecting agency arguments that authority is inherently retained in official that delegates such authority to subordinate, absent express reservation of power in superior officer); *see also United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 267 (1954) (Attorney General may not exercise powers delegated to Board of Immigration Appeals); *Service v. Dulles*, 354 U.S. 363, 388 (1957) (reaffirming *Accardi* holding); *Parsons v. U.S. Dep't of Air Force*, 707 F.2d 1406, 1412–13 & 1413 n.13 (D.C. Cir. 1983) (applying same principles of administrative law to military); *Am. Vanguard Corp. v. Jackson*, 803 F. Supp. 2d 8, 15 (D.D.C. 2011) ("Once authority has been delegated to a certain agency official to take a particular action under a statute, only that official may take such action. . . . [T]he fact that the person who authorized the [disputed order] in this case is the superior of the official who properly possesses authority to act under the [authorizing statute] is immaterial."). The exception power is clearly assigned to the Deputy Chief of Staff and, as the Supreme Court has made clear, a superior official may not exercise powers delegated by regulation even where the superior officer may have the authority to amend the regulation delegating such powers.[8] *See United States v. Nixon*, 418 U.S. 683, 695 (1974) ("Here, as in *Accardi*, it is theoretically possible for the Attorney General to amend or revoke the regulation defining the [Watergate] Special Prosecutor's authority. But he has not done so," and accordingly could not exercise powers delegated to the Special Prosecutor). Because the former Army Secretary was not the proponent for Army Regulation 190-8, he lacked the authority to unilaterally issue the purported exception.

---

[8]     As discussed below, *infra* Part I.C, the Army Secretary does *not* have the authority to unilaterally amend Army Regulation 190-8.

As noted above, since the promulgation of the current version of Army Regulation 190-8 in 1997, the position of the Deputy Chief of Staff for Operations and Plans has been renamed the "Deputy Chief of Staff ('DCS'), G-3/5/7." Mot. 9 n.5. Both positions are military positions, unlike the Army Secretary, who is a civilian political appointee. The regulation vests the authority to make any exceptions in a high-ranking career military official rather than a civilian appointed by the President and adhering strictly to that allocation of authority is important for at least two reasons. First, it ensures that the authority will rest in the hands of a career official with sufficient expertise and long-term responsibility for the treatment of prisoners of war. Indeed, the position is typically occupied by a three-star general: in November 1997, the role was held by Lt. Gen. Thomas N. Burnette (who had recently succeeded Lt. Gen. Eric K. Shinseki), and as of the date of Respondents' purported exception, the position was held by Lt. Gen. Charles A. Flynn. Second, the regulation's allocation of exception authority is especially sensible given that this regulation (which governs "Enemy Prisoners of War" and various other individuals detained in the course of armed conflict) implicates not only the army, but *all* the service branches involved in combat operations. Army Regulation 190-8 was issued "by order of" all three secretaries, not just the Secretary of the Army, and under the signatures of representatives of all four service branches: the Army, the Navy, the Marines, and the Air Force. *See* Army Reg. 190-8 at i. The fact that detentions at Guantánamo are under the auspices of a *Joint* Task Force (JTF-GTMO) involving more than one service further establishes that this Court should not permit the Secretary of the Army to usurp the authority to issue this purported exception unilaterally, let alone speak for all of the branches on the meaning or application of the regulation.

Nor does the fact that Army Regulation 190-8 is most commonly referred to as an "Army" Regulation mean that the Secretary of the Army may unilaterally change it. The regulation is

simultaneously a Navy regulation in the form of OPNAV Instruction 3461.6, an Air Force regulation in the form of Air Force Joint Instruction (AFJI) 31-304, and a Marine Corps regulation in the form of Marines Corp Order (MCO) 3461.1, as indicated on the face of the document. The inter-service-branch applicability and initial promulgation process for this multi-service regulation render it all the more important that only the specific person empowered by *all* the services (not just the Army) issue any exceptions.[9] The Secretary of the Army cannot exercise exception authority under Army Regulation 190-8 as it presently stands.

### B.    Respondents Misuse the Authority to Issue Exceptions

Exceptions are not meant to swallow rules. The power to carve out and implement exceptions to Army Regulation 190-8 is limited, and Respondents' effort to substantively rewrite the provision of domestic law at issue exceeds what the regulation permits. Military regulations often include boilerplate language about "exception authority" that identifies a subordinate official with authority (that can often be delegated further to lower, subordinate officers) to make exceptions or waivers "that are consistent with controlling law and regulation," as does Army Regulation 190-8. But this boilerplate permits the common practice of effecting discrete exceptions to broad military policies; it does not authorize Respondents to effect a sweeping, categorical, and permanent change to the rule for their own benefit as they attempt here.

As Army Regulation 25-30, which governs the publication of Army Regulations, states: "When the provisions of a regulation create unnecessary barriers to high performance and mission accomplishment, activities may request an exception to policy after ensuring the request does not

---

9       Respondents argue in their motion that "the Secretary of the Army has assigned responsibilities to the Deputy Chief of Staff," citing "the front matter of AR 190-8." Mot. 9. But the front matter says no such thing: it does not reflect that the Secretary of the Army is the one who, *alone*, has assigned responsibilities. Instead, the front matter displays his signature alongside those of representatives from the other services, acting "by order of" his counterparts, consistent with the interbranch nature of the regulation.

violate Federal statute, or DOD and/or Army policy. Exceptions to policy require an expiration date of no later than 1 year." Army Reg. 25-30, § 1-8(c). Typical exceptions to regulations or ETP (exception to policy) cases relate to specific requests seeking relief from military policies that have an adverse impact on performance and mission accomplishment. They are narrowly drawn and time-limited, lest they render the written policy or regulation nugatory.[10] For example, Army Regulation 670-1 contains, among other things, "Appearance and Grooming Policies," with restrictions relating to "hair and fingernail standards," beards, and so forth. Dep't of the Army, Army Reg. 670-1, *Wear and Appearance of Army Uniforms and Insignia*, § 3-2 (Jan. 26, 2021).

Certain subordinate officials and officers are, however, empowered to grant exceptions to such policy restrictions to protect *individuals* from unintended negative consequences, such as allowing members of the Sikh faith to keep beards that would otherwise violate the Army's grooming standards. *See, e.g., Singh v. Carter*, 168 F. Supp. 3d 216, 219-20 (D.D.C. 2016) (issuing TRO to enjoin additional safety testing of exception from religious grooming standard for purposes of religious accommodation); *see also Deese v. Esper*, 2020 WL 5230370 (D. Md. Sept. 2, 2020) (describing review of "exception to policy" request related to Air Force rule preventing service by officer who is HIV positive). The common thread is that the policies are broad and generally stated, and the exceptions narrowly drawn and consistent with the overall purpose of the policy—for example, allowing service by an HIV-positive officer not suffering from any related condition that would pose a risk to their health. *See* Army Reg. 25-30, § 1-8(c) ("HQDA principal officials may

---

[10] Indeed, before an exception becomes operative, its proponent must clearly identify its proposed effective date, as well as its expiration date and "any other dates that may concern the public." Dep't of the Army, Army Reg. 25-58, *Publishing in the Federal Register—Procedures for Adopted Rule Document*, App. D-1(6) (Aug. 7, 2015). Respondents' purported exception here fails to meet these (and many other) basic requirements, which renders the purported exception invalid.

grant exceptions to policy (also known as waivers) contained within the publications for which they are the proponent and exception authority.").

Respondents' purported exception here (or "clarification," as the Secretary of the Army also attempts to characterize it) is exactly the opposite: it exempts the *military* from the intended burden of the specific rules codified in Army Regulation 190-8, making it the beneficiary of its own "exception" to the detriment of an entire category of individuals whom the regulation protects. Put another way, the former Army Secretary's January 11th Memorandum is not an "exception" or a "clarification" at all, but rather a major substantive change to the regulation. And the regulatory provisions at issue here are not broad statements of general Army policies (like the grooming standards referred to above); they are binding and mandatory "domestic law." *Al Warafi v. Obama*, 716 F.3d 627, 629 (D.C. Cir. 2013) ("*Al Warafi II*"). For example, section 1-6(b) states that "persons *shall* enjoy the protection of the present Convention until such time as their status has been determined by a competent tribunal;" section 3-12(a) makes clear that "[s]ick and wounded prisoners *will* be processed and their eligibility determined for repatriation or accommodation in a neutral county during hostilities"; and section 3-12(f) mandates that "[t]he United States *will* carry out the decisions of the Mixed Medical Commission as soon as possible." Army Reg. 190-8, §§ 1-6(b), 3-12(a), 3-12(f) (emphases added in all provisions). By contrast, the exception proposed here is so contrary to the language of the regulation that it would undercut the fundamental principle that "regulations validly prescribed by a government administrator are binding upon him as well as the citizen." *Dulles*, 354 U.S. at 372. Indeed, under Respondents' theory, any Secretary of the Army, whether designated as a proponent or not, could simply write himself a series of additional "exceptions" to any of the other Army Regulations he no longer wishes his department to comply with.

Further, under Respondents' misreading, the "exception authority" boilerplate in Army Regulation 190-8 would empower not only the Deputy Chief of Staff, but also additional subordinates to whom he or she further delegates the authority—all the way down to military officers at the grade of colonel or "the civilian equivalent"—to substantively modify the law based on their personal interpretations of the Geneva Conventions. Those low-level officials could, for example, create *ad hoc* "exceptions" for detainees in a unit's custody, denying them the protections of Army Regulation 190-8. The result, of course, would undermine the purpose of any written regulation (particularly a multi-service regulation) to ensure consistent application. The straightforward, sensible reading of the provision, on the other hand, averts such absurd results. The Deputy Chief of Staff's authority is limited to specific, discrete exceptions.[11] Contrary to Respondents' contention, it does not amount to a sweeping delegation of power from all four service branches to essentially rewrite domestic law governing the handling of prisoners of war and other detainees captured in connection with armed conflict.

Not only is Respondents' position contrary to any principled application of law and regulation, it also threatens to recreate conditions similar to those that led to Abu Ghraib and other instances of torture or cruel, inhuman or degrading treatment under the supervision of military commanders who unilaterally decided the laws did not apply to detainees in their custody.

---

[11]     For example, the Deputy Chief of Staff, G-3/5/7 might appropriately create exceptions to accommodate specific cultural practices that otherwise would violate the prohibition in Army Regulation 190-8 on exchange of gifts between U.S. personnel and detainees, *id.* § 3-6(a)(2), or the blanket ban on mailing of parcels by detainees, *id.* § 3-5(k)(2). In the other direction, the DCS could authorize additional restrictions on categories of labor permitted to be performed by detainees. *Id.* § 4-4.

Moreover, it sets a precedent that will jeopardize U.S. troops in any future confrontations with rival powers when U.S. personnel may fall captive.[12]

## C.     No Other Source of Authority Allows the Secretary of the Army's Action

Respondents argue that "the Secretary of the Army, exercising the authority recognized in Army Regulation 190-8 'to approve exceptions to th[e] regulation' … issued an Exception Memorandum … provid[ing] expressly that Army Regulation 190-8 is not applicable to any detainees at Guantanamo, including Petitioner." Mot. 1; *see also id.* ("[T]hrough the Exception Memorandum, the Secretary … has exercised the authority, recognized in Army Regulation 190-8, to 'approve exceptions ….'"). In every instance, Respondents argue that the exception authority described within Army Regulation 190-8 is the power invoked by the former Army Secretary. For the reasons stated above, that is incorrect: the Secretary is not assigned the exception authority by Army Regulation 190-8, and the power to draw exceptions is more limited than the sweeping changes described in the January 11th Exception Memorandum.

Somewhat obliquely, Respondents also seem to invoke the Army Secretary's authority as "Executive Agent" under U.S. Department of Defense Directives ("DoDD") 2310.01E and 5101.1, and his general powers under the statute establishing his office, 10 U.S.C. § 7013. *See* Mot. 9 ("The Exception Memorandum specifies that it was issued under the Secretary of the Army's authority 'as the promulgating official for AR 190-8 and the DoD Executive Agent under DoD Directive 2310.01E.' [Exception Mem.], ¶ 4."); *id.* 10 ("The Secretary of the Army has authority to issue Army Regulation 190-8 …  under 10 U.S.C. § 7013, and through the role assigned to the Secretary … as Executive Agent under [DOD] Directives 2310.01E and 5101.1."); *id.* 13 (citing

---

[12]     One can easily imagine a scenario where a captured U.S. pilot is labelled as an "illegal war criminal" to which the laws of war do not apply as a prelude to, and justification for, his indefinite imprisonment and torture.

same provisions). None of those provisions conveys any authority to "formally and explicitly except the detention operations conducted by JTF-GTMO from AR 190-8" as the January 11th Exception Memorandum purports to do. Exception Mem. 2, ECF No. 407-1.

Specifically, DoDD 2310.01E does not mention Army Regulation 190-8, nor does it convey any exception authority to the Army Secretary, or assign to him the role of proponent for the regulation. *See* Dep't of Def., Directive 2310.01E (Aug. 19, 2014, as amended Sept. 18, 2020). Instead, it states that "[t]his directive … [d]esignates the Under Secretary of Defense for Policy (USD(P)) as the lead proponent for developing, coordinating, and implementing policies and guidance pertaining to detainee operations." DoDD 2310.01E, § 1(b); *see also id*., Encl. 2 at § 1(a) ("USD(P) … Develops policy and guidance pertaining to all detainee matters, including access, detainee review processes, transfer and release authority."); *id*., Encl. 2 at § 1(b) ("Prepares, coordinates, reviews, and approves all implementing policies and guidance developed pursuant to the DoD Detainee Program."); *id*., Encl. 2 at § 1(d) ("Serves as the principal DoD interlocutor with the ICRC for detainee issues.").

The directive does state that the Army Secretary shall be "DoD Executive Agent for *administration* of the DoD Detainee Program in accordance with DoDD 5101.1" (emphasis added), but the details of what this role entails set forth in DoDD 2310.01E are, in fact, *administrative* in nature. As Executive Agent, the Army Secretary "[e]nsures that all . . . responsibilities and functions for the administration of DoD detainee operations policy are assigned and executed," *id*., Encl. 2 at § 9(a); "[p]rovides DoD-wide detainee operations-related planning and programming guidance to the USD(P)," *id*., Encl. 2 at § 9(f); and "[p]rovides implementing regulations to USD(P) for review and coordination with the Senate Armed Services Committee and House Armed Services Committee." The directive also provides that the Army Secretary "[d]evelops and

publishes guidance necessary for the DoD-wide implementation of detainee operations in coordination with the USD(P)," *id.*, Encl. 2 at § 9(b), but this merely reinforces the primacy of the Under Secretary of Defense for Policy in articulating detainee policy, and Respondents provide no indication that the Exception Memorandum was reviewed by or "coordinated" with the Under Secretary.[13]

Nor is there any hint in DoDD 5101.1 that the former Army Secretary possessed any authority for his purported exception to Army Regulation 190-8. That directive describes the permissible roles of DoD Executive Agents generally, and the circumstances in which such an agent may be named by the Secretary of Defense (or her Deputy) to carry out "specific responsibilities . . . provide defined levels of support for operational missions, or . . . activities that involve two or more of the DOD Components." Dep't of Def., Directive 5101.1 § 3.1 (Sept. 3, 2002, as amended May 9, 2003). But nothing in the directive's text empowers a DoD Executive Agent to modify regulations.[14] Indeed, the directive specifies that "[t]he nature and scope of the DOD Executive Agents [sic] responsibilities, functions, and authorities shall … [b]e prescribed at the time of assignment." *Id.*, § 3.1.1. And Respondents have produced no citation to any source indicating that the power to unilaterally draw exceptions to Army Regulation 190-8 was assigned by the Defense

---

[13]     Mr. al-Qahtani reserves the right to seek appropriate discovery should Respondents later claim that the former Army Secretary did not issue his purported exception unilaterally.

[14]     Respondents seem to suggest that the Army Secretary's "Executive Agent" status with respect to Army Regulation 190-8 is a new development since the issuance of the regulation. But the regulation itself notes that the Secretary of the Army was the "DOD Executive Agent (EA) for administering" prisoner of war programs at the time the regulation was issued. Army Reg. 190-8, § 1-4. Notwithstanding the Army Secretary's "Executive Agent" status, the text of Army Regulation 190-8 still did not give the Secretary any unilateral authority to draw exceptions to this "multi-service regulation," and instead vested the "exception authority" in a different official. *Id.* at i.

Secretary (or his Deputy) to the Army Secretary as part of his DoD Executive Agent responsibilities with respect to the regulation.[15]

Likewise, the statute creating the position of Secretary of the Army, 10 U.S.C. § 7013 (2018), lays out, in general terms, the broad responsibilities of the office. Nothing in the statute authorizes the Secretary to substantively alter inter-branch rules such as Army Regulation 190-8. The statute generically describes the Secretary's role in formulating and implementing policies with respect to the *Army*, but not with respect to matters concerning all the combat branches such as the Prisoner of War rules set forth in Army Regulation 190-8. *See, e.g.*, *id.* (c)(2) ("formulation of policies and programs *by the Department of the Army*") (emphasis added); (c)(3) ("implementation of policy … relating to *the functions of the Department of the Army*") (emphasis added). Respondents cite only to the catchall provisions of the statute in support of their contention that the Army Secretary has complete power to modify the interbranch regulation of detainee treatment. *See* Mot. 10 (citing subsections 7013(b), (d), (g)(3)). But none of these provisions on their face can plausibly be read to convey to the Army Secretary authority to draw a sweeping exception to a "multi-service regulation," as Army Regulation 190-8 describes itself, Army Reg. 190-8 at i, nor would such a reading make any logical sense.

Respondents cryptically note in passing that because "the Exception Memorandum is valid and binding as an authoritative issuance of an exception to Army Regulation 190-8 … , there is no need to inquire into the deference that would be owed to the Secretary's interpretation that *he*

---

[15]    DoDD 5101.1 also makes clear that the powers of an Executive Agent may be "delegate[d] to a subordinate designee"—including for purposes of "arrang[ing] and execut[ing] inter-Service Support agreements…." *Id.*, § 4.3. Therefore, even if the Army Secretary had promulgated Army Regulation 190-8 all alone (which he did not), nothing in DoDD 5101.1 would bar the Army Secretary from delegating the exception authority to the Deputy Chief of Staff.

would have *the authority to issue such an exception were the regulation ambiguous* about whether

such authority existed." Mot. 13 (emphasis added). Mr. al-Qahtani agrees that there is no need to

inquire into any question of deference regarding who has the power to issue exceptions: Army

Regulation 190-8 unambiguously vests that power in the Deputy Chief of Staff. As the Supreme

Court noted in *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019), "[i]f uncertainty does not exist, there

is no plausible reason for deference" to the view of the agency. Only where a provision is "genu-

inely ambiguous" after "exhaust[ing]" all traditional interpretive tools may the courts apply any

deference to an agency's view of its own regulation. *Id*.

Moreover, here it is not the view *of the agency* that the Army Secretary possesses the ex-

ception power—let alone the "fair and considered judgment of the agency," as *Kisor* requires. *Id*.

at 2414. It is, instead, the view of the former Army Secretary; it does not represent the "authorita-

tive" or "official position" of the entities that issued Army Regulation 190-8, which "at the least

emanate[s] from [the agency head or equivalent final policymaking] actors, using those vehicles,

understood to make authoritative policy in the relevant context." *Id*. at 2416. Again, *multiple* ser-

vice branches issued Army Regulation 190-8. *Cf. id*. at 2424 (noting that Solicitor General cast

serious doubt upon whether single Board of Veterans Appeal Judge can be held to set policy for

entire Veterans' Administration). The notion that the former Army Secretary (rather than the DCS,

G-3/5/7) should have the power to create exceptions to Army Regulation 190-8 obviously falls

into the category of "interpretations" that *Kisor* holds outside of deference: a "construction 'con-

flict[ing] with a prior' one," a "new interpretation, … introduced in litigation, that created 'unfair

surprise' to regulated parties." *Id*. at 2418. In a long line of decisions, the Supreme Court has held

consistently that "a court should decline to defer to a merely 'convenient litigating position' or

'post hoc rationalizatio[n] advanced' to 'defend past agency action against attack.'" *Id*. at 2417

(quoting *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012) (quoting *Bowen v. Georgetown Univ. Hospital*, 488 U.S. 204, 213 (1988) and *Auer v. Robbins*, 519 U.S. 452, 462 (1997))). There is, in sum, no reason for this Court to defer to the former Army Secretary's own view that he had the power to draw exceptions to a regulation that explicitly assigns that power elsewhere.

Finally, Respondents' motion nowhere suggests that the former Army Secretary had the power to "amend" Army Regulation 190-8 to conform it to the terms of his Exception Memorandum. *See Rollins Env't. Servs. Inc. v. EPA*, 937 F.2d 649, 652 n.2 (D.C. Cir. 1991) (to raise issue litigant is "obligated to [state the claim] precisely … in its opening brief and to include an argument, with citations to authorities in its favor"). Even if Respondents had developed such an argument, it would be inconsistent with the language of the Exception Memorandum itself, which on its face purports to create an exception as outlined in the front matter of Army Regulation 190-8, not an amendment to the regulation. *See* Exception Mem. 2, ECF No. 407-1 ("Consistent with this [exception] procedure … I hereby formally and explicitly except the detention operations conducted by JTF-GTMO from AR 190-8.").

In any event, the Army Secretary does not have the authority to unilaterally amend this multi-service regulation. Even if the Memorandum were viewed—contrary to its own terms—as an attempt to modify Army Regulation 190-8, such an action would be *ultra vires*. As noted above, the Army Secretary did not create Army Regulation 190-8 alone—it was issued under the signature of officials from all the combat branches of the military, "by order of" the secretaries of the two other branches. The mere fact that the Army Secretary's signature appears first on the list of signatures is of no legal significance. *Contra* Mot. 9 (highlighting that the front matter is "leading with signature of the Secretary of Army"). The "proponent" identified by the regulation itself is

the Deputy Chief of Staff—the same career military official to whom the regulation assigns the power to make exceptions. Army Reg. 190-8 at i. And, as described above, the other authorities Respondents cite do not grant the Army Secretary any amendment or exception powers. In sum, there is no authority within or outside of Army Regulation 190-8 for the former Army Secretary's action.

## II.     The Purported Exception Is Inconsistent with Controlling Law and Regulation

By its own terms, Army Regulation 190-8 only permits "exceptions to [the] regulation that are consistent with controlling law and regulation." Army Reg. 190-8 at i. Specifically, for Respondents' purported exception to be valid, it must comport with the law as it existed *at the time* of the purported exception's issuance. *Id*. The Court should deny Respondents' motion for reconsideration as their purported Guantánamo exception to Army Regulation 190-8 runs afoul of controlling law and regulation as of January 11, 2021, including this Court's ruling, binding D.C. Circuit precedent, as well as Army Regulation 190-8 itself and, through it, the Third Geneva Convention.

By claiming to exclude Guantánamo detainees from the sweep of Army Regulation 190-8 and bar Mr. al-Qahtani from treatment as an "other detainee," Respondents seek to depart from and rewrite the law. In its March 2020 opinion, this Court held that Army Regulation 190-8 requires Mr. al-Qahtani's examination by a Mixed Medical Commission at Guantánamo as an "other detainee." *Al-Qahtani*, 443 F. Supp. 3d at 129-33. The Court concluded that "Army Regulation 190-8 is domestic law and can apply to a Guantánamo detainee's habeas petition." *Id.* at 133. Further, the Court ruled Mr. al-Qahtani to be an "other detainee" under Army Regulation 190-8, meeting all legal criteria: "he is a person in the custody of the United States and has not been otherwise classified as either an enemy prisoner of war, retained person, or civilian internee." *Id.*

at 130. The Court's ruling in this case is itself consistent with an earlier ruling. *See Aamer v. Obama*, 58 F. Supp. 3d 16, 25-26 (D.D.C. 2014) (holding that Guantánamo prisoner petitioner may "seek[] release pursuant to domestic law (Army Regulation 190-8) and those portions of an international accord that it incorporates (the Third Geneva Convention)" if he establishes entitlement to repatriation under regulation and irrespective of "enemy combatant" designation). In sum, Respondents' purported exception directly contradicts this Court's express conclusions of law.

Respondents also issued their purported exception in the teeth of the law of this circuit. In *Al Warafi II*, 716 F.3d at 629, a Guantánamo prisoner invoked Army Regulation 190-8. The court of appeals held that "Army Regulation 190-8 is domestic U.S. law, and in a habeas proceeding such as this, a detainee may invoke Army Regulation 190-8 to the extent that the regulation explicitly establishes a detainee's entitlement to release from custody." *Id.* This Court followed suit, "bound by the precedent set by the D.C. Circuit," permitting Mr. al-Qahtani's claim based on Army Regulation 190-8 to proceed in habeas. *Al-Qahtani*, 443 F. Supp. 3d at 133. Respondents' purported exception, therefore, is also inconsistent with the binding holding of the D.C. Circuit.

Finally, even setting aside this Court's and the court of appeals' pronouncements, the purported exception is doubly invalid on wholly independent grounds: first, by virtue of the requirement in Army Regulation 190-8 that any exception be consistent with law, which, in the United States, includes treaty law; and second, by application of the separate requirement in the domestic law provisions of Army Regulation 190-8 that any inconsistency between the regulation and the Geneva Conventions be resolved in the Conventions' favor.

As a treaty ratified by the United States, the Third Geneva Convention is the "supreme Law of the Land" under the Constitution's Supremacy Clause. U.S. Const. art. VI, cl. 2; *see, e.g., United States v. Pink*, 315 U.S. 203, 230 (1942) ("A treaty is a 'law of the land.'"); *Foster v.*

*Neilson*, 27 U.S. 253, 254 (1829) ("Our constitution declares a treaty to be the law of the land. It is consequently to be regarded in courts of justice as equivalent to an act of the legislature, whenever it operates of itself without the aid of any legislative provision."); *see also Hamdan v. Rumsfeld*, 548 U.S. 557, 642 (2006) (Kennedy, J., concurring) ("The provision [of the Third Geneva Convention] is part of a treaty the United States has ratified and thus accepted as binding law.") (internal citation omitted). Respondents' own Department of Defense Law of War Manual similarly recognizes that "treaties to which the United States is a Party are part of U.S. law" and "[a] State's domestic law does not justify that State's noncompliance with an international obligation as a matter of international law." U.S. Dep't of Def., Law of War Manual ¶¶ 1.10.2.1, 1.10.1.4 (2016). The requirement in Army Regulation 190-8 that any exception be consistent with law therefore incorporates the relevant treaty law provisions of the Third Geneva Convention.

The Third Geneva Convention, in turn, does not provide for any exception of the sort Respondents claim to have carved out here, nor does it generally contemplate that detaining powers may unilaterally proclaim exceptions to its terms. *See* Third Geneva Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949, 6 U.S.T. 3316 ("Third Geneva Convention"). Nowhere does the Convention provide mechanisms by which parties to the Convention might issue amendments or exceptions to the various articles' application or scope. Further, the relevant treaty provisions incorporated by Army Regulation 190-8—namely, Article 4 of the Convention, defining "prisoners of war"; Article 5, addressing scenarios where there may be doubt over a prisoner's designation; and Articles 110, 112, and 113, setting forth eligibility for repatriation and the functions of a Mixed Medical Commission—do not allow for the kind of exception Respondents purport to create here. *Id.*, arts. 4, 5, 110, 112, 113. In fact, where the Third Geneva Convention contemplates "doubt" as to a prisoner's designation, it mandates that "such persons shall enjoy the

protection of the present Convention until such time as their status has been determined by a competent tribunal." *Id.*, art. 5. And even in cases of ambiguity, there is a presumption in favor of extending the protections provided by the Third Geneva Convention. Respondents' purported exception is therefore invalid because it contravenes relevant law as enshrined in the Third Geneva Convention, which makes it inconsistent with Army Regulation 190-8 itself.

Separately, even assuming its validity for the sake of argument, Respondents' purported exception still fails by application of the conflicts-or-discrepancies provision in Army Regulation 190-8, which resolves any inconsistencies between the regulation and the Geneva Conventions in favor of the latter. *See* Army Reg. 190-8, § 1-1(b)(4) ("In the event of conflicts or discrepancies between the regulation and the Geneva Conventions, the provisions of the Geneva Conventions take precedence."). Respondents' purported exception cannot be reconciled with the fact that the Third Geneva Convention brooks no exception of this kind (or any other limiting or eliminating prisoner protections). Put differently, Respondents purport to prohibit what the Third Geneva Convention clearly requires: examination of prisoners by a Mixed Medical Commission and, where appropriate, direct repatriation on medical grounds. *See* Third Geneva Convention, arts. 110, 112, 113. Given this conflict, by dint of the domestic law provision of Army Regulation 190-8 reproduced above, the Third Geneva Convention's requirement takes precedence over Respondents' purported exception barring Mr. al-Qahtani from being examined by a Mixed Medical Commission.[16]

---

[16]     Of course, not every protection outlined in Army Regulation 190-8 necessarily applies at Guantánamo. Rather, in line with the courts' pronouncements, Mr. al-Qahtani's position in this litigation has been that the domestic law provisions of Army Regulation 190-8 that may result in his repatriation are actionable in his habeas corpus proceedings. *See Al Warafi II*, 716 F.3d at 629 ("[I]n a habeas proceeding such as this, a detainee may invoke Army Regulation 190-8 to the extent that the regulation explicitly establishes a detainee's entitlement to release from custody."); *Al-Qahtani*, 443 F. Supp. 3d at 129 (recognizing that Mr. al-Qahtani's request for a Mixed Medical

Further, the application here of domestic law provisions requiring that any exception to Army Regulation 190-8 be consistent with law (including treaty law) and stipulating that any conflict between a valid exception and the Geneva Conventions be resolved in favor of the latter squares with longstanding precedent that U.S. detention authority in this context must be informed by the law of war. *See Hamdi v. Rumsfeld*, 542 U.S. 507, 521 (2004) (plurality) ("[W]e understand Congress' grant of authority for the use of 'necessary and appropriate force' to include the authority to detain for the duration of the relevant conflict, and our understanding is based on longstanding law-of-war principles."); *see also Hamdan*, 548 U.S. at 603 ("At a minimum, the Government must make a substantial showing that the crime for which it seeks to try a defendant by a military commission is acknowledged to be an offense against the law of war."); *Al Warafi II*, 716 F.3d at 629 (holding that domestic law incorporating treaty provisions must be analyzed together with those treaty provisions); Resp'ts' Mem. Regarding the Gov't's Det. Auth. Relative to Detainees Held at Guantanamo Bay 1, ECF No. 132 (Mar. 13, 2009) ("The detention authority conferred by the AUMF is necessarily informed by principles of the laws of war.").

The purported exception is therefore invalid on the independent grounds that it is inconsistent with binding law as held by this Court and the court of appeals, as well as with the domestic law provisions of Army Regulation 190-8, requiring that any exception be consistent with the Third Geneva Convention and that any conflict be resolved in the Conventions' favor.

---

Commission pursuant to Army Regulation 190-8 "fits squarely into this Court's habeas jurisdiction"); Hr'g Tr. 60:24-61:2, ECF No. 380 ("[I]f the Geneva Conventions say that he gets a Nintendo game console, we're not here arguing for that. We're just saying that this particular provision of domestic law entitles him to release, it is actionable in habeas.").

### III. The Purported Exception Cannot Apply Retroactively

Under longstanding precedent, an agency's power to promulgate regulations is "limited to the authority delegated by Congress." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). In examining the validity of retroactive rulemaking, *Bowen* restates the familiar principle that "[r]etroactivity is not favored in the law." *Id.* Here, Respondents' purported exception to Army Regulation 190-8 is an attempt to alter the effect of a decades-old provision of domestic law by declaring retroactive changes to it. Specifically, Respondents' effort to extend the purported exception's reach to "the district court order," Exception Mem. 2, ECF No. 407-1, which predates the exception, is inconsistent with general retroactivity principles under which a statutory grant of legislative rule making authority will not, as a general matter, "be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms." *Bowen*, 488 U.S. at 208. Absent that sort of Congressional delegation here, the purported retroactive exception is invalid and without effect.

In examining questions of retroactivity, the D.C. Circuit looks to whether the change at issue involves (1) a new application of law, clarification, or addition; or (2) the substitution of new law for old law that was reasonably clear. *Williams Nat. Gas Co. v. F.E.R.C.*, 3 F.3d 1544, 1554 (D.C. Cir. 1993); *see also Aliceville Hydro Assocs. v. FERC,* 800 F.2d 1147, 1152 (D.C. Cir. 1986) (quoting 4 Kenneth C. Davis, Administrative Law Treatise § 20:7, at 23). In the latter situation, which may give rise to questions of fairness, courts have found that "it may be necessary to deny retroactive effect to a rule announced in an agency adjudication in order to protect the settled expectations of those who had relied on the preexisting rule." *Williams Nat. Gas Co.*, 3 F.3d at 1554. Retroactivity is thus only appropriate when the agency's ruling represents "a new policy for

a new situation," rather than being "a departure from a clear prior policy." *New England Tel. & Tel. Co. v. FCC,* 826 F.2d 1101, 1110 (D.C. Cir. 1987).

In this case, the purported exception to Army Regulation 190-8 amounts to an attempt to substitute new law for the law previously recognized by the D.C. Circuit and this Court, and thus constitutes "a departure from a clear prior policy" under *New England Telephone. See Al Warafi II*, 716 F.3d at 629 (finding that Army Regulation 190-8 is domestic law that may be invoked in habeas proceedings); *see also Al-Qahtani*, 443 F. Supp. 3d at 129-31 (holding that Mr. al-Qahtani is entitled to examination by Mixed Medical Commission pursuant to Army Regulation 190-8). The applicability of this domestic law provision to people incarcerated at Guantánamo is "reasonably clear" law within the meaning of the D.C. Circuit's test. Moreover, Mr. al-Qahtani has a settled expectation regarding his right to seek release in a habeas corpus proceeding by relying on the medical repatriation provision in Army Regulation 190-8. Indeed, he brought his motion on these grounds years ago in 2017, relying in part on the earlier decisions of the court of appeals and of this Court holding that Army Regulation 190-8 is "domestic law that may be invoked in habeas proceedings," *Al Warafi II*, 716 F.3d at 629, and that a request for examination by a Mixed Medical Commission is a request for "release pursuant to domestic law (Army Regulation 190-8) and those portions of an international accord that it incorporates (the Third Geneva Convention)." *Aamer*, 58 F. Supp. 3d at 25. This Court has since vindicated Mr. al-Qahtani's expectation in his own case, holding that, under Army Regulation 190-8, he is entitled to an examination by a Mixed Medical Commission. *Al-Qahtani*, 443 F. Supp. 3d at 129-31.[17]

---

[17] Even if Respondents' purported exception fit within the other category of "new applications of law, clarifications, and additions," it still would not apply retroactively when "to apply the new rule to past conduct or to prior events would work a 'manifest injustice.'" *Verizon Tel. Cos. v. FCC*, 269 F.3d 1098, 1109 (D.C. Cir. 2001) (citation omitted). That is certainly the case here, where permitting the purported exception to Army Regulation 190-8 to unsettle the existing

Mr. al-Qahtani has a settled expectation in the adjudication of his habeas claim under Army Regulation 190-8, given these judicial rulings. By invoking the domestic law provisions of Army Regulation 190-8, Mr. al-Qahtani exercises his constitutional right to habeas corpus review. Respondents' purported exception is a last-ditch attempt to retroactively deny Mr. al-Qahtani the legal relief already granted by this Court and to curtail his access to the protection of the great writ through this species of habeas relief. *See Boumediene v. Bush*, 553 U.S. 723, 771 (2008) (holding that Guantánamo prisoners "are entitled to the privilege of habeas corpus to challenge the legality of their detention").

In sum, having lost under the rules, Respondents attempt to change those rules through their purported retroactive exception to Army Regulation 190-8. Courts long have frowned on retroactive rule changes in many other doctrinal areas.[18] The cases Respondents cite to justify their attempt to retroactively change the rule are clearly distinguishable from the instant case. Indeed, many of the cases Respondents cite deal with the propriety of judicial review, and none of which discusses the validity of retroactive rule changes in response to judicial rulings against the government.[19]

---

interpretation of longstanding law would work a manifest injustice given the years that Mr. al-Qahtani has waited on the adjudication of his motion under Army Regulation 190-8, even as his health steadily deteriorated, as discussed at length above. Against the backdrop of Mr. al-Qahtani's nineteen-year incarceration without trial, the systematic torture that he survived at Respondents' hands by their own admission, and his psychological conditions (both predating and resulting from his torture and open-ended imprisonment), the purported exception simply cannot be retroactively applied without working a "manifest injustice."

[18]    In tax law, for example, agency officials may not take advantage of their power "to promulgate retroactive regulations during the course of a litigation for the purpose of providing [themselves] with a defense based on the presumption of validity accorded to such regulations." *Chock Full O' Nuts Corp. v. United States*, 453 F.2d 300, 303 (2d Cir. 1971).

[19]    *See Greene v. Fisher,* 565 U.S. 34 (2011) (finding that clearly established federal law allows judicial review of state court proceeding if decision was contrary to already established law);

## IV. The Purported Exception Raises Grave Separation of Powers Concerns

To accept the Army Secretary's exception memorandum would threaten the separation of powers in two respects: it would overturn judicial determinations on the same question, and it would trench on the Senate's power to bind future executive branch action by ratifying treaties.

This Court has already decided the very question that Respondents' "clarification/exception" memorandum purports to address. One need look no further than the memorandum itself for confirmation: "A Federal district court, nevertheless, has interpreted AR 190-8 to require treating a detainee held at JTF-GTMO as an enemy prisoner of war for purposes of compelling examination by a Mixed Medical Commission pursuant to Section 3-12 of AR 190-8." Exception Mem. 1, ECF No. 407-1. In reaching that conclusion, this Court followed the court of appeals' *Al Warafi II* decision. *Al-Qahtani*, 443 F. Supp. 3d at 129-31. In *Al Warafi II*, as in this case, among other objections, Respondents characterized the same conflict as non-international in nature, and also claimed that the courts should defer to the Combatant Status Review Tribunal's finding that the petitioner in that case was an "enemy combatant." 716 F.3d at 627-29; *see also Aamer*, 58 F. Supp. 3d at 25. Just as the court of appeals and this Court found that the Military Commissions Act did not bar consideration of the claims at hand, *Al Warafi II*, 716 F.3d at 629; *Al-Qahtani*, 443 F. Supp. 3d at 129-30; *see also Aamer*, 58 F. Supp. 3d at 23, Respondents' characterization of the conflict as non-international in nature did not stop the courts from exercising their habeas jurisdiction and applying the domestic law provisions of Army Regulation 190-8. The court of appeals nonetheless

---

*Slekis v. Thomas*, 525 U.S. 1098 (1999) (holding that case could be remanded to lower court in light of new interpretive guidance); *Lawrence ex rel. Lawrence v. Chater,* 516 U.S. 163 (1996) (granting certiorari appropriate in light of new agency interpretation); *Schmidt v. Espy,* 513 U.S. 801 (1994) (case remanded to lower court in light of new position asserted by Solicitor General); *City of Chicago v. Env't. Def. Fund,* 506 U.S. 982 (1992) (case remanded to lower court in light of new memorandum issued by agency).

proceeded to analyze Warafi's entitlement to relief under provisions of the Geneva Conventions as incorporated into domestic law in the form of Army Regulation 190-8. *Al Warafi II*, 716 F.3d at 629. This Court followed suit with respect to Mr. al-Qahtani, holding that "Army Regulation 190-8 is domestic law which may be invoked in habeas proceedings." *Al-Qahtani,* 443 F. Supp. 3d at 129.

Nor did the court of appeals defer to the Combatant Status Review Tribunal's finding that the petitioner in that case was an "enemy combatant," delving instead into the specific protections afforded "Retained Personnel" under the Geneva Conventions as it construed and applied the domestic law provisions of Army Regulation 190-8. *Al Warafi II*, 716 F.3d at 627-31. Likewise, this Court focused on the protections that domestic law afforded Mr. al-Qahtani as an "other detainee." *See Al-Qahtani,* 443 F. Supp. 3d at 130 ("[T]his Court concludes that Mr. al-Qahtani meets the criteria for an 'other detainee' in Army Regulation 190-8 . . . ."). The former Army Secretary's disagreement with the courts' conclusion on the matter is of no moment. The last word on this issue belongs with the federal courts. *See Sanchez-Llamas v. Oregon*, 548 U.S. 331, 353-54 (2006) ("If treaties are to be given effect as federal law under our legal system, determining their meaning as a matter of federal law 'is emphatically the province and duty of the judicial department,' headed by the 'one supreme Court' established by the Constitution.") (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 53, 137, 173, 177 (1803)).

Congress's power, too, is at stake. Army Regulation 190-8 implements treaty obligations, which on their own terms extend beyond just those individuals detained in International Armed Conflicts. *See* Army Reg. 190-8, § 1-1 ("This regulation implements international law, both customary and codified, relating to EPW, RP, CI, and ODs *which includes those persons held during military operations other than war*.") (emphasis added); *see also* Pet'r's Reply in Further Supp. of

Mot. to Compel Exam by Mixed Med. Comm'n 10-11, ECF No. 373 ("Pet'r's Reply") (citing various other military authorities regarding broad protective scope of detainee treatment law and regulations). As noted above, neither this Court nor the D.C. Circuit has found Respondents' characterization of Guantánamo detainees as fitting into a novel class of "enemy combatants" to be dispositive of the issue of whether Army Regulation 190-8 applies. Allowing such a conclusion to have the force of law—particularly when that decision was made by a political appointee acting without apparent authority, from Congress or otherwise—raises serious separation of powers concerns, as it would allow executive branch rewriting of treaty obligations ratified by a supermajority of the Senate. That is especially problematic as the treaty obligations in question derive from one of the most widely subscribed treaties in history,[20] universally considered declarative of underlying international humanitarian law.[21]

## V. The Courts Have Already Rejected Respondents' Other Arguments

With the remainder of their arguments, Respondents attempt to relitigate issues already resolved against them by this Court and the court of appeals.

*Nature of the Conflict*—Respondents repeat their claim that "the U.S. conflict against Al-Qaeda is a non-international armed conflict," which they argue makes Army Regulation 190-8 inapplicable. Mot. 4; *see also id.* 16, 21; Opp'n to Pet'r's Mot. to Compel Exam. by Mixed Med. Comm'n 29, ECF No. 372-1 ("Resp'ts' Opp'n"). Yet, even assuming *arguendo* the accuracy of Respondents' characterization of the conflict in question as non-international, the legal conclusion Respondents invite this Court to draw from that single consideration would be at odds with the law in this circuit. Indeed, in *Al Warafi II*, undeterred by Respondents' characterization of the same

---

[20]     196 countries have subscribed to the Conventions. *See* https://bit.ly/2OZiW5f.

[21]     *See, e.g.*, *Hamdan*, 548 U.S. at 633; *Hamdi*, 542 U.S. at 551 (Souter, J., concurring).

conflict as non-international in nature, the court of appeals delved into the specific protections afforded "Retained Personnel" under the Geneva Conventions as it construed and applied the domestic law provisions of Army Regulation 190-8. 716 F.3d at 629-31. If, as Respondents contend, their characterization of the conflict determined the application of the domestic law provisions of Army Regulation 190-8, then the D.C. Circuit would have stopped at that threshold characterization of this very conflict instead of conducting its thorough analysis.

Just as the court of appeals found that the Military Commissions Act did not bar its consideration of the claims in *Al Warafi II*, *id.* at 629; *see also Aamer*, 58 F. Supp. 3d at 23, and just as it did not defer to the Combatant Status Review Tribunal's finding that the petitioner in that case was an "enemy combatant," *Al Warafi II*, 716 F.3d at 627-29; *see also Aamer*, 58 F. Supp. 3d at 25, so, too, Respondents' characterization of the conflict as non-international in nature did not stop the court of appeals from exercising its habeas jurisdiction and applying the domestic law provisions of Army Regulation 190-8.

Furthermore, Respondents' argument also has been rejected by this Court. Specifically, this Court addressed Respondents' contention that "Army Regulation 190-8 does not apply to detainees in non-international armed conflict," concluding that "Respondents cite nothing in the Regulation that suggests the exception" and "ignore the D.C. Circuit opinion in *Al Warafi II*, 716 F.3d at 629, that found Army Regulation 190-8 applicable to a Guantanamo detainee." *Al-Qahtani*, 443 F. Supp. 3d at 129 n.7. Later, in denying Respondents' motion to stay the March 2020 order, this Court reaffirmed its findings on this point. *See* Order Denying Stay 3, ECF No. 397 (rejecting Respondents' "argument that the Court misapplied the Circuit's rulings in *Al Warafi I* and *II*").[22]

---

[22]     In fact, as detailed in earlier briefing, there is no controlling authority finding that the conflict out of which Mr. al-Qahtani's open-ended imprisonment arose was non-international in nature and this Court need not be the first to rule on the question. Pet'r's Reply 14-15, ECF No. 373. In

***"Other Detainee"***—Respondents also recycle the argument that their designation of Mr. al-Qahtani as an "enemy combatant" disqualifies him from the status of "other detainee" under Army Regulation 190-8. Mot. 13; Resp'ts' Opp'n 30, ECF No. 372-1. It does not. The D.C. Circuit was not swayed by that argument, and it analyzed whether the petitioner in *Al Warafi II* was "retained personnel" under the provisions of the Geneva Conventions incorporated into U.S. domestic law through Army Regulation 190-8. 716 F. 3d at 629. Also, as this Court found, the term "enemy combatant" is not defined or listed in Army Regulation 190-8. *Al-Qahtani*, 443 F. Supp. 3d at 130 n.8. It rejected Respondents' very argument in its March 2020 opinion, holding that "Mr. al-Qahtani meets the criteria for an 'other detainee' in Army Regulation 190-8" and that his "mere designation as an 'enemy combatant' did not render Army Regulation 190-8 inapplicable."[23] *Id.* at 130. The Court even noted Respondents' disregard for the D.C. Circuit's decision in *Al Warafi II*, holding Army Regulation 190-8 applicable to Guantánamo. *Al-Qahtani*, 443 F. Supp. 3d at 129 n.7.

***"Enemy Combatant"***—Related to the above (and just as ineffectually), Respondents repeat their assertion that Mr. al-Qahtani's designation as an "enemy combatant" by the President of

---

any event, Army Regulation 190-8 protects Mr. al-Qahtani because he was captured during an international armed conflict. *Id.* 15-17. And even if Respondents were correct that Mr. al-Qahtani's imprisonment arose from a non-international armed conflict, he would still have recourse to release on grounds of illness. *Id.* 17-19; *see also* Pet'r's Opp'n to Resp'ts' Mot. for Stay 37-39, ECF No. 398-2 ("Opp'n to Stay") (addressing same claims).

[23]    In *Aamer*, 58 F. Supp. 3d at 21, the Court referred to the definition in Army Regulation 190-8 of an "other detainee" as a person in the custody of U.S. Armed Forces who does not fall into any of the designations enumerated in the regulation and who shall therefore be treated as an enemy prisoner of war until a legal status is ascertained by a competent authority. *Id.* at 21-22. Until the legal status of an "other detainee" is determined by a competent authority, he or she "shall be treated as [an enemy prisoner of war]." *Id.* at 22; *see also* Army Reg. 190-8, Glossary, Section II –Terms.

the United States and by a Combatant Status Review Tribunal ("CSRT") excludes him from the ambit of the domestic law provisions of Army Regulation 190-8. Mot. 23; Resp'ts' Mot. for Stay 12, ECF No. 398-1; Resp'ts' Opp'n 32, ECF No. 372-1.[24] However, as Mr. al-Qahtani has already explained at length, Respondents' "enemy combatant" designation is not recognized under domestic or international humanitarian law, and the President is not a "competent authority" or a "competent tribunal." *See* Pet'r's Mot. to Compel Exam. 9-10, ECF No. 369; Pet'r's Reply 19-22, ECF No. 373; Opp'n to Stay 34-37, ECF No. 398-2. Importantly, this Court has already concluded that, under controlling law, "mere designation as an 'enemy combatant' d[oes] not render Army Regulation 190-8 inapplicable." *See Al-Qahtani*, 443 F. Supp. 3d at 130 (citing *Aamer*, 58 F. Supp. 3d at 23-35 (finding that CSRT "enemy combatant" designation did not preclude application of Army Regulation 190-8)).[25]

*Al-Qaida*—Respondents also attempt to reopen their rejected claim that al-Qaida members are not entitled to protection, Mot. 22, and that the court of appeals' references in the *Al Warafi* decisions to the Taliban, not al-Qaida, distinguish those cases from this one, *id.* 25. *See also*

---

[24]    On this point, Respondents resort again to the court of appeals' decision in *Hamdan*, Mot. 24, although it was reversed by the Supreme Court and has no remaining force of its own. *See Al-Bihani v. Obama*, 619 F.3d 1, 21 (2010) (Kavanaugh, J., concurring) (noting that D.C. Circuit's *Hamdan* decision is "an opinion that is not precedential").

[25]    Respondents even seem to argue that this Court's application of Army Regulation 190-8 to Mr. al-Qahtani at Guantánamo would extend to "unprivileged belligerents" at other U.S. facilities abroad. Mot. 20. However, this Court's March 2020 ruling sounds in habeas. *Al-Qahtani*, 443 F. Supp. 3d at 129. Prisoners incarcerated at U.S. military facilities abroad other than Guantánamo have been held not to enjoy any habeas rights, and accordingly would not be able to invoke Army Regulation 190-8 in habeas as Mr. al-Qahtani did here. *See Maqaleh v. Hagel*, 738 F.3d 312, 337 (D.C. Cir. 2013) (holding that Suspension Clause does not extend to noncitizen detainees held without trial at U.S. detention facility at Bagram in Afghanistan); *al Maqaleh v. Gates*, 605 F.3d 84, 99 (D.C. Cir. 2010) (same).

Resp'ts' Opp'n 27, ECF No. 372-1.[26] In *Hamdan*, the Supreme Court rejected the argument Respondents repackage here, disagreeing with Respondents' claim "that the war with al Qaeda evades the reach of the Geneva Conventions." 548 U.S. at 628. It was not persuaded by the notion that the petitioner, a Guantánamo prisoner like Mr. al-Qahtani, was "not entitled" to the protections of the Geneva Conventions. *Id.* at 625-26. And, crucially, the Supreme Court expressly reserved the question of Hamdan's potential status under Army Regulation 190-8 and the Geneva Conventions, regardless of Respondents' refrain then and now that the Executive has unilaterally resolved that very question. *See id.* at 630 n.61 ("Because we hold that Hamdan may not, in any event, be tried by the military commission the President has convened […], the question whether *his potential status as a prisoner of war* independently renders illegal his trial by military commission may be reserved.") (emphasis added).

Moreover, Respondents' position has always been that both Taliban and al-Qaida affiliated detainees do not enjoy protection as prisoners of war under the Geneva Conventions. White House Mem., Humane Treatment of Taliban and al Qaeda Detainees 2 (Feb. 7, 2002).[27] But that did not prevent the court of appeals in *Al Warafi II* from applying domestic law implementing the Conventions to an alleged "enemy combatant" detainee whom Respondents notably described as "an al-Qaida operative" who traveled to Afghanistan to "fight with the Taliban." *Al Warafi v. Obama*, Case No. 04-CV-1254, 2015 WL 4600420 (D.D.C. July 30, 2015).

*Al Warafi I*—Respondents' apparent argument that the first decision in *Al Warafi v. Obama*, 409 F. App'x 360 (D.C. Cir. 2011) ("*Al Warafi I*"), somehow controls and that, there, the

---

[26] Mr. al-Qahtani disputes Respondents' unproven allegations about his membership in al-Qaida.

[27] *Available at* https://www.aclu.org/other/memo-president-bush-white-house-senior-executive-branch-officials-regarding-humane-treatment.

court of appeals only assumed for the sake of argument the applicability of Army Regulation 190-8 is unavailing. Mot. 15; Resp'ts' Opp'n 34 n.22, ECF No. 372-1; Resp'ts' Mot. for Stay 10, ECF No. 398-1. The court of appeals' subsequent decision in *Al Warafi II*, however, is binding precedent in this circuit, and it stands for the proposition that Army Regulation 190-8 is U.S. domestic law applicable to individuals incarcerated at Guantánamo. *See* 716 F.3d at 629; *Al-Qahtani*, 443 F. Supp. 3d at 130, 133.

*Third Geneva Convention*—Respondents again make much of the fact that the *Al Warafi II* court analyzed whether the petitioner qualified for the protections afforded "medical personnel" under the First Geneva Convention, while this Court accorded Mr. al-Qahtani protection as an "other detainee" under the Third Geneva Convention. Mot. 25; Resp'ts' Opp'n 33-35, ECF No. 372-1. This is a distinction without a difference: there is no reason why only the parts of the Geneva Conventions cited by Respondents would be relevant, but the one at issue here would be inapplicable. Indeed, Respondents themselves routinely invoke other parts of the Geneva Conventions— to wit, Article 118 of the Third Geneva Convention—to justify detaining people until the cessation of hostilities. *See, e.g.*, Br. for Resp'ts in Opp'n on Pet. for a Writ of Cert. at 14-15, *al-Alwi v. Trump*, 139 S. Ct. 1893 (2019) (No. 18-740) ("To the contrary, petitioner's authorities addressing international armed conflicts confirm the 'open-ended and unqualified' nature of the basic rule.") (citing Third Geneva Convention, art. 118); Pub. Br. for Appellees at 14, *al-Alwi v. Trump*, 901 F.3d 294 (D.C. Cir. 2018) (No. 17-5067) ("The Geneva Conventions similarly require that prisoners of war be released only at the 'cessation of active hostilities.'") (citing same). Further, as the court of appeals reiterated, "[t]he Geneva Conventions and their commentary provide a roadmap for the establishment of protected status." *Al Warafi II*, 716 F.3d at 631. This Court agreed, holding

that "Army Regulation 190-8 finds its principal guidance in the Geneva Conventions, of which the Third Geneva Convention is relevant here." *Al-Qahtani*, 443 F. Supp. 3d at 122.

***Prison Camp Discipline***—Respondents reproduce their argument that Mr. al-Qahtani's examination by a Mixed Medical Commission will encourage prisoners to jeopardize their health to qualify for an evaluation of their own. Mot. 18-19; Resp'ts' Mot. for Stay 12, ECF No. 398-1; Resp'ts' Opp'n 25, ECF No. 372-1. The Court rejected this argument as "speculative" and ultimately inconsequential, because only those applicants who are "actually ill and . . . complete the prerequisite procedural steps to request review, including obtaining a court order" would be eligible for examination by a Mixed Medical Commission. Order Denying Stay 5, ECF No. 397. Moreover, even if the Court were to credit or entertain this speculation, any Mixed Medical Commission would be composed of medical experts who would quickly be able to distinguish valid claims from false ones. Opp'n to Stay 24-25, ECF No. 398-2.

***Military Commission Proceedings***—Respondents also reprise their argument that the Mixed Medical Commission might interfere with attempts to try "high-value detainees." Mot. 19; Resp'ts' Mot. for Stay 14, ECF No. 398-1. Any of the nine so-called "High Value Detainees" referred for trial by military commission who seek examination by a Mixed Medical Commission in habeas corpus proceedings would have to contend with the *Councilman* abstention doctrine. *See generally Schlesinger v. Councilman*, 420 U.S. 738 (1975). *Councilman* allows Respondents to move to halt a prisoner's habeas proceedings in order to allow the criminal case against that prisoner to proceed first. *Id.* at 756-58. Respondents have not hesitated to invoke the doctrine in Guantánamo cases. *See, e.g., Al-Nashiri v. Obama*, 76 F. Supp. 3d 218 (D.D.C. 2014) (granting Respondents' motion to hold habeas petition in abeyance while military commission trial was pending), *aff'd sub nom. In re Al-Nashiri*, 835 F.3d 110 (D.C. Cir. 2016); Resp'ts' Mot. to Dismiss

Habeas Pet. Without Prejudice or, Alternatively, to Hold Pet. in Abeyance Pending Completion of Military Comm'n Proceedings at 8-9, *Al Darbi v. Obama*, Case No. 05-cv-2371 (RCL), 2009 WL 949088 (D.D.C. Apr. 7, 2009) (arguing that habeas petition should be dismissed or held in abeyance until completion of military commission proceedings). Indeed, this Court already acknowledged that the remaining forty Guantánamo prisoners "will only be eligible for Mixed Medical Commission review if they are actually ill and they complete the prerequisite procedural steps to request review, including obtaining a court order," Order Denying Stay 5, ECF No. 397, which they cannot do without overcoming *Councilman*. It is therefore implausible that the examination by Mixed Medical Commission this Court ordered in Mr. al-Qahtani's case would jeopardize Respondents' interests in ongoing military commission proceedings in any significant way.

*"Higher-Level Guidance"*—To the extent any of Respondents' other arguments are new, they are nonetheless just as unavailing. While the former Secretary of the Army claimed that Army Regulation 190-8 is "intended to implement" Department of Defense Directive 2310.01E, and "must be interpreted and applied in light of this higher-level guidance," Exception Mem. 1, ECF No. 407-1; Mot. 5, the very first chapter of the domestic law provision at issue states that it "implements international law," listing the Third Geneva Convention as one of the "principal treaties relevant to this regulation." Army Reg. 190-8, § 1-1(b). Moreover, as noted above, any conflicts or discrepancies between the regulation and the Conventions are to be resolved in favor of the Conventions. *Id.*, § 1-1(b)(4). Finally, Department of Defense Directive 2310.01E itself reflects the guiding purpose of "ensur[ing] compliance with the laws of the United States, the law of war, including the Geneva Conventions of 1949." DoDD 2310.01E, § 1(a). Clearly, then, the principal "higher-level guidance" in light of which Army Regulation 190-8 must be interpreted and applied is the Third Geneva Convention. This Court and the D.C. Circuit are in agreement on this point.

*See Al Warafi II*, 716 F.3d at 629 ("[W]e may and must analyze the relevant aspects of the Geneva Conventions that have been expressly incorporated into Army Regulation 190–8."); *Al-Qahtani*, 443 F. Supp. 3d at 122, 124 (observing that "Army Regulation 190-8 finds its principal guidance in the Geneva Conventions" and analyzing the relevant incorporated provisions accordingly).

## CONCLUSION

For the foregoing reasons, Respondents' motion for reconsideration should be denied.

Dated: February 26, 2021

Respectfully submitted,

_____/s/_____
Ramzi Kassem
(pursuant to LCvR 83.2(g))
*Supervising Attorney*
Shezza Abboushi Dallal
Dana Jabri
*Law Student Interns*
**Main Street Legal Services, Inc.**
City University of New York School of Law
2 Court Square
Long Island City, NY 11101
(t) (718) 340-4558
(f) (718) 340-4478
(e) ramzi.kassem@law.cuny.edu

Lawrence S. Lustberg
(pursuant to LCvR 83.2(g))
**Gibbons P.C.**
One Gateway Center
Newark, NJ 07102-5310
(t) (973) 596-4731
(f) (973) 639-6285
(e) LLustberg@gibbonslaw.com

Shayana Kadidal
(D.C. Bar No. 454248)
Luna Martinez
(*pending admission to the New York Bar*)
**Center for Constitutional Rights**
666 Broadway, 7th Floor
New York, NY 10012
(t) (212) 614-6438
(f) (212) 614-6499
(e) kadidal@ccrjustice.org

Sandra Babcock
(pursuant to LCvR 83.2(g))
**International Human Rights Clinic**
Cornell University School of Law
158A Myron Taylor Hall
Ithaca, NY 14853
(t) (607) 255-5278
(f) 607 255-7193
(e) slb348@cornell.edu

*Counsel for Petitioner*